# 14-0826-CV

## 14-0832-cv(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

—against—

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants,*

(*Caption continued on inside cover*)

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS HUGO GERARDO CAMACHO NARANJO AND JAVIER PIAGUAJE PAYAGUAJE

BURT NEUBORNE
40 Washington Square South
New York, New York 10012
(212) 998-6172
burt.neuborne@nyu.edu

*Counsel for Defendants-Appellants*
  *Hugo Gerardo Camacho Naranjo*
  *and Javier Piaguaje Payaguaje*

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iv

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   xii

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   xiv

INTRODUCTORY STATEMENT AND SUMMARY
    OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

ARGUMENT:

  I. NO LEGAL BASIS EXISTS TO ENJOIN INNOCENT
      INHABITANTS OF THE AMAZON BASIN OF ECUADOR
      FROM SEEKING TO ENFORCE AN UNTAINTED $8.65
      BILLION REMEDIATION JUDGMENT ISSUED AGAINST
      CHEVRON BY THE PROVINCIAL COURT OF
      SUCUMBÍOS, AS AFFIRMED BY THE NATIONAL
      COURT OF ECUADOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

     A. Intermediate Appeals Court Judges in Ecuador's Civil
        Law System Are Vested With the Power and Duty to
        Conduct a *De Nov*o Review of the Trial Record, and to
        Engage in *De Novo* Fact-Finding and Law Declaration
        Designed to Correct Errors Occurring in the Trial Court . . .   25

     B. The Provincial Court of Sucumbíos Exercised Its *De
        Novo* Review Powers Over Both Fact and Law in a
        Thoughtful and Judicious Manner, Thereby Severing
        Any Link with the Allegedly Tainted Trial
        Court Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

i

PAGE

C. Hugo Camacho Naranjo and Javier Piaguaje Payaguaje Are Legally Entitled to Seek to Enforce the Untainted Ecuadorian Intermediate Appeals Court Judgment in any Court ...................................................... 49

D. The District Court's Wholesale Condemnation of the Ecuadorian Judicial System Was Both Clearly Erroneous, and Barred by Judicial Estoppel.................. 53

1. Chevron is Judicially Estopped From Asserting the Wholesale Inadequacy of the Ecuadorian Judicial System ........................................... 54

2. The Condemnation is Based on Shockingly Inadequate Evidence..................................... 59

3. The Condemnation is Inconsistent with Binding Principles of International Comity ..................... 63

E. The Ecuadorian Remediation Judgment Should be Payable to a Newly-Established Independent Entity ........ 65

II. THE DISTRICT COURT LACKED POWER TO ENJOIN THE LAGO AGRIO PLAINTIFFS FROM SEEKING TO ENFORCE THE $8.65 BILLION *DE NOVO* REMEDIATION JUDGMENT AGAINST CHEVRON ............................... 66

A. No Lago Agrio Plaintiff Maintains Sufficient Contacts with New York to Justify the Assertion of *In Personam* Jurisdiction ...................................................... 66

1. General Jurisdiction ..................................... 66

2. Specific Jurisdiction..................................... 70

B. The Imposition of Rule 37 Sanctions Designed to Bootstrap the District Court into *In Personam* Power Over Hugo Camacho Naranjo and Javier Piaguaje Payaguaje Was an Abuse of Power........................... 73

ii

PAGE

C.  The District Court Erroneous Refusal to Permit The
    Intervention of Members of the Waorani People As
    "Persons Required to Be Joined" If "Feasible" Rendered
    the Proceedings Below Void Under Rule 19 FRCP.......... 78

D.  Under the Law of This Case, the District Court Lacked
    Authority to Issue a Nationwide Pre-Enforcement
    Injunction Purporting to Block Efforts by Inhabitants of
    the Amazon Basin of Ecuador from Seeking to Enforce
    a Foreign Money Judgment ................................... 83

CONCLUSION ............................................................... 86

Certificate of Compliance .................................................. 87

# TABLE OF AUTHORITIES

PAGE

## Cases

*ABF Freight System v. NLRB,*
    510 U.S. 317 (1994)......................................... 6, 16, 30, 53

*Ackerman v. Levine,*
    788 F.2d 830 (2nd Cir. 1986)....................................... 38

*Aguinda v. Texaco, Inc.,*
    945 F. Supp. 626 (S.D.N.Y. 1996), *vacated and remanded sub.*
    *nom. Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir.1998),
    *on remand, Aguinda v.Texaco, Inc.,* No. 93-cv-5727,
    2000 U.S. Dist. LEXIS 745 at *9 (S.D.N.Y. Jan. 31, 2000)........ 11-12

*Aguinda v. Texaco, Inc.,*
    142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd, Aguinda v.*
    *Texaco, Inc.*, 303 F.3d 470 (2nd Cir 2002).................... 12, 71, 82

*Amchem v. Windsor,*
    521 U.S. 591 (1997)............................................... 81

*Arizona v. Fulminante,*
    499 U.S. 279 (1991)............................................. 32-33

*Bank Melli Iran v. Pahlavi,*
    58 F.3d 1410 (9th Cir), cert. denied, 516 U.S 989 (1995)........... 63

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964)............................................... 63

*Bose Corp. v. Consumers Union,*
    466 U.S. 485 (1984)............................................... 27

*Bridgeway Corp. v. Citibank,*
    201 F. 3d 134 (2d Cir. 2000) ..................................... 56, 62

*Caperton v. Massey*,
    556 U.S. 868 (2009)............................................... 61

iv

PAGE

*Chevron Corp. v. Donziger,*
768 F. Supp. 2d 581 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chevron Corporation v. Steven R. Donziger et al.,*
974 F. Supp. 2d 362 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Chevron Corp. v. Naranjo,*
667 F.3d 232 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*City of New York v. Mickalis Pawn Shop,*
645 F.3d 114 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Collins v. Forman,*
729 F.2d 108 (2d Cir 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Crowell v. Benson*,
285 U.S. 22 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Daimler AG v Bauman,*
134 S. Ct. 746 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Dow Chemical Co v. Stephenson,*
539 U.S. 111 (2003), affirming by an equally divided court,
*Stephenson v. Dow Chemical Co.*,
273 F.3d 249 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Ehrenfeld v. Bin Mahfouz,*
9 N.Y.3d 501, 881 N.E.2d 830, 851 N.Y.S.2d 387 (2007) . . . . . . . . . 67

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Executive Benefits, Ins. Agency v. Arkison,*
134 S. Ct. __ (2014), 2014 WL 2560461 . . . . . . . . . . . . . . . . . . . . . . . . . 6, 28

*Goodyear Dunlop Tires Operations, SA v. Brown,*
131 S. Ct. 2846 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

*Guaranty Trust Co. v. York,*
326 U.S. 99 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 83-84

*Hamilton v. Atlas Turnover, Inc.,*
197 F.3d 58 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

v

PAGE

*Hanson v. Dencla,*
  357 U.S. 235 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 71

*Hazel-Atlas Glass v. Hartford Empire Co.,*
  322 U.S. 238 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

*Headley v. Tilghman,*
  53 F. 3d 472 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Helicopteros v. Hall,*
  466 U.S. 408 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68, 69

*In re Oil Spill by the "Amoco Cadiz,"*
  MDL Docket No. 376, 1984 US Dist. LEXIS 17480 at 135-36
  (N. D. Ill. April 18, 1984, (finding No. 43), aff'd 4 F.3d 997
  (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*In re Tronox Incorporated et al. v. Kerr-Mcgee Corp,*
  503 B.R. 239 (Dec. 12, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
  456 U.S. 694 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 74, 76, 77

*Intellivision v. Microsoft Corporation,*
  No 11-1657 (cv) (June 11, 2012) (post-2007 summary order)
  484 Fed Appx. 616, 2012 WL 2086297 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55, 56

*International Shoe Co. v. Washington,*
  326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

*J. McIntyre Machinery, Ltd. v. Nicastro,*
  131 S. Ct. 2780 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 70, 73

*Jarndyce v. Jarndyce,*
  (*In re* Bleak House) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Kotteakos v. United States,*
  328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 53

*Martin v. Wilks,*
  490 U.S. 755 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  83

PAGE

*Marvel Characters, Inc. v. Kirby,*
    726 F.3d 119 (2d Cir. 2013) ................................. 67, 78, 79, 80

*McDonough Power Equipment, Inc. v. Greenwood,*
    464 U.S. 548 (1984)........................................... 6, 30, 31, 53

*New Hampshire v. Maine,*
    532 U.S. 742 (2001)................................................    55

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) ...................................................    28

*Ortiz v. Fibreboard,*
    527 U.S. 815 (1999)................................................    81

*Petrella v. Metro-Goldwyn Mayer,*
    134 S. Ct. 1962 (2014) ........................................... 10, 84

*Provident Tradesmen Bank & Trust Co. v. Patterson*,
    390 U.S. 102 (1968).................................................    80

*Republic of Ecuador v. Chevron,*
    638 F.3d 384 (2d Cir. 2011) .........................................    55

*Republic of the Philippines v. Pimentel,*
    553 U.S. 851 (2008)............................................. 9, 82-83

*Republican Party of Minnesota v. White,*
    536 U.S. 765 (2002)................................................    61

*Roberts v. Texaco, Inc.,*
    979 F. Supp. 185 (S.D.N.Y. 1997) .................................    41

*Satcorp Intl. Group v. Chinese National Imp. & Exp. Co.*,
    917 F. Supp. 271 (S.D.N.Y. 1996) ............................... 75, 76

*St. Mary's Honor Center v. Hicks,*
    509 U.S. 502 (1993)......................................... 6, 16, 30, 33, 53

*Schaeffer v. Weast,*
    546 U.S. 49 (2005) .................................................    37

vii

PAGE

*Shields v. Barrow,*
58 U.S. 130 (1854) ................................................. 78

*Sindell v. Abbot Labs,*
607 P.2d 924 (Cal. 1980) ........................................ 45

*Stern v. Marshall,*
131 S. St. 2594 (2011) .......................................... 28

*Swift v. Tyson,*
41 U.S. (6 Pet.) 166 (1842) ..................................... 83

*Texaco, Inc. v. Pennzoil Co.,*
626 F. Supp. 250 (S.D.N.Y. 1986) *aff'd* 784 F.2d 1133
(2d Cir 1986), *rev'd sub nom., Pennzoil Co. v. Texaco, Inc.,*
481 U.S. 1 (1987) ............................................. 17, 18

*Texaco v. Pennzoil Co.,*
729 S.W. 2d 768 (Texas Ct. App. 1987) ....................... 17, 40

*United States v. Ivezaj,*
568 F.3d 88, 98 (2d Cir. 2009) ............................... 31, 53

*United States v. Clarke,*
134 S. Ct. __ (2014), 2014 WL 2765284 ......................... 27

*United States v. Raddatz,*
447 U.S. 667 (1980) ............................................ 28

*Volkart Bros. v. M/V Palm Trader,*
130 F.R.D. 285 (S.D.N.Y. 1990) ................................ 75

*Walden v. Fiore,*
134 S. Ct. 1115 (2014) ........................................ 7, 71

*Waldman v. Stone,*
698 F.3d 910 (6th Cir. 2012) ................................... 28

*Wellness Int'l Network, Ltd v. Sharif,*
727 F.3d 751 (7th Cir. 2013) ................................... 28

## Statutes and Rules

18 U.S.C §§ 1861-68 (RICO) ............................................  20

28 U.S.C. §§ 157(b) and (c) (Bankruptcy Code) ........................  28

28 U.S.C. § 1291 ......................................................  xii

28 U.S.C § 1332(a)(2) .................................................  xii

28 U.S.C §2111 ...................................................... 31, 53

New York Recognition Act
  (NY CPLR §§ 5301-09) ...........................................passim

NY CPLR §302(a) ................................................... 67, 69

NY CPLR §5304(a)(1) ..................................................  54

NY CPLR §5304(b)(3) ..................................................  54

Rule 19 FRCP.....................................................passim

Rule 24 FRCP...........................................................  80

Rule 61 FRCP....................................................... 31, 53

*Código Orgánico de la Funcion Judicial,* art. 19 .......................  25

*Código Procedimiento Civil,* art. 838 (Ecuador 2005)...................  37

## Secondary Authorities:

## Books

James J. Apple and Robert P. Deyling,
  A PRIMER ON THE CIVIL LAW SYSTEM
  (published by the Federal Judicial Center on behalf of the
  International Judicial Relations Committee of the Judicial
  Conference of the United States) ....................................  26

Alicia Bannon, et al., THE NEW POLITICS
  OF JUDICIAL ELECTIONS (2013) ................................  61

PAGE

Keith J. Bybee, ALL JUDGES ARE POLITICAL,
  EXCEPT WHEN THEY ARE NOT (2010) .......................... 58

Phillip Kurland and Ralph Lerner
  Vol. I, THE FOUNDERS CONSTITUTION ......................... 65

Peter L. Murray and Rolf Stürner,
  GERMAN CIVIL JUSTICE, (2004).................................. 26

A.T. von Mehren, THE CIVIL LAW SYSTEM:
  CASES AND MATERIALS (1957) .................................. 26

Wright & Miller, FEDERAL PRACTICE AND
  PROCEDURE §§ 2283-84 ............................................ 75

David Yalof, PURSUIT OF JUSTICE:
  PRESIDENTIAL POLITICS AND THE SELECTION OF
  SUPREME COURT NOMINEES (1999) .......................... 62

**Articles**

Adolf A. Berle, Jr., *The Theory of Enterprise Liability*,
  47 Colum. L. Rev. 343 (1947) ......................................... 42

R.H. Coase, *The Nature of the Firm,*
  4 Economica 386 (1937) .............................................. 43

John Coffee, *The Regulation of Entrepreneurial Litigation:*
  *Balancing Fairness and Efficiency In the Large Class Action,*
  54 U. Chi. L. Rev. 877 (1987) ....................................... 50

Emily H. Damron, Comment, *Reviving the Market for Liability*
  *Theories: The "Comingled Product" Theory of Market Share*
  *Liability Enters the Lexicon*, 111 Penn. St. L. Rev. 506 (2006) .... 45-46

Meredith Dearborn, *Enterprise Liability: Reviewing and*
  *Revitalizing Liability for Corporate Groups,*
  97 Cal. L. Rev. 195 (2009) .......................................... 42-43

x

PAGE

William O. Douglas & Carol M. Shanks, *Insulation From Liability Through Subsidiary Corporations*, 39 Yale L. J. 193 (1929) ............................................... 42

Judith Kimerling, *Indigenous Peoples and the Oil Frontier: The Case of Ecuador, ChevronTexaco, and Aguinda v. Texaco*, 38 NYU Jour. of Int'l Law and Politics 413 (2006) ................. 13

Judith Kimerling, *Lessons from the Chevron Ecuador Litigation: The Proposed-Intervenors' Perspective*, 1 Stanford Journal of Complex Litigation 241 (2013)................................... 13

John Langbein, *The German Advantage in Civil Procedure,* 52 U. Chi. L. Rev. 823 (1985)................................... 26-27, 32

Robert Mnookin & Robert Wilson, *Rational Bargaining and Market Efficiency: Understanding Pennzoil v. Texaco*, 75 Va. L. Rev. 295 (1989) ............................................... 18

Linda S. Mullenix, *Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes,* 57 Vand. L. Rev. 1687 (2004) ............................... 81

Burt Neuborne, *A Plague on Both Their Houses: A Modest Proposal for Ending the Ecuadorean Rainforest Wars,* 1 Stanford Journal of Complex Litigation 509 (2013)............... 65-66

Steven M. Shepard, *The Case Against Automatic Reversal for Structural Errors*, 117 Yale L. J. 1180 (2008)....................... 32

Kurt A. Strasser, *Piercing the Veil in Corporate Groups*, 37 Conn. L. Rev. 637 (2005) ......................................... 43

# JURISDICTIONAL STATEMENT

Pursuant to Rule 28 F.R. App. Proc., counsel represents:

The District Court exercised subject matter jurisdiction over the Appellants in 14-832 pursuant to 28 U.S.C. §1332(a) (2). This court is vested with appellate jurisdiction over the final injunction issued by the District Court under 28 U.S.C §1291. The final order appealed from was entered by the District Court on March 4, 2014. A timely Notice of Appeal was filed on March 18, 2014. The scheduling order herein directs the filing of this authorized oversized brief on or before July 1, 2014. This is an appeal from a final order that disposes of the claims of all the parties.

Pursuant to Local Rule 28.1, counsel represents:

In Docket No. 14-832, Appellants, Hugo Camacho Naranjo and Javier Piaguaje Payaguaje, appeal from the issuance of a prospective injunction barring them from seeking to enforce the judgment of the *Sala Única* of the Provincial Court of Justice of Sucumbíos, dated January 3, 2012, as affirmed by the National Court of Ecuador on November, 12, 2013, against Chevron Corporation in any court in the United States. The extensive procedural history of this litigation is set forth *infra* in the Statement of the Case. The extensive opinion below is set forth in the Special Appendix ("SA"), and has been reported. *Chevron Corporation v. Steven R. Donziger et al.,* 974 F.

xii

Supp.2d 362 (S.D.N.Y. 2014) (per Kaplan, J.).  Page citations to portions of

Judge Kaplan's extensive opinion in the Special Appendix are designated

herein as "D. Op. ___."

The opinion and judgment of the *Sala Única* of the Provincial Court

of Sucumbíos, dated January 3, 2012, ("the intermediate appeals court

opinion') is set forth at A 453-468. The order of clarification issued by the

Provincial Court of Sucumbíos, dated January 3, 2012, is set forth at A 489-

493. The opinion and judgment of the National Court of Ecuador, dated

November 12, 2013, ("the Ecuadorian Supreme Court opinion") is set forth

at A 3449-3670.

## QUESTIONS PRESENTED

1. Is the *de novo* judgment of  the *Sala Única* of the Provincial Court of Justice of Sucumbíos, dated January 3, 2012, as affirmed by the National Court of Ecuador on November, 12, 2013, a separate and independent basis for imposing liability on Chevron untainted by any alleged misconduct in the trial court?

   The District Court answered "no."

2. Was the District Court empowered to exercise *in personam* jurisdiction over Appellants Hugo Camacho Naranjo and Javier Piaguaje Payaguaje?

   The District Court answered: "yes."

3. Did the District Court exclude "persons required to be joined" within the meaning of Rules 19(a) and 19(b) FRCP when, nine months prior to trial, it declined to permit independent and unconflicted counsel for the Waorani people to intervene in defense of the Ecuadorian remediation judgment?

   The District Court answered: "no."

4. Was the District Court empowered to issue prospective injunctive relief against Appellants Hugo Camacho Naranjo and Javier Piaguaje Payaguaje enjoining each of them from seeking to enforce the untainted remediation judgment, dated January 3, 2012, of the *Sala Única* of the Provincial Court of Justice of Sucumbíos, as affirmed on November 12, 2013 by the National Court of Ecuador?

The District Court answered: "yes."

## Introductory Statement and Summary of Argument[1]

This litigation has lost its way.  Commenced twenty-one years ago in an effort to invoke the rule of law on behalf of 30,000 indigenous peoples residing in the Amazon basin of Ecuador whose habitat had been ravaged in the search for oil, the litigation's current focus has been skillfully diverted from the central issue of Chevron's legal duty to remediate the ravaged land, to a distasteful sideshow featuring unremitting assaults on the integrity of Steven Donziger,  a lawyer for the Ecuadorian victims, in connection with the issuance of a disputed Ecuadorian trial court judgment, dated February 14, 2011, requiring Chevron to pay approximately $9 billion to remediate environmental damage to Ecuador's Amazon basin, and an additional $9 billion to its inhabitants in the form of punitive damages.

On January 3, 2012, the *Sala Única* of the Provincial Court of Justice of Sucumbíos, consisting of three randomly selected "first-instance" intermediate appeals judges, issued a slightly modified remediation judgment directing

---

[1]Appellate-counsel herein, Burt Neuborne, whose only prior connection with this litigation was the preparation and filing of a *pro bono* brief *amicus curiae* in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), appears on behalf of Hugo Camacho Naranjo and Javier Piaguaje Payaguaje in their respective capacities as named-plaintiffs in the "Lago Agrio" litigation in Ecuador, and as named-targets of the District Court's injunction.

Chevron to pay $8.65 billion in remediation damages based on the appeals court's *de novo* review of relevant portions of the trial record, and its *de novo* consideration of the legal issues raised by the parties.[2] On November 12, 2013, the National Court of Ecuador, vested with appellate "cassation" jurisdiction over the legality of the intermediate appeals court's $8.65 billion remediation judgment, held that no legal basis existed to disturb the appellate court's *de novo* findings concerning remediation of the land, but vacated the award of $9 billion in punitive pain and suffering damages as legally unjustified.[3]

Chevron alleges, and the District Court found, that Mr. Donziger had secretly influenced the preparation of an ostensibly neutral expert's submission to the trial court (the Cabrera report) D. Op. 425, 482;[4] and had secretly paid a corrupt ex-judge named Alberto Guerra (who had been removed from the

---

[2] English translations of the intermediate appeals court's decision and judgment, dated January 3, 2012, and its January 13, 2012 clarification order, are reproduced at (A. 453-468 (decision)); (A. 488 (judgment)); (A. 489-493 (order of clarification)).

[3] An English translation of the November 12, 2013 decision of the National Court of Ecuador affirming the $8.65 billion remediation aspects of the intermediate appeals court's judgment is reproduced at (A 3449-3670).

[4] When charges surfaced in Ecuador that the Cabrera report may have been tampered with, the Ecuadorian trial judge issued a clarification order on March 4, 2011, explicitly disavowing the Cabrera report. D. Op. 482. Accordingly, the discredited Cabrera report played no role in the Ecuadorian appellate process.

Ecuadorian bench for corruption) to assist the inexperienced Ecuadorian trial

judge, Judge Nicolas Zambrano, in preparing his February 14, 2011 opinion and

judgment. D. Op. 483.[5] Both Mr. Donziger and Judge Zambrano denied the

allegations under oath in the District Court.[6] Chevron's chief witness to the

contrary is the crooked judge, Alberto Guerra, who also testified below after

reportedly meeting with Chevron's lawyers at least 53 times to rehearse his

testimony.[7]

---

[5] Throughout its opinion, in an Orwellian use of language, the District Court seeks to fuse the allegedly improper actions of Mr. Donziger with the entirely innocent behavior of his 47 Ecuadorian clients, coining the phrases "the LAP's," or the "LAP Representatives" to denote a wholly fictive artificial entity that is allegedly guilty of misconduct. As we will see, however, there is no legal basis for tarring the innocent Lago Agrio clients with the alleged misconduct of their American lawyer. That is why Chevron refrained from naming any Lago Agrio plaintiffs as defendants in its RICO action. Accordingly, Appellants urge the Court to read the phrase "the LAP's," as used in the lower court opinion, as "Mr. Donziger and his associates."

[6] Judge Zambrano testified under oath below denying any connection with bribery, denying having received assistance in preparing his opinion, and reaffirming his commitment to it. The District Court declined to believe him. D. Op. 483-492, 521, and n. 1072.

[7]  While the District Court expressed grave doubts about Guerra's credibility, D. Op. 518-20, Judge Kaplan appears to have accepted as true virtually everything that Guerra said, including the wholly uncorroborated claim of attempted bribery of Judge Zambrano. D. Op. 514-16; 527-28; 528-31. The District Court simply overrode conclusive evidence refuting Guerra's story about a $500,000 bribe by rejecting a series of emails from plaintiffs' Ecuadorian counsel on the eve of the issuance of the trial court's opinion demonstrating panic concerning the possible content of the opinion. D. Op. 528-30. Judge Kaplan's characterization of the emails as inadmissible hearsay was clearly erroneous, since the state of mind of the senders was obviously directly relevant to, indeed dispositive of, Chevron's claim that the lawyers knew in advance what the judge would say because they had bribed him. *Headley v. Tilghman*, 53 F.3d 472 (2d Cir. 1995) (admitting out-of-court statement because state of mind of declarant independently

The District Court's 497 page opinion, issued on March 5, 2014, is reproduced in the Special Appendix, and is reported at 974 F. Supp.2d 362 (SDNY 2014) ("D. Op.").[8] The District Court found that misbehavior on the part of Judge Zambrano (in allowing his opinion to be ghost-written), and Mr. Donziger (in arranging for the ghost-writing of the opinion, and in improperly manipulating the content of an ostensibly neutral expert's report), had so tainted the trial court proceedings that injunctive relief should issue under the Racketeer Influenced Corrupt Organization (RICO) statute, and New York common law barring Mr. Donziger, his associates, and his Ecuadorian clients (the Appellants in 14-832) from seeking to enforce the fraudulently procured Ecuadorian judgment anywhere in the United States. D. Op. 425-446; 483-501; 502-533; 636-42.

---

relevant).  The emails are in the record at A. 1903. Guerra, who admits to having systematically solicited bribes from both sides, and to having accepted a back-pack from Chevron filled with cash in Ecuador (A. 801), has parlayed his chronic dishonesty into a small fortune, and a new life in the United States paid for by Chevron, including moving his entire family to the United States, paying for extremely comfortable living quarters, providing him with free counsel, free immigration lawyers for himself and his entire family, an automobile, health insurance, and an allowance of $12,000 per month. (A. 767-818 (Guerra cross)). As things stand now, Alberto Guerra is the big winner in this case, having milked it for well over a million dollars.

[8] The Special Appendix herein consists of the District Court's opinion as officially reported. Page references to the officially reported opinion are designated in this brief as "D. Op.___" to permit reference to the Special Appendix or to any other version of the reported opinion.

Mr. Donziger will doubtless challenge the legal validity of the District

Court's fiercely-contested factual findings of trial court misconduct in Ecuador,

as well as the District Court's legal authority to issue its injunction barring Mr.

Donziger from benefiting from the Ecuadorian judgment. Whatever the

outcome of Mr. Donziger's appeal in 14-826, however, the District Court's

preoccupation with Mr. Donziger's alleged wrongdoing in the Ecuadorian trial

court cannot erase the independent legal rights of thousands of innocent

inhabitants of the environmentally ravaged areas (including the Lago Agrio

plaintiffs) that rest, not on the allegedly tainted trial court judgment, but on an

untainted $8.65 billion *de novo* remediation judgment against Chevron issued

on January 3, 2012 by the *Sala Única* of the Provincial Court of Justice of

Sucumbíos (A. 453-468), as affirmed by the National Court of Ecuador on

November 12, 2013. (A. 3449-3670).

Both Chevron and the District Court are in deep denial concerning the

legal consequences of the $8.65 billion intermediate appeals court remediation

judgment, and its affirmance by the National Court of Ecuador. In Point I, *infra*,

Appellants demonstrate that the two Ecuadorian appeals courts independently

resolved the factual and legal issues raised by this litigation *de novo*, thus

severing any link between the alleged trial court misconduct and a finding that
Chevron is legally bound to remediate the land. The authority of a supervisory
appellate forum with *de novo* review power to cure defects in a lower court
proceeding is well known in both civil and common law systems. Indeed, the
United States Supreme Court has recently re-affirmed the curative power of *de
novo* review in the context of Article III *de novo* review of constitutionally
unauthorized proceedings in a bankruptcy court. *Executive Benefits, Inc. Agency
v. Arkison,* 134 S. Ct.__ (2014), 2014 WL 2560461.

Appellants demonstrate in Point I, moreover, that in severing
consideration of the merits of this inordinately protracted dispute from
resolution of the fiercely-contested allegations of misconduct during the trial
process, both Ecuadorian appeals courts mirrored the practice of the United
States Supreme Court in cases such as *ABF Freight System v. NLRB,* 510 U.S.
317 (1994), *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 521 (1993), and
*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).

Finally, appellants demonstrate in Point I, that Hugo Camacho Naranjo
and Javier Piaguaje Payaguaje, in their respective capacities as named-plaintiffs
in the "Lago Agrio" litigation in Ecuador, are legally entitled to enforce the

untainted $8.65 billion *de novo* remediation judgment against Chevron issued on January 3, 2012 by the *Sala Única* of the Provincial Court of Justice of Sucumbíos, in any court.

In Point II, *infra,* Appellants demonstrate that the District Court lacked power to issue a nationwide injunction purporting to bar appellants Hugo Camacho Naranjo and Javier Piaguaje Payaguaje from seeking to enforce the *de novo* January 3, 2012 remediation judgment against Chevron for the following reasons:

(1) the District Court lacked *in personam* jurisdiction over any of the forty-seven named-plaintiffs in the Ecuadorian remediation litigation (the Lago Agrio litigation) because the Lago Agro plaintiffs are neither "at home" in New York for the purposes of general jurisdiction. *See Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) (declining to recognize derivatively-based general jurisdiction); nor have they "purposefully availed themselves of the privilege of conducting activities within [New York]." *J. McIntyre Machinery, Ltd. v. Nicastro,* 131 S. Ct. 2780, 2788 (2011), quoting *Hanson v. Dencla,* 357 U.S. 235, 253 (1958), for the purposes of specific jurisdiction. *See also Walden v. Fiore*, 134 S. Ct. 1115 (2014) (requiring volitional contacts).

(2) the District Court's effort to bootstrap itself into *in personam*
jurisdiction over the Lago Agrio plaintiffs through the imposition of a discovery
sanction under Rule 37 FRCP was an abuse of power. In the absence of a
plausible belief that a party's failure to respond to jurisdictional discovery is a
culpable effort to block the court from learning about important jurisdictional
facts otherwise unavailable to the parties, a District Court may not bootstrap
itself into unjustified territorial power by punitively imposing a Rule 37
jurisdictional sanction. *See Insurance Corp. of Ireland v. Compagnie des
Bauxites de Guinee*, 456 U.S. 694 (1982) (upholding Rule 37 jurisdictional
sanction against a group of large European insurance companies who were
targets of discovery, and who, unlike the inhabitants of the Ecuadorian
rainforest, could be presumed to be refusing to disclose information revealing
substantial contacts with New York not otherwise available to the parties and
the court);

(3) the District Court proceedings must be vacated for failure to join
numerous indispensable parties "required to be joined" if "feasible" under Rule

19(a) FRCP.[9]  For example, members of the Waorani people, who, nine months
prior to trial, unsuccessfully sought to intervene below in order to provide an
independent, unconflicted voice in defense of the remediation judgment were
unquestionably "indispensable parties" under Rule 19. *See Republic of the
Philippines v. Pimentel*, 553 U.S. 851 (2008) (declaring lower court
proceedings a nullity for failure to join the Republic of the Philippines as a Rule
19(b) party).

(4) finally, even if valid *in personam* jurisdiction was present in the court
below (it was not), and even the District Court was correct in ignoring Rule
19(a), and denying Rule 24 intervention by the Waorani people (it was not),
under the law of this case, the District Court lacked power to issue prospective
injunctive relief against appellants Hugo Camacho Naranjo and Javier Piaguaje
Payaguaje barring them from seeking to enforce a foreign money judgment
anywhere in the United States. Chevron does not assert a RICO claim against
the innocent Ecuadorian plaintiffs. Instead, it bases its claim for injunctive relief
solely on New York common law.  Whatever common law power may once
have existed to issue a prospective injunction enjoining the enforcement of a

---

[9] Beginning in 2007, Rule 19 substituted the phrase "persons required to be joined" for the older
terminology that spoke of "necessary" and "indispensable" parties.

foreign money judgment, however, New York's common law has been

statutorily superseded by the New York Recognition Act, which does not

authorize prospective injunctions against the enforcement of a foreign money

judgment, even when the judgment was allegedly procured by fraud. *Chevron*

*Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) (New York Recognition Act

does not authorize prospective injunctive relief); *Guaranty Trust Co. v. York*,

326 U.S. 99 (1945) (enactment of statute of limitations supersedes common law

doctrine of equitable *laches*); *Petrella v. Metro-Goldwyn Mayer*, 134 S. Ct.

1962 (2014) (same). New York judges – state and federal – lack authority under

New York law to issue prospective nationwide injunctions ousting their

colleagues from the opportunity of deciding for themselves whether a foreign

money judgment is enforceable.

## Statement of the Case[10]

This modern incarnation of *Jarndyce v. Jarndyce* began in May, 1993, in the

Southern District of New York with the filing of a complaint against Texaco, Inc.

alleging that from 1964-1992 Texaco's wholly-owned Ecuadorian subsidiary

(Texpet) had unlawfully caused widespread environmental damage to the habitat

of thousands of indigenous peoples and settlers by failing to observe reasonable

standards of care in connection with the exploration for, and extraction of, oil in

the Amazon basin of Ecuador. In 2002, after almost a decade of procedural

sparring in the District Court, a panel of the Second Circuit accepted strenuous

representations by ChevronTexaco's lawyers that the courts of Ecuador were fully

capable of resolving this complex litigation fairly and adequately. *See Aguinda v.

Texaco, Inc.,* 945 F. Supp. 625 (S.D.N.Y. 1996) (granting *forum non conveniens*

dismissal), *vacated and remanded sub. nom, Jota v. Texaco, Inc.,* 157 F.3d 153 (2d

---

[10] Despite Chevron's calculated misuse of loaded terms like "co-conspirators" to describe the plaintiffs in the Lago Agrio litigation, neither Hugo Camacho Naranjo, nor Javier Piaguaje Payaguaje, (nor any of the other Lago Agrio plaintiffs), are alleged to have personally engaged in improper acts in connection with either the issuance of the February 14, 2011 trial court judgment, or the January 3, 2012 intermediate appeals court judgment. That is why Chevron did not risk a Rule 11 sanction by naming them as defendants in its RICO claim. Accordingly, this Statement of the Case is limited to a narrative of the facts and related legal principles that establish the rights of innocent inhabitants of the affected areas to seek to enforce the $8.65 billion Ecuadorian intermediate appeals court judgment of remediation, dated January 3, 2012.

Cir. 1998), *on remand, Aguinda v. Texaco, Inc.,* No. 93-cv-5727, 2000 U.S. Dist.

LEXIS 745 at *9 (S.D.N.Y. Jan. 31, 2000) (raising questions), *Aguinda v. Texaco,*

*Inc.,* 142 F. Supp. 2d 534 (S.D.N.Y. 2001) (once again granting *forum non*

*conveniens* dismissal), *aff'd Aguinda v. Texaco, Inc.,* 303 F.3d 470 (2d Cir 2002).

    As a condition of the grant of a *forum non conveniens* dismissal, Chevron

(then named ChevronTexaco) promised to submit to *in personam* jurisdiction in

Ecuador, and to pay any Ecuadorian judgment subject only to defenses under the

New York Recognition Act.[11] Both Ecuadorian appeals courts held that Chevron

was bound by Texaco's jurisdictional promise. (A. 453, 456-66) (intermediate

appeals court); (A. 3449, 3502-3513). (National Court of Ecuador).

    Following the *forum non conveniens* dismissal in *Aguinda*, plaintiffs'

attorneys raised funds (primarily from investors in Pennsylvania) to enable him to

prosecute the action in Ecuador. Several attorneys traveled to Ecuador and secured

additional Ecuadorian counsel, eventually led by Pablo Fajardo.  After discussing

the matter with affected residents of the area, Ecuadorian counsel, assisted by Mr.

Donziger, agreed to represent forty-seven inhabitants residing in the affected areas

---

[11] The promise was extracted by this Court in *Jota v. Texaco, Inc.,* 157 F.3d 153, 157 (2d Cir 1998) (grant of *forum non conveniens* motion requires "Texaco's consent to Ecuadorian jurisdiction.").

of the Amazon basin of Ecuador in connection with the prosecution of remediation claims against Chevron. D. Op. 395-401.

On May 3, 2003, Pablo Fajardo and a team of Ecuadorian lawyers commenced a remediation proceeding against Chevron in the Superior Court of Justice of Nueva Loja in the Amazon basin of Ecuador, commonly referred to as the "Lago Agrio" litigation, on behalf of 47 named inhabitants of the affected areas.[12] D. Op. 391.The Lago Agrio remediation proceedings were assigned to the President of the Nueva Loja Superior Court. Almost eight years later, on February 14, 2011, after the Lago Agrio remediation case had progressed through six trial judges, and had amassed a trial record of more than 200,000 pages,[13] the then-

---

[12] Ironically, the term "Lago Agrio" is not of Ecuadorian origin. Rather, it commemorates one of Texaco's early oil strikes in Texas. The Lago Agrio proceedings were based on an Ecuadorian statute modeled on superfund environmental remediation legislation in the United States. D. Op. 391.

[13] D. Op. 394. The background of the *Aguinda* litigation in the United States and the filing of the Lago Agrio remediation proceedings in Ecuador are recounted in detail in Judith Kimerling, *Indigenous Peoples and the Oil Frontier: The Case of Ecuador, ChevronTexaco, and Aguinda v. Texaco*, 38 NYU Journal of Int'l Law and Politics 413 (2006), and Judith Kimerling, *Lessons from the Chevron Ecuador Litigation: The Proposed-Intervenors' Perspective*, 1 Stanford Journal of Complex Litigation 241 (2013). Professor Kimerling, an experienced lawyer with ties to the Waorani people, has taught at CUNY Law School and currently teaches at Queens College. Nine months prior to the trial below, Professor Kimerling unsuccessfully sought to intervene in the District Court under Rule 24 on behalf of individual members of the Waorani people, a tribe of indigenous peoples residing in the ravaged area who are beneficiaries of the remediation judgment. Judge Kaplan denied the motion as untimely, and found that Mr. Donziger, despite his personal woes, would provide an adequate defense of the proposed

presiding trial judge, Judge Nicolas Zambrano, issued a remediation judgment

against Chevron of approximately $9 billion, and a punitive damage award of an

additional $9 billion, based largely on an assessment of the pain and suffering

caused by Texaco's culpable destruction of the environment.

Chevron's Ecuadorian lawyers filed a timely appeals brief of more than 200

pages that bitterly assailed the trial court's $18 billion judgment, alleging that the

report of a court-designated expert (the so-called "Cabrera report") had been

secretly ghost-written by Mr. Donziger, and that Mr. Donziger had also secretly

assisted the inexperienced Judge Zambrano in drafting his voluminous 188 page

judgment. D. Op. 535-40. A three-judge intermediate "first-instance" appeals panel

was empanelled by lot by the Judicial Council of the Sucumbíos Court.[14] D. Op.

535. On January 3, 2012, approximately eleven months after the trial court had

acted, and five weeks after the public announcement of the appeals court's random

selection, the three-judge intermediate appeals court, vested with classic civil law

---

intervenor's interest. (A. 514). Without taking any position on the merits of Professor
Kimerling's arguments, Appellants argue, *infra* in Point II that Judge Kaplan violated Rule 19(a)
when he denied the joinder of the Waorani intervenors even though their participation was
indispensable and joinder was clearly "feasible."

[14] In one of its rare rulings for Mr. Donziger, the District Court rejected efforts to challenge the
procedure by which the three appellate judges were randomly selected. D. Op. 535, n. 1149.

*de novo* fact-finding and law declaring authority, issued a remediation award of approximately $8.65 billion, and affirmed the trial court's grant of an additional award of approximately $9 billion, termed punitive, for pain and suffering. (A. 453-468).

Ten days later, on January 13, 2012, the intermediate appeals court issued an order of clarification declining to be drawn into the escalating battle between Chevron and Donziger, reasoning that since none of the allegations of misbehavior at the trial court level tainted the overwhelming evidence of environmental degradation in the record, and since the *de novo* appellate resolution of the legal issues in no way rested on the allegedly improper actions of the trial court, no basis existed to annul eight years of work on the basis of alleged trial court misbehavior.[15] (A. 489-493). Instead, the intermediate appeals court ruled that resolution of Chevron's charges of misconduct against Mr. Donziger and his

---

[15] Although the District Court was unremittingly hostile to Mr. Donziger and the Lago Agrio plaintiffs, even Judge Kaplan acknowledged the existence of overwhelming evidence in the record demonstrating the massive environmental harm to the Amazonian rainforest caused by the 1964-92 oil operations engaged in by the Texpet consortium.  D. Op. 385, 685.

associates in connection with procuring the trial court judgment should be left to other *fora*.[16] (A. 492-93).

Almost two years later, on November 12, 2013, the National Court of Ecuador, vested with appellate "cassation" jurisdiction over the legality of the intermediate appeals court's $8.65 billion remediation judgment, held that no legal basis existed to disturb the appellate court's $8.65 billion remediation judgment, but vacated the award of $9 billion in punitive pain and suffering damages as legally unjustified. (A. 3894). As had the intermediate appeals court, the National Court of Ecuador declined to be drawn into Chevron's dispute with Mr. Donziger about alleged misconduct in the trial court. The National Court reminded Chevron that the operative judgment was the decision of the Provincial Court of Sucumbíos, not the superseded trial court judgment (A. 3548), and observed that no legal basis existed for overturning the $8.65 billion remediation order issued by the

---

[16] As appellants will demonstrate in Point I, *infra,* the decision by the three Ecuadorian intermediate appeals judges to concentrate on the merits of the remediation claim against Chevron, and to rely on other *fora* to deal with allegations of wrongdoing during the trial process, closely tracks Justice Scalia's celebrated observation in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 521 (1993) ("Title VII is not a cause of action for perjury. We have other civil and criminal remedies for that."). See *ABF Freight System v. NLRB,* 510 U.S. 317 (1994) (declining to deny award of back-pay and damages to applicant guilty of perjury in the administrative proceeding).

intermediate appeals court, or for treating the entire proceeding as a nullity. (A. 3668-69).

Chevron declines to acknowledge the validity of the Ecuadorian remediation judgment, and has launched a blistering assault on Mr. Donziger and the integrity of Ecuador's judiciary that bears an uncanny resemblance to the scorched earth tactics of Texaco's lawyers a generation ago in responding to the entry of a $6 billion Texas jury verdict finding Texaco guilty of tortiously interfering with Pennzoil's contractual agreement to acquire Getty Oil Company. *Texaco v. Pennzoil Co.,* 729 S.W. 2d 768 (Texas Ct. App. 1987) (affirming Texas jury verdict). Then, as now, Texaco sought to persuade a federal judge sitting in New York to enjoin the enforcement of the Texas judgment, arguing that it had been procured by fraud, and that Texas law requiring an expensive appeals bond violated the Due Process clause. Texaco argued that Pennzoil's Texas trial counsel had, in effect, bribed the Texas trial judge by making large campaign contributions to him on the eve of trial, and had poisoned the Texas judicial well by appealing to the alleged anti-Semitic prejudices of the Texas jury. Then, as now, Texaco experienced initial success. *See Texaco, Inc. v. Pennzoil Co.,* 626 F. Supp. 250 (S.D.N.Y. 1986) (granting injunction), *aff'd* 784 F.2d 1133 (2d Cir 1986)

17

(affirming grant of injunction). In the end, though, the United States Supreme

Court unanimously rejected Texaco's scorched-earth tactics, ruling that federal

courts in New York lacked power to act affirmatively to enjoin the enforcement of

a trial judgment issued by the court of a sister-state pending resolution of the legal

issues in the appellate courts of the sister state. *Pennzoil Co. v. Texaco, Inc.*, 481

U.S. 1 (1987) (rejecting power of New York federal judge to enjoin the

enforcement of Texas judgment).[17]

     Substitute Ecuador for Texas, and you have this case. As they had a

generation ago, Chevron's lawyers turned to the United States District Court for

the Southern District of New York in an effort to enjoin the enforcement of the

Ecuadorian trial court judgment. In *Chevron Corp. v. Donziger*, 768 F. Supp. 2d

581 (S.D.N.Y. 2011), Chevron persuaded the District Court that the Ecuadorian

trial court judgment was likely to have been procured by a fraud perpetrated by

Steven Donziger, and induced Judge Kaplan to issue a world-wide injunction

under the New York Recognition Act purporting to enjoin efforts to enforce the

---

[17] Texaco declared bankruptcy six days after the Supreme Court judgment. After protracted negotiations in the bankruptcy court, Texaco eventually settled the judgment for $3 billion, and emerged from bankruptcy. See Robert Mnookin & Robert Wilson, *Rational Bargaining and Market Efficiency: Understanding Pennzoil v. Texaco*, 75 Va. L. Rev. 295 (1989).

Ecuadorian trial court judgment.[18] In *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), this court vacated the world-wide injunction, holding that the New York Recognition Act does not authorize a New York court to act affirmatively to enjoin the enforcement of a foreign money-judgment, even when the judgment-debtor alleges that the foreign money judgment has been procured by fraud.[19]

This appeal arises out of a successful effort by Chevron to persuade the same New York-based federal judge to issue affirmative injunctive relief against the enforcement of the Ecuadorian judgment anywhere in the United States on the twin grounds that: (1) the Ecuadorian trial court judgment had been procured by Mr. Donziger's fraud; and (2) that Ecuador's entire judicial system is incapable of resolving disputes in accordance with the rule of law. D. Op. 604-08. The District Judge rested its authority to issue affirmative injunctive relief against appellants Hugo Camacho Naranjo and Javier Piaguaje Payaguaje solely on the common

---

[18] Judge Kaplan made no secret of his initial intent to issue an injunction with worldwide effect. 768 F. Supp. 2d at 638. At the time Judge Kaplan acted in *Naranjo*, the intermediate appeals court had not yet issued its *de novo* ruling. Accordingly, his initial opinion in *Naranjo* granting the world-wide injunction is silent about the effect of such a *de novo* ruling.

[19] The *Naranjo* court noted that the intermediate appeals court judgment had been issued 23 days before the Circuit court's opinion. Tellingly, the panel noted that the appeals court was empowered under Ecuadorian law to exercise *de novo* review "on the merits of the record" over both the facts and the law. 667 F.3d at 237. The panel did not discuss the legal consequence of the *de novo* judgment.

law.[20] D. Op, 555-66.  Judge Kaplan argued that, under the common law, a

wrongdoer may be enjoined from unjustly enriching himself by enforcing (or

continuing to benefit from) a judgment allegedly procured by his own fraud. D.

Op. 555. Whatever the merits of such an argument as applied to Mr. Donziger and

his associates, Judge Kaplan carried his common law argument a bridge too far by

arguing, incorrectly, that Mr. Donziger's innocent Ecuadorian clients may also be

enjoined from enforcing the untainted Ecuadorian intermediate appeals court

remediation judgment. It is, however, unnecessary to explore whether innocent

clients can be barred from benefitting from a judgment tainted by their lawyer's

wrongdoing, since, in purporting to enjoin the innocent Ecuadorian plaintiffs, the

District Court overlooked the fact that the operative remediation judgment is not

the allegedly tainted February 14, 2011 trial court judgment, but an untainted

judgment entered on January 3, 2012 by three randomly chosen intermediate

---

[20] Steven Donziger and the Ecuadorian lawyers are sued under both 18 U.S.C §§ 1861-68
(RICO). and the common law. No RICO claims have been lodged against the Lago Agrio
plaintiffs.

appeals judges with power under Ecuadorian law to engage in a *de novo* "retrial by rereading" of the evidence in the massive trial record. [21]

In refusing to acknowledge the independent force of the untainted intermediate appeals court judgment, Judge Kaplan refused to believe that the three randomly selected Ecuadorian intermediate appeals judges had actually conducted a *de novo* review of the record, noting that it would have been impossible carry out a *de novo* review of the entire trial record in the five weeks between their appointment and the issuance of the judgment. D. Op. 607-08. However, as Appellants demonstrate in Point I, *infra*, Judge Kaplan's assumption that the intermediate appeals court had only five weeks to act was erroneous. Dr. Milton Toral Zevallos, the author of the opinion, was appointed on March 23, 2011, shortly after the appeal was filed (A. 1228). Dr. Zevallos served for ten months before his decision was issued. According to the record, two appellate colleagues who also had been appointed on March 23, 2011, served until they were replaced

---

[21] Judge Kaplan's curious treatment of evidentiary nature of the Ecuadorian appellate opinions reveals his misunderstanding of their legal relevance. D. Op. 605-06 (declining to admit Ecuadorian appellate court opinions for the truth of their contents). The opinions of the appellate courts are not offered as evidence that no wrongdoing occurred at the trial level, but as the actions of appellate judicial tribunals with power to issue judgments untainted by alleged misconduct at the trial level. As such, they are clearly admissible as out-of-court statements offered, not for the truth, but because they carry independent legal significance.

on November 29, 2011 by randomly chosen substitutes.[22] (A. 1228) (March 23, 2011appointment); (A. 1235) (November 29, 2011appointment).

In any event, only a fraction of the trial record dealt with factual issues requiring *de novo* re-consideration. As we will see, much of the massive trial record was bloated with documents dealing with purely legal issues, which were fully briefed in the appeals courts by Chevron's Ecuadorian lawyers, and decided *de novo* by both appeals courts without the need to re-read the same legal arguments *ad nauseam* in the trial record.

The District Court sought, as well, to justify its injunction by attacking the integrity of Ecuador's entire judicial system D. Op. 608-17, despite the fact that scarcely a decade ago Chevron had induced this Court to send the case to Ecuador by swearing that its courts were fully capable of resolving this dispute justly. Relying primarily on anecdotal testimony by a long-time political opponent of the current President of Ecuador (testimony that had already been called into question by this court in *Naranjo* (667 F.3d at 238)), Judge Kaplan made an extraordinary, indefensible finding that, under current conditions, no Ecuadorian judgment can be

---

[22] The District Court appears to have confused the selection of the two substitutes on November 29, 2011 with the appointment of the panel itself. As the record indicates, the appeals tribunal was considering motions as early as July 8, 2011, a date characterized by Judge Kaplan elsewhere as "several months" after their selection. See D. Op. 535-36, 606.

enforced in the United States because Ecuador does not provide impartial tribunals compatible with the rule of law. D. Op. 608-17.

This appeal followed.

## ARGUMENT

**I.    NO LEGAL BASIS EXISTS TO ENJOIN INNOCENT INHABITANTS OF THE AMAZON BASIN OF ECUADOR FROM SEEKING TO ENFORCE AN UNTAINTED $8.65 BILLION REMEDIATION JUDGMENT ISSUED AGAINST CHEVRON BY THE PROVINCIAL COURT OF SUCUMBÍOS, AS AFFIRMED BY THE NATIONAL COURT OF ECUADOR.**

No legal basis existed in the District Court to enjoin innocent inhabitants of the Amazon basin of Ecuador, including the Lago Agrio plaintiffs, from seeking to enforce the untainted $8.65 billion remediation judgment issued by the Provincial Court of Sucumbíos, dated January 3, 2012, as clarified on January, 13, 2012, and affirmed by the National Court of Ecuador on November 12, 2013.

In Part A, *infra*, Appellants demonstrate the existence of *de novo* review power over both facts and law in the Provincial Court of Sucumbíos, and *de novo* review power over the law in the National Court of Ecuador.

23

In Part B, Appellants demonstrate that the two Ecuadorian appeals courts thoughtfully and judiciously exercised their *de novo* review powers to sever the central issue of Chevron's liability to remediate the ravaged land from the collateral issue of misbehavior in the trial court, in order to concentrate on the issuance of an untainted remediation judgment that should, under established principles of international comity, command respect in this Court.

In Part C, *infra,* Appellants demonstrate that Hugo Camacho Naranjo and Javier Piaguaje Payaguaje, in their respective capacities as Lago Agrio plaintiffs, are entitled to enforce the *de novo* remediation judgment issued by the Provincial Court of Sucumbíos in any court.

In Part D, *infra,* Appellants demonstrate the inadequacy of the District Court's wholly unjustified attempt to condemn the courts of Ecuador as incapable of applying the rule of law.

Finally, in Part E, *infra,* Appellants briefly describe the characteristics of an appropriate, vehicle responsive to the wishes of the plaintiffs and subject to the supervision of the Ecuadorian courts that should administer the Ecuadorian remediation judgment.

### A. Intermediate Appeals Court Judges in Ecuador's Civil Law System Are Vested With the Power and Duty to Conduct a *De Novo* Review of the Trial Record, and to Engage in *De Novo* Fact-Finding and Law Declaration Designed to Correct Errors Occurring in the Trial Court.

Ecuador has maintained a civil law system of justice since the first codification of Ecuadorian law in 1861, drawing heavily on the influential codification of the Chilean civil law system in 1857.[23] Ecuador's modern civil law system differs from common law adversary systems, like ours, in two dramatic ways. In a civil law system, the trial judge takes the initiative in assembling a written trial record, often episodically over time, considering and consulting evidentiary sources and witnesses suggested by the parties, or uncovered by the trial judge's own initiative.  Oral testimony is extremely rare, and cross examination virtually unknown. The trial judge often prepares a written summary of complex evidentiary submissions and places it into the record. When the trial judge determines that further investigation into the facts is not necessary, the judge

---

[23] In 1998, Ecuador encouraged greater participation by parties in civil litigation, but retained the fundamental aspects of civil law fact-finding on the basis of a written record. See Article 19, *Código Orgánico de la Funcion Judicial*.

reviews the written trial record, resolves any factual disputes, and issues a

judgment on the merits. See generally, A.T. von Mehren, THE CIVIL LAW

SYSTEM: CASES AND MATERIALS (1957).

Once the trial court has acted, civil law systems like Ecuador's provide "first

instance" appellate review described by Professor John Langbein in *The German*

*Advantage in Civil Procedure*, 52 U. Chi. L. Rev. 823, 856-57 (1985) (describing

the role of three-judge intermediate appeals courts with *de novo* fact-finding

power).  *See also* Peter L. Murray and Rolf Stürner GERMAN CIVIL JUSTICE,

16-18, 367-86 (2004) (describing role of first and second instance appeals courts in

the German civil law system); and James J. Apple and Robert P. Deyling, *A Primer*

*on the Civil Law System* 28 (published by the Federal Judicial Center on behalf of

the International Judicial Relations Committee of the Judicial Conference of the

United States) ("A primary difference between common-law and civil-law

appellate procedure is that intermediate appellate review in the civil law tradition

often involves a de novo review of both the facts and the law of a case.").

As Professor Langbein explains, one of the characteristic roles played by a

"first-instance" intermediate appeals court in a civil law system like Ecuador's is to

conduct a *de novo* review of relevant portions of the trial record to correct any

26

factual or legal errors that may have been committed by the trial judge. Unlike the Anglo-American adversarial model, where: (1) facts are found solely at the trial level after an adversary hearing; and (2) an intermediate appeals court lacks corrective fact-finding power,[24] a civil law system relies on a written factual record assembled by the trial judge (or, in this case, six trial judges), over an extended period of time (in this case, over eight years), often using *ex parte* investigative techniques and prepared summaries of complex items of evidence. In Ecuador (as in virtually all civil law countries), the written trial court record assembled by the trial judge (or judges) is equally available to the three randomly selected "first-instance" appellate judges carrying out the first-tier of appellate review. As Professor Langbein notes, in such a civil law appellate setting, "retrial becomes…rereading." 52 U. Chi. L. Rev. at 857.

The exercise of *de novo* review of both facts and law by a reviewing tribunal in order to cure errors committed below is not unique to civil law systems. For

---

[24] A narrow exception exists in our system for "constitutional facts," permitting *de novo* appellate review of certain facts relevant to the resolution of the constitutional claim. See *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) (*de novo* appellate review of certain First Amendment-determinative facts in libel proceeding). For a classic summary of the division of labor between trial and appellate courts in our system, see *United States v. Clarke*, 134 S. Ct. ___ (2014), 2014 WL 2765284.

example, in *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. ___ (2014), 2014 WL 2560461, the Supreme Court recognized that a bankruptcy judge's improper adjudication of a fraudulent transfer claim falling outside the constitutionally-limited power of an Article I bankruptcy judge [25] may be cured by subjecting the constitutionally-deficient decision to *de novo* review in an Article III district court on both the law and facts. In *Arkison*, in order to salvage the considerable effort expended by the bankruptcy court in resolving the fraudulent transfer claim, a unanimous Supreme Court treated the bankruptcy court's constitutionally-unauthorized decision as proposed findings of fact and conclusions of law under 28 U.S.C. §§ 157(b) and (c) of the Bankruptcy Code, which were adopted by the Article III District Court after *de novo* review of the record.[26] The identical *de novo* review process in an Article III District Court validates the actions of Article I United States Magistrate Judges. *United States v. Raddatz*, 447 U.S. 667 (1980); *Collins v. Forman*, 729 F.2d 108 (2d Cir 1984). Indeed, much of the architecture of

---

[25]See *Stern v. Marshall*, 131 S. St. 2594 (2011), and *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982) for a discussion of the limits of Article I judicial power.

[26] Several Circuit courts, echoing Chevron's position in this case, had rejected such a sensible way to salvage the bankruptcy court's work, treating the lower court proceeding as a nullity. *Wellness Int'l Network, Ltd v. Sharif*, 727 F.3d 751 (7th Cir. 2013); *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

the modern administrative state rests on the compromise in *Crowell v. Benson*, 285 U.S. 22 (1932) reserving *de novo* review of the law to Article III judges in cases initially resolved by Article I administrative tribunals.

In Ecuador, and in each of the above-described *de novo* review settings in our law, the exercise of *de novo* review over facts and law enables the reviewing court to cure mistakes, if any, in the lower court or administrative tribunal, thereby sparing the parties and the legal system from having to begin again from scratch. That is exactly what happened in Ecuador in this case.

In January, 2012, nineteen years into this grinding litigation, and eight years into the Lago Agrio case, why would any sensible civil law appeals judge vested with *de novo* fact-finding and law declaring power, and complete access to the trial record, take Chevron's advice to declare the trial court proceedings "a nullity," thereby scrapping eight years of painstaking work in assembling the trial record, and forcing the innocent victims to begin all over again, for yet a third time in twenty-one years? Instead of calling the lower court proceedings a nullity, the Ecuadorian appeals judges elected to sever the central issue of Chevron's legal responsibility to remediate the land from collateral allegations of fraudulent behavior in the trial court, electing to concentrate on salvaging the eight years of

work in the trial court by exercising *de novo* fact-finding and law-declaring power, leaving the collateral allegations of trial court misconduct to be resolved by other *fora*.[27] (A 453-468; 492-93; 3668-69).

     That is precisely the course recommended by the United States Supreme Court in similar settings in our system where the merits are bound up with collateral charges of misconduct during the adjudicative process. For example, in *ABF Freight System v. NLRB,* 510 U.S. 317 (1994), the Supreme Court upheld the power of the NLRB to order back pay and reinstatement despite the claimant's commission of perjury during the administrative proceedings. The Court noted that issues of misbehavior during the administrative process, including perjury, could be handled in other *fora*. 510 U.S. at 325. *ABF Freight Systems* drew heavily on Justice Scalia's celebrated advice in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 521 (1993) that "Title VII is not a cause of action for perjury; we have other civil and criminal penalties for that." See also *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984)

---

[27] The appeals court stated that it had conducted:

> … a prior and exhaustive review of the proceedings, along with the judgment of the trial court, seeking what legal doctrine calls relation of consistency of the ruling with the supporting documents in the proceeding….   (A 454).

(preserving a substantially just trial verdict issued after a three week trial despite an error in the jury voir dire). In fact, the bifurcation approach followed by the Ecuadorian appeals courts parallels the oft-stated policy of United States courts to preserve substantially just outcomes despite errors during the adjudicative process. Eg., Rule 61 FRCP ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); 28 U.S.C §2111 ("On the hearing of any appeal…the court shall give judgment…without regard to errors or defects which do not affect the substantial rights of the parties."); *McDonough Power Equipment, Inc., v. Greenwood*, 464 U.S. 548 (1984) (recognizing strong policy of preserving substantially just civil judgments); *Kotteakos v. United States*, 328 U.S. 750 (1946) (establishing "substantially affects" standard for harmless error in criminal case); *United States v. Ivezaj*, 568 F.3d 88, 98 (2d Cir. 2009) (applying "fair assurance" test for harmless error in criminal case).[28]

It is, of course, impossible for appellate tribunals in the United States to salvage numerous erroneous lower court judgments because they lack *de novo*

---

[28] The District Court simply confused the thoughtful decision by the Ecuadorian appeals court to sever the merits from the collateral claims of misbehavior in the trial court, retaining the merits, but relying on other *fora* to deal with the allegations of misconduct, with a refusal to acknowledge the potential wrongdoing. D. Op. 606-07.

fact-finding power. In our system, trial court errors that may have affected the fact-finding process (like the errors alleged in this case) leave a United States appellate judge with no choice but to require the parties to begin again from scratch, no matter how much time and energy has been wasted on the erroneous lower court proceeding. In certain criminal settings, moreover, a trial court error may be so fundamental as to become "structural," requiring a retrial without regard to whether the mistake actually tainted the fact-finding process. *Arizona v. Fulminante*, 499 U.S. 279 (1991). *See* Steven M. Shepard, *The Case Against Automatic Reversal for Structural Errors,* 117 Yale L. J. 1180 (2008). But in Ecuador, as in other civil law systems (like Germany's), the existence of *de novo* fact-finding power at the first level of appellate review permits a reviewing court to salvage a substantially just outcome (as the Supreme Court did in *Arkison*, and the Ecuadorian appeals courts did in this case) without forcing the parties and the legal system to shoulder the often huge costs of beginning again. Indeed, it is that power that Professor Langbein has characterized as part of "the German advantage in civil procedure." 52 U. Chi. L. Rev. 823, 856-57 (1985).

Shorn of its venom, Chevron's basic argument is that the alleged wrongdoing at the trial level in Ecuador was so unacceptable that it triggers

*Arizona v. Fulminante*, even in a civil law system. The question of when an appellate court in a civil law system should refrain from using its *de novo* review power because the wrongdoing below was so unacceptable as to constitute a "structural error" is worth debating. But, as with the NLRB in *ABF Freighting*, once the courts of Ecuador have decided that issue as a matter of Ecuadorian law, the debate is over for the purposes of this case. [29]  Following Justice Scalia's advice in *St. Mary's Honor Center*, the Ecuadorian appellate tribunals chose to concentrate on the merits, and to leave the alleged wrongdoing to another forum. That decision is surely entitled to respect under principles of international comity.

To the extent that either Chevron or Judge Kaplan deign to take note of the *de novo* January 3, 2012 remediation judgment, the January 13, 2012 order of clarification, or the unanimous affirmance by the five Justice Civil and Mercantile Panel of the National  Court of Ecuador on November 12, 2013, it is to excoriate the appellate judges for failing to obliterate the entire eight years of effort in the trial court on the basis of Mr. Donziger's alleged misdeeds in connection with the

---

[29] The National Court of Ecuador noted the existence of the doctrine of *in procedendo*, resembling "structural error," calling for the nullification of irremediably flawed lower court proceedings, but explained that it was used sparingly, and not applicable to this case. (A 3499).

issuance of the trial court opinion. D. Op. 606-08. It was, however, perfectly reasonable – indeed judicious – for the three randomly chosen Ecuadorian intermediate appeals judges, empowered to carry out *de novo* fact-finding, to, in Professor Langbein's words, "reread" and "retry" relevant portions of the vast trial record assembled over an eight year period in order to judge for themselves whether their *de novo* reading of the untainted evidence, and *de novo* reconsideration of the law, warranted the issuance of an $8.65 billion remediation judgment. Unlike appellate review in the common law adversary world, where an appellate court's only option in a case like this one would be "affirmance" or "reversal to begin again," the civil law system seeks to salvage the usable portions of the trial record by permitting a "first-instance" appellate court to use its *de novo* fact-finding powers to shape the relevant, untainted portions of the trial record into the raw material of an untainted *de novo* judgment; a judgment that spares the plaintiff, the defendant, and the judicial system from having wasted enormous resources on a failed trial. That is precisely what the randomly selected three judge first-instance appellate tribunal did in this case. That is precisely what the National Court of Ecuador affirmed.

34

**B. The Provincial Court of Sucumbíos Exercised Its *De Novo* Review Powers Over Both Fact and Law in a Thoughtful and Judicious Manner, Thereby Severing Any Link with the Allegedly Tainted Trial Court Judgment.**

The District Court's reaction to the exercise of *de novo* review by the three judges of the Provincial Court of Sucumbíos was to refuse to believe that the appeals judges had actually carried out their statutory duties of *de novo* review. D. Op. 607-08. How, the District Court asked, could three appellate judges have reviewed a 200,000 page trial record *de novo* in five weeks? But Judge Kaplan was wrong on two levels. First, he appears to have misunderstood the date on which the Ecuadorian intermediate appellate panel was randomly selected.  The District Court noted that the panel was randomly selected on November 29, 2011, five weeks before the appeals court's judgment was announced on January 3, 2012. D. Op. 607. But the record indicates that Dr. Milton Toral Zevallos, who wrote the intermediate appeals court opinion, was randomly appointed on March 23, 2011 (A. 1228) along with two colleagues who apparently served until they were replaced by randomly chosen substitutes on November 29, 2011. (A. 1235). The District Court noted that motions were made to the intermediate appeals tribunal

35

on July 8, 2011, "several months" after their selection. D. Op. 535-36 Thus, Judge

Kaplan's assertion that the intermediate appeals judges had only five weeks to

conduct the *de novo* review appears to have been just wrong.[30]

More importantly, Judge Kaplan misunderstood the scope of the material in

the trial record requiring *de novo* review. He assumed it was the entire trial record

of more than 200,000 pages. But the Ecuadorian intermediate appellate judges had

no need to wade through the entire trial record. The massively "bloated" sections

of the trial record devoted to Chevron's unending legal arguments: (1) contesting

*in personam* jurisdiction over Chevron in Ecuador; (2) denying the derivative

liability of Chevron for the acts of Texaco: (3) questioning the relative causation of

the environmental degradation as between Texpet and the other members of the

Amazon basin oil consortium; and (4) asserting the earlier release or settlement of

the environmental claims, did not require *de novo* review of the trial record. As we

will see, after full appellate briefing on each issue, the intermediate appellate

courts' thoughtful *de novo* legal rulings resolved them as matters of law.

In fact, the only portion of the trial record requiring *de novo* review was the

evidentiary material cataloguing massive environmental degradation of an area the

---

[30] The National Court of Ecuador explicitly upheld the method of selecting the intermediate appeals panel. (A 3523-3526).

size of Rhode Island; a degradation that is obvious to every person living in the affected area. While reviewing even that material was a substantial task, there is absolutely no basis for assuming that it could not be done by Dr. Zevallos and his four colleagues during the ten months that the appeal was actively pending before them.

The District Court erroneously assumed that the burden rested with the Ecuadorian victims to prove that the intermediate appeals judges had, in fact, carried out their statutory duty under Ecuadorian law to render a *de novo* judgment on the law, and to conduct a *de novo* factual review of the relevant portion of the trial record. D. Op. 606. However, since Chevron is both the plaintiff, and the moving party seeking an extraordinary prospective nationwide injunction against the enforcement of the January 3, 2012 judgment, the burden clearly rests with Chevron to establish that the Ecuadorian appeals judges failed to carry out their statutorily-defined duties.[31] *See Schaeffer v. Weast*, 546 U.S. 49 (2005) (burden of proof normally on plaintiff seeking to alter *status quo*). As the *Naranjo* Court noted (667 F.3d at 241, n 15), in settings where a judgment creditor seeks

---

[31] As the *Naranjo* court noted (667 F.2d at 237), the duty of an Ecuadorian intermediate appellate forum to exercise *de novo* review power is set forth in *Código de Procedimiento Civil*, art. 838 (Ecuador 2005).

enforcement of a foreign judgment, the moving party bears the burden of

demonstrating the absence of mandatory bars to enforcement, while the judgment

debtor bears the burden of proving that discretionary reasons exist to withhold

enforcement. *Ackerman v. Levine*, 788 F.2d 830 (2d Cir. 1986). But, where, as

here, the judgment debtor seeks prospective injunctive relief barring any effort to

enforce a foreign money judgment anywhere in the United States, the burden

surely rests on the judgment debtor as the moving party to prove that a foreign

court failed to exercise its statutory jurisdiction. Although the intermediate appeals

court's judgment was issued on January 3, 2012, more than two years prior to the

trial below, and although the National Court of Ecuador acted on November 12,

2013, during the trial below, Chevron made no serious effort to challenge the

integrity or competence of the three randomly chosen intermediate appellate

judges, or the five Justices of the National Court of Ecuador. Indeed, apart from

claiming erroneously that *de novo* review was impossible during the five week

period between the public announcement of the composition of the intermediate

appellate tribunal and the issuance of its judgment, Chevron made no effort to

impugn the decisions of the two Ecuadorian appellate tribunals, other than arguing

that no Ecuadorian court was capable of applying the rule of law. See *infra,* Part D.

Chevron's Ecuadorian lawyers filed a 200 page appeal brief (and lodged 50,000 pages of new material) with the intermediate appeals tribunal attacking the trial judgment on multiple grounds.[32] First, despite the post-merger promise made to this court by ChevronTexaco in response to the concerns expressed in *Jota* (157 F.3d at 159) that, as a condition of securing a *forum non conveniens* dismissal, ChevronTexaco would submit to *in personam* jurisdiction in Ecuador, Chevron's lawyers argued at great length (some might say, interminably) before both appeals courts that, after the 2001 merger, the jurisdictional promise bound only Texaco. The three randomly chosen intermediate appeals judges, as well as the National Court of Ecuador, rejected Chevron's *in personam* jurisdictional defense, holding as a matter of Ecuadorian law that Chevron was bound by its jurisdictional promise to this court. (A. 453, 456-61; 465-66; 3502-3513).[33] There was, of course, no need to consult the trial record to make such a *de novo* decision on the law. Nor did such

---

[32] The decision of the National Court of Ecuador opens with a 50 page summary of Chevron's legal arguments. (A. 3454-3497).

[33] Any effort to parse complex decisions of a foreign judicial tribunal suffers from at least two difficulties – linguistic and cultural. The need for a literal precision often leads to a dense English translation that is awkward and difficult to read. The cultural divide often obscures conventions in a foreign legal culture, rendering a complex foreign opinion difficult to understand. While both difficulties are present in this case, the two Ecuadorian appellate decisions reward careful scrutiny.
.

a careful *de novo* decision have any connection to any alleged wrongdoing in the trial court.

Second, the three intermediate appellate judges rejected Chevron's formalistic contention that Chevron is not liable for pre-merger environmental violations committed by Texaco.[34] (A. 459-60; 3505-06). Both Ecuadorian appellate courts elected, as a matter of Ecuadorian law, to "pierce the corporate veil" by applying a form of enterprise liability to both Chevron and Texaco, ignoring technical corporate fictions designed to insulate the corporate parent from liability for the unlawful actions of its wholly-owned and wholly controlled subsidiaries.

The Ecuadorian appeals courts were right, under both Ecuadorian and United States law. Chevron acquired ownership and control over a weakened Texaco in 2001 through what the District Court reverentially characterized as a "reverse triangular merger."[35] The complex transaction which consisted of merging

---

[34] The *Naranjo* court recognized that the issue of derivative liability raised questions of Ecuadorian, as well as United States law. 667 F.3d at 235, n, 2.

[35] It was not a merger of equals. Texaco had been weakened by: (1) being forced into temporary bankruptcy as a result of a $6 billion Texas jury verdict finding Texaco guilty of tortious interference with Pennzoil's contractual agreement to acquire Getty Oil, which it eventually settled for $3 billion (*Texaco v. Pennzoil Co.,* 729 S.W. 2d 768 (Texas Ct. App. 1987) (affirming jury verdict); and (2) being threatened with a potentially crippling nationwide boycott after the

Texaco into a minor, wholly-owned subsidiary of Chevron (Keepon) left the

merged subsidiary under the ownership, direction and control of a renamed parent-

ChevronTexaco, and permitted Chevron to acquire complete ownership and

control over Texaco's valuable oil assets in a tax free transfer of Chevron stock to

Texaco's former shareholders.[36] Significantly, the merger agreement provided that

"… for accounting and financial reporting purposes, we will treat [Chevron and

Texaco] as if they had always been combined." Even more significantly, the

merger agreement carefully provided that ChevronTexaco would be responsible for

the payment of severance and other pension benefits owed to high-ranking officers

of Texaco who were displaced by the merger. It is impossible to argue plausibly

that ChevronTexaco should be treated as a single integrated economic enterprise

for accounting and financial reporting purposes, and, as liable for the severance

---

disclosure of racially-demeaning tape-recordings by Texaco's highest officials concerning hiring and promotion (*Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 190-93 (S.D.N.Y. 1997) (describing terms of Title VII settlement).

[36] The merger agreement between Chevron and Texaco is described and set forth in proxy materials sent to the shareholders of both corporations by their respective Boards of Directors. *See* media.corporate-ir.net/media_files/nys/cvx/reports/special proxy.pdf. When the smoke cleared after the merger, Chevron controlled 2/3 of the merged Board of Directors of ChevronTexaco, the CEO of Chevron became CEO of the merged company, corporate headquarters was moved to Chevron's California facility, and Chevron executives assumed control over the merged company's operating divisions.

and pension costs of high-ranking Texaco executives, while simultaneously claiming to fob-off Texaco's environmental liabilities on what was left of Texaco after the merger. Tellingly, not a word in the complicated merger agreement gives a hint of such a one-sided result.

Not surprisingly, both the Ecuadorian intermediate appeals court, and the National Court of Ecuador, rejected Chevron's argument that what was left of either Texpet or Texaco after the 2001 merger bore sole legal responsibility for Texpet's pre-merger environmental misbehavior. (A. 459-60; 3505-06). Instead, both Ecuadorian appeals courts ruled *de novo* that, as a matter of Ecuadorian law, Chevron, as the dominant partner in the merger, assumed Texaco's oil-related environmental liabilities when it acquired ownership and control over Texaco's valuable oil assets. Ecuador surely may choose, as a matter of Ecuadorian law, to impose "enterprise liability" on Chevron for the environmental damage unlawfully caused by Texaco's wholly owned Ecuadorian subsidiary, no matter how cunningly the Chevron/Texaco merger was structured. [37] Indeed, United States courts would

---

[37] The idea of enterprise-wide liability was launched by William O. Douglas in 1929, and powerfully supported by Adolf A. Berle, Jr. See William O. Douglas & Carol M. Shanks, *Insulation From Liability Through Subsidiary Corporations,* 39 Yale L. J. 193 (1929); Adolf A. Berle, Jr., *The Theory of Enterprise Liability*, 47 Colum. L. Rev. 343 (1947). For descriptions of its contemporary application, *see* Meredith Dearborn, *Enterprise Liability: Reviewing and*

42

do exactly the same thing. *See In re Tronox Incorporated et al. v. Kerr-Mcgee Corp,* 503 B.R.239 (December 12, 2013) (rejecting effort by Kerr-McGee and Andarko Petroleum to structure a reorganization permitting Kerr-McGee to shed its liability for degrading the environment, while retaining the financial benefits generated by such degradation).

As the Northern District of Illinois held in connection with the environmental damage caused by the Amoco Cadiz oil spill:

> …as an integrated multinational corporation which is engaged in the exploration, production, refining, transportation and sale of petroleum products throughout the world, Standard [the parent corporation] is responsible for the tortious acts of its wholly-owned subsidiaries and instrumentalities. *In re Oil Spill by the "Amoco Cadiz,"* MDL Docket No. 376, 1984 US Dist LEXIS 17480 at 135-36 (N. D. Ill. April 18, 1984, (finding No. 43), aff'd 4 F.3d 997 (7th Cir. 1993).

Moreover, Ecuador is far from unique in adopting a form of enterprise liability holding a parent liable for the acts of wholly-owned subsidiaries that it

---

*Revitalizing Liability for Corporate Groups*, 97 Cal. L. Rev. 195 (2009); Kurt A. Strasser, *Piercing the Veil in Corporate Groups*, 37 Conn. L. Rev. 637 (2005). *See also* R.H. Coase, *The Nature of the Firm*, 4 Economica 386, 393 (1937) (describing operation of integrated corporate economic entities).

controls, and from which it derives significant income. Enterprise liability has been formally adopted in Germany, Brazil, Portugal, Italy and India. It is being actively considered by the European Union, is recommended by the United Nations, and is supported by the vast body of academic commentators in the United States. See Dearborn, *supra,* n. 37 at 215-20. Accordingly, neither Ecuador, nor the United States, nor any other sovereign nation, is obliged to stand by while Chevron's lawyers move its environmental liability around in an international game of corporate three-card monte.

As with the *de novo* determination concerning *in personam* jurisdiction over Chevron, the *de novo* legal ruling on the issue of enterprise liability by both Ecuadorian appellate tribunals did not require review of the trial record. Nor was it linked in any way to allegations of misbehavior in the trial court.

Third, the Ecuadorian intermediate appellate court, acting *de novo* as a matter of Ecuadorian law, rejected Chevron's efforts to shift legal responsibility for the environmental disaster to Texaco's Amazon basin oil consortium partners. Chevron argued at enormous length in the briefs and trial record that its consortium partners, including Petroecuador, were the principal environmental culprits.

Whatever the formal ownership structure of the oil consortium may have been,[38] however, the Ecuadorian intermediate appeals judges recognized *de novo* that Texaco, as the only consortium participant with expertise in oil exploration and extraction, was the dominant force in the consortium, acting as a mentor, advisor, and guide to the wholly inexperienced Ecuadorian participants. Since, reasoned the Ecuadorian appeals courts, Texaco was in a dominant mentoring relationship with the inexperienced personnel of the remainder of the consortium, Texaco was responsible, as a matter of Ecuadorian law, for the consortium's monumental failures to abide by accepted standards of environmental protection.

The Ecuadorian appeals courts, by imposing primary causal responsibility on the concededly dominant partner in a group enterprise, are not the first group of judges to forge novel and substantially just doctrine dealing with difficult issues of causation. For example, United States courts have experimented with "market share" liability that allocates the causal responsibility in proportion to a defendant's market share in the dangerous product. *Sindell v. Abbot Labs*, 607 P.2d 924 (Cal. 1980). See generally Emily H. Damron, Comment, *Reviving the Market*

---

[38] In 1964, Texpet and a subsidiary of Gulf Oil owned 100% of the consortium. In 1973, Petroecuador acquired a 25% share, and eventually acquired Gulf's share, leaving TexPet with a 37.5% ownership share, which it maintained until 1992. D. Op. 386.

*for Liability Theories: The "Comingled Product" Theory of Market Share Liability Enters the Lexicon*, 111 Penn. St. L. Rev. 506 (2006). In fact, Ecuador's decision to recognize "dominant party" causal responsibility is considerably less adventurous than the United States' experiment with "market share" liability.

Once again, in order to reach its *de novo* decision on "dominant partner" causation, it was not necessary for the intermediate appeals court to undertake a searching review of the trial record. Nor is the *de novo* legal finding on causation linked in any way to allegations of misconduct in the trial court.[39]

With the crucial legal issues of *in personam* jurisdiction over Chevron, derivative corporate liability within the Chevron corporate family, relative causation, and alleged settlement and release resolved *de novo* as matters of law in a manner that is utterly unconnected to Chevron's allegation of trial court misbehavior, the Ecuadorian intermediate appeals court turned to Chevron's attack on the allegedly ghost-written expert report, and on allegations concerning

---

[39] The Ecuadorian appeals courts gave short shrift to Chevron's fourth principal legal argument, that Texaco had secured a complete environmental release in the 1990's because the signatories lacked power under Ecuadorian law to enter into a release binding on the nation. (A. 3622-26). Once again, the *de novo* legal ruling by the appellate courts on allocation of power under Ecuadorian law to grant releases binding on the nation did not require review of the trial record. Nor was it connected in any way to allegations of misbehavior in the trial court.

authorship of the trial court's opinion and judgment, by: (1) noting that the tainted expert report had already been disavowed by the trial judge;[40] and (2) conducting a *de novo* review of the relevant portions of the trial record cataloguing the scope of the environmental damage. (A. 462-63) (refusal to declare procceding "nullity); 3498-3551 (Section 5 of decision of National Court of Ecuador rejecting Chevron's argument that flaws in the trial court required nullification of entire proceeding). There is no doubt that the Lago Agrio trial record assembled over eight years contains massive evidence of environmental degradation linked to the activities of Texpet from 1964-1992. Not even Chevron or the District Court contests that fact. Rather than contesting the scope of the environmental degradation in the trial record, Chevron's principal defenses have focused on: (1) the inability to sue Chevron in Ecuador; (2) Chevron's lack of legal responsibility for the actions of Texaco's Ecuadorian subsidiary, TexPet ; (3) the responsibility of Petroecuador (the Ecuadorian national oil company) for much of the environmental damage; and (4) an alleged release provided to Texaco in 1990's, based on false representations that the land had been remediated. As we have seen, each one of those legal defenses was properly rejected *de novo* by the Ecuadorian intermediate

---

[40] The trial court judge had issued a clarification order on March 4, 2011, explicitly disavowing reliance on the Cabrera report. The District Court refused to believe him. D. Op. 482.

appeals court, and carefully reconsidered and rejected by the National Court of Ecuador.

Nor can there be any question that the three intermediate appeals court judges actually reviewed large segments of the trial record dealing with the scope of environmental damage, repeatedly citing to specific items dealing with scope of damages. (A 463). Indeed, while bitter disagreement continues over the legal issues of *in personam* jurisdiction, derivative corporate liability, causation, and settlement, the one thing that virtually everyone agrees on is the massive scope of the environmental damage demonstrated in the Ecuadorian trial record. Portions of the massive evidence of environmental harm in the Ecuadorian trial record were submitted to the District Court, which acknowledged the serious environmental degradation and expressed concern that the innocent victims have been unable to secure a just resolution of their remediation claims. D. Op. 644.

The District Court insisted, nevertheless, that Mr. Donziger's alleged misbehavior in the trial court made it impossible for the first-instance appeals court to salvage the proceedings by exercising *de novo* review. Intent on punishing Mr. Donziger (and protecting Chevron against what he perceived to be a fraudulent trial judgment), the District Court simply refused to acknowledge that a *de novo*

reading of the untainted portions of the trial record by the first-instance appellate tribunal cataloguing the scope of environmental damages, coupled with the thoughtful *de novo* resolution of the legal issues by both Ecuadorian appellate tribunals, provides the innocent victims with a long-delayed path to justice. This Court should lift the bar to taking that path.

### C. Hugo Camacho Naranjo and Javier Piaguaje Payaguaje Are Legally Entitled to Seek to Enforce the Untainted Ecuadorian Intermediate Appeals Court Judgment in any Court.

The District Court reasoned that a lawyer like Mr. Donziger, charged with procuring a foreign money judgment by fraudulent means, may be enjoined from reaping any economic benefit from the enforcement of the fruits of his alleged wrongdoing. D. Op. 555, 639-40.  The District Court then insisted that the 47 Lago Agrio plaintiffs, including Hugo Camacho Naranjo and Javier Piaguaje Payaguaje, are also vulnerable to identical common law-based injunctive relief, not because they personally engaged in any allegedly wrongful behavior, but because, as Mr. Donziger's clients, they are deemed to have acted as Mr. Donziger's "principals." D. Opp. 566, n. 1304. As "principals," reasoned the District Court, the Ecuadorian plaintiffs are derivatively responsible under New York law for their lawyer/agent's

49

alleged misconduct, and may, therefore, also be enjoined from benefiting from the enforcement of the Ecuadorian remediation judgment.[41]

*Hazel-Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238 (1944), the principal authority cited by the District Court (974 F. Supp.2d at 562) in support of its common law power to enjoin the enforcement of a fraudulently procured judgment, involved personal wrongdoing by the client, not an effort to saddle innocent clients with a lawyer's alleged wrongdoing. Whether (and when) the common law authorizes an injunction barring innocent clients from enforcing a judgment procured by their lawyer's alleged misconduct is a complex question that cannot be answered by a wooden application of principal/agent theory, especially in a case like this one where the so-called "principals" had absolutely no control over the so-called "agents."[42] Under general principles of unjust enrichment, the validity of such an injunction would turn on whether the lawyer's alleged

---

[41] In an impossibly cryptic finding, the District Court also suggested that the otherwise innocent Lago Agrio clients had "ratified" their lawyer's misconduct for reasons set forth in an unreported post-trial memorandum filed by Chevron. D. Op. 566, n.1304. It is one thing for a judge to endorse claims made in a party's legal brief; it is another not to specify precisely what those claims are.

[42] The breakdown in the ordinary principal/agent relationship in the context of entrepreneurial lawyers representing weak and unsophisticated clients in a mass adjudication context has been widely noted. John Coffee, *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action,* 54 U. Chi. L. Rev. 877 (1987).

misbehavior had so tainted the judgment as to render it void; or merely disqualified the wrongdoing lawyer from benefitting from it. The answer to that that question would rest on an inquiry into whether the lawyer's wrongdoing had materially altered the substantive content of the judgment. Mr. Donziger's two most serious alleged acts of wrongdoing – (1) allegedly secretly ghost-writing an ostensibly neutral expert's report that was ultimately rejected by both the trial court and, most importantly, the intermediate appeals court exercising *de novo* review of the facts; and (2) allegedly providing secret technical and legal assistance to the trial judge in drafting his judgment – while clearly unacceptable, if they took place -- do not appear to have actually altered the substantive terms of the trial court judgment in a manner that would preclude innocent victim-plaintiffs from seeking to enforce it.

It is, however, completely unnecessary to decide whether innocent clients could be enjoined from benefiting from the allegedly tainted trial court judgment in this case. As Appellants have demonstrated, *supra* in Parts A and B, the intermediate appellate judgment that the innocent plaintiffs would be seeking to enforce is the product of *de novo* review of the law and the facts, and is, therefore, entirely severed from any alleged wrongdoing in the trial court. Where, as here, the clients are innocent, and the appellate judgment to be enforced is untainted,

51

enforcement of the judgment would not unjustly enrich plaintiffs. To the contrary, refusal to enforce the untainted intermediate appeals court judgment would unjustly enrich Chevron, the proven wrongdoer.

Any doubt concerning the untainted nature of the January 3, 2012 remediation judgment issued by the Ecuadorian intermediate appeals court was erased by the court's January 13, 2012 order of clarification. (A. 489-93). In response to a request for clarification, the intermediate appeals judges explicitly noted that they had carefully considered the allegations of misconduct surrounding the issuance of the trial court's decision and judgment, but had determined, after a *de novo* review of the relevant portions of the trial record, and a *de novo* consideration of the legal issues, that its judgment satisfied the "principle of congruence" with the factual material in the trial record, including the evidentiary material submitted by Chevron. The appeals judges explained that once a *de novo* review of the factual record had satisfied them that the untainted evidence of environmental damage in the record supported an $8.65 billion remediation judgment, their role as a first-instance appellate court in a civil law system was at an end. The collateral question of whether Mr. Donziger should be sanctioned for alleged misbehavior in the trial court, noted the Ecuadorian courts, was to be left to

other *fora*. (A. 492-93) ( reciting decision "to stay out" of dispute over alleged

misconduct in trial court in view of existence of alternative *fora*).

Not only was the Ecuadorian appeals courts' thoughtful decision to bifurcate

the issues of Chevron's liability and collateral issues of Donziger's alleged

wrongdoing in the superseded trial court entitled to respect as a matter of

international comity, it is exactly what the Supreme Court counsels courts in the

United States to do in similar settings. *ABF Freight Systems v. NLRB*, 510 U.S. 317

(1994); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 521 (1993); *McDonough*

*Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984); *Kotteakos v. United*

*States*, 328 U.S. 750 (1946); *United States v. Ivezaj*, 568 F.3d 88, 98 (2d Cir.

2009). See also Rule 61 FRCP; and 28 U.S.C §2111.

### D. The District Court's Wholesale Condemnation of the Ecuadorian Judicial System Was Both Clearly Erroneous, and Barred by Judicial Estoppel.

Once it becomes clear that Chevron cannot paint the first-instance appeals

court's thoughtful and judicious *de novo* remediation decision as tainted by any

alleged trial court misconduct, the sole remaining obstacle to the enforceability of

the Ecuadorian judgment is Chevron's wholesale attack on the integrity of

53

Ecuador's entire judicial system.  Whatever the general shortcomings of Ecuador's

underfunded legal system, however, nothing in the record of this case comes close

to demonstrating the wholesale contempt for the rule of law needed to overcome

the principles of international comity codified in the New York Recognition Act.

### 1. Chevron is Judicially Estopped From Asserting The Wholesale Inadequacy of the Ecuadorian Judicial System.

While Chevron is – and should be - free to challenge specific judgments by

individual Ecuadorian judges as having been "obtained by fraud,"[43]  Chevron is

judicially estopped from launching a wholesale attack on the integrity of the entire

Ecuadorian legal system as a "system that does not provide impartial tribunals or

procedures compatible with the requirements of due process of law."  NY CPLR

5304(a)(1). Scarcely a decade ago, Chevron successfully demanded that this court

dismiss this litigation under the *forum non conveniens* doctrine in favor of

Ecuador. In support of its motion for a compelled transfer to Ecuador, Chevron

repeatedly assured this court that the courts of Ecuador were fully competent to

provide a just resolution of this litigation. Having induced this court in 2002 to

---

[43] Given the exercise of *de novo* review discussed *supra*, it is impossible to characterize the January 3, 2012 judgment of the Ecuadorian intermediate appeals court, as affirmed by the National Court of Ecuador, as having been "obtained by fraud" within the meaning of NY CPLR §5304(b)(3) of the New York Recognition Act.

transfer this litigation to Ecuador by praising the quality of its justice system

generally, Chevron is judicially estopped from urging precisely the opposite today

in an effort to avoid the enforcement of a judgment issued by the very judicial

forum to which Chevron demanded to be remanded. In keeping with the Supreme

Court's governing precedent in *New Hampshire v. Maine*,  532 U.S. 742, 749

(2001), a panel of this court has described the role of judicial estoppel in the

Second Circuit in *Intellivision v. Microsoft Corporation*, (post-2007 summary

order of affirmance) (June 11, 2012), Fed Appx. 616, 2101 WL 2086297. The

*Intellivison* panel noted that:

> Where a party assumes a position in a legal proceeding,
> and succeeds in maintaining that position, he may not
> thereafter, simply because his interests have changed,
> assume a contrary position, especially if it be to the
> prejudice of the party who acquiesced in the position
> formerly taken by him. The rule, known as judicial
> estoppel, generally prevents a party from prevailing in
> one phase of a case on an argument and then relying on a
> contrary argument to prevail in another phase.

 *See also Republic of Ecuador v. Chevron*, 638 F.3d 384, 397 (2d Cir. 2011)

(summarizing law of judicial estoppel and noting that Chevron's effort to invoke

arbitration under a Bilateral Investment Treaty signed by Ecuador is wholly

55

separate from the private plaintiffs' efforts to secure justice against Chevron in an Ecuadorian court).

Chevron's complete about-face concerning the general ability of the Ecuadorian judiciary to provide a fair forum for this litigation is a perfect fit with the *Intellivision* panel's description of judicial estoppel.[44] Once it induced the Second Circuit to send this case to Ecuador by warranting Ecuador's judicial fairness, and after the innocent Ecuadorian plaintiffs had invested eleven years in presenting this complex case to Ecuadorian courts, Chevron cannot change legal horses in midstream by arguing that current Ecuadorian courts cannot be trusted to apply the rule of law. If such a cynical ploy were to succeed, after twenty-one years of effort, the innocent Ecuadorian victims would be left with no forum within which to seek the rehabilitation of their ravaged habitat. It is inconceivable that this court would be a party to such a travesty of justice.

Chevron will no doubt argue that times have changed since it made its 2002 assertions about the quality of Ecuadorian justice. It will no doubt claim that

---

[44] In *Bridgeway Corp. v. Citibank,* 201 F. 3d 134 (2d Cir. 2000), this Court ruled that voluntarily engaging in litigation in a foreign country did not judicially estop a litigant from challenging the capacity of the country's courts to apply the rule of law. Chevron's affirmative conduct in this case in demanding a transfer to the courts of Ecuador, and vigorously affirming their fairness, is a far cry from merely engaging in litigation in Ecuador.

Ecuadorian courts were fair in 2002, only to have been rendered unfair by the machinations of the current elected President of Ecuador. In fact, as Chevron's arguments demonstrate, the only material change in Ecuadorian justice since Chevron successfully demanded to be allowed to litigate this case in Ecuadorian courts stems from a change in the political complexion of Ecuador, and a corresponding change in who gets to be a judge.[45] In every judicial system in the world, including the United States (where the political party in power tends to control the judicial appointment process), and the State of New York (where most judges are elected), the identities and political philosophies of sitting judges inevitably reflect the jurisdiction's political complexion. Given that fact of political and judicial life, defeated litigants, like Chevron today, and Texaco a generation ago, are often quick – much too quick - to ascribe their losses to a particular judge's politics. In fact, the luminous ideals of due process of law, and

---

[45] The current President of Ecuador, Raul Correa, holds a Ph.D. in Economics from the University of Illinois. He was elected in 2006, and re-elected twice with overwhelming majorities. President Correa was influential in securing the adoption of a new Constitution for Ecuador in 2008. He has not been bashful about placing his political supporters on the Ecuadorian bench. But then, neither are politicians in the United States, ranging from the President to the governors of many states, who routinely appoint their political supporters to the bench, to say nothing of the voters of numerous states who elect judges on the basis of political affiliation.

commitment to the rule of law, are fully compatible with a recognition that judges – in Ecuador, as in the United States - must often make discretionary choices in deciding hard cases that will inevitably (sometimes subconsciously) be tilted in one direction rather than another by their political beliefs. See Keith J. Bybee, ALL JUDGES ARE POLITICAL, EXCEPT WHEN THEY ARE NOT (2010). Over the past thirty years, membership in the Ecuadorian judiciary has evolved from judges who had been installed by, or educated under, a right-wing military junta or a series of unstable civilian governments highly dependent on the military, into a judiciary that reflects Ecuador's current populist political climate. Chevron may well be correct in believing that such a change in the political composition of the Ecuadorian judiciary may have played a role in the rejection by Ecuadorian appellate judges of: (1) Chevron's effort to immunize itself from *in personam* jurisdiction despite its promise to this Court; (2) Chevron's effort to pass the environmental buck to what is left of Texaco by denying derivative corporate liability while enjoying the financial benefits of the merger; (3) Chevron's effort to fob-off causal responsibility for the environmental destruction on its Ecuadorian consortium partners, especially Petroecuador; (4) Chevron's claim that it has been released from liability; and, finally (5) Chevron's unpersuasive effort to obfuscate

the scope of the massive environmental damages overwhelmingly documented in the trial record.

Each of those issues was firmly decided against Chevron by the currently-constituted Ecuadorian judiciary. Perhaps past Ecuadorian courts might have ruled differently. But resolving such disputed issues against Chevron is not evidence of a breakdown of the rule of law. Indeed, many would see the thoughtful actions of the untainted Ecuadorian appellate judges in this case as a re-assertion of the rule of law in the teeth of Chevron's effort to subvert it through manipulation of the corporate form, intimidation of counsel, and an unlimited supply of money to buy perjured witnesses like Guerra.

In short, there is nothing in the idea of fidelity to the rule of law that guarantees Chevron a corporate-friendly judicial climate, especially when Chevron, a decade ago, strenuously demanded the opportunity to try this case in the very judicial forum it now condemns. There is a limit to buyer's remorse.

## 2. The Condemnation is Based on Shockingly Inadequate Evidence.

Even in the absence of judicial estoppel, the evidence of alleged systemic inadequacy presented in the District Court (D. Op. 608-616) does not come close

to justifying its wholesale condemnation of Ecuadorian justice, especially at the

behest of a powerful corporate litigant like Chevron that demanded, only a decade

ago, to transfer this case to what it insisted was an Ecuadorian judicial system fully

capable of resolving this litigation justly. Chevron's principal witness for the

proposition that Ecuador does not maintain a judicial system capable of applying

the rule of law was Sr. Vladimiro Alaverez Grau, described in *Naranjo* as a

political opponent of the current regime in Ecuador, who filed an affidavit critical

of Ecuadorian justice and testified below. D. Op. 609. (A. 1407). The District

Court made a half-hearted effort to rebut the *Naranjo* court's description of Sr.

Alvarez as a "political opponent" of President Correa (667 F.3d 232, 238) by

noting that Sr. Alvarez Grau had never actually run against President Correain an

election. D. Op. 609, n. 1586. Perhaps "dedicated ideological opponent "would be

a more accurate, but equally damning description of Sr. Alvarez for the purpose of

assessing his credibility in assessing the state of Ecuadorian justice. Sr. Alvarez

Grau was the center-right Christian Democratic Party's candidate for president in

1992, has held numerous public offices, and has published numerous critical

articles about President Correa, a staunch left-wing populist, in his capacity as a

long-time political journalist.

60

The principal objection asserted by Sr. Alvarez Grau is that President Correa (as opposed to a military junta or a center-right government) exercises undue political influence over the selection of the judiciary. Chevron has not, however, produced an iota of evidence suggesting that President Correa tampered with the appellate judges in this case. At worst, he is accused of speaking out on the issues. D. Op. 616. If a President's, or a Governor's, speaking out on issues, and exercising political influence over the selection of judges, is sufficient to render an entire judiciary incapable of dispensing impartial justice in accordance with the rule of law, the judiciaries of more than thirty states that elect their judges, including New York, are rendered illegitimate. *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) (invalidating restrictions on political speech during judicial elections); *Caperton v. Massey*, 556 U.S. 868 (2009) (requiring recusal of judge who was the beneficiary of $3 million in independent campaign support from a litigant before him). See generally, Alicia Bannon, et al., *The New Politics of Judicial Elections* (2013)(documenting patterns of campaign spending in judicial elections).  Nor does the fact that appointed judges often mirror the political values of the appointing authority in making discretionary judgments in hard cases destroy their capacity to deliver impartial justice. If it did, this court, to

61

say nothing of the Supreme Court of the United States, would be rendered illegitimate.[46]

Thus, absent evidence of Presidential interference (going far beyond mere public exhortation) with the personnel or deliberations of the intermediate appeals court, or the  personnel or deliberations of the National Court of Ecuador in this case, anecdotal arguments that the current, widely popular President of Ecuador is aggressively putting his political stamp on the Ecuadorian judiciary should elicit a knowing yawn from those who see the 2016 Presidential election in the United States as a potentially crucial turning point in the judicial interpretation  of the open-textured provisions of the Constitution of the United States.[47]

---

[46] The literature documenting the role of political values in in the selection of judicial nominees is vast. For an example, see David Yalof, PURSUIT OF JUSTICE: PRESIDENTIAL POLITICS AND THE SELECTION OF SUPREME COURT NOMINEES (1999).

[47] Reports issued by the State Department and other watchdog agencies deploring corruption in the Ecuadorian judiciary, and warning of President Correa's efforts to appoint his political supporters to the bench, merit serious attention. D. Op. 610, 614-15. But they do not justify a wholesale condemnation of the entire Ecuadorian judicial system as incapable of applying the rule of law. Unlike the human rights reports concerning Liberia that were before the Court in *Bridgeway Corp. v. Citibank,* 201 F. 3d 134 (2d Cir. 2000), the human rights reports concerning Ecuador do not chronicle a complete breakdown of the rule of law in the Ecuadorian judicial branch during the very period of the litigation in question. Moreover, Ecuador, as a functioning democracy, cannot be compared to Liberia, a deeply troubled sovereignty riddled by civil war that did not enjoy democratic governance during the period in question. At most, the human rights reports concerning Ecuador counsel careful scrutiny to assure that there was no political interference with the appeals judges in this case. Apart from citing to President Correa's speeches to the nation on an issue of enormous national significance, there is not one iota of

### 3.  The Condemnation is Inconsistent with Binding
###     Principles of International Comity.

At the height of the Cold War, the United States Supreme Court announced the Act of State doctrine in recognition of the diversity of political, economic and social views held by persons and governments throughout the world. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) (barring challenges in United States courts to Cuban expropriation of private property). In *Daimler AG v. Bauman*, and *Naranjo*, both the Supreme Court and the Second Circuit noted that in the years since *Sabbatino*, international comity, defined as mutual acceptance and respect for the diverse social, legal and political systems that co-exist in a multi-cultural and transnational world, has become even more important. *Daimler*, 134 S.Ct. at 762-63; *Naranjo*, 667 F.3d at 242-44.

Practicing international comity, as well as preaching it, requires a healthy dose of judicial self-restraint, a quality that appears to have been in conspicuously short supply in the District Court. Practicing international comity means

---

evidence in the record of improper political interference in the appellate process, which actually halved the award against Chevron – hardly the result one would expect from political puppets. It should be noted that *Bank Melli Iran v. Pahlavi*, 58 F.3d 1410 (9th Cir), cert. denied, 516 U.S 989 (1995) is not relevant to this litigation since it dealt, not with the Iranian justice system as a whole, but with the inability of the deposed Shah's sister to receive a fair hearing in an Iranian court.

understanding and accepting the *de novo* fact-finding role of first-instance appellate tribunals in a civil law system very different from our own. Practicing international comity means exercising restraint in asserting unjustified territorial power over indigenous peoples living the Amazonian rainforest. Practicing international comity means respecting differing approaches to corporate formalism, ranging from the extreme formalism occasionally applied in the United States, to viewing integrated corporate enterprises as a single economically-interrelated whole as in Ecuador. Practicing international comity means respect for rules of causation and joint responsibility in complex settings that reflect the power relationships actually existing between and among participants in a common enterprise. Practicing international comity means deferring to the first-hand knowledge of residents, inhabitants and local Ecuadorian judges concerning the scope and intensity of the environmental damage caused by Texaco's oil exploration and extraction in the Amazon basin of Ecuador. Finally, and most importantly, practicing international comity means recognizing that regimes operating procedural systems and espousing political beliefs very different from our own may also have honest and competent judges committed to the rule of law.

The District Court's wholesale denunciation of the Ecuadorian legal system on the basis of anecdotal evidence presented by political opponents of the current regime,[48] its insistence on exercising *in personam* jurisdiction in New York over innocent inhabitants of the Amazon basin of Ecuador, and its refusal to accept the validity of *de novo* fact-finding by the untainted Ecuadorian intermediate appeals court violates every one of these precepts. In fact, the decision below is a veritable hornbook on how to ignore international comity.

### E. The Ecuadorian Remediation Judgment Should be Payable to a Newly-Established Independent Entity.

Depending upon the outcome of Mr. Donziger's appeal in 14-826, it may be prudent to consider the creation of a vehicle, fully responsive to the plaintiffs, capable of administering the proceeds of the $8.65 billion Ecuadorian remediation judgment consistent with the decision of this court. *See* Burt Neuborne, *A Plague*

---

[48] The District Court's narrative of extra-constitutional events from 2006-2010 surrounding the popular adoption of a new constitution for Ecuador in 2008 proves nothing. D. Op. 610-13. If the existence of extra-constitutional procedures surrounding the overwhelmingly popular adoption of a new constitution by the people is sufficient to call action under the new constitution into question, the Anti-Federalists were right in 1787-88 to challenge the validity of the new United States Constitution because the Founders in Philadelphia had clearly exceeded the legal authority delegated to them by the Articles of Confederation Congress. Phillip B. Kurland and Ralph Lerner, Vol. I THE FOUNDERS' CONSTITUTION, chapter 6 (1987). The question is not what happened in Ecuador between 2004-2011. It is what happened during the appellate process in this case in 2012 and 2013.

*on Both Their Houses: A Modest Proposal for Ending the Ecuadorean Rainforest Wars*, 1 Stanford Journal of Complex Litigation 509, 512-17 (2013).

## II. THE DISTRICT COURT LACKED POWER TO ENJOIN THE LAGO AGRIO PLAINTIFFS FROM SEEKING TO ENFORCE THE $8.65 BILLION *DE NOVO* REMEDIATION JUDGMENT AGAINST CHEVRON.

At a minimum, the Lago Agrio plaintiffs are entitled to be freed from the District Court's prospective injunction that currently bars them from seeking to persuade a judge anywhere in the United States to enforce the Ecuadorian appellate courts' *de novo* remediation judgment.

### A. No Lago Agrio Plaintiff Maintains Sufficient Contacts with New York to Justify the Assertion of *In Personam* Jurisdiction.[49]

#### 1. General Jurisdiction

All *in personam* jurisdiction is divided into two parts - general jurisdiction and specific jurisdiction. *Daimler AG v Bauman,* 134 S. Ct. 746 (2014). The Supreme Court defines specific jurisdiction as the assertion of power to adjudicate disputes when the plaintiff's cause of action arises out of the same set of facts (the "liability facts") that also establish minimum contacts with the forum state (the

---

[49] The *Naranjo* court found it unnecessary to reach the District Court's *in personam* power over Hugo Camacho Naranjo and Javier Piaguaje Payaguaje. 667 F.3d at 246 n. 17.

"jurisdictional facts"). *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)
(hiring workers within state establishes specific jurisdiction to adjudicate dispute
over unemployment taxes on their compensation). Conversely, the Court defines
general jurisdiction as an effort to adjudicate a dispute when the "jurisdictional
facts" establishing minimum contacts with the forum state are legally distinct from
facts occurring in another forum giving rise to the cause of action in question.
*Daimler AG v Bauman*, *supra*; *Goodyear Dunlop Tires Operations, SA v. Brown,*
131 S. Ct. 2846 (2011).

The District Court apparently assumed, erroneously, that it was exercising
specific jurisdiction in New York over Appellants Hugo Camacho Naranjo and
Javier Piaguaje Payaguaje based solely on the New York-related activities of their
New York-based lawyer, Steven Donziger.[50] D. Op. 617-27.  In fact, the District
Court was seeking to impose general jurisdiction over the Lago Agrio plaintiffs.

---

[50] Before reaching the constitutionality under the Fifth Amendment Due Process clause of the
District Court's assertion of personal jurisdiction, general or specific, it is necessary in a
diversity case to identify a New York jurisdictional predicate.  The District Court argued that
CPLR §302(a)(1), which purports to assert jurisdiction in New York over a non-domiciliary who
"transacts any business in the state" in person or through an "agent," provided the state predicate.
D. Op. 617-627. However, where, as here, the non-domiciliary's sole contact with New York is
through an "agent" who is seeking to advance the non-domiciliary's legal claims that arise under,
and are pending under, the laws of another forum, the New York Court of Appeals has ruled that
§302(a)(1) is inapplicable. *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 881 N.E.2d 830, 851
N.Y.S.2d 387 (2007). See also *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013).

Chevron's alleged causes of action against both Mr. Donziger and the Lago Agrio plaintiffs arise out of Mr. Donziger's allegedly wrongful conduct in Ecuador, not New York. Where, as here, a defendant's forum-based contacts ( the "jurisdictional facts") are legally distinct from the extra-forum "liability facts" giving rise to the substantive legal claim, it is more accurate to characterize the assertion of such judicial power as an assertion of general jurisdiction. *Daimler AG v. Bauman*, *supra*; *Goodyear Dunlop Tires Operations*, *supra*; and *Helicopteros v. Hall*, 466 U.S. 408 (1984).

In *Helicopteros*, for example, American victims of a negligent helicopter accident in Peru sought to sue Peruvian defendants in a Texas court for negligence, invoking the negotiation of the charter contract, the manufacture of the helicopter, the training of the pilots, and the maintenance of defendant bank accounts as affiliating jurisdictional facts. The Supreme Court noted that since the liability facts had occurred entirely in Peru, plaintiffs were asserting general jurisdiction in Texas, and ordered the complaint dismissed. While *Helicoptores* may be distinguished as a lawyer's mistake because plaintiffs' counsel elected to invoke general jurisdiction, the Court made no independent effort to view the facts as an assertion of specific jurisdiction. Indeed, the *Helicoptores* majority rejected Justice

68

Brennan's effort to create a new category of specific jurisdiction based on a transactional relationship between forum activities and the extra-forum conduct establishing liability. 466 U.S. at 419-28 (Brennan, J., dissenting).

Any doubt about the point was removed by *Daimler AG*, where plaintiffs unsuccessfully sought to use the massive legally-distinct California contacts of Daimler's wholly-owned United States subsidiary to assert jurisdiction over the parent in connection with claims arising in Argentina. The Court correctly characterized the asserted jurisdiction as general. Here, Chevron seeks to use the New York-related actions of Donziger, an agent, as jurisdictional facts to assert *in personam* jurisdiction over the Appellants (Ecuadorian principals) in connection with an assertion of liability for Donziger's allegedly unlawful conduct in Ecuador. Under *Daimler AG* and *Helicopteros*, the resulting assertion of power must be treated as an effort to assert general jurisdiction.[51]

Once it is clear that general jurisdiction is being asserted over the Lago Agrios plaintiffs, one assumes that even the District Court would not argue that the

---

[51] In an effort to satisfy the "arising out of" requirement of §302(a)(1), the District Court argues that Mr. Donziger carried out activities in New York in aid of the Ecuadorian fraud. D. Op. 626-27. Whatever the effect of such arguments under New York law, it is clear that the mere transactional linkage between Mr. Donziger's New York activities and the filing of an allegedly improper expert's report and the alleged ghost-writing of the trial court opinion in Ecuador is insufficient under *Helicopteros* to turn the jurisdiction from general to specific.

47 Amazonian rainforest inhabitants are "at home" in New York. *See Daimler AG*

*v. Bauman, supra.* (defining the general jurisdiction concept of "at home').

## 2. Specific Jurisdiction

Even if one erroneously treats the assertion of jurisdiction below as specific,

none of the Lago Agrio plaintiffs have volitionally established sufficient minimum

contacts with New York to satisfy due process of law. The District Court

acknowledged that no personal contacts unrelated to the litigation existed between

the forty-seven residents of the Amazonian rainforest who are the Lago Agrio

plaintiffs, and New York. Instead, the District Court based its jurisdictional ruling

solely on the fact that the Lago Agrio plaintiffs had accepted Steven Donziger's

offer to represent them in an Ecuadorian provincial court in an effort to seek

remediation of Ecuadorian land. The District Court argued that Mr. Donziger's

extensive post-retainer activities in New York must be attributed to his principals

(the Lago Agrio plaintiffs) because Mr. Donziger's New York-related actions, like

fund-raising and publicity, were designed to advance the Ecuadorian litigation. D.

Op. 617-25. But the District Court ignored the need for personal volitional

affiliation with New York by the Ecuadorian clients. *J. McIntyre Machinery, Ltd.*

*v. Nicastro,* 131 S. Ct. 2780, 2785 (2011), quoting *Hanson v. Dencla,* 357 U.S.

235, 253 (1958). *See also Walden v. Fiore*, 134 S. Ct. 1115 (2014) (requiring volitional contacts).

Apart from hiring a New York lawyer, the only instances of volitional affiliation with New York by the Lago Agrio plaintiffs asserted by the District Court was participation as parties in actions in New York brought by their New York lawyer. D. Op. 627. Ironically, in *Aguinda*, this Court rebuffed the Ecuadorian victims in 2002 when they sought to litigate this case in New York. To claim now that such a rebuffed attempt to affiliate with New York constitutes volitionally availing themselves of the benefits of New York law gives new meaning to the concept of the "benefits of law." One more such benefit and we are undone.

Mr. Donziger's wholly autonomous decisions to engage in activities in New York and dozens of other jurisdictions world-wide in an effort to fund and publicize the Ecuadorian litigation do not render the Lago Agrio plaintiffs subject to *in personam* jurisdiction in every state and country in which the peripatetic Mr. Donziger performed. The District Court apparently believed, erroneously, that the mere existence of a formal agency relationship between Mr. Donziger (as nominal agent) and the Lago Agrio plaintiffs (as nominal principals), was sufficient to

71

attribute all New York-based acts of the agent to the principal for jurisdictional purposes. D. Op. 624. In order to attribute Mr. Donziger's peripatetic behavior in New York or elsewhere to his clients in the Ecuadorian Amazon, however, Chevron must make a clear showing that the Lago Agrio plaintiffs exercised a degree of personal control over where Mr. Donziger performed. The District Court acknowledged that the unsophisticated Ecuadorian indigenous clients "did not control case management or strategic minutiae." D. Op 625. The District Court insisted, nevertheless, that the Lago Agrio plaintiffs bore full legal responsibility, both substantively and for the purpose of specific jurisdiction, for Mr. Donziger's actions in New York and Ecuador because they did not "ask questions of their attorneys" D. Op. 625, n. 1731. What questions 47 unsophisticated inhabitants of the Ecuadorian rainforest were supposed to have asked Mr. Donziger are known only to the District Court.

It borders on the Kafkaesque to insist on treating indigenous peoples residing in the Ecuadorian rainforest as true "principals" who actually directed, controlled, and ratified their attorney/agents' activities all over the world when the attorneys owned a substantial equity stake in the litigation, and exercised complete control over its prosecution. In fact, the Lago Agrio plaintiffs had no more control

over where Mr. Donziger performed his antics than did the British manufacturer in *J. McIntyre* over where his United States distributor sent his goods, or the customs agent in *Walden v. Fiore* over where the target of his enforcement activity might reside. In none of cases does a putative defendant maintain a subjective, volitional affiliation with the forum jurisdiction sufficient to justify the imposition of *in personam* jurisdiction.

> **B. The Imposition of Rule 37 Sanctions Designed to Bootstrap the District Court into *In Personam* Power Over Hugo Camacho Naranjo and Javier Piaguaje Payaguaje Was an Abuse of Power.**

The District Court punished two Lago Agrio plaintiffs, Hugo Camacho Naranjo and Javier Piaguaje Payaguaje (who appeared specially below in order to challenge the court's *in personam* jurisdiction), for their Ecuadorian lawyers' failure to respond to Chevron's discovery demands by asserting *in personam* jurisdiction over the two Ecuadorians as a Rule 37 FRCP sanction. D. Op. 617.[52] Such a punitive use of Rule 37 in an effort to shore up a deeply-flawed assertion of *in personam* jurisdiction was not merely an abuse of discretion; it was a gross abuse of the District Court's power.

---

[52] The District Court's decision imposing Rule 37 sanctions is reproduced at (A 651-757).

It is true, of course, that a District Court, in an appropriate case, may, in response to the culpable refusal of a defendant to respond to jurisdictional discovery, invoke Rule 37 to create an evidentiary presumption that unknown facts exist establishing minimum contacts consistent with due process. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).  In *Bauxites de Guinee*, a consortium of major European insurance companies who were sued under insurance contracts totaling $100 million dollars refused to comply with jurisdictional discovery aimed at establishing the existence of minimum contacts with New York as a major financial center. The Supreme Court upheld the District Court's power to treat the insurance companies' carefully considered decision to refuse to respond to discovery as presumptive evidence of a cover-up, and authorized the Court to create a spoliation presumption that, but for the cover-up, evidence of significant minimum contacts with New York would have been revealed. In order to fall within the carefully limited rationale of *Bauxites de Guinee*, a District Court must: (1) be faced with a culpable, considered refusal to respond to jurisdictional discovery; and (2) must have a plausible basis for suspecting that the failure to respond to discovery is a part of a cover-up designed

to hide important (and otherwise unavailable) jurisdictional facts from the court's notice. Neither precondition is present in this case.

While an extensive body of case law, summarized in 8 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE §§ 2283-84, discusses the rules governing the imposition of Rule 37 sanctions, reported cases dealing with the imposition of *in personam* jurisdiction under Rule 37 for failure to comply with jurisdictional discovery are quite rare. Courts recognize that, unlike the ordinary Rule 37 sanction that deals with cases concededly within their territorial power, the impact of a jurisdictional sanction under Rule 37 may result in the extra-territorial assertion of judicial power. Accordingly, such a potentially extra-territorial sanction is issued only when the target is: (a) personally culpable; (b) in a position to respond to the discovery orders personally; (c) plausibly believed to be hiding significant information; and (d) no other means of obtaining the information exist. See *Satcorp Intern. Group v. China National Import & Export Co.,* 917 F. Supp. 271 (S.D.N.Y. 1996) (per Kaplan, J.); *Volkart Bros. v. M/V Palm Trader*, 130 F.R.D. 285 (S.D.N.Y. 1990).

No plausible basis exists to believe that a trove of hidden facts exists linking any of the Lago Agrio plaintiffs to New York. No one, not even Chevron, believes

75

that any of the 47 inhabitants of the Amazon basin of Ecuador have had significant personal contacts with New York apart from their relationship to this litigation. No one, not even Chevron, believes that any of the Lago Agrio plaintiffs have been freelancing, establishing hidden significant personal contacts with New York over and above whatever contacts, if any, their lawyers may have overseen in connection with this litigation. In short, nothing in the record or in the circumstances of this litigation could give rise to a plausible belief that, unlike the behavior of the major insurance companies in *Bauxites de Guinee*, or the Chinese parent corporation in *Satcorp*, the failure of unsophisticated residents of the Amazon rainforest to respond to jurisdictional discovery aimed at their lawyers was part of a calculated plan by the victims themselves to shield otherwise unknown facts from the court's knowledge. On this record, there simply is no basis for a Rule 37 spoliation presumption.

Second, neither Hugo Camacho Naranjo, nor Javier Piaguaje Payaguaje have engaged in culpable behavior in failing to respond to discovery sanctions. Unlike the sophisticated insurance companies in *Bauxites de Guinee* that were calling the shots for their lawyers, the Lago Agrio plaintiffs were not in a position to direct Mr. Donziger, much less Ecuadorian counsel, to comply with discovery demands of which they were

76

ignorant, and the significance of which they could not understand. The lack of culpability is reinforced by the District Court's recognition that Ecuadorian law forbade the lawyers from compliance. How can one possibly expect an unsophisticated inhabitant of the Amazon basin of Ecuador to force his Ecuadorian lawyer to comply with a discovery request that violates Ecuadorian law?

Finally, Rule 37 jurisdictional sanctions are limited to settings where no other method exists to obtain the information at issue. In this case, any lawyer-fostered contact by a Lago Agrio plaintiff with New York was already fully discoverable from Mr. Donziger, or from a host of alternative sources. There simply was no need to place the Lago Agrio plaintiffs in a position where the District Court could invoke Rule 37 strategically and punitively to bootstrap itself into *in personam* jurisdiction over two Ecuadorean appellants who made the mistake of appearing specially in the District Court to contest its *in personam* jurisdiction over them.[53]

---

[53] Appellants note that Circuit precedent governing waiver of jurisdictional objections in no way supports the District Court's abusive use of Rule 37. *City of New York v. Mickalis Pawn Shop*, 645 F.3d 114 (2d Cir. 2011) (strategic default on merits after unsuccessfully contesting *in personam* jurisdiction in District Court waives right to assert jurisdictional defense on appeal); *Hamilton v. Atlas Turnover, Inc.,* 197 F.3d 58 (2d Cir. 1999) (failure to contest jurisdiction for four years in trial court constitutes a waiver of issue). No suggestion of a volitional waiver exists in this case.

### C. The District Court Erroneous Refusal to Permit
### The Intervention of Members of the Waorani People
### As "Persons Required to Be Joined" If "Feasible"
### Rendered the Proceedings Below Void Under Rule 19 FRCP.

Three sets of parties were "persons who should be joined" below within the meaning of Rule 19 FRCP. First, at least some of the 47 Lago Agrio plaintiffs, who share an intense interest in enforcing the Ecuadorian judgment designed to remediate their habitat, clearly fall within the traditional category of indispensable party. *See Shields v. Barrow*, 58 U.S. 130 (1854) (all joint endorsers are indispensable parties to any proceeding capable of altering pre-existing legal rules affecting the endorsement). The absence of *in personam* jurisdiction over the Lago Agrio plaintiffs would, therefore, require dismissal of the proceedings below under Rule 19(b).

While a Rule 19(b) dismissal may be avoided if the party before the court can adequately represent the interests of the jurisdictionally-barred defendants (*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 131-35 (2d Cir. 2013), given Chevron's full scale assault on Mr. Donziger's integrity, it is impossible to view Mr. Donziger as an adequate representative of the innocent Lago Agrio plaintffs.[54]

---

[54] As in *Marvel Characters*, the District Court did not consider the Rule 19(b) issue because Judge Kaplan erroneously believed that *in personam* jurisdiction existed over at least two of the

78

For example, it may be in the best interests of the Lago Agrio plaintiffs to leave Mr. Donziger to his fate, and to chart an independent course in seeking to enforce the untainted intermediate appeals court remediation judgment without the participation of Mr. Donziger, financially or otherwise. It is impossible to expect Mr. Donziger to argue affirmatively that he should be cut out of the case in order to advance the interests of the Lago Agrio plaintiffs. Indeed, no such argument was made below.

Second, non-party indigenous peoples residing in the affected areas whose cultural patrimony and human identity are bound up with remediating their homeland, such as the members of the Waorani people, constitute a second category of Rule 19 parties whose interest in enforcing the Ecuadorian remediation judgment renders them indispensable. Indigenous peoples, like the Waorani intervenors, have never maintained an agency relationship with Mr. Donziger and fall, therefore, outside the District Court's theory of agency liability. Accordingly, the Waorani's intervenors' ability to participate the District Court proceedings as parties capable of defending and enforcing the Ecuadorian remediation judgment free from Judge Kaplan's common law theories is crucial to the protection of their

---

Lago Agrio plaintiffs. Once again, as in *Marvel Characters*, since the indispensable nature of at least some of the Lago Agrio plaintiffs is undeniable, no need for a remand exists.

rights. *Provident Tradesmen Bank & Trust Co. v. Patterson,* 390 U.S. 102 (1968) (discussing method of assessing whether absent party is indispensable, or merely necessary).

Unlike the Lago Agrio plaintiffs, moreover, the Waorani intervenors actually sought to participate in the District Court proceedings, only to be rebuffed by the District Court. (A. 514-23) (denying motion to intervene).[55]  The most egregious violation of Rule 19 below was the District Court's clearly erroneous order, dated January 14, 2013, denying the Rule 24 FRCP motion to intervene filed by Professor Judith Kimerling on behalf of identified members of the Waorani tribe. The District Judge's refusal to permit the participation of independent and unconflicted lawyers for the Waorani intervenors rendered his subsequent orders void under Rule 19(a) for failure to join a "required" party when joinder was clearly "feasible."[56]

---

[55] The fact that trial counsel for the appellants in 14-832 joined trial counsel for Mr. Donziger and Chevron in opposing intervention below demonstrate the importance of independent and unconflicted representation for the victims on appeal. Appellate counsel takes no position on the merits of the intervenors' arguments, but agrees that they had a Rule 19(a) right to be heard.

[56] Judge Sack, writing in *Marvel Characters,* noted the existence of a Circuit split on the appropriate standard of review in Rule 19(b) cases. 746 F.3d at 131, n.3. No such concern exists when, as with the Waorani, the failure to join occurs under Rule 19(a). Where, as here, the

The District Court's insistence that Steven Donziger was capable of adequately representing the interests of the Waorani people was untenable.  Given the pending allegations against him, Mr. Donziger would not be permitted to serve as an adequate class representative for the innocent Ecuadorian victims because of clear conflicts of interest, much less as an adequate representative for an absent Rule 19 party. *Amchem v. Windsor,* 521 U.S. 591 (1997); *Ortiz v. Fibreboard*, 527 U.S. 815 (1999); *Dow Chemical Co v. Stephenson*, 539 U.S. 111 (2003), affirming by equally divided court, *Stephenson v. Dow Chemical Co.,* 273 F.3d 249 (2d Cir. 2001) (finding inadequacy of representation). See Linda S. Mullenix, *Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes,* 57 Vand. L. Rev. 1687 (2004).

Unfortunately, the personally beleaguered Mr. Donziger can barely represent himself, much less effectively assert the interests of unrelated parties with a life-or-death interest in enforcing the remediation judgment, and an interest removing Mr. Donziger himself, if necessary, as an obstacle to the enforcement of the remediation judgment. Indeed, the overwhelming need for an unconflicted voice

---

joinder of an indispensable party was "feasible," but the District Court nevertheless improperly blocked the joinder, no reason exists to defer to the District Court's discretion.

for the innocent victims other than Mr. Donziger's is the principal reason appellate counsel agreed to represent the Lago Agrio plaintiffs in connection with this appeal.

Finally, the District Court's insistence that the intervention motion was untimely is belied by the nine month gap between denial of the motion and the ultimate commencement of trial.

Third, given Chevron's wholesale assault on the Ecuadorian judiciary, the Republic of Ecuador is a Rule 19(b) party, as well. The District Court's finding that Ecuador's courts are incapable of applying the rule of law threatens to make it impossible to secure the international enforcement of any and all Ecuadorian judgments throughout the world. There could not be a more direct assault on Ecuador's sovereignty, rendering it necessary, at a minimum, to seek to join Ecuador under Rule 19(b). As the *Naranjo* court noted (667 F.3d at 335, n.4), Judge Rakoff had ordered the dismissal of the initial *Aguinda* litigation for failure to join the Republic of Ecuador as an indispensable party. *Aguinda v. Texaco, Inc.*, 142 F. Supp.2d 534, 627 (SDNY 2001). It was no less indispensable in this proceeding. Thus, under *Republic of the Philippines v. Pimentel*, 553 U.S. 851

82

(2008), the District Court's failure to have even attempted to join the Republic of

Ecuador requires vacation of the proceedings below under Rule 19(b) FRCP. [57]

### D. Under the Law of This Case, the District Court Lacked Authority to Issue a Nationwide Pre-Enforcement Injunction Purporting to Block Efforts by Inhabitants of the Amazon Basin of Ecuador to Enforce a Foreign Money Judgment.

The District Court based its injunction against Hugo Camacho Naranjo and

Javier Piaguaje Payaguaje solely on an alleged common law power to enjoin the

enforcement of a fraudulently obtained foreign money judgment. D. Op. 555-66.

Under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), however, diversity judges

must apply the law of the state in which they sit. Accordingly, it is the New York

Recognition Act (§§ 5301-09, NY CPLR), not the statutorily superseded New

York common law that governs the power of a federal diversity judge sitting in

New York to issue prospective injunctions against efforts to enforce foreign money

judgments.[58]  In *Guaranty Trust v. York*, 326 U.S. 99 (1945), the Supreme Court

---

[57] There was no duty on the part of the Republic of Ecuador to seek to intervene below. It was unquestionably the duty of Chevron or the District Court *sua sponte* to seek to join Ecuador as an indispensable party. *Martin v. Wilks,* 490 U.S. 755 (1989).

[58] Even under *Swift v. Tyson*, 41 (6 Pet.) U.S, 166, 170 (1842), a diversity judge was obliged to apply state statutory law under the Rules of Decision Act. ("It is observable that the courts of New York do not found their decisions upon this point upon any local statute…").

recognized that passage by the New York legislature of a statute of limitations superseded the pre-existing common law defense of *laches*. The point was recently reinforced in *Petrella v. Metro-Goldwyn Mayer*, 134 S. Ct. 1962 (2014), when the Supreme Court ruled that the enactment of a statutory three-year limitations period for asserting a claim for copyright infringement superseded the pre-existing common law defense of *laches* despite a delay of 40 years in asserting a claim.

It is equally true that the passage of the New York Recognition Act, construed in *Naranjo* as barring the issuance of prospective injunctive relief against the enforcement of a foreign money judgment, superseded any pre-existing common law rule authorizing the issuance of such an injunction. Otherwise, the common law would reduce the New York statute to a nullity. Thus, under *Guaranty Trust, supra,* and *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), the law of this case holds that in the absence of an effort by the judgment creditor to enforce a foreign money judgment in New York, or, in the absence of some other statute granting authority to issue pre-enforcement injunctive relief, a federal diversity judge sitting in New York is powerless to issue prospective injunctive relief affirmatively barring the enforcement of foreign money judgment throughout the United States– period.  As in *Naranjo* and *Pennzoil*, judges –state

84

and federal – sitting in New York's sister-states are entitled to make up their own minds about whether the Ecuadorian *de novo* remediation judgment issued by three randomly selected intermediate appeals judges of the Provincial Court of Sucumbíos at issue herein is worthy of enforcement free from the superintendence of federal judges sitting in the Southern District of New York.

Accordingly, whatever the District Court's power to issue injunctive relief designed to prevent Mr. Donziger from profiting financially from his alleged wrongdoing, no power existed in the District Court to enjoin either Hugo Camacho Naranjo or Javier Piaguaje Payaguaje from seeking to enforce the judgment of the *Sala Única* of the Provincial Court of Justice of Sucumbíos throughout the United States in an effort to begin the long-delayed process of remediating their habitat and their culture.

## CONCLUSION

For the above-stated reasons, appellants Hugo Camacho Naranjo and Javier Piaguaje Payaguaje respectfully urge this court to vacate the injunction issued against them by the District Court.

Dated:  July 1, 2014
              New York, New York

                              Respectfully submitted,

                              <u>/s/ Burt Neuborne</u>
                              Burt Neuborne
                              *Counsel of Record for*
                              *Hugo Camacho Naranjo, and*
                              *Javier Piaguaje Payaguaje*
                              40 Washington Square South
                              New York, New York 10012
                              (212) 998-6172
                              burt.neuborne@nyu.edu

## CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)(7(C) F. R. App. Proc.

1. This brief complies with the type-volume limitation of F. R.

   App. Proc. 32(a)(7)(B). The brief contains 20,174 words,

   excluding the material described in F. R. App. Proc.

   32(a)(7)(B)(iii). Leave to file an oversize brief of not

   more than 21,000 words was granted by the Court on

   June 26, 2014.

2. This brief complies with the typeface and style requirements

   of F. R. App. Proc. 32(a)(5) and (6). It has been prepared in

   a proportionally spaced typeface using *Microsoft Word 2002*

   in Times New Roman 14 point type.

   Dated: July 1, 2014

                                        /s/ Burt Neuborne
                                        Burt Neuborne