# No. 14-826(L)

**No. 14-832(CON)**

## In the United States Court of Appeals for the Second Circuit

———————————————

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE, STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants*,

(*caption continues on inside cover*)

———————————————

On Appeal from the United States District Court for the
Southern District of New York (The Honorable Lewis A. Kaplan)

———————————————————————————

### BRIEF FOR DEFENDANTS-APPELLANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN DONZIGER, AND DONZIGER & ASSOCIATES PLLC

———————————————————————————

JUSTIN MARCEAU
JOHN CAMPBELL
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000

DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
Gupta Beck PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Defendants-Appellants Steven Donziger,
The Law Offices of Steven Donziger, and Donziger & Associates PLLC*

July 2, 2014

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA
AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR,
CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA
AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA,
LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE
GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA,
FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA
GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ,
BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR
TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA
CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES
CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES
BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA
MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL
CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE
PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA
PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ
PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN
PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE,
ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI
BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI,
AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI,
COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI,
MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE
KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA
HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA
HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA,
CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA
NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE
LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA,
WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................vii

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ................................................. 3

STATEMENT OF THE ISSUES ...................................................... 4

STATEMENT ................................................................................... 5

    A.    For two decades, Ecuadorian rainforest communities seek—and ultimately win—a judgment holding Chevron responsible for dumping billions of gallons of toxic waste into the Amazon. ..........................................................5

        1.    Chevron pollutes the Ecuadorian Amazon (1970s & 1980s) ...............................................................5

        2.    Ecuadorians bring an environmental case against Chevron in New York, and Chevron convinces the court to dismiss the case by promising to satisfy any Ecuadorian judgment against it (1993-2002)....................8

        3.    Disregarding its promises to this Court, Chevron repeatedly tries to thwart the Ecuadorian case (2003-2010) ....................................................10

        4.    Hundreds of site inspections and expert reports—including those from Chevron's own experts—confirm Chevron violated the law (2006-10)....................19

        5.    Chevron shifts its strategy to collateral attacks outside Ecuador and adopts the "demonize Donziger" playbook (2007-2011)......................................20

        6.    Chevron obtains unprecedented discovery in U.S. Courts................................................................23

        7.    Chevron uses the vast "universe" of documents it obtained in discovery to carry out its "demonize Donziger" strategy .......................................29

        8.    The Ecuadorian court enters a preliminary judgment against Chevron (February 2011)....................33

9.    The Ecuadorian court clarifies its judgment (March 2011).................................................................36

10.   Chevron declines to challenge the preliminary judgment under Ecuador's Collusion Prosecution Act........................................................................36

11.   An Ecuadorian three-judge court reviews the case de novo and enters a substitute judgment against Chevron (2012) ...........................................37

12.   The Ecuadorian Supreme Court grants "cassation" review, affirms liability, and reduces damages (2013) ......38

B.   Chevron brings this action as yet another collateral, preemptive attack on enforcement of the Ecuadorian judgment. .........................................................40

1.    Chevron files this action..................................40

2.    The district court grants a temporary restraining order.................................................................42

3.    The district court issues a worldwide injunction. ............44

4.    This Court, in *Chevron v. Naranjo*, promptly reverses the injunction and orders dismissal of the severed ninth claim. ...................................................45

5.    Chevron immediately attempts to evade *Naranjo*.............47

6.    The district court refuses to allow defendants to drop their collateral-estoppel defenses..............................48

7.    The court allows Chevron to drop "sham litigation" claim.................................................................48

8.    Chevron forces Donziger to proceed *pro se* and drops its damages claim on the eve of trial to avoid a jury.........49

C.   After a seven-week bench trial, the district court again issues a judgment preemptively nullifying the Ecuadorian judgment. .........................................................50

        1.     The court holds a seven-week bench trial ........................50

           a.    Chevron's allegations of impropriety regarding the judgment ............................................................... 52

           b.    Chevron's allegations of fraud regarding the Cabrera Report................................................... 61

           c.    Chevron's allegation that the Ecuadorian judiciary is corrupt. ...................................................... 64

        2.     The court issues its decision.............................................65

STANDARD OF REVIEW.............................................................. 67

SUMMARY OF ARGUMENT ........................................................ 67

ARGUMENT ................................................................................... 69

   I.   Because Chevron lacks standing, the district court lacked jurisdiction to issue its opinion and judgment. ........................69

        A.   Chevron cannot show that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court. ...................................................72

           1.     The appellate court's substitute judgment—the product of a de novo review of the record—breaks any causal link between alleged trial-level improprieties and Chevron's injuries................................73

           2.     The district court's conclusion about the standard of review contradicts Ecuador's highest court on a question of Ecuadorian appellate procedure. ...................74

        B.   Chevron failed to demonstrate any concrete injuries that could be redressed by the relief sought. ......................................79

        C.   Because the district court lacked jurisdiction to hear this case, its findings—particularly findings related to professional misconduct—should be vacated. ...........................81

  II.  Chevron's collateral attack on the Ecuadorian judgment violates bedrock international-comity principles and is authorized by neither state nor federal law. ...............................................................83

A.    The district court's "non-statutory" analysis provides no legitimate basis to circumvent *Naranjo*. ..........................................86

B.    The federal RICO statute does not provide a vehicle for collaterally attacking a judgment—let alone the judgment of a foreign sovereign's court system. ..........................................93

III.   Chevron's wholesale attack on the integrity and competence of the Ecuadorian judiciary is foreclosed by judicial estoppel, offensive to international comity, and contradicted by Chevron's own evidence. ..................................................................................98

A.    Chevron's arguments that Ecuador's judiciary is systemically unfair are estopped by its directly contrary stance during the *Aguinda* litigation. ..............................99

B.    Chevron's promise to submit to Ecuadorian jurisdiction further estops it from arguing that it should not be subject to the Ecuadorian judgment, and the defenses it reserved do not apply here. ..................................................101

C.    Chevron's own evidence suggests that Ecuador's situation has improved since the time Chevron characterized its judiciary as adequate and promised to submit to its jurisdiction. ....................................................................104

IV.   Even setting aside the lack of jurisdiction or legal authority, Chevron has no cause of action under RICO and RICO does not authorize any of the relief granted by the district court. ......................109

A.    The relief granted by the district court pushes RICO's already strained language far beyond the breaking point.........109

B.    The district court did not find that Chevron satisfied RICO's statutory prerequisites for a private right of action. ..................................................................................111

C.    The absence of any authorization for equitable relief in RICO's civil-remedies provision, far from justifying a judgment for Chevron, is an independent reason for rejecting Chevron's claims. ....................................................115

CONCLUSION ................................................................................ 118

# TABLE OF AUTHORITIES

## Cases

*Aguinda v. Texaco*, 945 F. Supp. 626 (S.D.N.Y. 1996) ...................................................8

*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001)............... 9, 10, 76

*Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002)...........................................passim

*Anza v. Ideal Steel Corporation*, 547 U.S. 451 (2006) ...................................................113

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001) ..............................................................................................98

*Banco Do Brasil v. Madison S. S. Corp.*, 307 N.Y.S.2d 341 (N.Y. Sup. Ct. 1970)...............................................................................................................89

*Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995).........................................108

*Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469 (2d Cir. 2006) ..........................67

*Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2010) ................................ 100, 108

*Chevron Corp. v. Donziger*, 768 F.Supp.2d 581 (S.D.N.Y. 2011) .......................... 44, 45

*Chevron v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) ..................................................passim

*CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 792 N.E.2d 155, 159 (N.Y. 2003) ...............................................................................................88

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013)...................................................80

*Crouse v. McVickar*, 100 N.E. 697 (N.Y. 1912).............................................................89

*Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238 (10th Cir. 2005)................................................................................................................82

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ....................................................70

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) .......................................112

*Diorinou v. Mezitis*, 237 F.3d 133 (2d Cir. 2001)........................................................75

*Earle v. McVeigh*, 91 U.S. 503 (1875) .........................................................................81

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998)..............................95

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ......................................................... 75, 87

*Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920 (3d Cir.1984) ...........................93

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) .......... 112, 113

*Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59 (D.C. Cir. 1988)............................97

*Grossman v. Johnson*, 674 F.2d 115 (1st Cir. 1982) ................................................97

*Guaranty Trust v. York*, 326 U.S. 99 (1945)..................................................................87

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum*, 512 F.3d 742 (5th Cir. 2008)............................................................................................. 95, 96

*Hendrick v. H.E. Avent*, 891 F.2d 583 (5th Cir. 1990)..................................................97

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ...............................113

*Homola v. McNamara*, 59 F.3d 647 (7th Cir. 1995) .......................................................94

*Hubbard v. Haley*, 262 F.3d 1194 (11th Cir. 2001) .......................................................97

*In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010) ...................26

*In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010) ............. 26, 27

*In re Application of Chevron Corp.*, No. 3:10-cv-00686, Dkt. 108, at 3 (M.D. Tenn. Sept. 21, 2010) ...........................................................................91

*In re Application of the Republic of Ecuador re Diego Borja*, No. C 10-00112 (N.D. Cal.) ...................................................................................................16

*In re Chevron Corp.*, 633 F.3d 153 (3d Cir. 2011)...........................................................24

*In re Goldstein*, 430 F.3d 106 (2d Cir. 2005)................................................................82

*In re Robinson*, 151 A.D. 589, 136 N.Y.S. 548 (1st Dept.1912)................................83

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012)..................................67

*Jota v. Texaco, Inc.*, 157 F.3d 153, 155, 159-60 (2d Cir. 1998)...................................9

*Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506 (7th Cir. 1996) ................................94

*Keach v. Cnty. of Schenectady*, 593 F.3d 218 (2d Cir. 2010) ...........................82

*Khallad v. Blanc,* 947 N.Y.S.2d 859 (N.Y. App. Div. 2012)..........................89

*Knight v. Mooring Capital Fund, LLC,* 749 F.3d 1180 (10th Cir. 2014) .......................93

*Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir. 1964) ................................90

*Leon v. Million Air, Inc.*, 251 F.3d 1305 (11th Cir. 2011) ...........................109

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)................................. 72, 78

*Maharaj v. Bankamerica Corp.*, 128 F.3d 94 (2d Cir. 1997).........................100

*Manez v. Bridgestone Firestone N. Am Tire*, 533 F.3d 578 (7th Cir. 2008) ....................91

*McDonald v. McDonald*, 239 N.Y.S. 533 (N.Y. 1930)..................................89

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d. Cir. 2008) ..................................112

*Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003).........................112

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804).................................97

*National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001) ...................117

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........................................100

*Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783 (9th Cir. 1992) ...........................112

*Overseas Dev. Bank in Liquidation v. Nothmann*, 480 N.Y.S.2d 735 (N.Y. App. Div. 1984)..........................................................88

*Pinkley v. City of Frederick*, 191 F.3d 394 (4th Cir. 1999) ...........................................92

*Polur v. Raffe*, 912 F.2d 52 (2d Cir. 1990)..................................................94

*Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) ...........................116

*Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011)......................passim

*Republic of Ecuador v. ChevronTexaco Corp.*, 269 F. App'x 124 (2d Cir. 2008)..............................................................21

*Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452 (S.D.N.Y. 2007)............................................................21

*Republic of Ecuador v. TestAmerica Labs. Inc.*, No. 4:11-mc-00088 (N.D. Fla.) ............................................................................................18

*Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168 (1st Cir. 1995).................................93

*Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107 (D. Del. 1983) ..................................................................92

*Schultz v. Boy Scouts of America, Inc.*, 480 N.E.2d 679 (N.Y. 1985)............................91

*Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ........................... 114, 116, 117

*Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1 (1st Cir. 2005) ..........................82

*Smith v. Bayer*, 131 S. Ct. 2368 (2011) .......................................................................90

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ..............................................110

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008)....................114

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008)......................67

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ..............................40

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ................................81

*Trane Co. v. O'Connor Sec.*, 718 F.2d 26 (2d Cir. 1983) ................................... 116, 117

*Trebilcox v. McAlpine*, 17 N.Y.S. 221 (N.Y. App. Div. 1891) .....................................89

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945).............................98

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005) ....................................67

*Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214 (E.D. Wis. 1994).....................................91

*Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977) ................................................90

*Vinokur v. Penny Lane Owners Corp.*, 703 N.Y.S.2d 35 (N.Y. App. Div. 2000)...........................................................................................89

*Yahoo! v. La Ligue Contre Le Racisme*, 433 F.3d 1199 (9th Cir. 2006)..........................90

*Zimmermann, Inc. v. Challoner*, 423 U.S. 3 (1975)......................................................92

## Statutes

18 U.S.C. § 1962 .................................................................41

18 U.S.C. § 1964 ......................................... 111, 114, 115, 117

28 U.S.C. § 1291 ..................................................................4

28 U.S.C. § 1782 ........................................................ 19, 23

28 U.S.C. § 2283 ................................................................90

28 U.S.C. §§ 1331 .................................................................3

28 U.S.C. §§ 1332 .................................................................3

9 U.S.C. § 201 ...................................................................96

*Código de Procedimiento Civil*, art. 288 .......................................14

*Código de Procedimiento Civil*, art. 838 .......................................73

N.Y. C.P.L.R. 5303 (McKinney) .................................................88

N.Y. C.P.L.R. 5304(b)(6) .......................................................96

## Rules

Fed R. App. P. 4(a) ..............................................................3

Fed. R. Civ. P. 39(a)(2) .........................................................50

Fed. R. Civ. P. 44.1 .............................................................75

Fed. R. Civ. P. 60, 1946 Advisory Comm. Notes...................................97

Fed. R. Civ. P. 61 ..............................................................71

Federal Rule of Civil Procedure 15(b) ..........................................92

## Treatises

19 Stacy L. Davis & Lisa A. Zakolski, *Federal Procedure, Lawyer's Ed.*, 47:117 (2014)...................................................................90

Wright & Miller, *Fed. Prac. & Proc.* (3d ed. 2014)......................... 75, 90

## Constitutional Provisions

U.S. Const. amend. VII ........................................................................50

## Articles

Christopher Helman, *Chevron's Expensive Problems*, Forbes, Mar. 4, 2013
    issue, *available at* http://onforb.es/1fFj3nk ........................................25

Clifford Krauss, *Revelation Undermines Chevron Case in Ecuador*, N.Y.
    Times, Oct. 30, 2009, *available at* http://nyti.ms/T9R1Ne ................16

Doug M. Keller, *Interpreting Foreign Law Through an Erie Lens*, 40 Tex.
    Int'l L. J. 157 (2004) ........................................................................75

John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. Chi. L.
    Rev. 823 (1985) ................................................................................73

John Henry Merryman & Rogelio Pérez-Perdomo, *The Civil Law
    Tradition: An Introduction to the Legal Systems of Western Europe and Latin
    America* 121 (3d ed. 2007)................................................................73

Jose Delreal, *Michele Bachmann: Obama rewrote Constitution*, Politico (Dec.
    3, 2013)..........................................................................................105

José Rafael Bustamente *"Ecuador" in Civil Appeal Procedures Worldwide*
    262 (1992)........................................................................................74

Judith Kimerling, *Amazon Crude* 33 (1991).................................................5

Judith Kimerling, *Disregarding Environmental Law: Petroleum Development in
    Protected Natural Areas and Indigenous Homelands in the Ecuadorian Amazon*,
    14 Hasting Int'l & Comp. L. Rev. 849, 853 (1991). .............................5

Lee Coppola & Nicolas DeMarco, *Civil RICO: How Ambiguity Allowed
    the Racketeer Influenced and Corrupt Organizations Act to Expand Beyond Its
    Intended Purpose*, 38 New Eng. J. on Crim. & Civ. Confinement 241
    (2012)..............................................................................................110

Mary Cuddehe, *A Spy in the Jungle*, THE ATLANTIC, Aug. 2, 2010,
    *available at* http://bit.ly/1pUKToW ..................................................31

Patrick Radden Keefe, *Reversal of Fortune*, THE NEW YORKER, Jan. 9,
    2012, *available at* http://nyr.kr/1wuTEbd..................................8, 21

Ralph Nader, *The Rule of Law or the Rule of Men?*, The Huffington Post (Feb. 5, 2013)..................................................................................................105

Simon Romero & Clifford Krauss, *Chevron Offers Evidence Of Bribery Scheme In Ecuador Lawsuit*, N.Y. Times, Sept. 1, 2009, *available at* http://nyti.ms/1oJV15Q.....................................................................................16

Ted Folkman, *Chevron, Lobbying, and Lago Agrio*, Letters Blogatory (Oct. 4, 2013)..................................................................................................107

William Finnegan, *The Secret Keeper*, THE NEW YORKER, Oct. 19, 2009, *available at* http://nyr.kr/UZ94Hf ....................................................................32

## INTRODUCTION

For the second time, the district court has granted Chevron an extraordinary injunction. It bars collection anywhere on the globe of an Ecuadorian court's judgment in favor of Ecuadorian citizens, based on Ecuadorian law, arising from pollution of the Ecuadorian rainforest. Last time, this Court warned the district court not to sit as a "transnational arbiter" and "dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." *Chevron v. Naranjo*, 667 F.3d 232, 242 (2d Cir. 2012). This time, Chevron circumvented that warning by painting the rainforest communities' two-decade-long quest for justice as a RICO conspiracy.

Drawing on its bottomless war chest, Chevron has shifted the focus from its own wrongdoing in the Amazon to trumped-up allegations of corruption and misconduct against the Ecuadorian trial judge, advocates for the rainforest communities, and every branch of Ecuador's government. In pursuing this effort, Chevron has left no stone unturned, amassed staggering discovery—hundreds of hours of raw footage from a documentary filmmaker, two decades' worth of litigation files, and even the personal diary of the American lawyer, Steven Donziger, at whom Chevron takes principal aim. Chevron's strategy, in its own words: "demonize Donziger."

1

The scale of Chevron's efforts to avoid compensating its victims are breathtaking. But nobody should lose sight of the one thing that Chevron has chosen *not* to litigate: the fact that Chevron dumped billions of gallons of toxic waste into a region roughly the size of Rhode Island. Instead, Chevron has sought to reduce this long-running controversy to allegations that an expert report was prepared improperly and that an Ecuadorian trial judge was influenced inappropriately. As to the first, Ecuador's Supreme Court found that Chevron could point to no law or procedure that had been violated. As to the second, Chevron's case rested on a paid witness who admitted to making false statements to sweeten his deal with Chevron— a deal that has netted him well over a million dollars in benefits. If anyone here was guilty of bribery, it wasn't Steven Donziger.

But the bigger problem with Chevron's alleged trial-level improprieties is that they have nothing to do with the Ecuadorian judgment that Chevron is attacking. A three-judge appellate court in Ecuador, consistent with the nation's civil-law system, conducted a de novo review of the full record—the equivalent of a retrial—and produced a substitute judgment. Chevron is akin to a criminal defendant who has been given a retrial and has been convicted again but still complains of alleged irregularities in the first trial.

Aware of this fatal causation problem, the district court had a backup argument. Just as it did the last time, the court condemned the entire Ecuadorian

judiciary, top to bottom, as incapable of producing decisions worthy of respect. And it did so based on the testimony of an avowed political opponent of Ecuador's current president. The district court's unseemly display of American judicial imperialism is bad enough, and has already caused diplomatic friction. But it is intolerable in light of the history of this litigation: The only reason the case was tried in Ecuador in the first place is that Chevron got what it asked for.

For nearly a decade, Chevron showered praise on Ecuador's judiciary, extolling its virtues to persuade this Court to move the case from New York to Ecuador. That effort succeeded, but only after Chevron promised to satisfy any Ecuadorian judgment subject only to the right to raise a defense in future enforcement proceedings. That promise has to mean something. Because it was "enforceable against Chevron in . . . any future proceedings between the parties," *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011), it should preclude Chevron from once again changing the forum and stringing its victims along across decades, courtrooms, and continents.

## JURISDICTIONAL STATEMENT

The district court asserted subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1332. The appellants in No. 18-826 timely appealed on April 1, 2014, from the district court's opinion and judgment of March 4, 2014. Fed R. App. P. 4(a). As explained in the argument below, the district court lacked subject-matter jurisdiction

3

because Chevron lacks Article III standing. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     In light of the Ecuadorian appellate court's substitute judgment and the lack of any concrete injury to Chevron that is likely to be redressed by the district court's judgment, does Chevron lack Article III standing?

2.     In light of *Chevron v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), and principles of international comity, is Chevron's preemptive collateral attack on the substitute Ecuadorian judgment permissible under the common law or RICO?

3.     Is Chevron's wholesale attack on the Ecuadorian judiciary foreclosed by judicial estoppel and international-comity principles and contradicted by Chevron's own evidence?

4.     Given RICO's injury and causation requirements and the absence of any authorization for equitable relief, should the district court have dismissed Chevron's RICO claims in their entirety?

## STATEMENT

**A.** **For two decades, Ecuadorian rainforest communities seek—and ultimately win—a judgment holding Chevron responsible for dumping billions of gallons of toxic waste into the Amazon.**

### 1. Chevron pollutes the Ecuadorian Amazon (1970s & 1980s)

From 1972 to 1990, Chevron drilled for oil in an area of the Ecuadorian rainforest roughly the size of Rhode Island.[1] The *Oriente* region, where this drilling took place, had been "known and revered for [its] high levels of biological diversity" and was "surely the richest biotic zone on Earth."[2] It also "has a rich heritage of indigenous cultures, and is home to eight groups of indigenous people" who have lived in the region "for thousands of years in harmony with their rain forest environment."[3]

Rather than take special care to protect this region, Chevron dug hundreds of unlined waste pits into the jungle floor and filled them with toxic drilling muds and other oil-field waste, including a host of well-known carcinogens—contrary to the

---

[1] Although it was Texaco that owned and operated the oil fields in Ecuador, Texaco became a wholly owned subsidiary of Chevron in 2001, and between 2001 and 2005 the combined company was known as ChevronTexaco. *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 387 n.1 (2d Cir. 2011). We refer to both companies as "Chevron" unless otherwise noted.

[2] Judith Kimerling, *Amazon Crude* 33 (1991).

[3] Judith Kimerling, *Disregarding Environmental Law: Petroleum Development in Protected Natural Areas and Indigenous Homelands in the Ecuadorian Amazon*, 14 Hasting Int'l & Comp. L. Rev. 849, 853 (1991).

prevailing industry practice of pumping waste back into well cavities deep underground, where the waste can't harm the environment. Because the pits were unlined, Chevron's toxic chemicals leached into the surrounding soils and groundwater. And Chevron built pipes into the sides of many of its pits so the toxic contents could easily flow into nearby streams relied on by the local population for drinking water. By design, Chevron's drilling activities discharged billions of gallons of toxic production water directly into the local waterways of the Amazon basin.

Chevron does not contest any of these facts. To the contrary, Chevron has admitted that it dumped three million gallons of production waters daily into Amazon waterways, totaling "15.834 billion … gallons." A-3139.202. And Chevron's internal memoranda reveal that the company eschewed modern waste-management practices used in the United States in favor of cheaper, outdated, and dangerous methods—which Chevron's own investigators concluded "cannot be considered 'good practice.'" A-1910. An internal memo from 1980, for example, notes that Chevron had studied "the cost and necessity of eliminating possible contamination of the environment by the earthen pits used in the drilling, producing, and workover operations in the *Oriente* Region." A-2072. Even though the unlined pits fell below industry standards, the memo "recommended that the pits neither be fenced, lined, or filled"—solely because of "cost" (less than $5 million). A-2072-73.

Another memo, written by a Texaco executive in 1972, directed company employees to take steps to conceal misconduct by not reporting oil spills and other environmental incidents unless the media or government became independently aware of them: "Only major events … are to be reported. … A major event is further defined as one which attracts the attention of press and/or regulatory authorities." A-2071. The memo also ordered the destruction of records: "No reports are to be kept on a routine basis and all previous reports are to be removed … and destroyed." *Id.* These policies remained in effect throughout the relevant period.

Two decades later, as it was winding down operations in Ecuador in the early 1990s, Chevron commissioned a study that found "contamination of soil and water … at wells sites, production stations along road ways, flow lines and secondary pipelines." A-2306. It also found evidence of oil spills at 97% of the sites assessed—158 out of 163—and numerous violations of Ecuadorian law. A-3182-85. The firm that conducted the study recommended that Chevron conduct a comprehensive environmental investigation to determine the full scope of the company's liability. A-3187. Chevron never did so.

Instead, Chevron fled the country, leaving behind hundreds of open pits full of toxic sludge in the backyard of the Amazonian communities. A-2333. These communities, which depend on local waterways for virtually every facet of their lives, have been continuously exposed to toxic and hazardous chemicals not only through

their drinking water, but also by cooking, bathing, and washing with contaminated water, by consuming contaminated fish and livestock, and in numerous other ways. *Id.* The harm done by this ongoing exposure can "be measured in cancer deaths, miscarriages, birth defects, dead livestock, sick fish, and the near-extinction of several tribes." Patrick Radden Keefe, *Reversal of Fortune*, THE NEW YORKER, Jan. 9, 2012, *available at* http://nyr.kr/1wuTEbd.

## 2. Ecuadorians bring an environmental case against Chevron in New York, and Chevron convinces the court to dismiss the case by promising to satisfy any Ecuadorian judgment against it (1993-2002)

In 1993—one year after Chevron shuttered its Ecuadorian operations—the victims of its pollution (indigenous people and farmers, known as the *afectados*) sued Chevron in the Southern District of New York, alleging that they and their families had various physical injuries and seeking relief to redress environmental contamination. *See Aguinda v. Texaco*, 945 F. Supp. 626 (S.D.N.Y. 1996).

For the next nine years, Chevron fought vigorously to have the case dismissed on *forum non conveniens* grounds, heaping praise on the Ecuadorian judiciary and swearing by its impartiality and independence.[4] "Ecuador's courts," Chevron

---

[4] Chevron went so far as to "work[] with" the Ecuadorian ambassador to the United States to ghostwrite a letter to the State Department requesting that it support dismissal. A-410. The letter argued that litigating the case in New York "would do violence to the international procedural system" because U.S. courts "lack the authority and knowledge needed to consider and judge matters concerning foreign

8

maintained, "conduct and adjudicate cases filed by or against multinationals and oil companies in a fair and impartial manner"; a "history of corruption-free litigation" would "assure a fair adjudication if plaintiffs refile their claims in Ecuador." *Aguinda*, RJN Ex. A at 3 (S.D.N.Y. Apr. 24, 2000). In 1996, the district court (Rakoff, *J.*) granted Chevron's motion to dismiss. *Id.* But this Court reversed, holding that the case may not be dismissed on *forum non conveniens* grounds unless Chevron submitted itself to jurisdiction in Ecuador. *Jota v. Texaco, Inc.*, 157 F.3d 153, 155, 159-60 (2d Cir. 1998).

On remand, Chevron "provided the missing commitment" to submit to the Ecuadorian courts and "renewed its motion to dismiss." *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538 (S.D.N.Y. 2001). It "unambiguously agreed in writing to being sued on [the plaintiffs'] claims (or their Ecuadorian equivalent) in Ecuador, to accept service of process in Ecuador, and to waive for 60 days after … dismissal any statute of limitations-based defenses that may have matured since the filing of the [case]." *Id.* at 539. Chevron "also offered to satisfy any judgments in Plaintiffs' favor, reserving its right to contest their validity only in the limited circumstances permitted by New York's Recognition [Act]." *Republic of Ecuador*, 638 F.3d at 389.

---

laws and their application," which should "belong[] exclusively to Ecuadorian courts." A-347-48; A-411; A-417. The letter also explained that it "would be highly offensive" and "false" if a U.S. court were to hold that litigants "cannot expect a fair hearing in Ecuadorian courts." A-418.

Relying on these promises, the district court again dismissed the case. It held that the case has "everything to do with Ecuador and nothing to do with the United States," that Ecuador's judiciary provides the "modicum of independence and impartiality necessary to an adequate alternative forum," and that "the courts of Ecuador are in the best position to find and apply their own law." *Aguinda*, 142 F. Supp. 2d at 537, 545-46, 552.

This Court affirmed. It rejected the plaintiffs' criticism of Ecuador's judiciary as "subject to corrupt influences" and "incapable of acting impartially," and "found Ecuador to be an adequate forum for hosting tort suits" because its courts are "sufficiently independent and impartial to provide due process." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 475, 477-78 (2d Cir. 2002). In granting Chevron its requested relief and relying on its promises, this Court adopted those promises, which then became "enforceable against Chevron in ... any future proceedings between the parties." *Republic of Ecuador*, 638 F.3d at 389 n.4. As a result, the Recognition Act is "the sole reserved route for Chevron to challenge any final judgment resulting from the Lago Agrio litigation." *Id.* at 399.

### 3. Disregarding its promises to this Court, Chevron repeatedly tries to thwart the Ecuadorian case (2003-2010)

The *Aguinda* plaintiffs then did exactly what Chevron had said it wanted them to do. In 2003, they refiled their claims against Chevron in the *Corte Provincial de*

10

*Justicia de Sucumbíos*—a small courthouse in Lago Agrio, Ecuador, a town that once served as a hub of Chevron's Ecuadorian operations. *See id.* at 390 n.5. But Chevron—now outside the reach of this Court—immediately broke its promise and contested jurisdiction in Ecuador. And early on, Chevron lawyer Ricardo Reis Veiga tried to torpedo the litigation by persuading the country's Attorney General to call the trial judge and urge him to throw out the lawsuit. *See, e.g.*, A-420. When a reporter later asked what forum Chevron preferred, a company spokesperson answered: "We didn't want to get sued, period. We don't want to be in any court, much less a court with respect to this kind of claim, which we consider to be frivolous." ECF No. 47-21.

As it would turn out, this was only the beginning. Time and again, as the Ecuadorian case moved forward, Chevron sought to delay or corrupt the proceedings by manipulating testing sites, clogging the courts with repetitive filings, and forcing the recusal of judges who were either unable to keep up with Chevron's document-dump strategy or were falsely accused of bribery by someone on Chevron's payroll.

**a. *The judicial site inspections.*** At the heart of the Ecuadorian environmental case against Chevron was a series of dozens of "judicial site inspections"—where, under the supervision of the judge, the parties' experts collected soil and water samples at the well sites and operating stations, while

attorneys for both sides made public arguments and submitted evidence. SPA-64; A-1039. During these inspections, the parties hand-submitted an enormous number of documents to the court. This process was not always orderly, and although these documents were supposed to be logged into the official record, the court's small administrative support staff often struggled to keep up and frequently made mistakes. On one occasion, for example, Chevron filed dozens of motions on a single day— four of which were not logged into the official record. The staff bunched the documents they received into small stacks (or *cuerpos*) that were "sewed with a thick thread" or "fixed with elastic bands to avoid scattering around" and then manually maintained over an eight-year period. ECF No. 1413-10. By the end, the record exceeded 200,000 pages.

**b. *Testing-site manipulation.*** Chevron went to great lengths to sabotage the site inspections. It conducted secret pre-inspection testing of various sites to pre-determine "safe" sampling locations within the contemplated inspection sites, hoping to conceal the true extent of the contamination. A-1874.

Chevron's experts once secretly conducted pre-inspection sampling at a critical site called Guanta Station. A-3209-10. What they found worried them: Their sampling revealed unusually high levels of contamination, including high levels of arsenic, chromium, and polycyclic aromatic hydrocarbons (or PAHs, many of which are well-known carcinogens). *Id.* This was particularly worrisome to Chevron

because the Guanta site was one of the last fields discovered and developed. If it was contaminated because of substandard practices, then all sites were likely contaminated. *See* A-3210.

So Chevron requested that the Ecuadorian court cancel the Guanta inspection. But it didn't stop there: The day before the inspection was set to take place, Chevron's lawyers rushed to the court armed with what the company claimed was a military intelligence report calling for the suspension of the inspection to avert a threatened riot. A-1091-93; A-1918; A-2080. That report, it later became clear, was fake. An investigation by an Ecuadorian intelligence agency confirmed that the report had been improperly obtained at the request of Chevron's security officer—unsupported by actual intelligence. A-1920. The agency further explained that it had never received or reported any threat in connection with the scheduled inspection. *Id.* Nevertheless, Chevron's ploy worked: Unaware that the report was bogus, the Court granted Chevron's last-minute request and suspended the inspection, causing substantial delay.

**c. *Chevron's document-dump strategy.*** Chevron's gamesmanship extended beyond the systematic disruption and delay of the discovery process. It was also designed to create the appearance of supposedly unfair treatment and due-process violations. One example is Chevron's vexatious document-dump strategy, which aimed to take advantage of a unique feature of Ecuadorian law—the statutory

requirement that a judge must act on any motion within three days. Any judge who fails to do so may be recused from the case, while any who takes more than nine days must withdraw.[5]

Chevron abused this obscure procedural rule by repeatedly filing multiple motions to delay the proceedings and force successive judges who presided over the case to withdraw. To give just two examples: On August 5, 2010, minutes before the court closed, Chevron filed 17 motions in rapid-fire succession, the majority of which challenged the same ruling. A-1934-2013. And on October 14, 2010, Chevron filed 39 motions within a 50-minute window, each one separately addressing different aspects of a court order issued three days earlier. A-2014. Notably, only 35 of these motions made it into the official court record—an illustration of the difficulty the court's tiny administrative staff had in formally processing all the paper thrust upon it.[6]

Chevron's filings were also regularly accompanied by the submission of thousands of documents. Any court would have difficulty handling this deluge, and the Ecuadorian court was no exception. It found that Chevron's tactic was improper

---

[5] *Código de Procedimiento Civil*, art. 288 (requiring that "court orders [be issued] within three days"); *id.* art. 856 (providing for recusal of judge if "[h]e does not hear the case within three times the time period provided for by law").

[6] As the Republic of Ecuador recently explained, "*Cuerpo* 1989 ends with Chevron's Motion filed at 5:44 PM—the 35th of 39 Chevron filed that evening. *Cuerpo* 1990 starts with the Court's Order addressing those 39 motions." A-2168 at n.35.

and that most of its massive submissions were irrelevant or time-barred. Yet the tactic has persisted throughout this sprawling litigation: As the three-judge *Corte Provincial* would later note in criticizing Chevron's "abusive," "overtly aggressive[,] and hostile" approach, the many "thousands [of] documents submitted by Chevron Corporation bloated the case … so much that at this stage alone there were almost two hundred record binders (about twenty thousand pages), not counting the more than two hundred thousand papers in the first instance case." A-454; A-467.

**d. *Chevron's first concocted "bribery" allegation.*** In an effort to cause the presiding judge's removal from the case—this time on the eve of an anticipated judgment—a long-time Chevron contractor named Diego Borja and a convicted felon named Wayne Hansen sought to entrap the judge (Judge Núñez) in an elaborate "bribery" scheme in which he was secretly videotaped. Based on the recording, Chevron launched a public-relations campaign accusing Judge Núñez of bribery. It triumphantly declared in August 2009 that it had obtained recordings "reveal[ing] a $3 million bribery scheme implicating" the judge presiding over the case. Chevron Press Release, *Videos Reveal Serious Judicial Misconduct and Political Influence in Ecuador Lawsuit* (Aug. 31, 2009), *available at* http://bit.ly/1l4kx26. Chevron said that the two men who recorded the scheme—Borja and an "American businessman," according to Chevron—were environmental-remediation contractors "pursuing business opportunities in Ecuador" who had happened upon

15

"serious judicial misconduct." *Id.* Chevron claimed that the videos showed that the two men were able to coax the judge into revealing that he would rule in favor of the Ecuadorian plaintiffs. *Id.*; *see also* Simon Romero & Clifford Krauss, *Chevron Offers Evidence Of Bribery Scheme In Ecuador Lawsuit*, N.Y. Times, Sept. 1, 2009, *available at* http://nyti.ms/1oJV15Q.

None of that was true. To begin with, neither Borja nor Hansen was an environmental remediation contractor. ECF No. 175-10. Borja was still under contract with Chevron at the time, charged with handling litigation-related laboratory samples and moving Chevron laboratory equipment. CA-41. His spouse had also been a Chevron contractor, while his uncle was "the legal representative for the company." *Id.*; A-1601. And Hansen was a convicted felon and drug-trafficker. *See* Clifford Krauss, *Revelation Undermines Chevron Case in Ecuador*, N.Y. Times, Oct. 30, 2009, *available at* http://nyti.ms/T9R1Ne. Moreover, the recordings show that Judge Núñez never asked for and was never offered a bribe of any kind and repeatedly declined invitations to say which way he intended to rule. CA-41. Indeed, the only U.S. judge who reviewed the transcripts and commented on them said that he saw no evidence of a bribe. *See* Hearing Tr. 11/10/10, at 38:19-39:5, *In re Application of the Republic of Ecuador re Diego Borja*, No. C 10-00112 (N.D. Cal.) ("[T]here was no hint in there about him taking a bribe.").

16

After the tapes were released, Chevron publicly distanced itself from Borja. It represented to the Ecuadorian court that his "[w]ork [for Chevron] had already concluded" and that his "functions had nothing to do with the sampling process." ECF No. 366-22 at 2. But that too was untrue: Borja was still working as Chevron's "Sample Manager" for the "Litigation Team" even after his failed bribery allegation. CA-45.

What *is* true, however, is that Borja's own, unguarded statements at the time implicate *Chevron*—not Judge Núñez—in illegal activity. Between August and October 2009, Borja's childhood friend, Santiago Escobar, recorded conversations in which Borja conceded that the bribery scheme was illusory. A-1547; A-1564; A-1580; A-1595; *see also* ECF No. 152-2 ("Because really, there was no bribe. I mean there was never … there was never a bribe."). Borja also asserted that Chevron, among other things, "cooked" the evidence in the Ecuadorian case, used labs that were supposedly independent but actually belonged to Chevron, and generally engaged in misconduct that, if publicly revealed, would cause the courts to "close [Chevron] down." A-1585-90. Borja explained:

> I have the [e]mails. … I have correspondence that talks about things you can't even imagine, dude … I can't talk about them here, dude, because I'm afraid, but they're things that can make the Amazons win this just like that [snapping fingers]. … [W]hat I have is conclusive evidence, photos of how they managed things internally.

A-1571-72. Escobar subsequently testified under oath in Ecuador that, according to Borja, Chevron knowingly substituted soil samples taken from contaminated well sites with clean soil taken from areas 10 to 20 kilometers away. Office of Public Prosecution of the Republic of Ecuador, Ex. 39, ECF No. 1-41, filed in *Republic of Ecuador v. TestAmerica Labs. Inc.*, No. 4:11-mc-00088 (N.D. Fla.). Finally, Borja made clear that if Chevron did not look after him, he would publicly reveal the company's misdeeds. ECF No. 152-2 ("[I]f something bad happened to me … and they don't give my wife what they have to … There's a document for that, where I … immediately go to the other side.").

Chevron apparently took the threat seriously. Borja and his family were plucked from Ecuador shortly after the recordings were made public and installed in a gated community roughly one mile from Chevron's California headquarters. ECF No. 152 at 26. Chevron provided furnishings, a car, and a cell phone, as well as a job for Borja's wife. CA-46. Through counsel, Chevron also pays Borja's monthly rent, characterized as "Witness Rent Payments," as well as other perks and benefits. CA-13-40; *see also* ECF Nos. 174-44, 174-51, 174-52. Chevron has even paid Borja's state and federal income taxes. ECF Nos. 174-56, 174-57. And although Borja performs no work for Chevron, the company gives him a $5,000 to $10,000 monthly "stipend." *See* ECF Nos. 174-2, 174-6, 174-10, 174-16, 174-18, 174-19, 174-26, 174-36, & 174-58; A-3155. Altogether, Chevron gave Borja more than $2.2

million in benefits in the first 29 months after he was relocated. CA-47. As he put it, "crime does pay." A-1553. Chevron's money seems to be well spent: In 2010, under the supervision of Chevron's counsel, Borja signed two declarations ostensibly renouncing his previously recorded statements. CA-2; CA-5.

As for Chevron's "American businessman," convicted felon Wayne Hansen, he too threatened to reveal information damaging to Chevron if the company did not improve his situation. CA-1. It is unclear whether his wish was granted, but this much is clear: The Republic of Ecuador filed a 28 U.S.C. § 1782 discovery application against Hansen in his home state of California in September 2010; he never showed up, and by the next month was living a life of leisure in a Peruvian beach town, in the market for a beach house with maid service and a private chef. CA-8.

Notwithstanding the falsity of Chevron's bribery charges, they nevertheless achieved their intended result: Although Judge Núñez denied any wrongdoing, he recused himself to eliminate any appearance of impropriety—thereby delaying final resolution of the case for another eighteen months. *See* A-360-61.

###     4.     Hundreds of site inspections and expert reports—including those from Chevron's own experts—confirm Chevron violated the law (2006-10)

Despite Chevron's best efforts to distract attention from its wrongdoing—and despite its unlimited resources—Chevron could not combat the growing mountain

of evidence showing the devastating and widespread environmental contamination caused by its drilling practices. Even Chevron's own handpicked evidence, limited and distorted as it was, confirmed the company's culpability. Two of its experts found significant toxic contamination at 91% of the wells operated solely by Chevron. A-2330. Half the sites had illegal amounts of two carcinogenic PAHs, 90% had illegal amounts of the PAH pyrene, and 82% had illegal amounts of naphthalene. *Id.* Even more damning, a number of these pits were certified as "completely remediated" by Chevron following a sham cleanup it conducted in the mid-1990s. A-2348-50

Chevron also tested sediment in nearby streams and swamps, showing that the pollution had spread and persisted almost two decades later. A-2330. Although Chevron conducted only modest sediment sampling, more than half of its samples showed unlawful amounts of contamination. *Id.* Chevron's sampling of the surface water showed even clearer evidence of pollution: It detected phenols—a soluble toxic component of crude oil—at every location tested, nearly twenty years after the drilling had stopped. A-2331.

### 5. Chevron shifts its strategy to collateral attacks outside Ecuador and adopts the "demonize Donziger" playbook (2007-2011)

Unable to overcome the mounting evidence against it, and desperate to avoid paying for its wrongdoing, Chevron shifted gears, adopting a strategy to collaterally attack the Ecuadorian litigation in any forum possible, through any means possible.

20

The company's message, according to one of its lobbyists, was simple: "We can't let little countries screw around with big companies like this." Keefe, *Reversal of Fortune*. "We're going to fight this until hell freezes over," a company spokesman declared. *Id.* "And then we'll fight it out on the ice." *Id.*

**a.** Chevron's opening gambit was to file an arbitration proceeding against the Republic of Ecuador before the American Arbitration Association and then offer to dismiss the arbitration in exchange for the government's "intervention" in the Ecuadorian litigation. But the district court stayed the arbitration and rejected all of Chevron's arguments, including its argument that Ecuador was bound by a 1960s-era joint-operating agreement that was "executed in Florida between two American corporations." *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 460, 469 (S.D.N.Y. 2007). This Court summarily affirmed. 269 F. App'x 124 (2d Cir. 2008).

Chevron next initiated international proceedings against Ecuador under the U.S.-Ecuador Bilateral Investment Treaty. *Republic of Ecuador*, 638 F.3d at 390; ECF No. 65-4. Chevron requested that a private arbitration panel—meeting in secret without allowing the *afectados* to participate—declare that Chevron has "no liability or responsibility for environmental impact ... or for performing further environmental remediation" in Ecuador and order Ecuador's executive branch to compel the judiciary to dismiss the case. *Republic of Ecuador*, 638 F.3d at 390. Chevron

21

made two primary arguments: (1) that its sham cleanup during the 1990s precluded "any judgment issued against it," and (2) that "Ecuador's judicial branch" has disregarded "Ecuadorian law, international standards of fairness, and Chevron's basic due process and natural justice rights," and its executive branch "improperly interfered" with the case because the current president, Rafael Correa, expressed public "support for the plaintiffs." *Id.* Chevron also asked for fees, costs, and "moral damages." Later, Chevron submitted Borja's secretly recorded videotapes to the panel, claiming that they showed Judge Núñez had been bribed. But after that scheme backfired, Chevron quietly dropped the allegation. The panel has not yet ruled.

**b.** Around this time, Chevron also began to train its focus on Steven Donziger—an American lawyer who had joined the case early in his legal career, after working as a newspaper reporter in Latin America and, after graduating from law school, as a public defender representing juvenile defendants and at a social-justice nonprofit. A-3387-88. Donziger was not the only lawyer on this case; he worked alongside a team of Ecuadorian lawyers, one of whom (Pablo Fajardo) was the lead trial counsel. A-3391. But Donziger had emerged over time as a principal spokesperson for the *afectados* in the United States. In the mid-to-late 2000s, hoping to bring attention to their plight, he and Ecuadorian counsel decided to give an acclaimed American filmmaker (Joseph Berlinger) substantial behind-the-scene

22

access to make a documentary about the case, eventually entitled *Crude: The Real Price of Oil*, which premiered at the Sundance Film Festival in January 2009.

*Crude* not only conveyed the painful saga of the *afectados* and their quest for justice; it also captured the unfiltered range of Donziger's personality: his brashness and tendency toward hyperbole; his tenacity and passion in the service of his clients; his courage in the face of Chevron's unremitting attacks; and his often irreverent, over-the-top sense of humor. When Chevron's public-relations team saw the film, it sensed an opportunity. After one strategist stated his belief that Chevron "should not tread on Berlinger" because he "put some balance into the documentary," a company publicist, in an internal email to his colleagues, stressed the game plan: "Our [long-term] strategy is to demonize Donziger. This film provides us a great opportunity to do so." CA-9-10. This came after another Chevron strategist wrote a memo to company officials recommending that they launch a campaign to cast Ecuador "as the next major threat to America"—like "Iran"; a "Cuban missile crisis in the making"—and Donziger as "the most powerful man in Ecuador," "pulling the strings of an emerging banana republic." ECF No. 1324-11, at 10.

### 6. Chevron obtains unprecedented discovery in U.S. Courts

With this new strategy in place, Chevron began using a little-known U.S. statute permitting discovery "for use" in foreign litigation, 28 U.S.C. § 1782, in an effort to show—preemptively and somewhat "ironically," given its earlier position in

*Aguinda*—that "the judicial process in Ecuador is corrupt." *See also In re Chevron Corp.*, 633 F.3d 153, 158-59 (3d Cir. 2011). Chevron also sought to expose what it claimed was fraud in the relationship between the Ecuadorian plaintiffs' legal team, Donziger, and an environmental expert named Richard Cabrera who was appointed by the *Corte Provincial de Justicia de Sucumbíos* to provide a report on the economic value of damages at the plaintiffs' request—one of many expert reports submitted to the court throughout the litigation.

The scale of this discovery effort, like all of Chevron's efforts to avoid compensating its victims in Ecuador, has been breathtaking. By 2011, the company had initiated "an extraordinary series of at least 25 requests to obtain discovery from at least 30 different parties" in more than a dozen federal courts across the country, *In re Chevron*, 633 F.3d at 159—"an effort the Third Circuit aptly characterized as 'unique in the annals of American judicial history,'" *Naranjo*, 667 F.3d at 236 (quoting *In re Chevron Corp.*, 650 F.3d at 282 n.7). This unprecedented assault was designed to isolate the plaintiffs' contacts with Dr. Cabrera from the context of Ecuadorian law and ultimately gain access to huge amounts of evidence that it hoped would derail the Ecuadorian case, all the while draining the plaintiffs of their resources by forcing them to simultaneously litigate these cases nationwide. As Chevron CEO John Watson would later say: The litigation "will end when the plaintiffs' lawyers give up."

24

Christopher Helman, *Chevron's Expensive Problems*, Forbes, Mar. 4, 2013 issue, *available at* http://onforb.es/1fFj3nk.

Chevron originally based its extraordinary requests on a single scene in *Crude*. The scene showed a meeting between the Ecuadorian plaintiffs and their lawyers, including Donziger, while a member of Dr. Cabrera's staff was present. Chevron argued that this proved that Dr. Cabrera was not independent. Yet Chevron identified no provision of the Ecuadorian Civil Code prohibiting a party from communicating *ex parte* with a court-appointed expert, formulating a work plan for the expert, or drafting materials for that expert's adoption as his own. Distinguished Ecuadorian law professors have also attested that nothing in Ecuadorian law at that time prevented a party from meeting with a court-appointed expert *ex parte*, planning the work the expert will perform, and drafting proposed findings for the expert. A-424; A-440. Indeed, Chevron's technical consultant met with Dr. Marcelo Muñoz Herrería—a "neutral," court-appointed expert like Dr. Cabrera—at a hotel for a "technical planning meeting" to plan his expert report. A-2075. This meeting took place before Muñoz was formally appointed by the Ecuadorian court. *Id.* Dr. Muñoz also stated that his work plan was "requested and approved" by Chevron's technical consultant. A-2076.

Still, Chevron took advantage of American courts' unfamiliarity with Ecuadorian procedure to obtain an unprecedented volume of discovery in these

proceedings—at least a million documents worth. Of the 25 proceedings before 16 different judges, the two most successful were against Berlinger (the *Crude* filmmaker) and Donziger. *See In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010) (Berlinger); *In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010) (Donziger). The Honorable Lewis A. Kaplan of the Southern District of New York was the judge in both proceedings.

**The Berlinger § 1782 proceeding.** In the first proceeding, Chevron successfully demanded all 600-plus hours of *Crude* outtakes. SPA-160. The court declined a request to wait until the Ecuadorian court ruled on an application asking whether it would be "receptive to 1782 discovery in the United States"—the purpose of the statute. ECF No. 287-1 (Hearing Tr. 4/30/10, at 35:9-36:10). The court did not hide why: "Believe me, if this were the High Court in London, you can be sure I'd wait." *Id.* The court's view, it later made clear, was that Ecuador should wait for it, not the other way around. *See* ECF No. 287-5 (Hearing Tr. 11/22/10, at 33:15-21) ("The one inescapable, overwhelmingly obvious fact in this whole scenario is that Danziger [sic] and his clients, the Lago Agrio plaintiffs, utterly refuse any delay in Ecuador to permit the proceedings here to move at a more deliberate speed. Each and every time I have asked that question, I've gotten a flat no. Don't talk to me about urgency."); *see also id.* at 26:19-24 ("[I]t's a giant game here. It's a giant game.

26

The name of the game is to string it out. … That is the Danziger [sic] Lago Agrio strategy. And it has been from the beginning.").

**The Donziger § 1782 proceeding.** In the second proceeding, the court ordered Donziger to turn over to Chevron his entire eighteen-year litigation file—including virtually every scrap of correspondence that he and the other lawyers had made about the case—and to sit for fourteen days of deposition testimony. "[H]e has one privilege left," Chevron's counsel told the court. "He can assert the Fifth Amendment." ECF No. 287-3 (Hearing Tr. 9/23/10, at 64:1-2). The court agreed with Chevron that Donziger had waived "each and every privilege claim" because he filed his privilege log too late. *In re Chevron Corp.*, 749 F. Supp. 2d at 185. The court acknowledged that the log "took a good deal of effort" to prepare—it was over 2,000 pages and identified 8,652 documents as privileged, and Donziger did not have a staff of associates to help him go through it—but the court nevertheless ordered Donziger to produce "each and every document responsive to the subpoenas (irrespective of whether any privilege or other protection against disclosure has been or hereafter is or may be claimed) forthwith." *Id.* at 184-85, 188. As Judge Kaplan put it: "The subpoenas called for the universe. And I said give them the universe." ECF No. 287-5 (Hearing Tr. 11/22/10, at 13:10-14).[7]

---

[7] During an earlier hearing, Judge Kaplan opined: "[T]he likelihood that there is actually an attorney-client communication under any of this I think is about

That "universe" amounted to more than 200,000 pages of material, much of it personal—including Donziger's tax returns, his bank-account information, his personal computers, mobile devices, text messages, private phone records—even a copy of the eulogy he delivered after the death of his mother. Chevron's lawyers at Gibson Dunn pored through stacks of memos and emails marked "Confidential" and "Attorney Work Product," at a clip of 5,000 pages a day, and made complete copies of his hard drives. When his counsel protested that this would give Chevron access to his "communications to his wife" as well as "his communications on other matters," Judge Kaplan responded: "He doesn't have any other matters. Let's not worry about that. This is his life." ECF No. 287-3 (Hearing Tr. 9/23/10, at 27:6-10).

Chevron didn't worry. When its lawyers scanned Donziger's computer files, they found his entire personal diary—a running account of his most private thoughts, including his hopes, dreams, and doubts; his perpetual fear that Chevron was corrupting the process; his unvarnished opinions of close professional colleagues; even his reflections on the impact his work in Ecuador was having on his marriage. A-2513. When Chevron filed the document with the court—in its entirety—it entered the public domain.

---

the same as the likelihood that the Ecuadorian Air Force is going to take over New Jersey. Let's get real." ECF No. 287-3 (Hearing Tr. 9/23/10, at 36:21-24).

7. **Chevron uses the vast "universe" of documents it obtained in discovery to carry out its "demonize Donziger" strategy**

With this unprecedented quantity of material in tow, Chevron's public-relations operation went to work, often taking Donziger's words out of context—even twisting them to mean the *opposite* of what he said—to shift the focus from Chevron's wrongdoing to Donziger, which wasn't hard to do because of his personality and speaking style.

Chevron, for instance, has repeatedly quoted Donziger as saying: "If you repeat a lie a thousand times it becomes the truth," as if he were speaking about his own beliefs. But he was talking *about Chevron*—not himself. What he actually wrote was "*Si repitan una mentira mil veces se hace la verdad*," accurately translated as: "if *they* repeat a lie a thousand times it becomes the truth." A-1288.6. The "they" was Chevron/Texaco. Chevron has also constantly quoted Donziger as professing what Chevron claims is a personal motto: "Facts do not exist. Facts are created." *See, e.g.*, ECF No. 1855, at 141. But he goes on to say: "And you talk to Texaco, because *they* create facts. *Texaco* creates facts. They create standards. … That's what I am saying. They create fiction." ECF No. 7-8, at 4 (emphasis added). In another scene, he tells the camera that he and the *afectados* are:

> going to confront the judge **who we believe is paid by Texaco. We believe he is corrupt, and we're gonna confront him, ah, with—with our suspicions about his corruption** and let him know what time it is. And, ah, you know, this is something that you

29

would never do in the United States. I mean, this is something you would, I mean, this is just out of bounds, both in terms of judicial behavior, and what—what lawyers would do. But Ecuador, you know, there's almost no rules here. And this is how the game is played, it's dirty. ***And, you know, they're playing dirty, we're honest, they're dirty. They play dirty, we have to occasionally use, um, pressure tactics to neutralize their corruption. And today is one of those examples.***

ECF No. 6-4 at 6 (emphasis added). But when Chevron presented this clip to the court, it excluded all the bold text above. A-1038.1. A clip in which Donziger expresses frustration at Chevron's corrupt practices was transformed into a clip in which Donziger appears to admit his own corruption. The transcript that Chevron provided to the court did not indicate with an ellipsis that 25 words had been omitted midsentence. *Id.*

When Donziger's counsel brought Chevron's omissions to the attention of the district court, Chevron conceded that it had doctored several clips, but blamed the error on its transcriptionist. ECF No. 1661 at 5 ("Chevron's transcriber … did not realize that material had been redacted from this clip, and, as a result, she did not note or identify the redaction in the transcript … Chevron's counsel did not pick up on that omission."). The court acknowledged that "the custom is to put ellipses in," but did not press the issue. ECF No. 1792 at 182.

Time and again, using carefully edited clips, Chevron sought to portray Donziger as corrupt—the head of a vast criminal conspiracy. In truth, however, most of the statements were him venting about *Chevron*—its scorched-earth tactics, massive

war chest, and strategy of delay—or expressing frustration or fear that what he said to American courts in the 1990s would come to pass: that Chevron would corrupt the process.[8]

Chevron also sought to instill fear in anyone who might be sympathetic to the plaintiffs' cause. Shortly after an expert named Harry Dunkelberger agreed to help the Ecuadorian plaintiffs estimate the environmental damage caused by Chevron, "two men in dark suits" appeared at his door on a Friday evening while he was about to go out to dinner with his family and pressured him to "turn[]" on Donziger. A-646.2. Days later he received a call from a Gibson Dunn associate who warned Dunkelberger that he would be better off "do[ing] it the easy way" rather than the "alternative." *Id.*

Up until this point, Chevron had been "losing the PR battle, if not the whole war." Mary Cuddehe, *A Spy in the Jungle*, THE ATLANTIC, Aug. 2, 2010, *available at* http://bit.ly/1pUKToW. So Chevron "regrouped and hired Kroll [& Associates]," *id.*—a firm known for its "corporate espionage" work—to start spying on the *afectados*

---

[8] *See, e.g.*, A-2579 (Donziger in personal diary: "We are winning on the proof, but we are losing the larger war because of time."); A-2586 (Donziger in personal diary: "I am getting this creeping feeling that we are not going to make it. There are just too many obstacles—the structure and weakness of the court, the obvious friendly ties of the judge and his staff to the Texaco lawyers, our own disorganization and lack of resources, a lack of fight among the affected communities and indigenous tribes which is a reflection of weakness resulting from the violence Texaco has inflicted on them for so many years.").

and their lawyers.[9] Kroll offered to pay one freelance journalist tens of thousands of dollars to "go undercover as a journalist-spy in the Ecuadorian Amazon" for a few weeks. *Id.* "There was a reason they wanted me," she said: "With one Google search, anyone could see that I was, in fact, a journalist. If I went to Lago Agrio as myself and pretended to write a story, no one would suspect that the starry-eyed young American poking around was actually shilling for Chevron." *Id.* Although she found the offer enticing, she ultimately resisted Chevron's advances. *Id.*

Chevron also began spying on Donziger. Although the full extent and duration of this activity is not publicly known, when Donziger hired a former FBI agent to investigate whether he was under surveillance, the investigator confirmed that "three vehicles followed [Donziger]" around New York, even getting out of their cars when he did and then "walk[ing] towards" him. A-646. When Donziger returned home to his apartment, where he lives with his wife and young child, the men "took up positions on the street." *Id.*

Chevron has never denied that it has engaged in extensive surveillance of Donziger and his family. Daniel Karson, Kroll's Chairman and the case manager for the Donziger project, acknowledged that Kroll had drafted "between 20 and 30 reports regarding Mr. Donziger" since the company was retained in August 2009.

---

[9] *See*, William Finnegan, *The Secret Keeper*, THE NEW YORKER, Oct. 19, 2009, *available at* http://nyr.kr/UZ94Hf ("With its international intelligence networks and their sometimes unnerving abilities," Kroll is often "described as 'a private C.I.A.'").

CA-8.2; CA-8.4. Kroll operatives were also active in Ecuador; the record includes several photographs of the plaintiffs' lawyers captured by Kroll operatives in Quito. ECF Nos. 754-02-05. All this surveillance came at an astronomical cost to Chevron—the total figure, as of June 10, 2013, is available in the sealed volume of the appendix but cannot be disclosed in this brief because Chevron has designated it as confidential. CA-8.3.

### 8.    The Ecuadorian court enters a preliminary judgment against Chevron (February 2011)

Meanwhile, the litigation in Ecuador was heading toward a conclusion. On February 14, 2011—after eight years of litigating the case in Ecuador, a 215,000-page court record, and scores of inspections and expert reports detailing the extensive scope of Chevron's malfeasance—the *Corte Provincial* entered a provisional *sentencia* (or "preliminary judgment," as this Court called it) against Chevron in a comprehensive 188-page decision. A-1039; *Naranjo*, 667 F.3d at 242 n.1. Several aspects of this decision are worth highlighting.

*First*, the court addressed Chevron's concerns about expert objectivity by granting its request and refusing to take into consideration either the Cabrera Report or the submissions of the plaintiffs' expert, Dr. Charles Calmbacher, in issuing its verdict. A-1086-89. The court also gave reduced weight to an expert report on health effects because its author disclosed that he had been hired by the Amazon Defense Front, a nonprofit environmental organization assisting the plaintiffs. *Id.*

33

*Second*, the court compensated for the experts' perceived lack of objectivity by relying repeatedly on test results by Chevron's own experts—and on Chevron's own admissions—to support the conclusion that Chevron had contaminated the environment. For example, although Chevron had argued that the "production waters" it dumped into the environment posed no environmental risk, the Ecuadorian court cited contrary sample results by Chevron's own expert and a statement by Chevron experts that even if production waters didn't contain significant concentrations of toxic compounds, they might "represent a potential harm to receptive bodies and to vegetation." A-1183.

*Third*, the court also addressed Chevron's charges of misconduct by Donziger, which Chevron tried to establish by presenting carefully edited outtakes from *Crude* that it had obtained in the § 1782 proceeding against him. Judge Nicolás Zambrano condemned both Donziger's statements criticizing the Ecuadorian judiciary—which Donziger made out of fear that the judiciary would be corrupted by *Chevron*, not him—as well as Chevron's attempts to trash Donziger's reputation by quoting the *Crude* outtakes out of context.[10]

---

[10] The court held: "[I]nsofar as concerns the merits of [Donziger's] statements, they are rejected—especially the unwarranted statements regarding the Ecuadorian Judiciary—and the Court does not recognize anything that Mr. Donziger might say or do when he is in front of the cameras or in any other act. No pressure has effectively been exerted on this Court. In addition, the Court notes that [even if it had] the power to judge Mr. Donziger due to his disrespectful statements, it could

*Finally*, the court calculated the actual damages at $8.646 billion. The court rejected the plaintiff's request for damages for excess cancer deaths and unjust enrichment—the two highest-value categories that they advocated. A-1222-24. The breakdown of the damages award was as follows: $5.396 billion for soil remediation; $1.4 billion for health care costs; $800 million for deaths due to cancer; $600 million for groundwater remediation; $200 million for damage to the ecosystem; $150 million for drinking water remediation; and $100 million for damages to indigenous culture. *In re Chevron Corp.*, 650 F.3d at 280-81. The total cleanup cost awarded by the court, assessed per cubic meter, is well within the average for oil spills of this magnitude, including the 1978 Amoco Cadiz spill in France, the 1989 Exxon Valdez spill in Alaska, the 1991 spills in Kuwait, and the 2002 Prestige spill in Spain. Republic of Ecuador Rejoinder, available at http://bit.ly/1xjS3p5.

The court also assessed $8.646 billion in punitive damages (100% of the remedial damages) in light of Chevron's egregious procedural and substantive misconduct and the need to dissuade Chevron and others from similar misconduct in the future. A-1086-89. But the court gave Chevron the option to avoid punitive damages by issuing a public apology—"a symbolic measure of moral redress"

---

not do so based on such limited portions, chosen and edited from hours of taping, and without giving the accused the right to defend himself or explain the context of those statements." A-1089-90.

recognized by the Inter-American Court of Human Rights. A-1224. Chevron did not do so. Nor has it paid a dime of the judgment to the people it injured.

### 9. The Ecuadorian court clarifies its judgment (March 2011)

On March 4, 2011, the *Corte Provincial* issued a 24-page order in response to a laundry list of requests by Chevron for clarification of the judgment. Importantly, the order confirmed the provisional judgment's exclusion of the Cabrera Report, explaining that "the report had NO bearing on the decision," which is why the court had "refused to void the entire case" against Chevron based on allegations concerning the report's preparation. A-1245.

### 10. Chevron declines to challenge the preliminary judgment under Ecuador's Collusion Prosecution Act.

At this point, Chevron had two ways in which it could seek relief from the provisional judgment—each with its own, non-mutually-exclusive procedural path. The first: Challenge the judgment's legal and factual basis by asking a three-judge panel to review the record de novo and issue a substitute judgment. The second: Challenge the legitimacy of the proceeding by bringing a separate action to nullify the provisional judgment as tainted by fraud—irrespective of whether it reached the right result. Both options are available to losing parties under Ecuadorian law, but they must be kept separate; one is not a substitute for the other.

Chevron chose not to avail itself of the second option—Ecuador's exclusive remedy for aggrieved parties who allege that a proceeding was collusive or fraudulent. Indeed, the Collusion Prosecution Act expressly allows such parties to make their collusion allegations in a separate action, and to submit whatever evidence they have to support those allegations, even if it lies outside the original proceeding's record. SPA-631 (Collusion Prosecution Act, art. 6). If the grounds for the claim are confirmed, the Act mandates that "measures to cancel the collusi[ve] proceeding" will be issued, "cancelling the act or acts, ... and [redressing] the damage caused ... and, in general, returning ... things to the state they were before the collusion." *Id.*[11]

Even though Chevron has not yet pursued this remedy, it is still available. Recognizing that evidence of fraud can take time to come to light, the Act has a five-year limitations period. SPA-632 (CPA, art. 10). Chevron thus has until February 14, 2016 to avail itself of this local remedy.

## 11. An Ecuadorian three-judge court reviews the case de novo and enters a substitute judgment against Chevron (2012)

Chevron did, however, avail itself of its other remedy—seeking direct, de novo review of the trial court's decision. The Ecuadorian plaintiffs did the same. In March 2011, after the trial court issued its clarification order, a panel of three judges from

---

[11] To ensure the effectiveness of this remedy, the Act also provides for two levels of appellate review—the first entirely de novo. SPA-631 (CPA art. 8).

the same court was randomly selected to review the trial court record and issue a substitute judgment of its own. A-1228.

The three-judge court issued its modified, substitute judgment in January 2012—nearly ten months after the first panel had been selected. A-452. The court's opinion addressed and rejected each of the Ecuadorian plaintiffs' grounds for appeal. *Id.* It also rejected Chevron's contention that "fraud and corruption of plaintiffs, counsel and representatives" should serve as a basis to reverse the decision. A-462. The court explained that its obligation was to assess the evidence "as a whole." A-464. After "evaluating the evidence collectively," the court found that it amply supported the decision. *Id.*

The three-judge court later clarified its decision at Chevron's request, confirming that it had considered all of Chevron's charges of "irregularities in the preparation of the trial court judgment" and found them to be pure speculation, belied by the trial-court record. A-491. The court declined to "make a pronouncement on the interminable and reciprocal accusations over misconduct of some of the parties' attorneys, experts or contractors" because they "could not affect the final result of the lawsuit." A-492.

### 12.   The Ecuadorian Supreme Court grants "cassation" review, affirms liability, and reduces damages (2013)

Chevron then filed a "cassation" petition with the *Corte Nacional*—Ecuador's highest non-constitutional court—seeking review of the substitute judgment, which

the Court granted. The Court issued an opinion in November 2013 largely affirming the judgment. A-3449. The Court addressed Chevron's complaints about the Cabrera Report, explaining that "the trial court's judgment did not take [the report] into account," and Chevron has "not indicate[d] which law [was] violated" by the judgment, nor has it explained how its allegations, even if true, "affect[ed] the validity of the proceeding" or "harm[ed]" Chevron in any way. A-3545-46.

More broadly, the Court explained that Chevron's claim of a "great collusive demonstration" in the trial court was irrelevant to its cassation appeal. For one thing, the Court stressed that "the court decision sought to be annulled here is the one rendered by the [three-judge] court of appeals, and not the one issued by a trial court, something which the cassation appellant has confused in this allegation." A-3548. For another, the Court explained that it lacked jurisdiction to consider Chevron's collusion claim anyway because "[w]hen collusion is an independent action" it is "regulated under the Collusion Prosecution Act"—the exclusive remedy provided by Ecuadorian law. A-3543. And so "it is not possible," the Court emphasized, "to seek the cassation of a judgment by making these kinds of allegations." *Id.* The Court thus affirmed the appellate court's conclusion that Chevron's claims of "procedural fraud" and "collusion" were "not within scope of [its] jurisdiction." *Id.*[12]

---

[12] *See also id.* ("If, as [Chevron] alleges, there were irregularities in the proceeding, Ecuadorian legislation establishes actions that can be brought for these

39

But the *Corte Nacional* did not affirm the substitute judgment in its entirety. Quite the contrary, the Court struck the entire punitive damages award—thus cutting the damages award nearly in half, by $8.646 billion—because the Court found that "there is no legal justification" for it. A-3669. *Cf. State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

Chevron has now sought relief from the *Corte Constitucional del Ecuador* (or Constitutional Tribunal of Ecuador) which granted its petition for review and will conisider the company's due-process arguments.

**B.    Chevron brings this action as yet another collateral, preemptive attack on enforcement of the Ecuadorian judgment.**

### 1.    Chevron files this action

Rather than exhausting its remedies under Ecuadorian law, Chevron filed this case in New York in early 2011—two weeks *before* the preliminary Ecuadorian judgment was entered and nearly a year before the three-judge court issued its substitute judgment. ECF No. 1. Chevron named more than 50 people as defendants: Donziger, Pablo Fajardo (the *afectados'* lead Ecuadorian lawyer), and dozens of indigenous people who have never left the jungles of Ecuador.

---

kinds of facts, … but allegations of this kind may not be made nor may cassation of the relevant judgment be sought without any reasoned legal basis.").

Chevron's complaint quotes Judge Kaplan, who "summarized" the case "a few months" before it was filed: "[T]he name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money. Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?" *Id.* at 118 (quoting Hearing Tr. 9/23/10, at 24:6-22).

The complaint alleges that they do. It originally asserted nine claims:

(1) substantive RICO violations under 18 U.S.C. § 1962(c), including "extortion in violation of [the] Hobbs Act, 18 U.S.C. § 1951";

(2) conspiracy to violate RICO under 18 U.S.C. § 1962(d);

(3) common-law fraud (under New York law);

(4) tortious interference with contract (under New York law);

(5) trespass to chattels (under New York law);

(6) unjust enrichment (under New York law);

(7) civil conspiracy (under New York law); and

(8) violations of New York Judiciary Law § 487.

ECF No. 1, at 119-144. The ninth claim, which was later severed from the rest, was a request that the anticipated Ecuadorian judgment be deemed "unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New

41

York's Recognition [Act]," on "grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy." ECF No. 1, at 144. Under this claim, Chevron also sought an injunction barring anyone "from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad." *Id.* at 145.

When filing the complaint, Chevron noted on the cover sheet that the case was "related to" the two § 1782 proceedings presided over by Judge Kaplan. Judge Kaplan accepted the case, immediately issued an order to show cause why a temporary restraining order shouldn't be granted, and set a hearing for *five days later*. ECF Nos. 3, 4.

## 2. The district court grants a temporary restraining order

Just before the hearing—after Chevron had filed a 70-page preliminary-injunction motion and nearly 7,000 pages of supporting affidavits and exhibits, *see* ECF Nos. 4-58—Donziger hand-delivered a letter to the court informing it that he had returned from a trip to Ecuador only the day before and had not been able to retain counsel on such short notice. He asked the court to briefly continue the hearing. But the court refused and said that it would grant Chevron a temporary restraining order. The court explained its thinking: "[W]e are dealing here with a

company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks have attached it in Singapore or wherever else." Hearing Tr. 2/8/2011, at 49:21-50:4.

The next day—eight days after Chevron filed its complaint and without an evidentiary hearing—the court issued a temporary restraining order preventing the defendants from taking any steps to enforce "any [Ecuadorian] judgment entered against Chevron" anywhere in the world outside of Ecuador, where Chevron has no assets. ECF No. 77. The court gave Donziger and the other defendants two days to file oppositions to Chevron's preliminary-injunction motion—even though there was still no Ecuadorian judgment, let alone an enforceable one—and set a hearing for a week later. *Id.* Donziger was unable to retain counsel until the day before the hearing.

At the preliminary-injunction hearing, the court made clear that it wouldn't let Donziger submit any filings, even though his professional reputation and life's work were on the line. The court was emphatic: "[Donziger] had until the date I gave him to file papers. He didn't, it's over … Over. Closed. … If for whatever reason Mr. Donziger just elected or failed to submit papers, well, that's what happens." Hearing Tr. 2/18/11, at 79:18-80:16. That is indeed what happened.

43

One week later, after Donziger's new counsel worked around the clock to prepare a brief on his behalf, the court refused to accept it, denying him any opportunity to respond in writing to Chevron's unprecedented motion. *See* ECF No. 137.

### 3.    The district court issues a worldwide injunction.

In March 2011, still without having held an evidentiary hearing, the court entered a preliminary injunction nullifying the Ecuadorian judgment and blocking any attempt to enforce it outside of Ecuador. *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011).[13]

Based on what it called "abundant evidence," the court found that "the Ecuadorian judgment in this case 'was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law.'" *Id.* at 633, 636. That "abundant evidence" consisted of three things: (1) a report submitted by Vladimiro Álvarez Grau, an avowed political opponent of President Correa, from which the court thought it was "reasonable to infer" that the entire Ecuadorian judiciary was corrupt, *id.* at 634; (2) Donziger's own statements from the *Crude* outtakes expressing his fears that the Ecuadorian judiciary was

---

[13] Although the court gave Mr. Donziger no opportunity to be heard, its opinion (a) referred to him by name 190 times, (b) used carefully edited *Crude* outtakes—which the Ecuadorian court had criticized—to impugn his character, (c) placed him at the center of an alleged conspiracy to subvert the Ecuadorian justice system and deny justice to Chevron, and (d) faulted him for failing to explain his statements "under oath" and to submit "sworn proof" to counter Chevron's evidence. *Id.* at 595, 606.

44

corrupt (the same position he advanced—and the court rejected—in *Aguinda*), *id.* at 634-35; and (3) State Department and World Bank reports saying the same thing they did in the 1990s, when Chevron was the Ecuadorian judiciary's staunchest defender. *Id.* at 535; A-387-408.

The court was transparent about its intentions: "This Court's judgment should finally determine the controversy worldwide" because a "decision by this Court holding that the judgment is unenforceable and enjoining its enforcement would bind all of the parties that potentially could enforce the judgment and therefore should foreclose even the filing of foreign enforcement suits." 768 F. Supp. 2d at 638, 647. "Moreover," the court continued, "even if enforcement actions were to be filed abroad in violation of an injunction, a decision by this Court with respect to the enforceability of the Ecuadorian judgment likely would be recognized as sufficiently persuasive authority—if not binding on the parties—to dispose of the question of enforceability in the foreign fora." *Id.* at 647.

### 4.   **This Court, in *Chevron v. Naranjo*, promptly reverses the injunction and orders dismissal of the severed ninth claim.**

In September 2011, this Court heard oral argument in the preliminary-injunction appeal. During the argument, it became clear that no precedent supported the district court's sweeping injunction and that it raised profound international-comity concerns regardless. *See* Oral Arg. Tr. 9/16/11, at 58:11-60:12.

45

Toward the end of the argument, a panel member expressed concern that, even if the court were to reverse the district court's order and vacate the injunction, Chevron "would then go back to Judge Kaplan and ask to reactivate the RICO claims and seek the same injunction under those claims." *Id.* at 76:19-77:7. Chevron's counsel dodged the question and instead asked the Court to wait "just a few weeks" so it could have a "full trial record." *Id.* at 77:25-78:14.

This Court declined the invitation. The very next business day, it vacated the injunction and stayed proceedings on the ninth claim—the only claim over which it had jurisdiction—and announced that an opinion would follow. ECF No. 351; *see also Chevron Corp. v. Naranjo*, 2011 WL 4375022 (2d Cir. Sept. 19, 2011). In vacating the injunction, the Court declined Chevron's invitation to keep it "in place in light of Chevron's RICO and state-law claims," which were "based on" the same "underlying allegations." Chevron Br. in *Naranjo* at 70-71.

In the opinion that followed, this Court explained that New York's "Recognition Act and the common-law principles it encapsulates are motivated by an effort to *provide for* the enforcement of foreign judgments, not to prevent them." *Naranjo*, 667 F.3d at 241. They do not create "causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them, or to preempt the courts of other countries from making their own decisions about the enforceability of such judgments." *Id.* at 243.

The Court also emphasized the "far graver" affront to international comity that would result from a contrary interpretation. *Id.* at 244.

The Court reversed the judgment, vacated the "radical" injunction, and remanded the case to the district court with instructions to dismiss Chevron's ninth claim—the only claim before the Court—"in its entirety." *Id.* at 244, 247.

### 5.    **Chevron immediately attempts to evade *Naranjo***

About a month after this Court's decision, Chevron again asked the district court for a preemptive ruling that the substitute Ecuadorian judgment, which had just been issued, was not entitled to recognition—this time in their RICO case. *See* ECF Nos. 396 & 397. Chevron's new theory was that *the defendants* had put the judgment at issue by raising the affirmative defense of collateral estoppel in their answers. So Chevron moved for summary judgment, hoping that the court would reject the defense on the ground that the judgment wasn't entitled to recognition under New York law. *See* ECF No. 396 & 397. The defendants' responded by making clear that they "are not asserting in this lawsuit the affirmative defenses of res judicata and/or collateral estoppel." ECF No. 450, at 2. And "lest there be any doubt," the defendants "affirmed that they will never assert in this case the defense of res judicata or collateral estoppel with respect to the Ecuadorian Judgment"—a position they have taken ever since. *Id.* at 3.

### 6. The district court refuses to allow defendants to drop their collateral-estoppel defenses.

The court rejected the defendants' express disavowals and kept the collateral-estoppel defense in the case—putting the Ecuadorian judgment's enforceability once again at issue. ECF No. 550, at 67-71; *see also* Hearing Tr. 10/18/12, at 11:1-3 ("I am not going to allow you to amend to delete the res judicata or collateral estoppel defense, period. That's not going to happen."). Only later, in denying a recusal motion, did the court acknowledge that, just as the plaintiff is the master of the complaint, the defendants "of course" have "the option" of selecting their own defenses. ECF No. 1407, at 15 n.50. Chevron's counsel said the same to this Court: The defendants, he represented, "still have the right to [assert the defense] or not. … If they didn't press it [at trial], it won't be in the case. It will not be in the case." Oral Arg. Tr. 9/26/13, at 19:16-21.

### 7. The court allows Chevron to drop "sham litigation" claim

As the case proceeded, the defendants requested all of Chevron's documents concerning the scientific evidence of its pollution in Ecuador. They argued that this evidence was needed to disprove the complaint's repeated allegations that the Ecuadorian case was "sham litigation" that was "objectively baseless." *See* ECF No. 705-1. Chevron took steps to ensure this wouldn't happen by dropping the allegations and renouncing any attempt to prove that the litigation was baseless:

> Chevron does not intend here to relitigate the environmental conditions existing in the Oriente or the relative, substantive merit of scientists' expert opinions on that subject. In that regard the discrete inquiry here will be whether the judgment's findings have any support untainted by fraud in the record that existed before the Ecuadorian court at the time the judgment was issued.

ECF No. 705, at 3-4. The district court granted the request, saying that it would let Chevron "clarif[y] its position with respect to the 'sham' allegations." ECF No. 720. But even though the "discrete inquiry" was now "whether the judgment's findings have any support untainted by fraud in the [Ecuadorian] record," *id.*, the court refused to allow the defendants to submit evidence from the Ecuadorian record of Chevron's contamination in Ecuador, calling their attempts to do so "a joke." Tr. 501-02.

Shortly thereafter, the court again denied a request by the defendants to allow them to withdraw their collateral-estoppel defense. ECF No. 826. The defendants had argued that "the Court in substance amended plaintiff's complaint" by letting Chevron drop its "sham litigation" allegations, and that they should be treated similarly, but the court disagreed. *Id.* at 2-3.

### 8. Chevron forces Donziger to proceed *pro se* and drops its damages claim on the eve of trial to avoid a jury

In May 2013, shortly after its CEO declared that the case would not end until the other side's lawyers gave up, Chevron forced Donziger's lawyer to do just that. ECF No. 1100. In his withdrawal motion, John Keker explained why: "Through

49

scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather than merit." *Id.* 1-2. Donziger and his lawyers couldn't keep up with Chevron's "endless drumbeat of motions" and depositions "from Park Avenue to Peru." *Id.* The case, Keker lamented, had "degenerated into a Dickensian farce." *Id.* at 1. Donziger represented himself for the next five months.

One month before trial—faced with the prospect of having a jury evaluate its evidence—Chevron dropped its request for billions of dollars in damages against the Ecuadorian defendants. ECF No. 1404. It did so because the U.S. Constitution guarantees every defendant in a federal case the right to a jury only so long as "the amount in controversy shall exceed twenty dollars." U.S. Const. amend. VII. Three weeks later—on the last possible day—Chevron did the same with respect to Donziger, but only "upon a finding from this Court under Fed. R. Civ. P. 39(a)(2) that all issues in this case will be tried by the Court." ECF No. 1469. The court made the finding and denied the request for a jury trial. ECF No. 1500.

### C.    After a seven-week bench trial, the district court again issues a judgment preemptively nullifying the Ecuadorian judgment.

#### 1.    The court holds a seven-week bench trial

When the trial started in October 2013, the resource disparity between the two sides could not have been starker, or more visual: On one side, a phalanx of

Chevron's lawyers filled the booths, lined the walls, and occupied a large overflow room that had been annexed and converted into a Gibson Dunn war room. Chevron's General Counsel attended nearly every day for the full seven weeks. On the other side were Donziger, his new counsel (two lawyers who had entered their appearances only the week before), and a handful of youthful volunteers, some on leave from their day jobs with environmental groups, as well as counsel for the Ecuadorians (a solo practitioner who had never handled a jury trial). ECF No. 1507. When the defendants wanted to confer as a group, they met in a room the size of a closet. Tr. 838:3-11.

Chevron's case at trial rested on four primary allegations—two new and two old. The new allegations, although new, provoked a sense of déjà vu: Chevron claimed that the defendants bribed the first-level Ecuadorian judge and ghostwrote the judgment he issued. But this time, instead of relying on Diego Borja, Chevron relied on Alberto Guerra—a man who confessed to bribing judges as an attorney and accepting bribes as a judge. Tr. 1216:20-1218:8. The old allegations were that the defendants corrupted the entire case by working with Cabrera and that Ecuador's judicial system is so systematically inadequate that any judgment emanating from it is unworthy of respect.

Of these four allegations, the first three do not in any way implicate the substitute Ecuadorian judgment. The fourth—systemic inadequacy—does not in

any way implicate the defendants. Chevron's sole reason for including it in the case is to show, as its post-trial brief argues, that the "judgment is not subject to recognition" under New York's Recognition Act. ECF No. 1847, at 274-80.

### a. Chevron's allegations of impropriety regarding the judgment

*a. Chevron's second alleged "bribery" scheme.* Chevron's star witness at trial was Guerra, a former Ecuadorian judge who contacted Chevron in 2012 with "a story to tell" about "the drafting of the judgment at the trial court level." A-2916.[14] At that time, Guerra was making $500 per month in Ecuador and had no savings, and his son was facing "serious [immigration] problems" in the United States. A-2902-03; CA-102. Chevron arranged for Kroll representatives to meet Guerra in a Quito hotel room, where he told them that he had helped ghostwrite the judgment in exchange for $300,000 from the Ecuadorian plaintiffs' lawyers. CA-96, 115, 134, 170, 173. He said this story was "worth a million dollars." CA-118.

---

[14] This was not the first time Guerra made an overture to Chevron. In October 2009, he reached out to Chevron's lawyers offering to "'fix' the entire case" in Chevron's favor. A-1864-65. One or two months later, he made the same offer to Chevron in person. A-1865; *see* A-2600-01. Guerra later claimed that he and Judge Zambrano struck a deal with the plaintiffs and Donziger at a Quito restaurant shortly thereafter—in mid-to-late November or December 2009—even though Donziger's immigration records show that he was outside the country at that time because his mother was dying from cancer. Tr. 919-922; A-1356; A-1291. The district court declined to credit this part of Guerra's testimony, finding that it conflicted with a previous account he had given. SPA-251.

When Chevron's representatives met Guerra a few weeks later, they brought a bag filled with $20,000 in cash. A-2769. Although this amount was 40 times his monthly income, Guerra was unimpressed, calling it "very little" and asking: "Couldn't you add a few zeros?" *Id.*; A-2778. "[M]oney talks," he said, but "gold screams." A-2778. (When asked at trial whether he said these words, he answered: "I don't recognize that adage that you are quoting. It's not something that's typical in my country. But in one way or another I did express that feeling." A-800.) A few minutes later, a Kroll investigator explained that Chevron wanted photocopies of Guerra's day planners and access to his email accounts, prompting this exchange:

> GUERRA: "[A]ctually, actually … I have some attachment to that, right? All the information I have there.
>
> ANDRÉS RIVERO: That can be fixed.
>
> INVESTIGATOR 5: You will become more attached to what you can buy with the money we pay you. [LAUGHS]
>
> RIVERO: Yes, sure, true, true.
>
> GUERRA: It helps, but, but it's so little.
>
> \*       \*       \*
>
> INVESTIGATOR 5: "[W]e'll make a deal on the way to your house. This is what we have in cash. Between now and afternoon's end we'll have managed to have a little more. How much is it?
>
> RIVERO: How much? Not when. I said how much. [LAUGHS]
>
> GUERRA: Make it fifty thousand.

A-2784.

Chevron ended up paying Guerra much more than fifty thousand. As it did with Borja, Chevron has paid Guerra hundreds of thousands of dollars in cash and over a million in benefits, much of which continues to this day, including:

- $18,000 and a new laptop in exchange for his hard drive, USB drives, day planners, and access to his email accounts;

- $20,000 and a new cell phone in exchange for his phone records, bank records, old cell phone, and access to his bank account;

- $10,000 for handing over an 8-page Word document and several bank deposit slips;

- an ongoing monthly stipend of $10,000, even though he has performed no work for Chevron besides getting ready for trial;

- an ongoing monthly housing allowance of $2,000;

- a personal lawyer whose bills Chevron pays;

- all moving expenses—including airfare and a temporary hotel—for him, his wife, his son, and his son's family;

- $12,000 to purchase household items for his new life in the U.S.;

- a car with insurance;

- health insurance covering him, his wife, and his son's family; and

- payment of all legal fees to finalize the immigration of his entire family.

A-770-82; A-801-04; A-1370.

Once Chevron started paying him, Guerra began changing his story. He admitted that the Ecuadorian plaintiffs' lawyers did not in fact promise him $300,000

to write the judgment, calling this "an exaggeration [on his] part towards Chevron's people in order to secure a better position for [himself]." A-816. By "exaggeration," he meant: "It was not true." *Id.*; A-3002; A-3007.

Guerra also changed his story of how he wrote the judgment. He previously claimed to have worked on it at his home in Quito after Judge Zambrano gave him a flash drive containing a draft. A-790-91. But when no corroborating evidence was found, Guerra claimed that he actually wrote the judgment in Lago Agrio, on Fajardo's laptop. A-2941. His explanation for the change was that his "memory improved regarding those facts." A-809.

Guerra's story shifted in another important respect. When he first met with Chevron's investigators, he told them that Fajardo had emailed him a short background document to use while drafting the judgment (the so-called "memory aid"). CA-180. When asked whether he could provide proof of the email, Guerra replied: "Uhmm. That, damn, well, technically it can be obtained, right?" *Id.* A couple weeks later, after a Chevron investigator again asked him for the email, Guerra said that he "[didn't] know anything about that." A-2767. The investigator explained that Chevron could access Guerra's account and find the email for him, to which Guerra responded: "Well, you know that I, in that one … precisely a few days ago I had problems with my email." A-2767-68 (ellipsis in original). Later, when the email didn't turn up—and Fajardo's email address didn't even appear in

Guerra's list of contacts—Guerra said that he "recalled that [Fajardo] personally handed [Guerra] the document in the nighttime hours of the first of day of [his] review." A-1343; Tr. 1012:9-12. Guerra explained that he hadn't been able to locate the document before because "[i]t was stuck to some other ones that [he] had in [his] possession." A-773. He never provided a draft of the judgment he supposedly worked on, nor could Chevron's investigators ever find one. A-803-04.

Guerra did not deny that he kept changing his story. As with his admittedly made-up $300,000 bribery allegation, he claimed that his shifting narrative served a purpose—to net him more money from Chevron. He was transparent about this: "I said many things to the gentlemen, to their representatives from Chevron. On many of those I was exaggerating. I wanted to improve my position regarding these gentlemen." A-807-08. And: "I did tell them some exaggerated things because it was my intention or for the purpose of bettering or improving my position." A-813. And again: "I told Chevron several things. Some them were true, others were exaggerations." A-3020.

Although the district court was cagey about the extent to which it relied on Guerra's testimony, the court determined that "Guerra was an impressive witness" and credited his story that he was bribed to ghostwrite the provisional Ecuadorian judgment. SPA-262, 277, 291-93. The court was not troubled by the money he

received to testify, dismissing it as "a private witness protection program created for him by Chevron." SPA-234.

**b. *Chevron's ghostwriting allegation.*** Closely related to its bribery allegation is Chevron's claim that the plaintiffs' legal team—Donziger, Fajardo, and others—secretly ghostwrote the preliminary Ecuadorian judgment under an agreement they struck with Guerra in late 2010. A-1361. Like the bribery allegation, this allegation does not in any way implicate the three-judge court's substitute judgment. Even so, Chevron was unable to provide any direct evidence to support its ghostwriting theory. Despite having access to the entire "universe" of computer files and internal communications, Chevron could not produce a single draft of any allegedly ghostwritten judgment or find any correspondence among the plaintiffs' lawyers mentioning one. Nor could Chevron identify any emails showing that the plaintiffs had a relationship with Judge Zambrano or knew of his intentions.

The emails Chevron identified actually show the opposite. On December 31, 2010—shortly after the alleged deal with Guerra was struck and six weeks before the judgment was issued—Fajardo emailed Donziger expressing concern that the plaintiffs had not yet submitted their *alegato* (or final post-trial brief) to the court:

> Nobody knows when the Judge may issue the judgment; he may do it in two weeks, several months, or even years. If he does it in several months, he may possibly consider the memoranda of law, but if the judge issues the judgment soon, we will end up with the document in hand and it will be useless to us. We are not going to run that risk.

A-1900. He concluded: "I'm sorry my friends, but we are behind schedule with this memorandum of law, which could have serious consequences for the case." *Id.*

When Chevron filed its own *alegato* one week later, Fajardo grew even more worried that the plaintiffs might lose the case. He emailed the team on January 8:

> As you can see, my concerns are well founded. Chevron has gotten ahead of us by filing their *alegato*, while we are still writing ours. All the more reason to speed up our work, otherwise the Judge could be convinced by Chevron's theory.

A-1905. After another team member expressed his surprise that Chevron had filed so quickly, Fajardo responded: "The one who strikes first has greater success or causes greater impact…They want to influence the judge with their theory. It is a mistake on our part to have fallen asleep for so long on the *alegato*." A-1904.[15] Chevron did not explain why Fajardo would have been so concerned if he had already arranged for a favorable judgment.

Nor did Chevron explain why the judgment would have denied many of the plaintiffs' damages requests if they had actually written it, as illustrated below:

---

[15] The district court determined that these emails are "classic hearsay" and thus inadmissible evidence. SPA-286. But the emails were not offered to prove the truth of the matter asserted—that the plaintiffs were actually late in filing their *alegato*, or that their delay would actually have serious affects for the case. They were offered instead to show the lawyers' state of mind at the time: that they were worried the judge would rule against them. The emails thus fall under a well-recognized hearsay exception—despite the district court's conclusory assertion to the contrary. *See Headley v. Tilghman*, 53 F.3d 472 (2d Cir. 1995).

| Type of Remediation | Damages Requested By Plaintiffs | Damages Awarded By Court |
|---|---|---|
| *Groundwater* | $394 to $910 million (Cabrera: $3.24 billion) | $600 million |
| *Potable Water System* | $536 to $541 million. | $150 million |
| *Ecosystem Restoration* | $874 million to $1.697 billion | $200 million |

A-1217; A-1220-22; A-3139.186-87; A-3139.191-93.

Instead, Chevron based its ghostwriting theory on similarities between language in the preliminary judgment and in some of the plaintiffs' work product that was supposedly never filed. *See, e.g.,* PX 3800. Chevron's experts reached this conclusion without having reviewed by hand approximately 100,000 pages in the record—which is unavailable electronically—and without accounting for how Chevron had filed motions and other documents that are not part of the official record (either because they were never formally logged or because they were not properly maintained). *See* ECF No. 918-52.

Based on this theory, Chevron subjected Judge Zambrano to a lengthy cross-examination during trial, forcing him to endure a pop quiz—through translation—about a 188-page decision he wrote nearly three years before. Here are some examples of what Chevron's counsel asked Judge Zambrano:

1. MR. MASTRO: "[S]ir, please tell us what the judgment says on page 107 is 'the most powerful carcinogenic agent considered in this decision.' Please tell us what that was." A-820-21.

59

2. MR. MASTRO: "Sir, can you tell us what theory of causation the judgment says its author agrees with on page 88 of the judgment? Do not look at the judgment, sir. Do not look at the judgment, please." A-826.

3. MR. MASTRO: [C]an you tell me, Mr. Zambrano, what report the judgment says at page 134 is the "statistical data of highest importance to delivering this ruling," yes or no?  Yes or no?
MR. MASTRO:  He's leafing through the document, your Honor.
THE COURT: Mr. Zambrano, stop. Put the document down and answer the question. A-823.

Judge Zambrano did not know the exact answer to every question. Unlike Guerra—who had met with Chevron's lawyers at Gibson Dunn approximately 50 times before taking the stand, A-767-68—Judge Zambrano had not been prepared for his testimony, nor was he paid to give it. Tr. 1807:25. When Guerra told him that Chevron would offer Judge Zambrano over $1 million in exchange for his testimony, he declined. Tr. 1915:1-2.

The district court determined that the judgment was ghostwritten. The court did not believe that Judge Zambrano could have written the decision himself and refused to consider the possibility that other judges who presided over the case (like Judge Núñez) could have contributed to its preparation along the way, but that Judge Zambrano, in an attempt to salvage some pride and dignity, had nonetheless claimed sole credit. The court found that no judge could have reviewed the record in the case and written a 188-page decision only two months after trial—a finding he made in a 586-page decision issued three months after trial in this case, which has its own 100,000-plus-page record. SPA-203-04.

60

### b. Chevron's allegations of fraud regarding the Cabrera Report

Chevron's next allegation focused on the way in which the report by a damages expert, Richard Cabrera, was prepared. As it did before this Court in *Naranjo*, Chevron claimed that the Ecuadorian plaintiffs' lawyers had irreparably corrupted the Ecuadorian proceeding by working with Cabrera—an argument Chevron also made, unsuccessfully, to all three levels of Ecuador's judiciary.

Despite Chevron's allegations, the interactions between Cabrera and the plaintiffs' lawyers were fully consistent with Ecuadorian law and practice at the time, which permitted parties to communicate *ex parte* with court-appointed experts (as Chevron itself did). A-427−31; A-441−43; A-2075−76. It also permitted parties to create work plans and to draft materials for the experts to adopt as their own (as Chevron did too). *Id.* And it permitted—indeed, *required*—that the party who requested the expert pay for the fees and expenses. Although Chevron contended that the Ecuadorian plaintiffs' lawyers paid Cabrera additional money to influence his conclusions, this money covered only expenses for work he had actually performed or was set to perform. The plaintiffs' lawyers advanced the money (which they were obligated by law to pay) so that his work would not be delayed. One contemporaneous internal email, for example, explained that the Ecuadorian trial court had been "taking [its] time in resolving [Chevron's] recusal" motion, which prevented the court from acting on Cabrera's request that "we pay him for financing

61

the costs of the field work." A-1288.1. "[I]f there's no money," the email continues, "the job simply becomes paralyzed," and "the expert's job can't wait" until "the judge orders us to pay" his "expenses." *Id.* The money for Cabrera's expenses was therefore paid out of a segregated account (an account kept secret from the employees of the law firm, which was having difficulty making payroll as litigation expenses mounted) in anticipation of court approval. A-3435-36.

None of the three Ecuadorian courts found anything improper about this arrangement, but nonetheless set aside the Cabrera Report because it was unnecessary to their decisions. The first-level court granted Chevron's request that the report "not be taken into account" (rather than waste time addressing Chevron's "excessively voluminous" filings regarding it) and later clarified that "the report had NO bearing on the decision." A-1089; A-1245. The second-level court, reviewing the evidence de novo, similarly declined to rely on the report and found that Chevron's allegations "could not affect the final result of the lawsuit" given the overwhelming evidence of Chevron's liability. A-492. And the Supreme Court confirmed that the judgment "did not take [the report] into account." A-3545-46. It noted that Chevron had "not indicate[d] which law [was] violated," nor had it explained how the allegations, even if true, "affect[ed] the validity of the proceeding" or "harm[ed]" Chevron in any way. *Id.*

That conclusion is not surprising. Throughout the Ecuadorian litigation, Chevron took the position that it owed *nothing* to the victims of its pollution and refused to work with Cabrera as he prepared his report on damages. Instead of providing an alternative damages calculation, Chevron tried to obstruct the process: It "filed a considerable number of motions" attacking Cabrera and took out full-page ads in several prominent publications assailing his "complete lack of integrity"—an attempt to force his withdrawal through public humiliation. A-1088; ECF Nos. 154-2, 154-3, 154-4.

Nonetheless, the district court again sided with Chevron. Citing the *current* version of an Ecuadorian statute governing the payment of experts in *criminal* proceedings, the district court concluded that the payments to Cabrera "were illegal or at least improper" as a matter of Ecuadorian law, SPA-105-06—even though Ecuador's highest court found that Chevron could "not indicate which law [was] violated." A2545-46. And the district court determined that the judgment had actually relied on the Cabrera Report—despite the Ecuadorian courts' express statements to the contrary—because the judgment used a "pit count" of 880 to calculate damages. SPA-546. That number, however, was based on a review of "aerial photographs," plus documents "submitted by the parties" and "the expert Gerardo Barros." A-1163. The Ecuadorian court explained that it wasn't based on the Cabrera Report, where "[t]he number 880 does not appear." Tr. 1337:1-5. The

Ecuadorian Supreme Court, addressing this very issue, independently held that "the judge did not weigh the challenged report" or "contradict[] any principles of logical evaluation" in calculating the total number of pits. A-3607. And Chevron did not give the Ecuadorian trial court its own pit count—of *its own* pits—nor did it do so below. *See* A-1163. In other words, Chevron did not contest that there were at least 880 pits.

### c. Chevron's allegation that the Ecuadorian judiciary is corrupt.

Aware that none of its case-specific allegations could carry the day— particularly with respect to the substitute judgment—Chevron proceeded to attack the Ecuadorian judiciary as a whole. The basis for this attack was the same as before: State Department reports, Donziger's own unguarded statements, and the testimony of a single person—Dr. Vladimiro Álvarez Grau, a man this Court has described as "an avowed political opponent of the country's current President, Rafael Correa." *Naranjo*, 667 F.3d at 238.

Dr. Álvarez, a former presidential candidate and current newspaper columnist, is the kind of figure who would be a regular on Fox News or MSNBC in the United States. Admitting at trial that he did not "know anything at all regarding the Lago Agrio case other than what is made public," Tr. 2041:1-2, Dr. Álvarez instead denounced Ecuador's judiciary with broad, politically barbed statements about judicial independence and the rule of law. For the proposition that Ecuador's judicial

reforms in the mid-2000s violated the separation of powers, Dr. Álvarez cited his own comments in Ecuador's media. A-1418. Dr. Álvarez then argued that the administration of justice in the Lago Agrio case could not have been impartial because Correa made public statements in support of the LAPs. A-1473. Nonetheless, for this sweeping criticism of Ecuador's judiciary Chevron paid Dr. Álvarez at least $150,000. A-829. The district court bought wholesale these statements by a foreign political figure, citing Dr. Álvarez's testimony 52 times in nine pages and corroborating his claims only once. SPA-420-28.

## 2.    The court issues its decision

The district court issued a 586-page decision, including appendices, ruling for Chevron across the board and finding that the Ecuadorian judgment "was obtained by corrupt means." SPA-497.

The court concluded that Chevron had Article III standing. Of the nine injuries that Chevron alleged, the district court found that three were sufficiently redressable to generate standing: the loss of Ecuadorian trademarks held by a Chevron subsidiary; the loss of an arbitral award against the Republic of Ecuador; and the present and future costs associated with defending against the enforcement of the Ecuadorian judgment around the world. SPA 325-27.

The court  also reasoned that the Ecuadorian appellate court's de novo review of the facts and the substitute judgment it issued did not break the chain of causation

required for standing. It found as a matter of fact that the appellate court did not engage in de novo review because the judges had too little time to review the record. SPA-428. The court further reasoned that, in any event, "the subsequent appellate rulings are not entitled to any recognition in consequence of the systemic deficiencies of the Ecuadorian legal system." SPA-326.

Turning to the defendants' claim that Chevron was estopped from making a wholesale attack on Ecuador's judiciary in light of its promise to submit to Ecuadorian jurisdiction, the court concluded that when this Court found in *Republic of Ecuador* that Chevron had merged with Texaco, it was "misinformed." SPA-469. The district court therefore held that "Chevron is not bound by any of the statements made in *Aguinda* by Texaco," including the promise to submit to Ecuadorian jurisdiction. *Id.*

The court then issued its relief, including (1) a constructive trust on all property that the defendants receive that is "traceable to the [Ecuadorian] Judgment or the enforcement of the Judgment anywhere in the world"; and (2) an injunction against "[f]iling or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment…in any court in the United States." SPA-590. The court defined "New Judgment" as "any judgment or order that hereafter may be rendered in the Lago Agrio Case [by] any court in Ecuador." SPA-592. The district court determined that this relief was consistent with this Court's decision in *Naranjo* because

66

*Naranjo* was "limited to the panel's interpretation of New York's Recognition Act." SPA-493.

In addition to Chevron's RICO claim, the court grounded the relief in what it called Chevron's "non-statutory claims for equitable relief with respect to the judgment." SPA-330. It did not identify which, if any, of the claims in Chevron's complaint constituted this category.

Following the district court's decision, Chevron moved for $32 million in attorneys' fees from Donziger. ECF Nos. 1889-90.

## STANDARD OF REVIEW

A district court's determination of its own subject-matter jurisdiction is reviewed de novo. *Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469, 471 (2d Cir. 2006). Whether a claim states a cause of action is also reviewed de novo. *See, e.g.*, *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Finally, whether to apply judicial estoppel is a "pure question of law," *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 143 (2d Cir. 2005), and should therefore be reviewed de novo as well. *Intellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012) (declining to decide the standard of review for judicial estoppel but applying de novo review).

## SUMMARY OF ARGUMENT

**I.** Because Chevron lacks standing, the district court lacked jurisdiction. There is no causal link between the conduct it complains of and the injuries it alleges. The

decision Chevron attacks is the substitute judgment of the appellate court. But Chevron only alleges misconduct at the trial level. And it has not even sought to contest its environmental liability.

Chevron's standing problems do not end there. When it comes to relief, Chevron is stuck between Article III and *Naranjo*. If Chevron's injunction satisfies *Naranjo*, it is too narrow and speculative to redress Chevron's injuries; if it prevents collection of the judgment worldwide, it is no more valid than the injunction this Court struck down in *Naranjo*.

**II.** This Court has already held that "[t]here is no legal basis for the injunction that Chevron seeks." *Naranjo*, 667 F.3d at 242. Neither RICO nor the district court's "non-statutory claims for equitable relief" provide a basis for circumventing *Naranjo*, and doing so would make the Second Circuit a magnet for disappointed litigants the world over.

**III.** Even if Chevron were to make it past standing and *Naranjo*, it would be judicially estopped both by its prior representations regarding the adequacy of Ecuador's judiciary and by its promise to this Court that it would submit to Ecuador's jurisdiction as a condition of its *forum non conveniens* dismissal. Despite the district court's attempts to rewrite history, that promise is "enforceable against Chevron." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011).

**IV.** Finally, Chevron has no cause of action under RICO. RICO's causation

68

and injury requirements are both more stringent than Article III's, and the statute cannot be used to provide the equitable relief that the district court awarded. The district court, which defied comity, the common law, and common sense, should have its judgment and factual findings vacated.

## ARGUMENT

## I. Because Chevron lacks standing, the district court lacked jurisdiction to issue its opinion and judgment.

When it filed this RICO action in 2011, Chevron made grand promises. It promised to show that a two-decade quest by indigenous Ecuadorians to seek justice for Chevron's pollution of their rainforest homeland was nothing but "sham litigation." ECF No. 1 at 2. But along the way, Chevron dropped *any* attempt to contest the overwhelming evidence that it willfully polluted the water, land, and air of the Amazon for decades. Then, on the eve of trial, Chevron dropped *all* of its damages claims—a transparent maneuver designed to deprive Donziger of his constitutional right to a trial by jury. And, finally, in its post-trial briefing, Chevron ditched its request for an injunction against all foreign enforcement proceedings— an apparent attempt to avoid the serious international-comity concerns that led this Court in *Naranjo* to reverse the district court's previous worldwide anti-enforcement injunction.

These three strategic decisions, taken together, leave Chevron on the horns of an intractable legal dilemma. On the one hand, nobody may bring a case in federal

court without demonstrating the requirements of Article III standing: (1) a legally cognizable injury that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and (3) "likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). As the plaintiff, Chevron must show that it satisfies these three elements—injury, causation, and redressability—for each claim and form of relief it seeks. *Id.* at 352. Until it has done so, there is no jurisdiction over the case and the Court has "no business deciding it." *Id.* at 341. Because there has been no attempt to enforce the Ecuadorian judgment in the U.S., Chevron and the district court had to attempt to demonstrate standing by giving the injunction real teeth— by proving that it binds foreign courts in a way that makes it likely to redress Chevron's claimed injury.

On the other hand, Chevron and the district court had to try to satisfy the international-comity principles identified in *Naranjo*. That means they had to appear to strip the injunction of any binding effect—by showing that it preserves the ability of foreign courts to make their own decisions about how to apply their own laws on enforceability. The dilemma facing Chevron and the district court is that they had to somehow do both—a logical impossibility.

In addition to the dilemma it faces with its relief, Chevron faces a severe causation problem. Its claimed injuries stem from the three-judge court's substitute judgment, which in Ecuador's civil system is effectively a retrial. And yet the

wrongdoing Chevron alleges all occurred at the trial level. To be clear, Mr. Donziger vigorously contests these allegations: The accusation that he bribed a judge itself hinges on the paid testimony of a man who confesses to bribing and being bribed, Tr. 1216:20-1218:8, and Ecuador's own Supreme Court pointed out that Chevron has "not indicate[d] which law [was] violated" by its allegations surrounding the Cabrera Report. A3545-46.

But even setting that aside, Chevron's position is akin to that of a criminal defendant who complains of procedural irregularities in a trial and is retried and convicted once again, but continues to complain about the first trial in his habeas petition. In that situation, no sensible reviewing court would reach out to overturn the second trial. *Cf.* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

This lack of causation also means that Chevron's injuries will not be redressed by the relief it sought and obtained. None of Chevron's alleged injuries will be remedied by the district court's prospective injunction, and its future harms are speculative and incapable of being prevented by an injunction that falls short of the worldwide injunction rejected in *Naranjo*. Chevron cannot be allowed to obtain a U.S. court's "advisory opinion" that can be deployed for its persuasive value in enforcement proceedings around the world. *Naranjo*, 667 F.3d at 246.

71

### A. Chevron cannot show that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court.

Chevron lacks standing because it cannot, as a matter of logic, prove "a causal connection between [its] injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Chevron's case boils down to two things: that an expert report submitted at trial was allegedly prepared improperly and that the trial judge who issued the preliminary judgment was allegedly influenced inappropriately. But Chevron seeks relief from the substitute judgment issued by the three-judge court, which did not include the trial judge and did not consider the report. And Chevron has chosen not to contest its liability for environmental damage. It therefore cannot demonstrate that its alleged injuries are "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan*, 504 U.S. at 560.[16]

---

[16] The district court considered it "hornbook law" that standing is determined only at the time the action is brought, and that the jurisdictional problems raised are therefore questions of mootness, not standing. SPA-320 n.1230. But when a party "seeks new relief, he must show (and the District Court should have ensured) that he has standing to pursue it." *Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring). As the "party invoking federal-court jurisdiction," Chevron "'bears the burden of showing that [it] has standing for each type of relief sought.' A plaintiff cannot sidestep Article III's requirements by combining a request for injunctive relief for which he has standing with a request for injunctive relief for which he lacks standing." *Id.* (quoting *Summers v. Earth Island Institute*, 555 U.S. 488 (2009); citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

### 1. The appellate court's substitute judgment—the product of a de novo review of the record—breaks any causal link between alleged trial-level improprieties and Chevron's injuries.

Chevron has failed to prove any causal link between its alleged injuries (which flow from the substitute judgment) and the alleged wrongdoing (which affects the provisional judgment). After the trial court issued its 2011 judgment, an independent three-judge court reviewed the record *por el merito de los autos*—a standard of review that this Court has recognized is "similar to the American standard of de novo review" but "applicable to questions of both fact and of law." *Naranjo*, 667 F.3d at 237; *Código de Procedimiento Civil*, art. 838, SPA-629. Indeed, in civil-law systems like Ecuador, the term "'appeal' has a special meaning … that is unfamiliar in the United States" because the reviewing court "arrive[s] at an independent determination of what the facts are and what their significance is." John Henry Merryman & Rogelio Pérez-Perdomo, *The Civil Law Tradition: An Introduction to the Legal Systems of Western Europe and Latin America* 121 (3d ed. 2007). In these systems, "fact-finding will be reassigned from the court that did the primary fact-gathering," John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. Chi. L. Rev. 823, 856-57 (1985), resulting in a "[f]ull redetermination of the law and the facts" and a "substitute trial court decision[]."

José Rafael Bustamente *"Ecuador" in Civil Appeal Procedures Worldwide* 262, 263, 266 (1992).[17]

Chevron cannot overcome this causation problem by pointing to the three-judge court's refusal to adjudicate Chevron's criminal accusations against Donziger. Just as a U.S. court would not hold a criminal hearing amid a civil trial to assess a possible violation of a witness-bribery statute, the three-judge Ecuadorian court lacked "jurisdiction to hear [Chevron's claims of] collusive action," which Chevron could bring separately under Ecuador's Collusion Prosecution Act. A-3543. Chevron received a full review of the factual and legal determinations on appeal—determinations that it declined to challenge here—and the judgment against it disregarded the allegedly tainted evidence. That dooms its case for causation.

> **2.    The district court's conclusion about the standard of review contradicts Ecuador's highest court on a question of Ecuadorian appellate procedure.**

Aware of Chevron's causation problem, the district court tried to get around it in two ways: (1) by launching a wholesale attack on Ecuador's judiciary based on the testimony of a talking head, SPA-326 n.1251, and (2) by "finding" that the three-judge court did not actually engage in de novo review. SPA-426. But questions of

---

[17] For this reason, "Chevron's expert on Ecuadorian law" previously admitted to this Court that "the Ecuadorian judgment remained unenforceable until the intermediate court issued its decision." *Naranjo*, 667 F.3d at 237; *see also Código de Procedimiento Civil*, art. 300(5); *Ley de Casación*, art. 10.

foreign law are still questions of law, not fact. Fed. R. Civ. P. 44.1. And in Ecuador, as in the United States, the question whether a court applied the correct standard of review is a question of law. It is also one the Ecuadorian Supreme Court answered: It found that the intermediate court properly exercised de novo review—directly contradicting the district court's "finding" in this case. A-3605. ("[T]here has been a correct weighing of the evidence in accordance with legal standards.").

A federal district court cannot use its authority as a fact finder to make pronouncements of another nation's law that contravene that nation's highest court. The purpose of Rule 44.1 was "to abandon the fact characterization of foreign law and to make the process of determining [foreign] law identical with the method of ascertaining domestic law to the extent that it is possible to do so." 9A Fed. Prac. & Proc. Civ. § 2444 (Wright & Miller, 3d ed). If the rule means anything, it is that the pronouncements of a foreign supreme court *on the same issue, in the same case* control. Federal courts are bound by the decisions of state high courts when sitting in diversity jurisdiction. *See Erie R.R. v. Tompkins,* 304 U.S. 64 (1938). A sovereign nation's high court deserves at least as much respect "as a matter of comity." *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001); *see* Doug M. Keller, *Interpreting Foreign Law Through an Erie Lens*, 40 Tex. Int'l L. J. 157 (2004).

Even beyond comity, it is difficult to understand how a U.S. trial judge would be better positioned than Ecuador's Supreme Court to assess an Ecuadorian

75

appellate court's compliance with Ecuadorian standards of review. As Judge Rakoff noted in *Aguinda*, the idea that an American fact-finder "is better equipped than an Ecuadorian judge to apply Ecuadorian law to Spanish-language testimony and documents relating to 30 years' of activities by an Ecuador-sponsored Consortium in an Amazonian rain forest is preposterous." *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 552 (S.D.N.Y. 2001), *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002). It is even more "preposterous" in light of the history: This litigation was moved from the U.S. to Ecuador in the first place based in part on Chevron's representation that "Ecuador's courts are far better suited to apply their own laws." Appellee's Brief at 67, *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir. Dec. 20, 2001).

In any event, the Ecuadorian Supreme Court was correct to conclude that the three-judge court considered the record with care. That court found a number of small errors in the previous court's analysis: that it had mistakenly read a unit of measurement as milligrams, instead of micrograms, A-463; that one sample had the wrong expert's name attributed to it, *id.*; that a sample showing a certain amount of benzene contamination was misreported, *id.* When Chevron alleged that the trial judge's ruling referred to evidence not in the record (which Chevron claimed was proof of fraud), the three-judge panel found where in the record the evidence was located. A-463. And the court's judgment reversed the trial court's findings as to

76

mercury contamination, noting an error in the judge's assessment of the evidence. A-468.

Disregarding all of this, the district court based its "factual finding" on uninformed assumptions about Ecuadorian procedure. The court asserted—without citation—that "additional evidence presented at trial reveals" that the three-judge court did not engage in the appropriate level of review. SPA-426 n.1568. What evidence, exactly? The court did not say.

Instead, the court surmised that "it would have been impossible for any court to have conducted a *de novo* review of the 188-page judgment and the trial record in the time the appellate court rendered its decision." SPA-427. But elsewhere, the court admitted that it had been given no "evidence or foreign law materials explaining the procedure for selection of appellate judges under Ecuadorian law." SPA-295 n.1149. So on what basis did the court make this determination other than armchair speculation? There were nine months between selection of the first appellate panel and issuance of the substitute judgment. A-1228. Yet, in the absence of any evidence, the district court not only refused to defer to Ecuador's Supreme Court—it made the most unfavorable assumptions possible: that the only time in which the three judges could review the case was after establishment of the *final* panel, five weeks before the judgment, and that this length of time made it impossible for them to engage in meaningful review. Although the court pointed to the total

number of pages in the Ecuadorian record to back up its assumptions, that number is surely inflated by Chevron's known propensity to "bombard [courts] with distracting and irrelevant documents." *Republic of Ecuador*, 638 F.3d at 388 n.2. And the court itself issued a 586-page opinion with 1,800-plus footnotes less than a month after briefing was completed in this case.

In a particularly strange and conclusory statement, the district court declared that "Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery, and other misconduct." SPA-416. But the court did not explain how it ruled out the obvious independent cause: Chevron's own decades-long illegal pollution in Ecuador, which Chevron chose not to contest here. Reconsidering the evidence of that pollution de novo, the three-judge court held Chevron liable and entered judgment against it—a judgment that Chevron has cast no doubt on in this appeal. As a result, Chevron cannot prove that its injuries are "fairly traceable" to the misconduct it alleges, and so it does not have constitutional standing to bring this case. *Lujan*, 504 U.S. at 560.[18]

---

[18] This is to say nothing of Chevron's failure to show "but for" causation under RICO, which we address in Section IV. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

**B.    Chevron failed to demonstrate any concrete injuries that could be redressed by the relief sought.**

To have standing, Chevron must also demonstrate that it is "likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Id.* at 561. Chevron has not done so. The district court grounded Chevron's standing in three asserted injuries—none of which will be likely redressed by the relief granted.

Chevron first asserts that it has suffered harm due to the seizure of trademark assets belonging to one of its subsidiaries in Ecuador. ECF No. 1847 at 6. But Chevron has not demonstrated that its relief will likely redress this injury. Chevron does not contend that the relief nullifies the embargo over the trademarks in Ecuador. Rather, Chevron says that it has satisfied redressability because the relief bars the Ecuadorian defendants from receiving funds from a future auction of the trademarks, which would instead go "in constructive trust for Chevron." ECF No. 1863 at 13. That relief, according to Chevron, is "more than adequate" to establish standing. *Id.* at 14.

Hardly. Here is what would have to happen for the district court's injunction to redress this injury:

(1) The Republic of Ecuador would have to hold an auction of the subsidiary's trademark at some point in the future;

(2) someone would have to buy the trademarks;

(3) the Ecuadorian co-defendants *in this case* would have to be selected out of all the individuals eligible to receive the funds from the auction;

(4) the Ecuadorian courts (which Chevron claims do "not follow the rule of law," *id.*) would have to agree to enforce this Court's judgment deeming them corrupt; and

(5) the Ecuadorian courts would then have to give the money back to Chevron.

That is not only well short of "likely"—it is completely far-fetched. A plaintiff "cannot rely on speculation about 'the unfettered choices made by independent actors not before the court,'" and no foreign court is bound by this Court's decision. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013). It is nothing short of absurd to think that Chevron has pursued this lawsuit to obtain compensation for the loss of the dormant Ecuadorian trademarks of its subsidiary.

Chevron's second asserted injury relied on by the district court is the Ecuadorian courts' embargo of a $96 million arbitral award against the Republic of Ecuador. SPA-326. But Chevron has not even alleged, let alone proven, that this award will likely be redressed by the district court's injunction. As with the trademark injury, redressability depends on Ecuadorian courts (a) enforcing the district court's opinion, (b) directing the embargoed funds to the two Ecuadorian defendants in this case, and then (c) requiring them to turn the money over to Chevron. Neither the district court nor Chevron gives any reason to think such a chain of events is even plausible, much less likely.

Moreover, Chevron cannot rely on either of these two alleged injuries to obtain standing for its claims against Mr. Donziger. He has not received any funds from any auction, nor from any arbitral award, nor is he slated to do so. Chevron makes no effort whatsoever to tie him to these so-called injuries or to otherwise establish how its claims against him could be rooted in them.

The final injury on which the district court relies to assert jurisdiction is Chevron's legal fees to defend against enforcement of the judgment. SPA-327. But neither the fees already incurred nor those that Chevron expects to incur in the future would be redressed by the district court's injunction. As for fees incurred, Chevron cannot recover them because it dropped its damages claim. As for fees expected, the district court's injunction, by its own terms, does not prevent *anyone* from enforcing the judgment overseas. SPA-496. So Chevron's money will be spent *regardless* of the district court's injunction.

### C. Because the district court lacked jurisdiction to hear this case, its findings—particularly findings related to professional misconduct—should be vacated.

There is no such thing as "hypothetical" jurisdiction—"[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998). For that reason, a court's decision that proceeds despite a lack of jurisdiction is "utterly void and unavailable for any purpose." *Earle v. McVeigh*, 91 U.S. 503, 507 (1875). But lacking such jurisdiction, the district court declared a

81

lawyer guilty of bribing a judge and pilloried a nation's entire judiciary, basing those findings almost entirely on paid testimony from an admitted bribe-taker and a foreign politician. In *Naranjo*, this Court made clear that it was inappropriate for Chevron to seek "such an advisory opinion." 667 F.3d at 246. Now that Chevron has obtained one in the form of the district court's opinion, the only remedy for those affected by the court's declaratory findings is to explicitly vacate them. *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245–46 (10th Cir. 2005) (vacating all orders issued in case where district court lacked subject-matter jurisdiction). That is what this Court should do.

But even if this Court does not vacate all the district court's findings, it should at least vacate those that implicate Mr. Donziger in professional misconduct. This Court's power to vacate factual findings of professional misconduct is well established. Because such findings result in significant "reputational consequences and potential costs," *In re Goldstein*, 430 F.3d 106, 111 (2d Cir. 2005), they can be subject to appeal when there is "a finding that an attorney is guilty of specific misconduct," *Keach v. Cnty. of Schenectady*, 593 F.3d 218, 225 (2d Cir. 2010). "Even factual findings by themselves" can be grounds for an appeal where appellate jurisdiction would otherwise be lacking. *Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1, 6 (1st Cir. 2005).

The district court—without providing the standards of proof or procedural safeguards that the Constitution mandates for criminal trials—found that Mr. Donziger, an attorney, gave his "express authorization" for payments to bribe a judge. SPA-293. And the court based this finding solely on the testimony of a paid witness, Alberto Guerra, who admitted to making false statements about the Ecuadorian proceedings to sweeten his deal with Chevron. A-813. Chevron paid Guerra a monthly stipend of $10,000 in addition to particular payments for individual pieces of evidence, such as $20,000 for his phone and bank records. A-771; A-800. *See* ECF No. 1423-2 (Erwin Chemerinsky declaration explaining that "payment of a salary to a witness, in exchange for the witness's agreement to testify … is a clear violation" of ethics rules). "The payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true." *In re Robinson,* 151 A.D. 589, 600, 136 N.Y.S. 548 (1st Dept.1912). If any case calls for vacating findings of misconduct, this one does.

## II.   Chevron's collateral attack on the Ecuadorian judgment violates bedrock international-comity principles and is authorized by neither state nor federal law.

This is *Naranjo* all over again. Then, as now, Chevron sought and obtained from the district court a determination that the Ecuadorian judgment was procured by fraud and an injunction preventing its enforcement. *Naranjo*, 667 F.3d at 238.

Chevron sought, as its complaint put it, a declaration that "any Lago Agrio judgment is unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New York's Recognition of Foreign Country Money Judgments Act," on "grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy." ECF No. 1, at 144 ¶ 394; *see also* ECF No. 283, at ¶ 430.

In addition to that breathtakingly broad claim, Chevron also asked this Court, in the alternative, to affirm the district court's injunction "in light of Chevron's RICO and state-law claims, which are based on—among other things—Donziger and his co-defendants' racketeering enterprise aimed at extorting a 'settlement' from Chevron" and "common law fraud." Appellee Br. 70-71, in *Chevron v. Naranjo*, No. 11-1150 (2d Cir., filed June 23, 2011).

This Court was unpersuaded. It reversed the injunction the day after oral argument. And it not only reversed but ordered Judge Kaplan to dismiss Chevron's declaratory-relief claim "in its entirety." *Naranjo*, 667 F.3d at 247. The Court held that there was "no legal basis for the injunction that Chevron seeks" and that, "on these facts, there will be no such basis until judgment-creditors affirmatively seek to enforce their judgment in a court governed by New York or similar law." *Id.* at 242. The Court took care to anchor its holding not only in an interpretation of New

York's Recognition Act, but also in "the common law principles it encapsulates" as well as principles of international comity and the role of American courts as "responsible participant[s] in an international system of justice" and an "overall enforcement-facilitation framework." 667 F.3d at 241-43.

Yet tucked away at the tail end of its opinion, the district court now offers a reading of *Naranjo* as "limited to the panel's interpretation of the New York's Recognition Act." SPA-493. It dismisses this Court's discussion of international comity as "tied to the panel's discussion of the Recognition Act," whereas the current injunction is based on "an entirely different statute, RICO, and non-statutory state law causes of action about which the *Naranjo* panel said nothing substantive." *Id.* But the Second Circuit necessarily rejected Chevron's alternative argument for affirmance on its RICO and common-law theories when it reversed the injunction: Had it found those arguments persuasive, it would have, and should have, upheld the injunction on those grounds.

More broadly, the district court's decision, if upheld, would render *Naranjo* a dead letter. If the district court is correct, disappointed litigants from around the globe should pack their bags and book a one-way ticket to Foley Square. They may not obtain a decree that will be obeyed back home, and they may never actually face enforcement in New York, but they can air their grievances of fraud, corruption, misconduct, and bias and be guaranteed an advisory opinion by a judge in New York.

Such a regime would "unquestionably provoke extensive friction between legal systems," unnecessarily foster "challenges to the legitimacy of foreign courts" (even where, as here, the enforceability of the judgment might never be presented in New York), and encourage litigants to "seek a res judicata advantage" for use in "potential enforcement efforts in other countries." *Naranjo*, 667 F.3d at 246. But as we now explain, even if *Naranjo* permitted it, even the most expansive sources of state law (the common law) and federal law (RICO) do not provide a basis for the extraordinary relief granted by the district court here.

### A.  The district court's "non-statutory" analysis provides no legitimate basis to circumvent *Naranjo*.

Of all the oddities in the district court's 586 pages of opinion and appendices, its discussion of what the court calls the "non-statutory claims for equitable relief with respect to the judgment" is perhaps the oddest. SPA-330-346. Invoking Lord Coke and John Marshall, the court concludes that the common law authorizes the very thing this Court rejected in *Naranjo*—a "cause of action[] by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them." *Naranjo*, 667 F.3d at 243. Along the way to that surprising conclusion, the court cites a law student's note from 1928; several eighteenth- and nineteenth-century English cases (including one from 1750 in which the Lord Chancellor settled a boundary dispute between the colonies); and a bookshelf's worth of equity treatises. *Id.* From all this, the court draws the lesson that

86

courts at equity could enjoin judgments procured by fraud "at least since the seventeenth century," and that "[t]here is a good deal of learning" on the sort of fraud that supports an independent action for relief from a judgment. *Id.* 331, 334.

The court assembles an impressive library of authorities, but what exactly are these "non-statutory claims" and how did they end up in this case? Are they related to any claim pled in Chevron's complaint, or were they dreamt up in chambers after the trial? How many of these "non-statutory claims" are there anyway? (The opinion vacillates between the singular and the plural.) Are they grounded in state or federal law? If federal law, under what authority? If state law, how does any of this square with *Naranjo*? And why in the world would New York's common law govern litigation conduct in a South American jungle courthouse three thousand miles away? To say the least, the district court's opinion raises more questions than it answers.

For starters, although the cases cited by the district court are overwhelmingly federal, its analysis cannot be properly grounded in federal law. There is a simple reason: "There is no federal general common law." *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) . As every first-year law student learns, "[t]he source of substantive rights enforced by a federal court under diversity jurisdiction, it cannot be said too often, is the law of the States." *Guaranty Trust v. York*, 326 U.S. 99 (1945). The state, "whether its voice be the legislature or its highest court," supplies the rule of

decision—not the wisdom of learned federal district judges. *Id.* And that is true "whether the remedies be sought at law or may be had in equity." *Id.*

The district court thus effectively declared the existence of a new cause of action under New York law—an affirmative fraud-on-the-court claim by a judgment debtor—without so much as a nod in the direction of New York's "legislature" *or* "its highest court." The court didn't even bother to cite any New York decisions from the past century.

Whatever may have been true "in the time of Lord Coke," (SPA-332) New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. 5301-5309 (article 53), enacted in 1970, codifies and supersedes the common law. *CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 792 N.E.2d 155, 159 (N.Y. 2003). New York courts have been clear: For foreign money judgments that "come directly within the scope of article 53," the Act displaces and preempts the common law. *Overseas Dev. Bank in Liquidation v. Nothmann*, 480 N.Y.S.2d 735, 738 (N.Y. App. Div. 1984). This is presumably what this Court meant in *Naranjo* when it grounded its decision in both the Recognition Act and "the common law principles it encapsulates." 667 F.3d at 240. The Recognition Act presumes, as a matter of New York law, that a foreign judgment "is conclusive between the parties" until challenged in an enforcement proceeding." N.Y. C.P.L.R. 5303 (McKinney). The district court's decision to fashion a new common-law claim thus contravenes both

*Naranjo* and the Recognition Act and "would turn [the international judgment-enforcement] framework on its head." *Naranjo*, 667 F.3d at 241.

In any event, New York's common law would not recognize such a claim even in the absence of the Recognition Act: "A litigant's remedy for alleged fraud in the course of a legal proceeding 'lies exclusively in that lawsuit itself,' … not a second plenary action collaterally attacking the judgment in the original action." *Vinokur v. Penny Lane Owners Corp.*, 703 N.Y.S.2d 35, 36 (N.Y. App. Div. 2000). This does not mean that a "defeated litigant" is "without redress" for fraud; rather, "[h]e can apply in the original action, and in a proper case obtain relief." *Crouse v. McVickar*, 100 N.E. 697, 698 (N.Y. 1912). If it is a foreign judgment, the judgment debtor has two choices: seek relief from the judgment in the foreign forum or wait and raise fraud as a defense in an enforcement proceeding in New York, if such a proceeding is ever brought.[19]

Federal civil procedure follows a similar approach. If a litigant complains that another court's judgment was procured by fraud and seeks relief under Rule 60—a procedure not raised by Chevron here but invoked by the district court, 319 n.1263—the rule is simple: "The court that was the victim of the fraud is the *only*

---

[19] *See McDonald v. McDonald*, 239 N.Y.S. 533, 536 (N.Y. 1930); *Khallad v. Blanc*, 947 N.Y.S.2d 859, 862 (N.Y. App. Div. 2012); *Trebilcox v. McAlpine*, 17 N.Y.S. 221, 223 (N.Y. App. Div. 1891); *Banco Do Brasil v. Madison S. S. Corp.*, 307 N.Y.S.2d 341, 345 (N.Y. Sup. Ct. 1970).

court that can decide the question and it cannot be raised by an independent action in another court." Wright & Miller, 11 *Fed. Prac. & Proc.* § 2870 (3d ed. 2014) (emphasis added). There are good reasons for that longstanding rule. The federal courts recognize that "for a nonissuing court to entertain an action for such relief would be seriously to interfere with, and substantially to usurp" the issuing court's authority. *Lapin v. Shulton, Inc.*, 333 F.2d 169, 172 (9th Cir. 1964). Thus, "considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction of such an action" *Id.* Of course, the intrusion and affront to comity are far greater when a court does what it did here: prematurely leap to declare a judgment of a foreign sovereign's courts—and, indeed, a nation's entire legal system—to be unworthy of respect. *Naranjo*, 667 F.3d at 242-246.[20]

Neither Chevron nor the district court could point to a single case in which a U.S. Court entertained a preemptive action to enjoin enforcement or collection of a

---

[20] By preemptively enjoining enforcement in all fifty states, the district court's injunction also raises a *domestic* comity problem. Indeed, "the Anti-Injunction Act bars federal injunctions against the enforcement of judgments allegedly obtained by fraud." 19 Stacy L. Davis & Lisa A. Zakolski, *Federal Procedure, Lawyer's Ed.*, 47:117 (2014); 28 U.S.C. § 2283; *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977). But the district court precluded enforcement proceedings in all fifty states without even considering whether "the relevant legal standards differed." *Smith v. Bayer*, 131 S. Ct. 2368 (2011); *see also Yahoo! v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1213 (9th Cir. 2006) (highlighting the "difficult" question of "whose law governs" when a dissatisfied litigant seeks a ruling that a foreign' court's judgment is "unenforceable anywhere in this country").

foreign judgment based on alleged fraud on the foreign court. If comity considerations dictate that a federal district court in New York lacks authority to entertain a collateral attack on the judgment of a sister district court in, say, Connecticut, then *a fortiori*, it lacks "authority to evaluate [a lawyer's] actions before [foreign] courts." *Manez v. Bridgestone Firestone N. Am Tire*, 533 F.3d 578, 588 (7th Cir. 2008) ("Whether the proceedings in [Mexico] were conducted in an honest and upright manner is a matter for the Mexican judicial authorities and bar authorities, not for us."); *Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214, 217 (E.D. Wis. 1994) ("[T]he proper forum … to challenge the enforceability of the Peruvian judgment is in the Peruvian court"). One of the many district courts in which Chevron brought § 1782 proceedings summed it up: "While fraud on any court is a serious accusation that must be investigated, it is not within the power of this court to do so, any more than a court in Ecuador should be used to investigate fraud on *this* court." *In re Application of Chevron Corp.*, No. 3:10-cv-00686, Dkt. 108, at 3 (M.D. Tenn. Sept. 21, 2010).

And even if a federal district court in New York were somehow an appropriate forum for such issues, it would be *Ecuadorian* law—not New York law—that would govern the relevant conduct. *See Schultz v. Boy Scouts of America, Inc.*, 480 N.E.2d 679, 198 (N.Y. 1985) (when "the appropriate standards of conduct, rules of the road, for example" are at issue, "the law of the place of the tort" usually controls); *see also Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107, 127-28 (D. Del.

1983) (applying Jamaican law to a fraud-on-the-court claim concerning a Jamaican court). A district court is bound to apply state conflict-of-laws rules, even when the rule directs the court to apply the substantive law of a foreign country. *See Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 3-4 (1975) (reversing for failure to apply Cambodian law in Texas to a dispute between an American solider and American company arising out of a tort in Cambodia). As it happens, Ecuadorian law provides a tailor-made remedy that New York law does not: the Collusion Prosecution Act, which creates a private civil action to air collateral allegations of fraud in Ecuadorian court proceedings. Moreover, Chevron has filed a case with the Constitutional Tribunal of Ecuador in which it has raised its fraud claims. The availability of these local remedies should counsel further hesitation before any unnecessary and unauthorized intervention by U.S. courts.

Finally, the district court's invention of a new common-law claim after trial raises serious due-process concerns. In our system, courts may not surprise defendants with decisions on "totally unpleaded, unlitigated claim[s]." *Pinkley v. City of Frederick*, 191 F.3d 394, 402 (4th Cir. 1999). In an apparent anticipation of this objection, the district court decreed, under Federal Rule of Civil Procedure 15(b) that "all of the issues were tried by consent even if all were not specifically raised in the pleadings." SPA-475. But Rule 15(b) permits relief on a theory that didn't appear in the complaint "only if that theory was squarely presented and litigated by the

parties at some stage or other of the proceedings." *Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920, 923−24 (3d Cir.1984). Here, "the absence of express or implied consent renders it impossible to fit the district court's freelancing within the confines of Rule 15(b)." *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1173 (1st Cir. 1995). A court so quick to condemn another nation's courts for lacking due process should not so lightly disregard it at home.

**B.   The federal RICO statute does not provide a vehicle for collaterally attacking a judgment—let alone the judgment of a foreign sovereign's court system.**

Chevron's attempt to circumvent *Naranjo* and the Recognition Act by framing its fraud-on-the-court claims as RICO claims fares no better. RICO is many things, but it is not boundless. One thing it is not is an all-purpose tool for attacking the judgments of courts around the world. This Court shouldn't open the floodgates.

**1.** It's no surprise that RICO has attracted more than its fair share of unhappy litigants hawking disguised fraud-on-the-court claims. But every circuit to consider the question has held the same thing: That "the remedies under RICO do not include setting aside a prior judgment or undermining its preclusive effect by a collateral attack." *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1187 (10th Cir. 2014) ("The circuits to consider the matter have rejected such relief."). With respect to domestic judgments, these decisions rest on the unavailability of collateral attack as a remedy under RICO, collateral-estoppel and res-judicata principles, and the

93

need for finality of judgments and an orderly end to litigation. *Id.* When it comes to foreign judgments and arbitral awards, they also rest on comity and respect for the applicable international enforcement framework.[21] Ultimately, they reflect a widely shared understanding that "the judicial system cannot tolerate litigants who refuse to accept adverse decisions." *Homola v. McNamara*, 59 F.3d 647, 651 (7th Cir. 1995).

Because RICO is a magnet for fraud-on-the-court claims, courts must frequently reprimand litigants for "seek[ing] to relitigate [a previous case] by recasting [their] allegations as a federal RICO claim." *Polur v. Raffe*, 912 F.2d 52, 56 (2d Cir. 1990); *see also Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 511 (7th Cir. 1996) (affirming dismissal of a case that "was 'dressed up' as a claim for RICO damages" but "was, nevertheless, a collateral attack on a state court judgment"). Chevron's litigation budget may be a bit larger than that of the typical disaffected litigant who cries RICO, but the essence of its claim is no different.

If RICO is unavailable as a vehicle for collaterally attacking the result of prior proceedings generally, as the circuits have held, then it is surely unavailable as a vehicle for attacking the judgment of a *foreign* court system—in this case, the Ecuadorian appellate court's substitute judgment, as affirmed by the National Court of Justice. To treat acts of alleged litigation misconduct as "predicate acts for purposes of RICO claims," would "improperly apply the RICO statute, invite forum

---

[21] To be clear, we are not—and never have—asserted a collateral estoppel defense.

shopping of the most pernicious sort, and embroil this Court in the supervision and review of proceedings in … a foreign court." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 483 (D.N.J. 1998) ("The remedy for any asserted improprieties Lilly believes may have occurred in … the Italian [courts] … lie[s] with the … Italian courts," not under RICO). Indeed, our research has not uncovered a single case in which an American court has found it appropriate to invoke RICO as authority to vindicate a claim that a foreign court's judgment has been procured by fraud, and to preemptively enjoin the enforcement and collection of a foreign judgment.

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum,* 512 F.3d 742, 749 (5th Cir. 2008), a case much like this one, shows how other circuits have approached the problem: There, an American oil company filed a complaint in federal court under RICO and the common law, arguing that bribery, corruption, and ex parte communications had tainted a foreign arbitral proceeding. *Id.* at 749. The company's argument was that it had "alleged a pattern of racketeering and conspiratorial conduct that, while arising in the context of [the foreign] proceedings, constitute[d] an independent violation of federal and state law and compel[led] relief analytically distinct from vacatur." *Id.* at 747. The court disagreed. Even though "the specific allegations of bribery and corruption" were "separate" from the underlying dispute, the claims nevertheless constituted a collateral attack because the company's fundamental

95

claim was "that wrongdoing had tainted" the proceedings such that the result was procured by fraud. *Id.* at 750.

Chevron's case is no different. Here, as there, "the ultimate significance of the conduct [Chevron] complains of can only be found in the effect that it had" on the Ecuadorian judgment, and it is plain that Chevron's "true objective in this suit" is to redress harm it will allegedly suffer as a result of the judgment. *Id.* This is self-evident by looking at the district court's opinion and judgment: *All* of the remedies granted to Chevron are related to the enforcement or collection of the Ecuadorian judgment. SPA-589. As the district court itself puts it: "Chevron here seeks a determination that the defendants procured the Judgment by fraud and through violation of the RICO statute." SPA-493. And while *Gulf Petro* involved a foreign arbitration proceeding, the upshot is the same: Both the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, at issue there, and the New York Recognition of Foreign Country Money Judgments Act, at issue here, provide the exclusive means for recognizing and enforcing the results of foreign proceedings. *Compare* N.Y. C.P.L.R. 5304(b)(6) *with* 9 U.S.C. § 201. In either case, a RICO suit whose alleged injury stems entirely from the judgment would turn the relevant international enforcement framework "on its head." *Naranjo*, 667 F.3d at 241.

**2.** Chevron's attempted use of RICO to collaterally attack the Ecuadorian judgment is also inconsistent with Federal Rule of Civil Procedure 60, which

provides an exclusive federal scheme for relief from a judgment absent a "clear inconsistency" or "demonstrated congressional purpose" to displace it. *Grossman v. Johnson*, 674 F.2d 115, 122 (1st Cir. 1982). Rule 60 is intended to "deal with the practice in every sort of case in which relief from final judgments is asked, and prescribe the practice." Fed. R. Civ. P. 60, 1946 Advisory Comm. Notes; *see, e.g., Hendrick v. H.E. Avent*, 891 F.2d 583, 585–87 (5th Cir. 1990) (holding that a collateral attack could not be accomplished through RICO, but had to be brought via a Rule 60 motion in the original court). It would be very odd indeed to make Rule 60(b) and its limited exceptions the only means for relief from a judgment in federal court and then allow for a broad statutory cause of action for relief from a judgment under RICO—one that allowed relief in alternative forums, to boot. There is no evidence that Congress intended such an odd result. RICO, like any federal statute, must be "construed as to harmonize with the Federal rules if that is at all feasible." *Hubbard v. Haley*, 262 F.3d 1194, 1197 (11th Cir. 2001). Absent "a clear exemption from the Rule" by Congress, Rule 60's exclusive framework controls. *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 67 (D.C. Cir. 1988).

**3.** Because "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains," *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804), RICO should not be extended to allow collateral attacks on foreign judgments in the teeth of clear principles of international law. RICO is

an "expansive" statute, and "when an interpretation of a broad, general statute would implicate foreign relations, the Supreme Court has proceeded cautiously and looked for a clear expression of congressional intent as to the statute's scope." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001). As Judge Hand explained, "we are not to read general words . . . without regard to the limitations customarily observed by nations upon the exercise of their powers." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945) This Court has endorsed this approach in interpreting RICO. *See R.J. Reynolds*, 268 F.3d at 128 ("Adherence to this principle will ensure that the courts interpret RICO consistently with international law."). And in *Naranjo*, this Court held that concerns for the law of nations are "particularly weighty" when a court in one jurisdiction acts pursuant to legislation in its own jurisdiction to issue opinions about the courts of the world. *Naranjo,* 667 F.3d at 244. The radical step of transforming RICO into a right of global appellate review should not be taken without the explicit approval of Congress.

III. **Chevron's wholesale attack on the integrity and competence of the Ecuadorian judiciary is foreclosed by judicial estoppel, offensive to international comity, and contradicted by Chevron's own evidence.**

As explained in Part I, Chevron's case has an Achilles' heel: Chevron cannot prove that any of the alleged misconduct about which it complains actually *caused* the three-judge appellate court's substitute judgment or the *Corte Nacional*'s affirmance of it. It hasn't even tried. Instead, Chevron argued below, and the district court agreed,

98

that this problem can be escaped by simply declaring that the work of the Ecuadorian appellate tribunals is "not entitled to any recognition in consequence of the systemic deficiencies of the Ecuadorian legal system." SPA-314 n.1251. But that argument fails for three independent reasons: Chevron is estopped by its previous contrary representations to this Court about the adequacy of Ecuador's judiciary; Chevron is further estopped by its promise to abide by the judgment of an Ecuadorian court; and Chevron's own evidence demonstrates that Ecuador's judiciary has actually improved since the *forum non conveniens* determination in *Aguinda*.

Given the grave threat to comity and the paucity of the evidence, the district court should not have jumped to condemn an entire nation's legal system on the basis of arguments that Chevron is estopped from making. And this Court should not become an accomplice to Chevron's two-faced attempt to thwart the *afectados*' search for justice by shifting the goalposts across decades and continents.

### A.    Chevron's arguments that Ecuador's judiciary is systemically unfair are estopped by its directly contrary stance during the *Aguinda* litigation.

Chevron is judicially estopped by its years of ardent representations that "Ecuador can and does dispense independent and impartial justice."[22] Chevron's insistence that Ecuador is an adequate forum, like Chevron's promise to submit to

---

[22] Appellee's Br. at 57 in *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir., filed Dec. 20, 2001) (hereafter "*Aguinda* Br.").

99

Ecuadorian jurisdiction, was designed to "make the district court more likely to grant its motion to dismiss." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011). These arguments succeeded, and Chevron got what it asked for—but then changed its tune when the Ecuadorian trial didn't reach the conclusion it preferred. This is exactly the kind of thing that the doctrine of judicial estoppel is designed to prevent: Chevron has "secured a judgment in [its] favor by virtue of assuming a given position in a prior legal proceeding," and is now "assuming an inconsistent position in a later action." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir. 1997). Chevron has used the same evidence it used fourteen years ago to reach opposite conclusions, "changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001). Chevron's request that this Court endorse its about-face threatens "the integrity of the judicial process," and is precluded by estoppel. *Id*.

Chevron's briefing in the district court contradicts its prior stances so precisely that it could have been written by its opposing party in *Aguinda*.

- The district court and Chevron now analogize this case to *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2010). ECF No. 1847 at 275; SPA-418 n.1582. But as Chevron argued in *Aguinda*, "[t]he circumstances in Ecuador are not remotely like those that prevailed in Liberia when this Court decided *Bridgeway*." *Aguinda* Br. 56.

100

- Although the district court accepted Chevron's argument that "the rule of law is not respected in Ecuador in cases that have become politicized," SPA-428, Chevron's previous stance was that "[t]he public scrutiny these cases will receive in Ecuador and/or Peru will further assure a fair adjudication." *Aguinda* Br. 57.

- The district court opinion "draws significant support also from the U.S. Department of State's Country Reports," SPA-419 n.1586, which Chevron offered in support of its post-trial briefing. *See, e.g.*, ECF No. 1847 at 46 n.12. But just ask Chevron—these reports "have limited probative value" because they "do not focus in any detail on civil litigation" and instead "focus on human rights violations that largely relate to criminal cases." *Aguinda* Br. 58-59. (internal quotation marks omitted).

Such blatant flip-flopping could only be dictated by the "exigencies of the moment," *New Hampshire v. Maine*, 532 U.S. at 750, betraying a complete inconsistency when it comes to Chevron's representation of the facts.

## B. Chevron's promise to submit to Ecuadorian jurisdiction further estops it from arguing that it should not be subject to the Ecuadorian judgment, and the defenses it reserved do not apply here.

In addition to being estopped by its inconsistent statements regarding Ecuador's adequacy as a forum, Chevron is also estopped by its promise "to satisfy any judgments in [the Ecuadorians'] favor," which it said it would contest "only in

101

the limited circumstances permitted by New York's Recognition of Foreign Country Money Judgments Act." *Republic of Ecuador,* 638 F.3d at 389.

This promise was not a gesture or incidental to the litigation in any way—it was a condition that this Court required to uphold the *form non conveniens* dismissal that Ecuador sought. *Aguinda v. Texaco*, 303 F.3d at 475. This Court has since held that "that promise, along with Texaco's more general promises to submit to Ecuadorian jurisdiction, is enforceable against Chevron in this action and any future proceedings between the parties." *Republic of Ecuador*, 638 F.3d at 389 n.4.

This RICO action is far outside of the "limited circumstances" in which Chevron can contest the judgment. To be sure, when Chevron pursued BIT arbitration with Ecuador this Court noted that Chevron's promise does not "restrict the kind of forum or type of proceeding in which Chevron can raise those defenses." *Id.* at 397. But that proceeding involved "different parties and distinct claims" from this litigation and was held in an arbitral forum pursuant to an international treaty. *Id.* at 396. It therefore did not raise the same estoppel concerns. As this Court stated, judicial estoppel's purpose is "to protect the integrity of the *judicial* process." *Id* at 397 (emphasis added). Moreover, Judge Lynch, the author of both the *Republic of Ecuador* and *Naranjo* opinions, noted during oral arguments in *Naranjo* that when Chevron attempts to get a U.S. court to preemptively weigh in on a foreign judgment its promise arises in a "completely different context" from the *Republic of Ecuador* BIT

arbitration. Oral Arg. Tr. 66, *Naranjo*. Chevron is limited by "the scope of the statute and the availability of a forum prepared to address its claims." *Republic of Ecuador*, 638 F.3d at 397. Judicial estoppel makes this forum unavailable for these claims. Chevron's claims here run counter to the letter and the spirit of this Court's findings in *Aguinda II*—findings this Court made while granting Chevron's request and relying on Chevron's representations.

Chevron and the district court have attempted to resurrect an argument this Court put to rest three years ago—that Chevron "is not bound by the promises made by its predecessors in interest Texaco and ChevronTexaco, Inc." *Republic of Ecuador*, 638 F.3d at 389. The district court attempted to sidestep this Court's rejection of the argument by making a factual "find[ing]" that "Chevron did not merge with Texaco" and concluding that this Court was "misinformed" when it held to the contrary. SPA-457 n.170. But the district court cannot rewrite history. On December 20, 2001, ChevronTexaco filed a brief in this Court that could hardly have been clearer: "As generally known (and thus this Court may take judicial notice), *Texaco merged with Chevron* Inc." *Aguinda* Br. 10 (emphasis added). There is no doubt that "Chevron Corporation therefore remains accountable for the promises upon which [this Court] and the district court relied." *Republic of Ecuador*, 638 F.3d at 389 n.3.

### C. Chevron's own evidence suggests that Ecuador's situation has improved since the time Chevron characterized its judiciary as adequate and promised to submit to its jurisdiction.

Chevron tries to cover its inconsistency by alleging that the facts about Ecuador's judiciary have changed—but the only legitimate evidence it offers suggests that the changes have been for the better. The district court once again rests its sweeping denunciation of Ecuador's judiciary "almost exclusively on the declaration of Dr. Vladimiro Álvarez Grau." *Naranjo*, 667 F.3d at 238. But Dr. Álvarez admitted at trial that he does not "know anything at all regarding the Lago Agrio case other than what is made public," Tr. 2041:1-2, and offered no evidence even suggesting impropriety in the conduct of the judges handling the Lago Agrio case or the Sucumbios *Corte Provincial* generally.

Instead, Álvarez offered sweeping pronouncements, including his charge that Ecuador is a "hypocritical democracy," A1410, where "the judicial branch is under the control of President Correa." A1430. Dr. Álvarez—a former presidential candidate and current editorial columnist—is "an avowed political opponent of the country's current President." *Naranjo*, 667 F.3d at 238. Even in the United States, where our legal system is the envy of the world, we are accustomed to hearing similarly broad, politically charged statements from domestic figures who declare that there is a "systematic breakdown of the rule of law," Ralph Nader, *The Rule of*

*Law or the Rule of Men?*, The Huffington Post (Feb. 5, 2013)[23], or that the President "has rewritten the Constitution for himself as a part of his effort to fundamentally transform the United States of America." Jose Delreal, *Michele Bachmann: Obama rewrote Constitution*, Politico (Dec. 3, 2013).[24] But the district court nearly copied verbatim the testimony of this Ecuadorian political talking head, citing Dr. Álvarez fifty-two times in nine pages and corroborating his claims only once. SPA-420-28. Dr. Álvarez, moreover, was paid $150,000 by Chevron for his broadsides. A-829.

In addition to their questionable provenance, Dr. Álvarez's claims are contradicted by Chevron's own evidence, which shows that the quality of Ecuador's judiciary has actually remained the same or improved since Chevron fought for dismissal in *Aguinda*. This hasn't stopped Chevron from mischaracterizing the evidence, of course. The U.S. State Department Country Reports have presented nearly identical descriptions of Ecuador since the mid-90s. But Chevron and the district court cite only the later reports. The district court, for instance, points to the 2009 State Department Human Rights Report's language that "[w]hile the constitution provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption." SPA-429 n.1642. Compare that with the language from previous reports:

---

[23] available at http://huff.to/1lz5eKm
[24] available at http://bit.ly/1xqol

- 2006, 2007, 2008: "While the constitution provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption."[25]

- 2004: "The judiciary is constitutionally independent but, in practice, was inefficient and susceptible to outside pressure."

- 2000: "The judiciary is constitutionally independent, but in practice is inefficient and susceptible to outside pressure."

- 1996: "Members of the Supreme Court preside over a judiciary that is constitutionally independent but in practice is susceptible to outside pressure."

The language is identical or nearly so. Elsewhere, the reports indicate that Ecuador's judicial reforms in the mid-2000s had a positive effect: Beginning in 2006—two years after the district court claims Ecuador "changed dramatically" for the worse, SPA-420—every annual report has remarked that Ecuador's courts are "generally considered independent and impartial." Dr. Álvarez, who was a member of the pre-reform government, characterizes Ecuador's judicial reforms in the mid-2000s as "the greatest institutional crisis in recent history," saying they created a "disguised dictatorship." A-1409-10. The State Department Reports, upon which Chevron and the district court both selectively rely, clearly disagree.

What's more, the State Department reports have grown more favorable over time despite Chevron's attempts to lobby the highest levels of the State Department regarding their contents. *See* Ted Folkman, *Chevron, Lobbying, and Lago Agrio*, Letters

---

[25] State Department reports available by year at: http://1.usa.gov/1iXBpsh

Blogatory (Oct. 4, 2013).[26] Chevron cited the more-negative 2000 report in *Aguinda* to argue that "[t]he current Government of Ecuador has taken and continues to take vigorous steps to further the independence and impartiality of the judiciary." *Aguinda* Br. at 39 (internal quotation marks omitted). Now, it cites the more-positive recent reports to claim that Ecuador is systemically corrupt. Rather than tailor its arguments to the evidence, Chevron has tailored the evidence to its arguments.

The other evidence given fails to impugn Ecuador's judiciary at all. The district court points to a series of actions by President Correa, such as his declaration in a radio broadcast that "he want[ed] our indigenous friends to win," or his evaluation of the judgment as an "historic ruling." SPA-432. But statements by an elected official on noteworthy court battles are not evidence of judicial inadequacy. It is not "uncommon for an American president to comment on ongoing criminal prosecutions and even urge that wrongdoers be prosecuted in accord with the president's priorities." *In re Chevron Corp.*, 650 F.3d 276, 293 (3d Cir. 2011). In the wake of BP's 2010 Deepwater Horizon oil spill, for instance, President Obama remarked that BP had "moral and legal obligations here in the Gulf for the damage that has been done," and that "[w]e will make BP pay for the damage their company

---

[26] Available at http://bit.ly/1z7zTZu

has caused." [27] Similarly, the district court's concern over President Correa's appointment of a former friend to the position of Prosecutor General is not an adequate basis for condemning a nation's legal system. "After all, presidential transitions in the United States also typically include the replacement of high-level officials, oftentimes with persons who are friends, or have an even closer relationship to the incoming president, and it is not uncommon to see a shift in priorities along with a change in the presidential administration." *In re Chevron Corp.*, 650 F.3d at 293.

The fact of the matter is that Ecuador is not comparable to those few places that federal courts have found to lack basic levels of fairness. The district court cites two examples—Liberia (*Bridgeway*), and Iran (*Bank Melli Iran*). These two cases are radically different. Ecuador is not in a "state of chaos" as Liberia was during its civil war, where hundreds of thousands died and "judges" carried out the will of warring factions. *Bridgeway*, 45 F. Supp. 2d at 287. Ecuador is not Iran, where religious courts conduct secret trials and assert their jurisdiction over civil judicial authorities. *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995). "Though it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system. American courts, though justifiably proud of our system, should understand that other

---

[27] David Jackson, *Obama: BP has 'moral and legal obligations' to Gulf Coast*, USA Today, *available at* http://usat.ly/1qf1Yf1; *Full text of President Obama's BP Oil Spill speech*, June 16, 2010, *available at* http://reut.rs/1jnzWWW.

countries may organize their judicial systems as they see fit." *In re Chevron Corp.*, 650 F.3d at 294 (declining to find serious problems in Ecuador's justice system); *see also Leon v. Million Air, Inc.*, 251 F.3d 1305, 1313-14 (11th Cir. 2011) (same). Joseph Staats, a political science professor at the University of Minnesota who specializes in Latin American judicial performance, evaluates Ecuador as "equal to or better than 55% of all the countries of the world" when it comes to protecting political rights and civil liberties. ECF No. 400-14 at 214.   The district court's decision that Ecuador's judicial system is plagued with problems on par with those of Iran or war-torn Liberia is contrary to both comity and reality.

**IV.   Even setting aside the lack of jurisdiction or legal authority, Chevron has no cause of action under RICO and RICO does not authorize any of the relief granted by the district court.**

### A.     The relief granted by the district court pushes RICO's already strained language far beyond the breaking point.

Congress's "declared purpose" for enacting RICO was "to seek the eradication of organized crime in the United States."' *United States v. Turkette*, 452 U.S. 576, 589 (1981). But "[v]irtually everyone who has addressed the question agrees that civil RICO is now being used in ways that Congress never intended when it enacted the statute in 1970." William H. Rehnquist, *Remarks of the Chief Justice*, 21 St. Mary's L.J. 5, 9 (1989). The "lure of triple damages and access to a federal courtroom" has led to "inventive" uses of the statute against defendants—from the Catholic Church to Major League Baseball—that Congress could never have foreseen. Lee

Coppola & Nicolas DeMarco, *Civil RICO: How Ambiguity Allowed the Racketeer Influenced and Corrupt Organizations Act to Expand Beyond Its Intended Purpose*, 38 New Eng. J. on Crim. & Civ. Confinement 241, 253-55 (2012).

The district court's decision, however, takes this extension of RICO to the point of absurdity. The "racketeering" on which the judgment is based arises from Donziger's assertion of claims on behalf of Ecuadorian villagers, seeking damages resulting from an environmental disaster that Chevron does not deny causing. The lawsuit was "extortion," the district court held, because it caused Chevron to "fear … an economic loss." SPA-370. Emails containing legal opinions and characterizing the extent of environmental damage were "wire fraud" because the statements "falsely portray[ed] the extent of [Chevron's] potential exposure and the likelihood of an adverse result." SPA-391-93. And other attempts to hold Chevron accountable for its damage to Ecuador's environment—including an "expansive media campaign" and the lobbying of public officials and shareholders—were part of the scheme because they were designed to "driv[e] Chevron to the settlement table." SPA-307. None of this is "extortion;" it is an exercise of the freedom to speak and to petition government of the sort the First Amendment is designed to protect. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006) (holding that litigation-related conduct was protected petitioning under the First Amendment and thus immune from RICO liability).

Moreover, the remedy the district court granted for this alleged criminal enterprise was not damages, as RICO's plain language provides, but *equitable* relief against enforcement of the Ecuadorian court's judgment—a judgment independently examined and reaffirmed by that nation's high courts. The district court's decision brands as criminals not only Donziger and his legal team, but the Ecuadorian judicial system responsible for upholding that judgment. And it does so without even the benefit of a jury trial.

The district court was able to reach that result only by setting aside virtually every statutory limit on civil causes of action under RICO. 18 U.S.C. § 1964(c). As explained below, the court ignored that section's injury and causation requirements, finding them inapplicable for the paradoxical reason that the section does not authorize the equitable relief that the court was granting. That unprecedented interpretation would allow a single district judge vast power, untethered by RICO's usual statutory limits, to grant injunctions, seize assets, and dissolve or reorganize companies "to prevent or restrain" alleged RICO violations anywhere in the world.

**B.    The district court did not find that Chevron satisfied RICO's statutory prerequisites for a private right of action.**

Section 1964(c) creates a private right of action for damages under RICO, allowing "any person injured in his business or property by reason of a violation of section 1962" to "sue therefor in any appropriate United States district court" for "threefold the damages he sustains." By its plain language, RICO thus allows

111

plaintiffs to sue only when they have been "injured," and when the cause of the injury is "by reason" of a RICO violation. In light of the potential for vast civil liability within RICO's scope, both the Supreme Court and this Court interpret these statutory limits as "more rigorous" than Article III's analogous injury and causation requirements. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). Chevron fails both requirements.

First, RICO's requirement of "damage to business and property" requires an "actual, quantifiable injury," *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d. Cir. 2008). Although it has made broad statements about the costs of the Ecuadorian litigation and the allegedly fraudulent statements by the defendants, Chevron has not alleged any actual damages or identified specific monetary losses. *See Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc) ("A showing of injury requires proof of concrete financial loss."). Moreover, the risk of future loss is not enough: "[a] cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994). Given that Chevron has yet to pay *any* damages on the Ecuadorian judgment, and that it continues to fight enforcement, the company cannot come close to satisfying the "clear and definite" standard. *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003) (holding that claims for damages based on fraudulent loans were not a "cognizable injury under RICO" before the

loans had been foreclosed). RICO does not allow Chevron to recovery for "all losses that *may occur*, but only for those actually suffered." *First Nationwide*, 27 F.3d at 768 (emphases added).

Second, RICO's requirement that a private party be "injured … by reason of" a statutory violation is a "demand for some *direct relation* between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasis added); *see also Anza v. Ideal Steel Corporation*, 547 U.S. 451, 461 (2006) (describing the proper inquiry as "whether the alleged violation led directly to the plaintiff's injuries"). That means a plaintiff must prove that the RICO violations were "not only … a 'but for' cause of [its] injury, but … the proximate cause as well." *Holmes*, 503 U.S. at 268. The district court's 497-page decision devotes just one sentence to that critical question. It says: "Significantly, Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery and other misconduct." SPA-416. But the Court does not explain how it ruled out the obvious "independent" cause: Chevron's own illegal pollution.

Although the court acknowledged that RICO ordinarily requires a plaintiff to prove "injury to business or property … caused by the violation of Section 1962," SPA-366, it wrongly assumed that this requirement was relevant only "[i]n a suit for *damages* for such a violation." *Id.* (emphasis added). Because "Chevron at this point … seeks only equitable relief," the court wrote, the company was required to prove

only that a violation of RICO took place—that is, "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* Chevron, in other words, was required to prove only that a violation of RICO occurred, not that it was injured by the violation.

The district court cited no authority for conclusion, and there is none. Indeed, the two cases on which the court relied say the opposite. In the first, *Sedima S.P.R.L. v. Imrex Co., Inc.*, the Supreme Court wrote that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation*." 473 U.S. 479, 496 (1985). In the second, *Spool v. World Child Int'l Adoption Agency*, this Court wrote that, "[t]o establish a RICO claim, a plaintiff must show not just "a violation of the RICO statute," but also "an injury to business or property" and "that the injury was caused by the violation of Section 1962.'" 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir. 2001)). Neither case even suggests, much less holds, that a different standard applies to claims for equitable relief.

Nor does anything in RICO itself support any limitation to its requirement that a plaintiff prove an injury "by reason of a violation of" the law's substantive provisions. 18 U.S.C. § 1964(c). To be sure, the cause of action in § 1964(c) authorizes awards of *damages*, not equitable relief. But the lack of any statutory authorization for

114

Chevron's requested relief is hardly a reason for granting that relief untethered from other statutory requirements.

### C. The absence of any authorization for equitable relief in RICO's civil-remedies provision, far from justifying a judgment for Chevron, is an independent reason for rejecting Chevron's claims.

RICO's civil-remedies provision grants district courts "jurisdiction to prevent and restrain violations" of RICO by issuing the full range of "appropriate orders" available to courts of equity. 18 U.S.C. § 1964(a). But it limits *who* can seek such equitable relief: Whereas "[t]he Attorney General may institute proceedings under this section"—and the court may issue temporary relief in them "as it shall deem proper"—private parties are not similarly empowered; they "may sue therefor in any appropriate United States district court and shall recover threefold the damages . . . sustain[ed]," plus attorney's fees and costs. *Id.* § 1964(b), (c). Thus, as RICO's text and structure makes clear, the statute does not authorize equitable relief in private civil actions.

The analysis should end there. But if this Court needs further confirmation, there is no shortage of evidence in the statute's legislative history that limiting RICO to the private cause of action to damages claims was a deliberate choice by Congress. The Supreme Court has explained that RICO's civil-remedies provision was "limited to injunctive actions by the United States," and that a proposed "amendment that would have allowed private injunctive actions" was *withdrawn*

because it was "greeted with some hostility." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 487 (1985); *see Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084-85 (9th Cir. 1986) (reviewing legislative history).

Based on the statute's language and history, virtually all courts that have addressed the question have concluded that RICO's civil-damages provision means what it says: plaintiffs are entitled to *damages*, not injunctions and other equitable relief. In the only court of appeals decision to squarely confront the issue, the Ninth Circuit held that equitable relief is "not available to a private party in a civil RICO action." *Wollersheim*, 796 F.2d at 1084. And this Court has twice strongly suggested that, were it to address the question, it would conclude the same. *See Sedima S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 490 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479 (1985) (stating that RICO "was not intended to provide private parties injunctive relief"); *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28-29 (2d Cir. 1983) (expressing "serious doubt" about the "propriety of private party injunctive relief" under RICO). So too have other circuits.[28]

---

[28] *See, e.g.*, *Wheeling-Pittsburgh Steel Corp. v. Mitsu Corp.*, 221 F.3d 924, 927 n.2 (6th Cir. 2000) ("[O]nly treble damages, attorneys' fees and costs are afforded to private parties under RICO."); *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 726 (4th Cir. 1999) (expressing "substantial doubt whether RICO grants private parties . . . a cause of action for equitable relief," which is "especially acute in light of the fact that Congress has declined to authorize injunctive remedies for private parties"); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988) ("Congress indeed had several opportunities to give express authorization to private injunctive actions but chose

Without addressing this Court's reasons for doubting the availability of equitable relief in *Sedima* and *Trane Co.*, the district court sided against the majority and with the Seventh Circuit's now-vacated decision in *National Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003). But even assuming that *Scheidler* was decided correctly, it would not support the district court's decision here.[29] Although the Seventh Circuit did uphold injunctive relief, the plaintiffs in *Scheidler* also sought and were awarded damages. *Id.* at 693. *Scheidler* is thus expressly predicated on the assumption that the plaintiffs had "been injured in their business or property by reason of a RICO violation" and satisfied RICO's injury and causation requirements. *Id.* at 696.

Neither *Scheidler* nor, to our knowledge, any other court has held, as the district court did here, that injunctive relief is available in the absence of any damages claim and regardless of § 1964(c)'s requirements. In this way, too, the district court's decision was truly unprecedented.

---

not to do so, apparently because it hesitated in the face of the ramifications of that remedy.").

[29] The Solicitor General filed a brief in the Supreme Court in *Scheidler* expressing the United States' view that RICO does not authorize private parties "to seek equitable remedies." Br. of United States, 2005 WL 2138277, at *19-*27.

117

## CONCLUSION

The district court's judgment should be reversed and its findings should be vacated.[30]

Respectfully submitted,

*/s/ Deepak Gupta*
_____
Deepak Gupta
Gregory A. Beck
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Justin Marceau
John Campbell
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6000

July 2, 2014

*Counsel for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC*

---

[30] *Counsel gratefully acknowledge the contributions of University of Denver law students Aaron Belzer, Matt Fogg, Jonathan Goldstein, Meagan Healy, Alex Jennings, Katie McAuley, Juliana Okulski, Sam Peaslee, and Brycen Williams.*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)**

I hereby certify that my word processing program, Microsoft Word, counted <u>28,847</u> words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*

Deepak Gupta

July 2, 2014

# CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2014, I electronically filed the foregoing Brief for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
_____
Deepak Gupta