# 14-826-cv(L)

14-832-cv(Con)

## United States Court of Appeals
### for the
## Second Circuit

---

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

- v. -

STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
DONZIGER & ASSOCIATES, PLLC,

*Defendants-Appellants.*

*(caption continued on inside cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

### BRIEF OF PLAINTIFF-APPELLEE CHEVRON CORPORATION

---

THEODORE B. OLSON
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8668

WILLIAM E. THOMSON
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

RANDY M. MASTRO
ANDREA E. NEUMAN
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

*Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents*.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel state that Chevron Corporation is a publicly traded company (NYSE: CVX) that has no parent company.  No publicly traded company owns 10% or more of its shares.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... viii

PRELIMINARY STATEMENT ........................................................................... 1

JURISDICTIONAL STATEMENT ...................................................................... 7

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................... 8

STATEMENT OF THE CASE............................................................................ 10

I.    Background ............................................................................................. 11

II.   Donziger's Corruption of the Lago Agrio Litigation and
      Racketeering Targeted at Chevron ........................................................ 16

      A.    Fraud in Connection with the Lago Agrio Proceedings...................... 16

            1.    Initial Phases:  Judicial Inspections and the
                  Ghostwritten Expert Report ..................................................... 17

            2.    Final Phase:  Ghostwriting the Lago Agrio Judgment
                  Itself....................................................................................... 26

            3.    Ecuadorian Appellate Proceedings ........................................... 36

      B.    Donziger's Campaign to Extort Chevron.......................................... 39

      C.    Donziger's Misrepresentations to U.S. Courts in Discovery
            Proceedings....................................................................................... 45

III.  Related International Treaty Arbitration ................................................ 55

IV.   The Proceedings Below and Related Actions ......................................... 57

      A.    The Preliminary Injunction and this Court's Ruling in
            *Naranjo* ........................................................................................ 57

      B.    Discovery Sanctions ......................................................................... 60

      C.    Trial .................................................................................................. 61

      D.    Post-Trial Proceedings ..................................................................... 62

SUMMARY OF ARGUMENT ............................................................ 64

STANDARD OF REVIEW ............................................................... 67

ARGUMENT ................................................................................. 69

I.     The District Court Properly Held That Chevron Has Standing .................. 69

II.    The District Court Properly Held That Donziger Violated RICO
and Enjoined Donziger from Benefitting from His Misdeeds .................... 72

    A.    Chevron Satisfied the Elements of RICO by Demonstrating
That Donziger Injured Chevron Through a Pattern of
Racketeering ......................................................................... 73

        1.    Operation and Management of an Enterprise ........................... 74

        2.    Pattern of Racketeering Activity ........................................... 74

        3.    Injury .............................................................................. 77

        4.    Causation ......................................................................... 78

    B.    The District Court Entered Appropriate Relief ............................ 80

        1.    Equitable Relief Is Available to Private Litigants Under
RICO ............................................................................... 80

            a.    The Plain Language of 18 U.S.C. § 1964 Permits
Private Plaintiffs to Seek Equitable Relief in
Civil RICO Actions ....................................................... 80

            b.    Allowing Private Plaintiffs to Seek Equitable
Relief Promotes Congress's Purpose in Enacting
Civil RICO .................................................................. 86

            c.    Absent Clear Contrary Direction from Congress,
Federal Courts Can Grant Equitable Relief to
Address Violations of Federal Statutes ........................... 90

        2.    The District Court Properly Exercised Its Equitable
Powers to Bar Donziger from Profiting from His
Crimes and to Protect Chevron from Further Injury ................. 92

    C.    Donziger's Remaining Arguments Regarding RICO Are
Meritless ............................................................................. 95

1. The District Court's RICO Ruling Was Not an Impermissible Collateral Attack on the Lago Agrio Judgment .................................................................. 95

2. Neither *Naranjo* nor Texaco's Representations to This Court in *Aguinda* Bar Chevron's RICO Claim .......................... 98

3. Donziger's Conduct Was Not Protected by the First Amendment .................................................................. 98

III. The Ecuadorian Appellate Orders Cannot Salvage the Corrupt Judgment or Cure Donziger's Racketeering ................................ 102

A. The Ecuadorian Appellate Panel Did Not "Cleanse" Appellants' Fraud or Produce an Untainted "Substitute Judgment" .................................................................. 105

1. There Was No *De Novo* Review of the Facts:  The Appellate Panel Did Not Evaluate the Evidence or Make Factual Findings, and It Deferred Extensively to the Trial Court .......................................................... 106

2. The Panel Relied on a Tainted Record, Including the Ghostwritten Cabrera Report .................................... 113

3. Appellants Have No Support for Their Implausible Theory That Civil Law Appellate Panels May Ignore Massive Fraud in Trial Court Proceedings ............................. 115

B. The District Court Did Not Clearly Err in Holding That the Appellate Orders Could Not Cleanse the Fraudulent Judgment Because Ecuador Does Not Provide Impartial Tribunals .................................................................. 119

1. The District Court Correctly Held That Chevron Is Not Estopped from Challenging the Ecuadorian Judiciary or Its Judgments .......................................................... 119

a. Chevron's Position Here Is Not Inconsistent with Texaco's Representations in *Aguinda* ........................... 121

b. Appellants' Unclean Hands Bar Them from Raising Judicial Estoppel ............................................... 127

v

2. The District Court Did Not Clearly Err in Finding That Ecuador Fails to Provide Impartial Tribunals, Especially in Politicized Cases in Which President Correa Has an Interest ............................................................ 128

    a. The District Court Applied the Correct Legal Framework in Evaluating Ecuador's Judicial System .................................................................. 129

    b. The District Court's Factual Findings Regarding the Ecuadorian Judiciary Are Amply Supported by the Record ............................................................ 131

3. The District Court's Findings Regarding the Ecuadorian Judiciary Comport with Principles of Comity ............................................................................ 142

C. Donziger's Allegations of Environmental Harm Are Irrelevant, Unsupported by the Record, and False ........................... 146

IV. The District Court Properly Granted Chevron Equitable Relief from the Fraudulently Procured Lago Agrio Judgment ............................ 150

A. The District Court Has Personal Jurisdiction Over the LAPs ........... 151

1. The District Court Properly Exercised Specific Personal Jurisdiction Over the LAPs Under NY CPLR 302 ........................................................................ 151

2. The District Court Acted Well Within Its Discretion in Striking the LAPs' Personal Jurisdiction Defense ................... 158

    a. The District Court Applied the Correct Legal Standard .................................................................. 158

    b. The LAPs' Bad Faith Conduct Obstructed Discovery into Their Purposeful Availment of New York and Its Laws, Thus Justifying the Striking of Their Personal Jurisdiction Defense ............ 160

B. Claims for Equitable Relief from Fraudulently Procured Judgments Are a Well Established Feature of American Law ......... 162

1.   Federal Courts in New York Are Authorized to Relieve Parties from Fraudulently Procured Judgments ....................... 162

2.   Independent Actions for Relief from a Fraudulent Judgment Need Not Be Brought in the Issuing Court ............. 164

3.   Independent Actions Are Available to Provide Relief from Foreign Judgments ......................................................... 167

4.   The Recognition Act Does Not Displace New York Courts' Equitable Powers with Respect to Fraudulent Judgments, and *Naranjo* Does Not Suggest Otherwise .......... 168

5.   Ecuadorian Law Does Not Apply to Chevron's Independent Action for Equitable Relief ................................. 172

C.   Appellants Were on Notice That Chevron Sought Equitable Relief from the Fraudulently Procured Judgment ............................ 173

D.   The District Court Properly Held That Chevron Satisfied the Elements for Equitable Relief from a Fraudulent Judgment ............. 175

E.   Neither the Republic of Ecuador Nor Any of Its Citizens Were Indispensable Parties ............................................................. 178

1.   The LAPs Are Either Parties or Adequately Represented, and Are Not Necessary Parties to Chevron's RICO Claim in Any Event ..................................... 178

2.   Other Residents of the Region Are Not Necessary Parties ..................................................................................... 179

3.   The Republic of Ecuador Is Not a Necessary Party ................. 181

CONCLUSION ................................................................................................. 183

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABF Freight Sys., Inc. v. NLRB*,
    510 U.S. 317 (1994) ................................................................... 118

*Ackerman v. Levine*,
    788 F.2d 830 (2d Cir. 1986) ...................................................... 144

*AEP Energy Servs. Gas Holding Co. v. Bank of Am.*,
    626 F.3d 699 (2d Cir. 2010) ...................................................... 142

*Aetna Cas. & Sur. Co. v. Liebowitz*,
    730 F.2d 905 (2d Cir. 1984) ........................................................ 91

*Aguinda v. Texaco, Inc.*,
    142 F. Supp. 2d 534 (S.D.N.Y. 2001) ....................... 15, 122, 126

*Aguinda v. Texaco, Inc.*,
    303 F.3d 470 (2d Cir. 2002) .......................................... 14, 15, 122

*Alfadda v. Fenn*,
    966 F. Supp. 1317 (S.D.N.Y. 1997) .......................................... 144

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
    374 F.3d 23 (1st Cir. 2004) ........................................................ 120

*Ancile Inv. Co. v. Archer Daniels Midland Co.*,
    992 F. Supp. 2d 316 (S.D.N.Y. 2014) ....................................... 173

*Anderson v. City of Bessemer City, N.C.*,
    470 U.S. 564 (1985) ..................................................................... 67

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989) ................................................... 118

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,
    18 N.Y.3d 341 (2011) ................................................................ 169

*Attorney General of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*,
    268 F.3d 103 (2d Cir. 2001) ........................................................ 97

*Averbach v. Rival Mfg. Co.*,
    809 F.2d 1016 (3d Cir. 1987) ...................................................... 95

*Averbuck v. Averbuck*,
    270 A.D. 116 (1st Dep't 1945) .................................................. 165

viii

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)....................................................................................145

*Bank Melli Iran v. Pahlavi*,
58 F.3d 1406 (9th Cir. 1995) ................................... 126, 134, 182

*Bank of Am. Corp. v. Lemgruber*,
385 F. Supp. 2d 200 (S.D.N.Y. 2005) .........................................178

*Bano v. Union Carbide Corp.*,
273 F.3d 120 (2d Cir. 2001) .............................................. 99, 126

*Bell v. Hood*,
327 U.S. 678 (1946)......................................................................90

*Bonnifield v. Chevron Corp.*,
No. B20655, 2009 WL 1111601 (Cal. Ct. App. Apr. 27, 2009) ................121

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) .............................. 121, 123, 129, 130, 131, 182

*Bros. Inc. v. W. E. Grace Mfg. Co.*,
320 F.2d 594 (5th Cir. 1963) .....................................................165

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................................................................152

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
250 F.3d 171 (2d Cir. 2001) .......................................................179

*Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*,
547 F.3d 962 (9th Cir. 2008) ......................................................181

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
117 F.3d 655 (2d Cir. 1997) .......................................................175

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
626 F.3d 695 (2d Cir. 2010) ........................................................90

*Chafin v. Chafin*,
133 S. Ct. 1017 (2013)............................................................ 70, 71

*Chevron Corp. v. 3TM Consulting, LLC*,
No. CIV.A. 4:10-MC-134, 2010 WL 8814519 (S.D. Tex. Apr. 5, 2010)......48

*Chevron Corp. v. Berlinger*,
629 F.3d 297 (2d Cir. 2011) ................................................. 48, 121

*Chevron Corp. v. Champ*,
  Nos. 1:10mc27, 1:10mc28,
  2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ...................................... 49, 51

*Chevron Corp. v. Donziger*,
  — F. Supp. 2d —, 2014 WL 1663119 (S.D.N.Y. Apr. 25, 2014).................62

*Chevron Corp. v. Donziger*,
  296 F.R.D. 168 (S.D.N.Y 2013) ..................................................157

*Chevron Corp. v. Donziger*,
  768 F. Supp. 2d 581 (S.D.N.Y. 2011) .............................................57

*Chevron Corp. v. Donziger*,
  886 F. Supp. 2d 235 (S.D.N.Y. 2012) ........................................ 60, 96

*Chevron Corp. v. Donziger*,
  974 F. Supp. 2d 362 (S.D.N.Y. 2014) ............................................62

*Chevron Corp. v. E-Tech Int'l*,
  No. 10CV1146-IEG (WMc),
  2010 WL 3584520 (S.D. Cal. Sept. 10, 2010)................................49

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) ............ 5, 58, 59, 93, 98, 121, 144, 146, 170, 171

*Chevron Corp. v. Page*,
  — F. 3d —, 2014 WL 4723806 (4th Cir. Sept. 24, 2014)........... 29, 49, 51, 54

*Chevron Corp. v. Page*,
  No. 8:11-CV-00395 (RWT) (CBD) (D. Md. Jan. 25, 2013) ........................49

*Chevron Corp. v. Page*,
  No. 8:11-CV-1942 (RWT) (D. Md. Aug. 31, 2011) .......................................49

*Chevron Corp. v. Salazar*,
  807 F. Supp. 2d 189 (S.D.N.Y. 2011) ...........................................119

*Chevron Corp. v. Salazar*,
  No. 11 Civ. 3718 (LAK) (S.D.N.Y. Feb. 21, 2012) ................................59

*Chevron Corp. v. Shefftz*,
  754 F. Supp. 2d 254 (D. Mass. 2010) ...........................................48

*Chevron Corp. v. Stratus Consulting, Inc.*,
  No. 10-cv-00047-MSK-MEH (D. Colo. Mar. 4, 2010)................................48

*CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*,
  762 N.Y.2d 215 (2003) ........................................................169

x

*Comer v. Cisneros*,
　37 F.3d 775 (2d Cir. 1994) .......................................................................69

*ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.*,
　102 F.3d 677 (2d Cir. 1996) ............................................. 180, 182

*Cooney v. Osgood Mach., Inc.*,
　81 N.Y.2d 66 (1993) ...............................................................172

*Covington Indus., Inc. v. Resintex A.G.*,
　629 F.2d 730 (2d Cir. 1980) ...................................................165

*Cresswell v. Sullivan & Cromwell*,
　922 F.2d 60 (2d Cir. 1990) ..................................................... 68, 94

*Crouse v. McVickar*,
　207 N.Y. 213 (1912) ...............................................................165

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*,
　758 F. Supp. 2d 153 (E.D.N.Y. 2010) .........................................96

*Daimler AG v. Bauman*,
　134 S. Ct. 746 (2014) ....................................................... 145, 155

*Davis v. Cornue*,
　151 N.Y. 172 (1896) ...............................................................165

*DeJoria v. Maghreb Petrol. Explor. S.A.*,
　No. 1:13-cv-654-JRN, 2014 WL 4065614 (W.D. Tex. Aug. 13, 2014).......129

*Diebold Found., Inc. v. Comm'r.*,
　736 F.3d 172 (2d Cir. 2013) .....................................................67

*eBay Inc. v. MercExchange, L.L.C.*,
　547 U.S. 388 (2006)......................................................... 92, 93

*Ehrenfeld v. Bin Mahfouz*,
　9 N.Y.3d 501 (2007) ...............................................................153

*Eli Lilly & Co. v. Roussel Corp.*,
　23 F. Supp. 2d 460 (D.N.J. 1988)..............................................96

*Ellipso, Inc. v. Mann*,
　480 F.3d 1153 (D.C. Cir. 2007)................................................93

*Ellipso, Inc. v. Mann*,
　No. 05-1186 (RCL), 2005 WL 5298646 (D.D.C. Nov. 2, 2005) ..................93

*Elman v. Belson*,
　32 A.D.2d 422 (2d Dep't 1969)................................................156

*European Cmty. v. RJR Nabisco, Inc.*,
No. 11-2475-CV,
— F.3d —, 2014 WL 4085863 (2d Cir. Aug. 20, 2014) ...............................74

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) ......................................................................................79

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981) ....................................................................99

*Fischbarg v. Doucet*,
38 A.D.3d 270 (1st Dep't 2007) .................................................................152

*Fischbarg v. Doucet*,
9 N.Y.3d 375 (2007) ..................................................................................152

*Florida v. Seminole Tribe of Fla.*,
181 F.3d 1237 (11th Cir. 1999) ...................................................................83

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
503 U.S. 60 (1992).................................................................................90, 91

*Frietsch v. Refco, Inc.*,
56 F.3d 825 (7th Cir. 1995) .......................................................................104

*Frummer v. Hilton Hotels Int'l, Inc.*,
19 N.Y.2d 533 (1967) ...............................................................................156

*Garcia v. United States*,
469 U.S. 70 (1984)......................................................................................89

*Gibbs Wire & Steel Co. v. Johnson*,
255 F.R.D. 326 (D. Conn. 2009) ...............................................................181

*Grand Light & Supply Co. v. Honeywell, Inc.*,
771 F.2d 672 (2d Cir. 1985) ......................................................................174

*Gray v. Richmond Bicycle Co.*,
167 N.Y. 348 (1901) .................................................................................165

*Griffin v. Griffin*,
327 U.S. 220 (1946)..................................................................................144

*Griffith v. Bank of N.Y.*,
147 F.2d 899 (2d Cir. 1945) .................................................... 151, 163, 165

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)..................................................................................171

*Guar. Trust Co. of N.Y. v. York*,
    326 U.S. 99 (1945) .................................................................171

*Gulf Petro Trading Co. v. Nigerian National Petrol. Corp.*,
    512 F.3d 742 (5th Cir. 2008) ............................................ 96, 97

*Guzzo v. Cristofano*,
    719 F.3d 100 (2d Cir. 2013) .....................................................128

*Hadden v. Rumsey Prods., Inc.*,
    196 F.2d 92 (2d Cir. 1952) .......................................................165

*Hausman v. Buckley*,
    299 F.2d 696 (2d Cir. 1962) .....................................................173

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
    322 U.S. 238 (1944)...................................................... 93, 118, 163

*Healey v. Chelsea Resources, Ltd.*,
    947 F.2d 611 (2d Cir. 1991) .....................................................116

*Helicopteros v. Hall*,
    466 U.S. 408 (1984) .................................................................155

*Hendrick v. H.E. Avent*,
    891 F.2d 583 (5th Cir. 1990) .....................................................95

*Hilton v. Guyot*,
    159 U.S. 113 (1895).................................................................143

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992).................................................................78

*Homola v. McNamara*,
    59 F.3d 647 (7th Cir. 1995) ......................................................95

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999).................................................................81

*Huyer v. Wells Fargo & Co.*,
    295 F.R.D. 332 (S.D. Iowa 2013).................................................81

*In re Chevron Corp. (Allen)*,
    No. 2:10-MC-91, 2010 WL 9014422 (D. Vt. Dec. 2, 2010) .........49

*In re Chevron Corp. (Banco Pichincha)*,
    No. 1:11-cv-24599 (MGC) (S.D. Fla. Feb, 27, 2013) ...................49

*In re Chevron Corp. (Banco Pichincha)*,
    No. 1:11-cv-24599 (MGC) (S.D. Fla. June 12, 2012)...................49

*In re Chevron Corp. (Barnthouse)*,
No. 1:10-mc-00053-SSB-KLL (S.D. Ohio Nov. 26, 2010) ..........................49

*In re Chevron Corp. (Berlinger)*,
709 F. Supp. 2d 283 (S.D.N.Y. 2010) .........................................................48

*In re Chevron Corp. (Bonifaz)*,
762 F. Supp. 2d 242 (D. Mass. 2010).........................................................48

*In re Chevron Corp. (Calmbacher)*,
No. 1:10-MI-0076-TWT-GGB,
2010 WL 8767265 (N.D. Ga. Mar. 2, 2010) ...............................................48

*In re Chevron Corp. (Donziger)*,
749 F. Supp. 2d 170 (S.D.N.Y. 2010) .................................................. 49, 54

*In re Chevron Corp. (Donziger)*,
No. 10-MC-00002 (LAK) (S.D.N.Y. Aug. 6, 2010) .....................................49

*In re Chevron Corp. (E-Tech/Kamp)*,
Nos. 10-MC-21, 10-MC-22, 2010 WL 8786202 (D.N.M. Sept. 13, 2010)....49

*In re Chevron Corp. (E-Tech/Kamp)*,
Nos. 10-MC-21, 10-MC-22, 2010 WL 8786279 (D.N.M. Sept. 1, 2010)......49

*In re Chevron Corp. (Quarles)*,
No. 3:10-CV-00686 (M.D. Tenn. Sept. 21, 2010).......................................168

*In re Chevron Corp. (Quarles)*,
No. 3:10-CV-00686, 2010 WL 8767266 (M.D. Tenn. Aug. 17, 2010) .........49

*In re Chevron Corp. (Rourke/Picone)*,
753 F. Supp. 2d 536 (D. Md. 2010).............................................................48

*In re Chevron Corp. (Scardina)*,
No. 7:10-MC-00067, 2010 WL 4883111 (W.D. Va. Nov. 24, 2010) ...........49

*In re Chevron Corp. (Uhl, Baron, Rana & Associates, Inc./Villao)*,
633 F.3d 153 (3d Cir. 2011) .................................................................. 48, 49

*In re Chevron Corp. (Uhl, Baron, Rana & Associates, Inc./Villao)*,
No. 2:10-CV-02675 (SRC), 2010 WL 8767338 (D.N.J. June 15, 2010) .......48

*In re Chevron Corp. (Uhl, Baron, Rana & Associates, Inc./Villao)*,
No. 2:10-CV-02675 (D.N.J. June 11, 2010)..................................................49

*In re Chevron Corp. (Wray)*,
No. 1:10-mc-00371-CKK (D.D.C. July 22, 2010) ........................................48

*In re Chevron Corp.*,
650 F.3d 276 (3d Cir. 2011) ...................................................................145

*In re Holocaust Victim Assets Litig.*,
225 F.3d 191 (2d Cir. 2000) ...................................................................180

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d Cir. 2003) ...................................................................176

*In re Managed Care Litig.*,
298 F. Supp. 2d 1259 (S.D. Fla. 2003) ........................................................81

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008) ...................................................................177

*In re Treco*,
240 F.3d 148 (2d Cir. 2001) ...................................................................143

*In re Union Carbide Corp. Gas Plant Disaster
at Bhopal, India in December, 1984*,
809 F.2d 195 (2d Cir. 1987) ...................................................................123

*Indian Head Nat'l Bank of Nashua v. Brunelle*,
689 F.2d 245 (1st Cir. 1982) ...................................................................165

*Ingersoll Milling Mach. Co. v. Granger*,
833 F. 2d 680 (7th Cir. 1987) ...................................................................131

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982) ..................................................................... 158, 159

*Int'l Bus. Machs. Corp. v. Edelstein*,
526 F.2d 37 (2d Cir. 1975) ...................................................................124

*Intellivision v. Microsoft Corp.*,
484 F. App'x 616 (2d Cir. 2012) ...............................................................120

*Island Territory of Curacao v. Solitron Devices, Inc.*,
489 F.2d 1313 (2d Cir. 1973) ...................................................................169

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*,
815 F.2d 240 (2d Cir. 1987) ...................................................................183

*Jota v. Texaco, Inc.*,
157 F.3d 153 (2d Cir.1998) .......................................................................14

*Kamilewicz v. Bank of Boston Corp.*,
92 F.3d 506 (7th Cir. 1996) .......................................................................95

*Kashelkar v. Rubin & Rothman*,
  97 F. Supp. 2d 383 (S.D.N.Y. 2000) ............................................................96

*Khallad v. Blanc*,
  96 A.D.3d 1574 (4th Dep't 2012)................................................................165

*Knight v. Mooring Capital Fund, LLC*,
  749 F.3d 1180 (10th Cir. 2014) ..................................................................95

*Kreutter v. McFadden Oil Corp.*,
  71 N.Y.2d 460 (1988) ................................................................................152

*Krist v. Kolombos Rest. Inc.*,
  688 F.3d 89 (2d Cir. 2012) ........................................................................139

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) ......................................................................152

*Lago Agrio Plaintiffs v. Chevron Corp.*,
  409 F. App'x 393 (2d Cir. 2010) ..................................................................54

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984)....................................................................143

*Lapin v. Shulton, Inc.*,
  333 F.2d 169 (9th Cir. 1964) ......................................................................166

*LeBlanc-Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995) ..........................................................................83

*Lia v. Saporito*,
  541 F. App'x 71 (2d Cir. 2013) ..................................................................120

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  20 N.Y.3d 327 (2012) ....................................................................... 154, 155

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012) ......................................................................172

*MacWade v. Kelly*,
  460 F.3d 260 (2d Cir. 2006) ........................................................................67

*Mamouzian v. Ashcroft*,
  390 F.3d 1129 (9th Cir. 2004) ....................................................................144

*Manez v. Bridgestone Firestone N. Am. Tire, LLC*,
  533 F.3d 578 (7th Cir. 2008) ......................................................................168

*Manning v. Energy Conversion Devices, Inc.*,
  13 F.3d 606 (2d Cir. 1994) ........................................................................180

*Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*,
    689 F. Supp. 1340 (S.D.N.Y. 1988) ............................................161

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ..................................... 153, 154, 179

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) .................................................................72

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
    471 F.3d 377 (2d Cir. 2006) ........................................ 179, 180

*McDonald v. McDonald*,
    228 A.D. 341 (1st Dep't 1930) .................................... 151, 167

*McDonnell Douglas Corp. v. Islamic Republic of Iran*,
    758 F.2d 341 (8th Cir. 1985) .................................................144

*McGowan v. Smith*,
    52 N.Y.2d 268 (1981) ..............................................................152

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171, 180 (2d Cir. 2007) ........................................183

*Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*,
    788 F. Supp. 2d 71 (E.D.N.Y. 2011) .....................................93

*Milner v. Dep't of Navy*,
    131 S. Ct. 1259 (2011) .............................................................87

*Mintz & Gold LLP v. Zimmerman*,
    17 Misc. 3d 972 (Sup. Ct. N.Y. Cnty. 2007) ......................101

*Morrel v. Nationwide Mut. Fire Ins. Co.*,
    188 F.3d 218 (4th Cir. 1999) ...................................... 163, 165

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002) ............................ 81, 91

*Motorola Credit Corp. v. Uzan*,
    274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003) .........................127

*Motorola Credit Corp. v. Uzan*,
    322 F.3d 130 (2d Cir. 2003) ........................................... 81, 91

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004) .....................................................127

*NAACP v. Claiborne Hardware Company*,
    458 U.S. 886 (1982) ...............................................................100

*Nat'l Org. for Women, Inc. v. Scheidler*,
  267 F.3d 687 (7th Cir. 2001) .......................................... 81, 82, 84, 85, 88, 89

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*,
  319 F. Supp. 2d 352 (S.D.N.Y. 2004) ........................................156

*NCR Corp. v. Feltz*,
  Nos. 91-4011, 91-4033, 91-4058, 983 F.2d 1068 (6th Cir. Jan. 21, 1993) ....93

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)...................................................................120

*Niagara Frontier Transp. Auth. v. Patterson-Stevens, Inc.*,
  237 A.D.2d 965 (4th Dep't 1997).............................................123

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*,
  673 F.3d 84 (2d Cir. 2012) ............................................... 98, 101

*NML Capital, Ltd. v. Republic of Arg.*,
  699 F.3d 246 (2d Cir. 2012) ....................................................120

*Norton v. Sam's Club*,
  145 F.3d 114 (2d Cir. 1998) ....................................................131

*Oppenheimer v. Westcott*,
  47 N.Y.2d 595 (1979) ..............................................................163

*Ornelas v. United States*,
  517 U.S. 690 (1996)....................................................................67

*Osorio v. Dole Food Co.*,
  665 F. Supp. 2d 1307 (S.D. Fla. 2009) .............................. 124, 134

*Osorio v. Dow Chem. Co.*,
   635 F.3d 1277 (11th Cir. 2011) ........................................ 124, 134

*Parker v. Time Warner Entm't Co.*,
  331 F.3d 13 (2d Cir. 2003) ........................................................68

*Pathways, Inc. v. Dunne*,
  329 F.3d 108 (2d Cir. 2003) ....................................................178

*PenneCom B.V. v. Merrill Lynch & Co.*,
  372 F.3d 488 (2d Cir. 2004) ....................................................128

*Pennzoil Co. v. Texaco, Inc.*,
  481 U.S. 1 (1987)......................................................................168

*Pentz v. Kuppinger*,
  107 Cal. Rptr. 540 (Ct. App. 1973) .........................................167

*Peregrine Myanmar Ltd. v. Segal*,
    89 F.3d 41 (2d Cir. 1996) ........................................................................181

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)................................................................................126

*Polur v. Raffe*,
    912 F.2d 52 (2d Cir. 1990) .......................................................................95

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
    109 F.3d 850 (2d Cir. 1997) ............................................................ 142, 143

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
    219 F.3d 92 (2d Cir. 2000) .....................................................................100

*Prof'l Real Estate Investors*, *Inc. v. Columbia Pictures Indus.*, *Inc.*,
    508 U.S. 49 (1993)........................................................................ 99, 100

*Raila v. United States*,
    355 F.3d 118 (2d Cir. 2004) .....................................................................81

*Religious Tech. Ctr. v. Wollersheim*,
    796 F.2d 1076 (9th Cir. 1986) .......................................................... 88, 89

*Republic of Ecuador v. Chevron Corp.*,
    638 F.3d 384 (2d Cir. 2011) .....................................................................55

*Republic of Ecuador v. Chevron Corp.*,
    No. 09 CIV. 9958 (LBS), 2010 WL 1028349 (S.D.N.Y. Mar. 16, 2010)......55

*Republic of Ecuador v. ChevronTexaco Corp.*,
    376 F. Supp. 2d 334 (S.D.N.Y. 2005) ........................................................12

*Republic of the Phil. v. Pimentel*,
    553 U.S. 851 (2008)................................................................................182

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) .....................................................................161

*Rockwell Int'l Sys., Inc. v. Citibank, N.A.*,
    719 F.2d 583 (2d Cir. 1983) ...................................................................144

*Rotella v. Wood*,
    528 U.S. 549 (2000)................................................................................86

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) .......................................................................70

*Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms Co.*,
    466 F.3d 88 (2d Cir. 2006) .....................................................................143

*Salazar v. Buono*,
559 U.S. 700 (2010) ....................................................................69

*Satcorp Int'l Grp. v. China Nat'l Imp. & Exp. Co.*,
917 F. Supp. 271 (S.D.N.Y. 1996) ...........................................159

*Scheidler v. Nat'l Org. for Women, Inc.*,
537 U.S. 393 (2003).....................................................................81

*SEC v. Softpoint, Inc.*,
No. 95 Civ. 2951, 2012 WL 1681167 (S.D.N.Y. May 9, 2012) .................153

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)............................................................... 88, 90

*Sedima, S.P.R.L. v. Imrex Co.*,
741 F.2d 482 (2d Cir. 1984) ................................................. 89, 90

*Sexual Minorities Uganda v. Lively*,
960 F. Supp. 2d 304 (D. Mass. 2013) .......................................100

*Shardar v. Att'y Gen. of U.S.*,
503 F.3d 308 (3d Cir. 2007) .....................................................144

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
549 U.S. 422 (2007)...................................................................126

*Soc'y of Lloyd's v. Ashenden*,
233 F.3d 473 (7th Cir. 2000) ....................................................140

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001).....................................................................88

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ......................................................99

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)...................................................................118

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
374 F.3d 158 (2d Cir. 2004) .......................................................67

*Sunward Elecs., Inc. v. McDonald*,
362 F.3d 17 (2d Cir. 2004) .......................................................152

*Tamimi v. Tamimi*,
38 A.D.2d 197 (2d Dep't 1972)................................................167

*Trafigura Beheer B.V. v. M/T Probo Elk*,
266 F. App'x 309 (5th Cir. 2007) .............................................104

*Trane Co. v. O'Connor Secs.*,
  718 F.2d 26 (2d Cir. 1983) ...................................................................... 89, 90

*Trebilcox v. McAlpine*,
  17 N.Y.S. 221 (3d Dep't 1891)...............................................................167

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001).....................................................................................85

*United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
  151 F.3d 1139 (9th Cir. 1998) ................................................................124

*United States v. Angelilli*,
  660 F.2d 23 (2d Cir. 1981) .......................................................................95

*United States v. Beggerly*,
  524 U.S. 38 (1998)................................................... 94, 164, 170, 175, 176

*United States v. Certain Real Prop. & Premises,*
*Known as 890 Noyac Rd., Noyac, N.Y.*,
  945 F.2d 1252 (2d Cir. 1991) .................................................................174

*United States v. Eisen*,
  974 F.2d 246 (2d Cir. 1992) .....................................................................96

*United States v. Gowing*,
  683 F.3d 406 (2d Cir. 2012) .....................................................................89

*United States v. Manton*,
  107 F.2d 834 (2d Cir. 1938) ...................................................................118

*United States v. Peoples Benefit Life Ins. Co.*,
  271 F.3d 411 (2d Cir. 2001) ...................................................................180

*United States v. Razmilovic*,
  419 F.3d 134 (2d Cir. 2005) ...................................................................171

*United States v. Ross*,
  302 F.2d 831 (2d Cir. 1962) .....................................................................71

*United States v. Simmons*,
  923 F.2d 934 (2d Cir. 1991) ...................................................................102

*United States v. Timmons*,
  672 F.2d 1373 (11th Cir. 1982) ..............................................................171

*Uzdavines v. Weeks Marine, Inc.*,
  418 F.3d 138, 142 (2d Cir. 2005) ...........................................................120

*Veltze v. Bucyrus-Erie Co.*,
154 F.R.D. 214 (E.D. Wis. 1994) ...............................................168

*Venizelos v. Venizelos*,
30 A.D.2d 856 (2d Dep't 1968) ..................................................167

*Vinokur v. Penny Lane Owners Corp.*,
269 A.D.2d 226 (1st Dep't 2000) ...............................................165

*Volkart Bros., Inc. v. M/V Palm Trader*,
130 F.R.D. 285 (S.D.N.Y. 1990) ................................................160

*Weiss v. Mayflower Doughnut Corp.*,
1 N.Y.2d 310 (1956) ...................................................................128

*Welfare Fund, New England Health Care Emps. v. Bidwell Care Ctr., LLC*,
419 F. App'x 55 (2d Cir. 2011) ..................................................120

*Younger v. Harris*,
401 U.S. 37 (1971) ......................................................................168

*Zino Davidoff SA v. CVS Corp.*,
571 F.3d 238 (2d Cir. 2009) .........................................................87

## Statutes

18 U.S.C. § 1343 ................................................................................76

18 U.S.C. § 1503 ................................................................................76

18 U.S.C. § 1512 ................................................................................76

18 U.S.C. § 1951 ................................................................................75

18 U.S.C. § 1952 ................................................................................77

18 U.S.C. § 1956 ................................................................................77

18 U.S.C. § 1962 ................................................................................72

18 U.S.C. § 1964(a) ................................................. 80, 82, 83, 84, 90, 91

18 U.S.C. § 1964(b) ............................................................ 83, 85, 86

18 U.S.C. § 1964(c) ........................................................ 63, 84, 85, 91

28 U.S.C. § 1292(b) ........................................................................174

28 U.S.C. § 1331 ..................................................................................7

28 U.S.C. § 1332 ..................................................................................7

28 U.S.C. § 1367 ..................................................................................7

28 U.S.C. § 1604 ...................................................................181

28 U.S.C. § 1782 ............................................................ 45, 168

Ecuador Code of Civ. P. 838 ...............................................116

Private Securities Litigation Reform Act of 1995,
   Pub. L. No. 104-67, § 107 Stat. 737 .................................89

Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) .................. 82, 87

## Rules

Fed. R. Civ. P. 15(b) .............................................................174

Fed. R. Civ. P. 19(a)...................................................... 181, 182

Fed. R. Civ. P. 19(b) ...................................................... 178, 183

Fed. R. Civ. P. 44.1 ..............................................................104

Fed. R. Civ. P. 52(a)(6)...........................................................67

Fed. R. Civ. P. 60 .................................................................164

Fed. R. Civ. P. 60(d)(1).................................................... 97, 163

NY CPLR 302(a) .................................................................152

NY CPLR 5303 .......................................................... 59, 144, 146

NY CPLR 5304 ............................................................ 144, 170

NY CPLR 5304(a)(1)............................................................144

NY CPLR 5304(b)(3)............................................................170

## Other Authorities

10 Jack B. Weinstein et al., *New York Civil Practice: CPLR* § 5015.08 (2014)...163

12 *Moore's Federal Practice – Civil* § 60.81 (2014) ............................166

2 Joseph Story, *Commentaries on Equity Jurisprudence* § 899 (13th ed. 1886) ..167

4 Am. Jur. 2d *Amicus Curiae* § 8 (2014) ...................................124

73 N.Y. Jur. 2d Judgments ch. VIII, pt. D ...................................163

Barbara Kulzer, *Recognition of Foreign Country Judgments in New York: The
   Uniform Foreign Money-Judgments Recognition Act*, 18 Buff. L. Rev. 1
   (1969) ...........................................................................169

Charles Alan Wright et al., 11 *Federal Practice & Procedure* § 2868 (3d ed.
   2014) ...........................................................................166

Charles Alan Wright et al., 11A *Federal Practice & Procedure* § 2942 (3d ed. 2014) ....................................................................................................83

Editorial, *Ecuador's Assault on Free Speech*, N.Y. Times, Feb. 21, 2012 ..........135

Editorial, *Ecuadorean President Rafael Correa's assault on media freedom*, Wash. Post, Jan. 11, 2012 ..........................................................................135

*Foreign Judgments*, 73 N.Y. Jur. 2d Judgments § 234 (2014)..............................164

*Fraud as to Foreign Judgment*, 73 N.Y. Jur. 2d Judgments § 267 (2014)............167

G. Robert Blakey & Scott D. Cessar, *Equitable Relief Under Civil RICO: Reflections on* Religious Technology Center v. Wollersheim*: Will Civil RICO Be Effective Only Against White-Collar Crime?*, 62 Notre Dame L. Rev. 526 (1987) .......................................................................................... 85, 89

Henry Campbell Black, *A Treatise on the Law of Judgments* § 356 (1891) .........163

*Inadequacy of Remedy at Law*, 73 N.Y. Jur. 2d Judgments § 237 (2014) ............177

*Injunction Against Enforcement of Judgment Rendered in Foreign Country or Other State*, 64 A.L.R. 1136 (1930) ............................................................167

James Wm. Moore & Elizabeth B. A. Rogers, *Federal Relief from Civil Judgments*, 55 Yale L.J. 623 (1946) ............................................................164

John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. Chi. L. Rev. 823 (1985) .......................................................................................113

John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 919a (5th ed. 1941) .........................163

José Rafael Bustamente, *Ecuador, in Civil Appeal Procedures Worldwide* (Charles Platto ed., 1992) .........................................................................117

*Judge in Ecuador libel case flees country*, Miami Herald, Feb. 23, 2012 ............135

Judicial Conference Mem. in Support, Bill Jacket, L 1970, ch. 1981 ...................169

Mario Vargas Llosa, *The leader's honor*, El Pais, Feb. 26, 2012 ........................135

Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker (Jan. 9, 2012)......149

Peter L. Murray & Rolf Stürner, *German Civil Justice* (2004) .............................117

Ronald A. Brand, *Federal Judicial Center International Litigation Guide: Recognition and Enforcement of Foreign Judgments*, 74 U. Pitt. L. Rev. 491 (2013) ..................................................................................................130

## PRELIMINARY STATEMENT

The district court found that Steven Donziger organized a complex and massive conspiracy, with the goal of coercing Chevron Corporation ("Chevron") to pay him and his associates vast sums of money. After a lengthy trial, and meticulous findings, the district court determined that Donziger committed extortion, wire fraud, money laundering, bribery of foreign officials, witness tampering, and obstruction of justice. In aid of this enterprise, he and his associates procured a fraudulent judgment against Chevron in an Ecuadorian court (referred to herein as the "Lago Agrio judgment" and the "Lago Agrio court," respectively). They did so by fabricating evidence, pressuring experts to falsify reports, intimidating judges, bribing and ghostwriting the report of a supposedly neutral court expert, and then ghostwriting the court's final judgment in their own favor and bribing the judge to file it as his own. Donziger promoted these falsehoods to federal and state authorities, Chevron shareholders, the press, and other audiences. And to cover up this wrongdoing, Donziger lied to federal courts around the United States and encouraged his associates to do the same.

Based on these extensive factual findings, the district court held that Donziger violated the federal RICO statute. The court also held that "[t]he decision in the Lago Agrio case was obtained by corrupt means" (SPA497 (643)), giving rise to an independent action against both Donziger and the Lago Agrio Plain-

tiff appellants (the "LAPs") for relief from the fraudulent judgment. The court

concluded that "[t]he defendants here may not be allowed to benefit from that

[conduct] in any way." *Id.* To that end, it enjoined Appellants from seeking to en-

force the Lago Agrio judgment in the United States and imposed a constructive

trust on any profits derived from the judgment. SPA490 (641).[1]

On appeal, the district court's detailed — and damning — factual findings

go virtually unchallenged. The two LAPs appearing here as appellants, Hugo

Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje, make only a passing

reference to the fraud in Ecuador and the racketeering orchestrated from the United

States. Donziger attacks the credibility of a trial witness, Alberto Guerra, but ig-

nores the overwhelming contemporaneous documentary evidence corroborating

Guerra's testimony. Donziger also asserts that Guerra's testimony was the only

direct evidence that the LAPs bribed the trial court judge to permit their ghostwrit-

ing of the judgment. But Chevron provided ample corroborative evidence on that

---

[1]  Citations to the record are as follows: "Donz. __" to Donziger's principal brief;
"LAPs __" to Camacho and Piaguaje's principal brief; "A__" to the appendix filed
by Donziger on July 2, 2014; "SA__" to Chevron's Supplemental Appendix, filed
herewith; "SPA__" to the Special Appendix filed by Donziger on July 2, 2014. Ci-
tations to items on the district court docket or the docket of related proceedings in
this court are preceded by the relevant case number. For the convenience of the
Court, citations to the district court's opinion are cited both to the Special Appen-
dix, and to the reported version of the case at *Chevron Corp. v. Donziger*, 974 F.
Supp. 2d 362 (S.D.N.Y. 2014). The citations to the Federal Reporter follow the
SPA citation in parentheses.

point, as well, and as the district court noted, Appellants offered no rebuttal evidence other than the testimony of the Ecuadorian trial judge himself, whom the district court found to be "remarkably unpersuasive." SPA196 (483).

Rather than try to show that the district court's findings were clearly erroneous, Donziger now claims that his scheme to bribe Richard Cabrera, the Ecuadorian court-appointed "global expert," was "fully consistent with Ecuadorian law and practice at the time." Donz. 61. Any notion that a party can lawfully bribe and then dictate the work product of a supposedly independent court expert is outrageous — which is why Donziger and his associates went to such lengths to hide their dealings with Cabrera in the first place. As the district court explained: "The wrongful actions of Donziger and his Ecuadorian legal team would be offensive to the laws of any nation that aspires to the rule of law, including Ecuador — and they knew it." SPA16–17 (386). Indeed, Donziger's Ecuadorian co-counsel admitted in an internal email that "all of us . . . might go to jail" over what they did here. SPA17 (386) (quoting SA5974).

Appellants also regurgitate their longstanding and baseless charges against Chevron concerning environmental harm in Ecuador, and claim they were uncontested. But these allegations — including those regarding Texaco's remediation efforts in Ecuador — are false, they are not relevant to this fraud case, and they are not supported by any evidence adduced at trial. And, in any event, while Chevron

vigorously disputes these allegations, this Court is not a trier of fact.

Appellants' other arguments boil down to a few points. Both Donziger and the LAPs claim that the Ecuadorian intermediate appellate panel independently reviewed the trial court record, and cured the fundamental flaws in the trial court proceeding. But where, as here, a court decision is consumed by fraud, no appellate panel could legitimate that decision by engaging in a superficial review of a record that is infused throughout with deception and falsehoods. The appellate panel did not even purport to grapple with Chevron's evidence of fraud and ghostwriting and thus could not and did not identify, much less weed out, the tainted evidence from any arguably legitimate material in the record.

Donziger does not contest the district court's fact-finding or its conclusion that he engaged in RICO predicate acts including extortion, bribery in violation of the Foreign Corrupt Practices Act, wire fraud, money laundering, witness tampering, and obstruction of justice. While he does challenge the district court's ruling that RICO authorizes private injunctive relief, the plain language, purpose, and history of RICO compel the conclusion that the district court reached.

Both Donziger and the LAPs claim that the Ecuadorian appellate decisions preclude Chevron from showing that Appellants' conduct caused its injuries. There is no support for that contention, as a simple reading of the appellate orders themselves makes clear. In addition, the district court found Donziger liable for a

4

host of RICO predicate acts that are distinct from his conduct in the Lago Agrio proceeding, and Chevron proved various other injuries beyond those that flow from the Lago Agrio judgment itself, which independently support the district court's RICO ruling.

In addition to finding Donziger liable under RICO, the district court determined that equitable relief from the fraudulent Lago Agrio judgment was warranted on the separate ground of an independent action. Trial courts have long had inherent equitable authority through this mechanism to relieve a party from a judgment procured by fraud, and, contrary to Appellants' arguments, the New York Recognition Act did not displace this longstanding common law doctrine. And because the relief granted by the district court directly redresses Chevron's injuries, while respecting the prerogative of courts in other nations to decide whether to entertain enforcement actions brought in their jurisdictions, it is fully consistent with this Court's decision in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012). Even Appellants' former counsel had to concede — when this Court asked in an earlier, related proceeding whether there was anything wrong with "enjoining the person who paid the bribe from benefitting from it" — that he "would not have a problem" with that. SPA15 (385).

The other grounds on which Appellants challenge the decision below are likewise meritless. Appellants argue that more than a decade ago, Texaco, in seek-

ing dismissal of the *Aguinda* litigation on *forum non conveniens* grounds, made statements that foreclose the relief granted here. But Appellants have long mis-characterized the facts and legal significance of Texaco's statements. And, in any event, Texaco certainly did not promise to comply with a corrupt judgment such as the one here. Nor do principles of international comity shield Appellants' miscon-duct or require reversal of the district court's ruling. The court's findings regard-ing the Lago Agrio proceedings and the Ecuadorian judicial system are properly cognizant of the seriousness of the task at hand and reflect a careful analysis of the extensive evidence adduced at trial. Chevron proved that the Lago Agrio trial court succumbed to rampant fraud in the conduct of the proceedings, and comity does not require a United States court to turn a blind eye to a manifest fraud being masterminded from New York.

The district court's findings of fact are well supported, its legal rulings are well reasoned and correct, and the relief entered is just: a New York lawyer or-chestrated a massive fraud and an array of related unlawful acts from New York, and the district court rightfully addressed his misconduct and prevented him and those working with him from benefitting from it. The district court had full author-ity to hold both Donziger and his clients to account for this misconduct, and the re-lief the district court fashioned was closely tailored to the circumstances. Accord-ingly, this Court should affirm the district court's ruling in all respects.

## JURISDICTIONAL STATEMENT

In Donziger's Jurisdictional Statement, he asserts that the district court lacked subject-matter jurisdiction. Donz. 3–4. As Chevron explains in Argument Section I, *infra*, Donziger is incorrect. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.      Did the district court correctly reject Donziger's argument that Chevron lost Article III standing before trial by withdrawing its request for money damages and narrowing the geographic scope of its proposed injunction, where the court found that Chevron had proven injuries fairly traceable to Donziger's misconduct that would likely be redressed by the equitable relief granted below?

2.      In light of the district court's unchallenged factual findings that Donziger injured Chevron through a pattern of racketeering, did the court err in granting equitable relief to Chevron under the RICO statute to divest Donziger of his interest in the fruits of his misconduct and prevent future injuries to Chevron?

3.      Did the affirmance by Ecuadorian appellate courts "cleanse" the fraud, bribery, and other misconduct that resulted in the Lago Agrio judgment and thereby require the district court to deny relief under both RICO and an independent action, even though the Ecuadorian appellate panel did not conduct an independent review of the record or attempt to determine which portions of the record were untainted by fraud?

4.      Did the district court properly hold that it has personal jurisdiction over the LAPs and grant equitable relief pursuant to an independent action to prevent Appellants from profiting from the Lago Agrio judgment that their legal team ghostwrote and then bribed the judge to issue as his own?

## STATEMENT OF THE CASE

The district court's opinion describes in detail the three intertwined series of events that gave rise to this lawsuit.

*First*, Steven Donziger orchestrated a long-running scheme to secure a fraudulent judgment against Chevron in Ecuador. To this end, he and his associates employed bribery, forgery, fraud, collusion, and intimidation — infecting every aspect of the Ecuadorian proceedings. Their string of criminal acts culminated with the ghostwritten report of a court-appointed expert, and then the ghostwritten judgment itself.

*Second*, Appellants parlayed their corruption of the Ecuadorian litigation into what Donziger described as a campaign of "brute force," putting pressure on Chevron not just through the threat of a massive judgment obtained by corrupt means, but through criminal charges, false vilification, and vexatious asset seizures and enforcement actions, all intended to force Chevron to pay them billions of dollars.

*Third*, when Chevron sought discovery of this conduct through U.S. courts, Appellants tried to evade detection through false and misleading statements, corruption of witness testimony, and obstructive delay and misdirection.

All of this was carried out in the name of the LAPs, with their approval, and under their control. They have never disavowed any of it. On the contrary, they

vigorously tried to defend Donziger's conduct throughout the proceedings below, and continue to seek the benefit of Donziger's fraud even in their appeal to this Court.

Appellants' ongoing racketeering was — and is — funded by a succession of law firms, institutional investors, and wealthy individuals whose support Donziger obtained through further fraud and deceit, and others who have knowingly funded the conspiracy or who have turned a blind eye to the ever-mounting evidence of wrongdoing.  And it was pursued with the active support of Ecuador's authoritarian President, Rafael Correa, who has made the campaign against Chevron a signature issue, and has put his nation's courts, its law enforcement, and the highest levels of its executive branch into the LAPs' service.

All of this is recounted — with citations to Appellants' own documents, words, and video images — in the district court's detailed factual findings.  Appellants challenge almost none of these findings.  Instead, they level a host of allegations against Chevron that are untrue, unsupported by anything in the record, and irrelevant to the issues in this case.  Appellants have no answer to the relevant facts, which Chevron summarizes here.

## I.    Background

In 1964, the Republic of Ecuador (the "ROE") granted oil exploration and production rights in the Oriente region of Ecuador to a consortium formed by Gulf

Oil and an indirect subsidiary of Texaco, Inc. (Texaco Petroleum Company or "TexPet"). SPA17–18 (386). In 1973, the ROE revised the terms of the contract, and granted an ownership stake in the consortium to the Ecuadorian state oil company, now known as Petroecuador, which shortly thereafter bought out Gulf Oil and became the majority owner. *Id.*; SA686 ¶ 14. From 1964 until 1992, the consortium generated over $20 billion for the ROE and $500 million in profit for TexPet. SA687 ¶ 16. Petroecuador took over the consortium's operation in 1990, became the sole owner in 1992, and continues to produce oil in the region today. *See* SPA18, 54–55 (386, 406); *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 340–41 (S.D.N.Y. 2005); SA4879; SA6677.

In 1993, TexPet and the ROE agreed that TexPet would be released from any claims for environmental harm in the area once it completed specified remediation projects. SPA18 (386). As part of this process, the consortium commissioned an environmental audit. The audit concluded that TexPet's operations had complied with industry standards, that impact on water quality in the region was "none to moderate," and that there was "little evidence of significant subsurface contaminant migration beyond the boundaries of the production stations and well sites." SA6722; SA6774; SA6800. It recommended a $13.3 million remediation program. SA6833. A second, parallel audit made similar findings, and recommended a $6.8 million remediation. SA6369.

The parties agreed that TexPet would be responsible for the portion of the remediation work reflecting its approximately one-third minority share in the consortium, and that Petroecuador would remediate the remaining sites. SA690 ¶ 28. TexPet fulfilled its obligations at a cost of $40 million — including environmental remediation, social programs, public works projects, and lawsuit settlements — subject to site-by-site inspection and approval of the Ecuadorian government. SA692 ¶ 33; SA694 ¶ 40. In 1998, the ROE, along with regional and local governments, and Petroecuador, certified TexPet's full performance under the terms of the agreement with TexPet and released the company "from all potential claims by the ROE and PetroEcuador." SPA19 (387); SA692–93 ¶¶ 34–35. As confirmed many years later by an international arbitral tribunal, this agreement had the legal effect of releasing all claims for generalized or "collective" remediation (as opposed to personal or property damage) by the ROE *and* all third parties. SA6182. Petroecuador, for its part, did not undertake its share of the remediation until 2005, when it began an ongoing $67.8 million program to remediate 370 pits within the former concession area. SA7038; SA7055; SA6357.

In the midst of this settlement and remediation process, several American attorneys, including Steven Donziger, filed a class action lawsuit against Texaco in the Southern District of New York, alleging that TexPet's operations had caused personal injury and property damage to Lago Agrio residents. *See* SPA19–20

(387); *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

After Texaco moved to dismiss this action on *forum non conveniens* grounds, the ROE informed the court that it too objected to the lawsuit because the plaintiffs were "attempting to usurp" collective rights held exclusively by the ROE. SA4933. The district court granted Texaco's motion, but less than two weeks later, the ROE agreed to a *quid pro quo* with the *Aguinda* plaintiffs: the plaintiffs agreed not to sue Petroecuador or the ROE, or to collect on any contribution judgment Texaco obtained against the ROE, and the ROE agreed to support the lawsuit. SPA25 (390); *Jota v. Texaco, Inc.*, 157 F.3d 153, 158 (2d Cir.1998). This deal marked "the start of the LAPs' alliance with the ROE." SPA25 (390).

The plaintiffs appealed the *forum non conveniens* dismissal, and this Court reversed "on the ground that the district court had failed to obtain a commitment by Texaco to submit to the jurisdiction of the Ecuadorian courts." SPA24 (389) (citing *Jota*, 157 F.3d at 159). During subsequent negotiations over that commitment, Texaco offered to agree to "satisfy judgments that might be entered in plaintiffs' favor, subject to Texaco's rights under New York's Recognition of Foreign Country Money Judgments Act." SA6350; SPA471 (630–31) n.1753. The *Aguinda* plaintiffs rejected this offer, however (SA6355), and that proposed term does not appear in any agreement between the parties or in any court opinion. *See* SPA471 (630–31).

While the parties negotiated in the district court, the plaintiffs' lawyers "'worked with Ecuadorian legislators" to draft "Ecuador's Environmental Management Act of 1999 (the 'EMA'), which among other things created a private right of action for damages for the cost of remediation of environmental harms generally" — the "collective" or "diffuse" rights previously held by the ROE alone and already released by the ROE as Texaco.  SPA27 (391) (quoting SA6134.1); SA4933.

Texaco eventually agreed to submit to the jurisdiction of Ecuadorian courts; *Aguinda* was once again dismissed on *forum non conveniens* grounds, and this Court affirmed.  *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 554 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002); *see also* SPA24–25 (389–90).  During the pendency of the appeal, Texaco merged with a subsidiary of Chevron, leaving Texaco as the surviving entity.  SPA468 (629).  Texaco continued to exist as a separate corporation, as it does today (SPA468–69 (629); SA6345), and remained at all times the sole defendant in the *Aguinda* action (*see Aguinda*, 303 F.3d at 470).

After this Court affirmed the dismissal, the U.S. legal team behind the *Aguinda* action filed a complaint in Lago Agrio, Ecuador — but against Chevron only, and not Texaco, TexPet, Petroecuador, or the ROE — on behalf of 48 named individuals and the broader community.  The case, known as the "Lago Agrio" litigation, was brought under Ecuador's recently enacted EMA and sought damages and

generalized remediation of environmental harm purportedly caused by Texaco —
not personal injury and property damage claims, as in *Aguinda*. SPA28 (391). The
complaint designated the Amazon Defense Front, an organization controlled by
Donziger and his associates, as the sole recipient of any recovery. SPA28, 85
(391–92, 423).

## II. Donziger's Corruption of the Lago Agrio Litigation and Racketeering Targeted at Chevron

The district court found that Donziger, acting on behalf of the Lago Agrio
plaintiffs, "corrupted the Lago Agrio case." SPA14 (384). Simultaneously,
Donziger masterminded a scheme in the United States to extort Chevron — based
in substantial part on the threat and fruits of his frauds in Ecuador — and, in the
course of trying to cover up this scheme, lied repeatedly to U.S. courts.

### A. Fraud in Connection with the Lago Agrio Proceedings

After the Lago Agrio litigation commenced, Donziger gradually assumed
control over all aspects of it. SPA36–37 (396) n.94 (citing SA5811). He "super-
vised the Ecuadorian legal team, . . . directed the legal strategy, and coordinated
the work between the lawyers in Ecuador and the scientists, experts, lawyers, liti-
gation funders, politicians, and media consultants throughout the world." SPA38
(397). In short, he "called the important shots" (SPA39–40 (398)), and used this
authority to corrupt the adjudicatory process.

### 1. Initial Phases: Judicial Inspections and the Ghostwritten Expert Report

On the first day of the Lago Agrio trial, Donziger contrived to "take over the court with a massive protest," pursuant to his stated strategy "to control the court, to pressure the court." SPA97 (429) (quoting SA4735); *see also* SA715 ¶¶ 112–14 (describing protest). Donziger reprised this strategy to "mobilize[] demonstrations to intimidate" judges whenever he thought the LAPs needed greater influence over the court, assembling what he called a "private army" for this purpose, and telling his cohorts that "the only way the court will respect us is if they fear us." SPA48, 82, 95–101, 138 (403, 421, 428–31, 452) (quoting SA4868, Donziger describing his "familiar lecture"); SA5804; SA1031 ¶ 98 (describing protest featuring mock execution of Chevron executives).

The initial phase of the Lago Agrio proceedings involved "judicial inspec-tions," in which experts nominated by each side filed reports regarding specific sites, and then a panel of settling experts resolved any differences for the court. SPA62–64 (411–12). The LAPs' first expert was Dr. Charles Calmbacher. After inspecting the first two sites, Calmbacher "concluded that I did not see significant contamination that posed immediate threat to the environment or to humans or wildlife around it." SA673–76; SPA66–67 (412–13). After Calmbacher returned to the United States, the LAP team asked him to sign and initial blank pages on which to print his final report for the court. SPA66–67 (413–14). But the LAP

team printed a different report on those pages, which stated — contrary to Calmbacher's findings — that the site was contaminated with "highly toxic chemicals" for which TexPet was responsible. SPA68 (414). When later shown the report filed under his signature, Calmbacher testified, "I did not reach these conclusions and I did not write this report." SA671–72; SA673–76.

In order to procure a sizeable damages estimate with which to threaten Chevron, Donziger also arranged for another of his consultants, David Russell, to provide an estimate based on a cursory tour of the region. SPA53–55 (406). Russell, who testified at trial in this action, provided what he described to the district court as a "SWAG" — a "scientific wild ass guess" — of $6 billion based on Donziger's instructions to "assume there was contamination," that Chevron was liable for all of it, even any that took place after TexPet left in 1992, and to rely on "the most expensive remedial options available." SPA55 (406); SA747–48 ¶¶ 9–11; SA5801. Donziger also instructed Russell to stop testing for compounds that indicated recent contamination, in favor of a test that was "unable to distinguish" recent from historical contamination, and which was more likely to produce false positives. SPA71 (415).

Within a year, Russell repudiated his $6 billion estimate, telling Donziger it was "wildly inaccurate" (SPA56 (407)) and that "I have seen no data which would indicate that there is any significant surface or groundwater contamination caused

by petroleum sources in Ecuador" (SA5801).  When Donziger continued to public-

ly cite the estimate, Russell sent Donziger a letter ordering him to "cease and de-

sist" relying on it.  SA5798–5800; SA5807.  Donziger told Amazon Watch, an ad-

vocacy group that worked under Donziger's control, "I don't care what the fuck

that guy says," and instructed them to keep using the estimate.  SA4702–03.  As

the district court found, "Russell's $6 billion SWAG figure quickly became a key

weapon in Donziger's effort to exert pressure on Chevron" (SPA55 (407)), and he

and his surrogates continued to cite it publicly for years (SA1039 ¶ 9).

In addition to manipulating his own experts, Donziger sought to improperly

influence the court's neutral "settling experts."  To that end, Donziger hired two

Ecuadorian environmental engineers to pose as independent "monitors" of the set-

tling experts, but secretly paid them $50,000 to push for results favoring the LAPs.

SPA72–75 (416–18).  As the district court found, Donziger described this ar-

rangement as "go[ing] over to the dark side" and a "bargain with the devil."

SPA74–75 (417) (quoting SA4864; SA4866); *see also* SPA273 (523).  After the

settling experts concluded in their first report that "Texaco had fully remediated"

the site in question, Donziger privately characterized the result as "disastrous" and

instructed his "monitors" to attack the report.  SPA77–78 (418–19).  Despite

Donziger's bribe, these "monitors" could not come up with a substantive challenge

to the settling experts' conclusion.  *Id*.  "Donziger did not address — much less of-

fer any innocent explanation of — these events, either in his written direct testimony or on the witness stand."  SPA78 (419).

Subsequently, the LAP team asked the court to cancel the inspection process entirely, and instead rely on a single "global" expert who would make comprehensive recommendations on all issues.  SPA79–80 (420).  After the court denied their initial request, Donziger staged "several demonstrations outside the courthouse," he "initiated a press campaign" accusing the judge of bias towards Chevron, and he threatened the judge with a lawsuit.  SPA79–84 (420–22).  Donziger explained to his colleagues that these tactics were necessary because "the only way the court will respect us is if they fear us — and that the only way they will fear us is if they think we have . . . control over their careers, their jobs, their reputations — that is to say, their ability to earn a livelihood."  SPA82 (421) (quoting SA4868).  Eventually, the judge acquiesced and granted the LAPs' request to terminate the judicial inspection process.  SPA83 (422).

At the LAP team's direction, and after further protests aimed at the presiding judge, the court installed the LAP team's nominee, Richard Cabrera, as the "global expert."  SPA95–98 (428–30).  The court "on multiple occasions instructed Cabrera to conduct his work impartially and independently of the parties," and when Chevron alleged that there was evidence he was coordinating with the LAPs, Cabrera insisted that he was neutral and independent, proclaiming that it was "an

insult against me that I should be linked with the attorneys of the plaintiffs." SPA129 (447). Similarly, the LAPs' lawyers denied Chevron's allegations and told the court that they were "ridiculous" (SA5251) and "another infamy" (SA5261), and that Chevron should be "sanctioned" for suggesting that they were working with Cabrera (SPA130 (447–48); *see also* SA5246).

These representations were false. The district court found that Donziger and his associates selected Cabrera because they believed (in their own words) he would "totally play ball with us and let us take the lead while projecting the image that he is working for the court." SPA84–86 (422–24) (quoting SA4875). To maintain control over Cabrera, "they entered into a contract with [him], provided him with a secretary [the girlfriend of a LAP attorney], obtained life insurance for him, and provided other support." SPA108 (435). They made a series of what they referred to as "secret" payments to Cabrera that they knew were "illegal or at least improper" — in other words, they bribed him. SPA106 (434); SPA404–10 (595–99) (payments to Cabrera violated the Foreign Corrupt Practices Act); *see also* SPA99–108 (431–35).

In return, Cabrera allowed the LAP team to control his field work and ghostwrite his report. The LAP team "had chosen the sites which Cabrera was to visit . . . [knowing that] they could simply 'change the focus of the data at [their] offices.'" SPA109–10 (436) (quoting SA5862). The LAP team even charted out

each of the numerous annexes to the "independent" expert's report, assigning the drafting to various team members at the same time that it determined what purportedly independent person each annex would be publicly "attributed to." SPA115–21 (440–42); SA5893–98. As "Donziger eventually admitted," Cabrera's expert report was "written almost entirely by Stratus [a U.S. consulting firm hired by Donziger] and others working at the direction of Stratus and Donziger." SPA121 (442). And "while Donziger reviewed and commented on every aspect of the Cabrera Report and its annexes before they were filed, there is no evidence that Cabrera himself ever did." SPA121 (443). Indeed, the night before Cabrera filed the report, Donziger made changes to the presentation and amounts of the damages findings, eventually settling on $16.3 billion in damages — $8 billion in damages and $8.3 billion for a "punitive" "unjust enrichment" claim. SA5899; SPA120–21 (441–42) nn.454–55; SA5899.

Once the report was on file, the LAP team sought "to maximize the deception" by filing a response criticizing portions of the report as "unjustly favorable to [Chevron]" (SA4973) and recommending $11 billion more in damages (SPA123–27 (443–46)). Then they ghostwrote Cabrera's response, granting their own request. SPA125–27 (445–46). As the district court found: "This appearance of dissatisfaction with the Cabrera Report was important because it supported the false pretense that Cabrera had acted independently." SPA125 (444). Indeed, it

was part of Donziger's plan all along. Before Cabrera's appointment, Donziger proposed to Pablo Fajardo and others, "[b]ut as a concept, I ask, do we ask for much more than what we really want as a strategy? Do we ask for eight and expect three, so that [the judge] says, 'Look, Texaco, I cut down the largest part.'" SA1; SA6. Several months later, Donziger told Fajardo "to think of anything Richard [Cabrera] could do AGAINST us to prove his independence." SA5861.1.

Donziger and his associates went to great lengths to conceal this activity. They used what they called a "secret account" to funnel payments to Cabrera, and communicated about him in code, referring to the judge as the "cook," Cabrera as "the waiter," and Chevron as "the other restaurant." SPA93–94 (427–28). Fajardo instructed the team to keep "silent" about their role and pretend to be dissatisfied with its conclusions: "'*PLEASE, WE ARE NOT HAPPY*.'" SPA93 (427); SPA123–24 (444) (quoting SA5849; SA5904). Donziger admitted that he, too, had instructed his team to keep their work confidential, and that their use of code words like "cook" and "waiter" was intended to conceal their relationship with Cabrera. SPA93–94 (427–28). Donziger's lead consultants, Douglas Beltman and Ann Maest, even concealed the truth from their employer, Stratus, whose CEO testified that Beltman "provided information that was incomplete and misleading about the nature of his, and consequently Stratus's, involvement in the Ecuador Project." SA1366 ¶¶ 28–29; SA1368–69 ¶ 36.

None of this — the coercion of the court, the bribery of Cabrera and the ghostwriting of his report, or the efforts to conceal the scheme — was "seriously disputed at trial." SPA128 (446); *see also* SPA336, 342–43 (558, 561–62). Instead, after years of denying that these events took place, Donziger shifted positions and claimed that ghostwriting and bribery were acceptable under Ecuadorian law. SPA128–30 (446–48); Donz. 25.

The district court found that "Donziger's belated admission and explanation is incomplete and unpersuasive. It does not square with the facts." SPA128–31 (446–48). The LAPs offered the opinions of purported experts in Ecuadorian law in support of this position, but when presented with the undisputed facts of this case in depositions, the LAPs' own experts admitted that the conduct here was illegal. For example, one of these experts testified that "'if the Court-appointed expert were to incorporate information that is not his and did not expressly acknowledge that, the — the expert would be lying. And if that is proved, he would be subject to a criminal — criminal proceedings for providing false testimony.'" SPA130 (448) n.491 (quoting SA592.1–592.2 (Álban deposition transcript)); *see also* SA534–41; SA591–95.[2]

_____

[2] Donziger tries to draw a parallel to Chevron's meetings with Dr. Marcelo Munoz (Donz. 25), but those meetings were for logistical purposes only, as Donziger admitted (A3433), and even the LAPs' own lawyers acknowledged that there is no "real comparison" between the Munoz meetings and the LAPs' rela-

Had Donziger actually believed his conduct was permissible, the district court concluded, Donziger, Cabrera, and the LAPs would not have made such extensive efforts to conceal it — efforts that included repeated violations of federal laws against obstruction of justice and witness tampering. SPA128–30 (447–48); SPA399–403 (593–95). Indeed, "one Ecuadorian legal team member, in a moment of panicky candor, admitted that if documents exposing just part of what they had done were to come to light, 'apart from destroying the proceeding, all of us, your attorneys, might go to jail.'" SPA17 (386) (quoting SA5974). "In sum," the district court found, "Donziger knew at every step that what he and the LAP team did with Cabrera was wrong, deceptive, and illegal." SPA152 (460).

In September 2009, a new judge — the fifth to preside — took over the proceedings, after the previous presiding judge, Juan Nuñez, was caught on video participating in meetings relating to a proposed bribery and kickback scheme connected to the Lago Agrio litigation. SPA477–78 (634). The new judge, Nicolás Zambrano, relied on a former colleague, Alberto Guerra, to ghostwrite many of his orders in civil cases. SPA236–41 (505–07). The LAP team struck a deal with the ghostwriter, Guerra, paying him to favor the LAPs in the orders he wrote for Zambrano. SPA249–51 (509–11).

---

tionship with Cabrera (SA6007).

The district court's finding that the LAP team bribed Guerra is supported by extensive evidence. Besides Guerra's testimony, the record contains coded emails between Donziger and his colleagues discussing payments to Guerra, in which they referred to Guerra as the "Puppeteer" and Zambrano as the "Puppet." SPA246 (510); SA6081; SA6086. The timing of these emails matches a series of $1,000 withdrawals from the LAP team's account and corresponding $1,000 deposits in Guerra's account — including two deposits in Guerra's account made by a LAP team employee. SPA247–48 (509–11). The court found that "Defendants offered no evidence or testimony that rebuts or explains these emails or the payments." SPA249 (511). Indeed, Zambrano admitted at trial that Guerra ghostwrote orders for him, but he insisted that this arrangement did not extend to the Chevron case. SPA239 (506). That implausible testimony was disproved by, among other evidence, proof that among the 114 draft court orders in Zambrano's cases that were found on Guerra's computer, nine of them were in fact from the Chevron case, and all but one had been saved on Guerra's computer *before* Zambrano issued them as his own. SPA244 (509).

### 2. Final Phase: Ghostwriting the Lago Agrio Judgment Itself

In early 2010, Zambrano's term as presiding judge on the Lago Agrio case ended. His successor, however, failed to rule on a series of motions brought by Chevron, and Chevron eventually sought his recusal. SA1017–18 ¶ 62. Through

the procedures of the Lago Agrio court, the recusal request fell to Zambrano, who granted it and took over the case once again. SPA253–54 (513).

By this time, the lengthy litigation had nearly run its course, and it was expected that Zambrano would issue the judgment. SA1021 ¶ 71. And on February 14, 2011, just four months after he assumed jurisdiction over the case, Zambrano issued an $18.2 billion judgment in the LAPs' favor. SPA191 (481). It soon became apparent, however, that "the Judgment include[d] substantial passages and references that do not appear anywhere in the Lago Agrio Record, but that do appear verbatim or in substance in a number of documents from the LAPs' files." SPA278–79 (526); *see also* SPA212–226 (492–99). Chevron commissioned two separate analyses — one employing computer searches and one employing human review — seeking a source for this material in the record, and found none. The experts who led each of these analyses testified at trial, and the district court found "that the methodologies used by the Chevron experts were reliable and admissible, credit[ed] their testimony, and adopt[ed] their findings." SPA513 (650).

The LAPs' "fingerprints," as the district court termed them, "are all over the judgment." SPA212, 508–44 (492, 648–81); SA6121.[3] In all, material from eight

---

[3] SA6121 is a video showing overlap between the LAPs' unfiled work product and the Lago Agrio judgment. The district court found that the video was "especially helpful in understanding the expert testimony [SA826], which the Court fully credits." SPA214 (493).

separate pieces of LAP team "internal work product" appears throughout the judgment. SPA213 (492). Text from six of these documents "appear[s] verbatim or in substance on 30 pages of the Judgment." SPA213–14 (492); SA6090–6120. The LAPs' material appears "on important issues, including the question whether Chevron could be held liable for alleged pre-acquisition torts of Texaco." SPA214 (493). And it includes not just verbatim analyses and passages of language, but idiosyncratic naming conventions, such as the use of "–sv" and "–tx" suffixes following sample results, which appear in many of the judgment's citations and in LAPs' spreadsheets (the "Selva Viva Database") — but not in any of the sampling results filed with the court. SPA219–20 (495–96). In other cases, errors in the judgment come directly from the LAPs' documents containing those errors, or can be explained only if the LAPs' documents were the source. SPA220–23 (496–97).

The district court found that "Defendants had remarkably little to say regarding the evidence." SPA224 (498). They "utterly failed to explain how or why their internal work product—their 'fingerprints'—show up in the Judgment." SPA195 (483). Indeed, in the three years since Chevron first identified examples of this overlap, neither Donziger nor anyone else has identified a single filing or informal submission to the Lago Agrio court containing any of the overlapping material. At trial below, former Judge Zambrano testified that he never used any materials that were not in the official record, but he could not account for the over-

lap. SPA507 (647–48). As the District of Maryland noted in a related proceeding

shortly before the trial below, "[t]he failure or should I say more accurately the in-

ability for the Ecuadorian Plaintiffs or [LAPs attorney Aaron] Page to identify a

single explanation in that record at this time, after the passage of this much time,

doesn't help . . . . We are still left more than a year-plus later using speculative

terms, suggesting that the information at issue could have derived from other

sources." SA526 (Ex. 3725); *see also Chevron Corp. v. Page*, — F. 3d —, 2014

WL 4723806 (4th Cir. Sept. 24, 2014).

The district court rejected Appellants' claims — reprised here (Donz. 12, 59)

— that the Lago Agrio record was ill-kept and subject to expansion beyond the

100-page booklets maintained by the court staff. SPA224–25 (498–99); SPA504–

08 (646–48). Indeed, Appellants' internal correspondence reveals that they have

"a full digitized set of every single document filed in court" (SA5936), which

would have made it a simple matter for them to identify submissions containing the

unfiled work product appearing in the judgment, whether or not those submissions

appeared in the Lago Agrio record. And Appellants have abandoned their earlier

"speculative" suggestions, such as the ludicrous theory, advanced first by Fajardo

and then briefly echoed by the LAPs' counsel in the district court, that "Chevron

itself put it there from the beginning." SPA296 (536); SA507. On the basis of the

LAP team's "fingerprints" on the judgment, as well as substantial additional evi-

dence of the LAP team's motivation and intent to author the judgment themselves, the district court concluded that "the LAPs wrote the Judgment in its entirety or in major part[.]"  SPA231 (502).

As the district court put it, this conclusion raised a key question:  "How was this accomplished?"  SPA231 (502).  Guerra provided the answer.  Shortly after taking over the case for the second time in the fall of 2010, Zambrano instructed Guerra "to reach out to Chevron's attorneys" and offer them the opportunity to write the judgment in exchange for a bribe.  SPA253 (513).  When Guerra was told through an intermediary that Chevron's attorneys were not interested, Zambrano told him to make the same offer to the LAP team — which he did, at a meeting with Fajardo and Donziger.  SPA254–55 (514).  Although no deal was reached at that meeting, Zambrano later informed Guerra that "he had been in direct contact with Fajardo and that 'the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect from the judgment, in exchange for allowing them to write the judgment in the Plaintiffs' favor.'"  SPA255 (515) (quoting SA1142 ¶ 43).

Ultimately that was what transpired — Zambrano issued as his own the judgment the LAP team wrote for him.  SPA194–230 (483–501).  In early 2011, Guerra met with Fajardo and Zambrano at Zambrano's apartment, and they told Guerra to revise a draft prepared by the LAPs' attorneys "'to fine-tune and polish it

so it would have a more legal framework.'" SPA257 (515) (quoting SA1143–44 ¶

47). Guerra worked on the judgment over the next two days. When Guerra called

Fajardo with a question about two sections, Fajardo provided him with a "memory

aid" to clarify the points at issue. SPA257, 265 (515–16, 519); SA6019 (memory

aid). Less than two weeks later, after further edits by the LAP team, Zambrano is-

sued the judgment as his own. SPA258 (516).

 In their trial testimony, Zambrano and Donziger disputed aspects of Guerra's

account, and, on appeal, Donziger continues to attack Guerra's testimony — alt-

hough he does not assert that any of the district court's findings were clearly erro-

neous. A3423; SA3500; Donz. 4, 52–61. In evaluating Guerra's testimony, the

district court recognized Guerra's admitted "self interest," prior "dishonest[y],"

and several minor inconsistencies in his account, but noted that "[f]rom the stand-

point of demeanor, Guerra was an impressive witness" and "testified clearly, di-

rectly, and responsively." SPA262 (518). Appellants point to the benefits that

Guerra received from Chevron (Donz. 52–55, 83; LAPs 3 n.7), but a credible threat

to Guerra's safety necessitated his relocation, and the district court was well aware

of Chevron's assistance to Guerra. SPA259–64 (516–19); *see also* 691 Dkt. 1474;

691 Dkt. 1650; SA555; SA571.

 By comparison, the court found that "Zambrano was not a credible witness."

SPA268 (520); SPA196–212 (483–92). Donziger complains that Chevron

"forc[ed] [Zambrano] to endure a pop quiz" about the judgment Zambrano claimed to have written (Donz. 60), but he mischaracterizes both the cross-examination and Zambrano's answers. In the first place, the questioning could hardly have been a surprise — Chevron had been alleging for years that Zambrano did not write the judgment, and had asked him similar questions about its contents in Zambrano's deposition the weekend before. SPA196–97 (483). And while Donziger tells this Court that "Zambrano did not know the exact answer to every question" (Donz. 60), the district court found that "Zambrano was unable to answer basic questions about the Judgment that he ostensibly wrote and that he came to New York to defend." SPA196–97 (483–84). The court noted that "the aspects of the Judgment [Zambrano] was unable to recall were not insignificant details . . . . It is extremely unlikely that a judge who claims to have spent many months reviewing the record and to have written this lengthy and detailed decision would not recall such important aspects[.]" SPA198–99 (484–85).

Among the many glaring problems with Zambrano's testimony was his inability to explain the widespread presence of foreign language sources and concepts in the judgment. For example, the English-language oil production term "workover" appears twice in the judgment, but "Zambrano testified that he does not speak English, did not know what 'workover' means, and could not explain why the word was in the Judgment." SPA198 (484). Zambrano initially testified that "'no-

body helped [him] do the research [he] needed to do to write and author the judgment,'" but when he was confronted with "French, British, Australian, and American authorities that were cited in the Judgment," Zambrano claimed that "Ms. Calva," his 18-year old typist, "'would go onto the internet. She would look for a specific subject . . . she would print them out so that I would read them later'" — but he still could not explain how either of them read these French and English language sources, since neither speaks French or English. SPA199–201 (485–86) (quoting SA3310–11).

Zambrano's account of how he wrote the judgment was also inconsistent and implausible. After claiming in a declaration submitted before trial that "I composed and prepared the judgment on the computer that the Judiciary Council assigned to me" (A1546.3), he testified at trial that he had dictated the judgment to Calva, his previously undisclosed assistant. SPA201–02 (486). And Zambrano "was adamant that Calva typed only what he dictated orally to her. He 'never show[ed] Ms. Calva any document for her to type from.'" *Id.* But as the district court found, the judgment itself demonstrates how implausible this is, because it contains "many complicated words, citations, and numerical sequences. The sampling data cited in the Judgment consists of strings of alphanumeric sequences with dashes, periods, underscores, odd spacing, and parentheses in them" — sequences such as "'con resultados como 3142 y 466 en Auca 1 en AU01–PIT1–SD2–SU2–

R(220–240 cm)_sv y AU01–A1–SD1–SU1–R(60–100cm)_sv; 2450 y 876 en

Cononaco 6 en CON6–A2–SE1_sv y CON6–PIT1–SD1–DU1–R(160–

260cm)_sv[.]'" *Id.* (quoting Lago Agrio judgment, Spanish language version).

The court concluded that "[i]t is not credible that Zambrano dictated these se-

quences to Calva orally and that Calva then typed them exactly into the draft with-

out looking at any underlying document." *Id.* Nor did Zambrano have any plausi-

ble explanation for why the judgment contained typographic and other errors that

are identical to the errors in the LAPs' unfiled work product. SA3405; SA3571;

SA3572.

In summarizing why it declined to credit Zambrano's testimony that he was

the sole author of the Ecuadorian judgment, the district court explained:

> In sum, the Court finds that Zambrano did not write the Judgment is-
> sued under his name. He was astonishingly unfamiliar with important
> aspects of its contents. His testimony at trial was evasive and inter-
> nally inconsistent. He repeatedly contradicted himself when attempt-
> ing to explain how he wrote the Judgment, whether he received any
> assistance, and what materials he relied upon in doing so. The testi-
> mony he gave at trial was markedly different from that which he gave
> at his deposition just days before. And his responses and explanations
> at trial varied from one minute to the next. Not only was his version
> of events internally inconsistent, it was, as we shall see, in large re-
> spects thoroughly contradicted by evidence that was unrebutted and
> unexplained by the defendants.

SPA211–12 (491–92).

As for Donziger, the district court found that he was self-interested, deceit-

ful, made deliberate misrepresentations to the court, and displayed an evasive de-

meanor in depositions and at trial. SPA269–77 (521–26) ("Donziger has deceived when deception served his interests."); *see also* 691 Dkt. 1183 (Special Masters Interim Report No. 2). Moreover, the court found that Donziger's "narrow" testimony on the issue of the judgment ghostwriting, even "assuming its truth, would be of only limited value." SPA286–87 (531). Donziger admitted that Guerra proposed the $500,000 bribe to him (691 Dkt. 922 ¶ 5), and he denied only his personal role in the bribery negotiations and ghostwriting of the judgment. SPA286–87 (531); SA1652–54 ¶¶ 71–78. But as the district court noted, "Donziger's testimony would not necessarily have been inconsistent with a finding that Fajardo [arranged for the bribe]" — which is all Guerra claimed. SPA287 (531); SA1126.

Not surprisingly, the LAPs' ghostwritten judgment favored them in all respects. It imposed an $18.2 billion damages award against Chevron, including an $8.6 billion penalty to be paid unless Chevron issued a public apology within 15 days of the judgment. SPA191 (481). It disregarded Chevron's evidence of the fraud and misconduct by the LAPs and Donziger as irrelevant and chastised Chevron for asserting procedural and substantive due process rights. *See, e.g.*, A1039; A1087–90.

The judgment also disclaimed any reliance on the Cabrera report, but as the district court demonstrated in a detailed appendix, that "was not accurate." SPA191–92, 545–57 (481, 682–88). At a minimum, the court found, the judgment

relied on the fraudulent Cabrera report to determine the number of waste pits —

the "critical" component of the $5.4 billion soil remediation award — to calculate

potable water damages of $150 million, and for the $200 million award to restore

native flora and fauna.  SPA546–57 (682–88).[4]

### 3.  Ecuadorian Appellate Proceedings

Both Chevron and the LAPs appealed the Lago Agrio judgment.  SPA294

(535).  The intermediate appeal was heard by a panel drawn from trial judges in the

same court that issued the judgment.  SPA295 (535).[5]  Although three judges were

designated for the appellate panel in March 2011 (*id.*), the panel's composition

---

[4]  Appellants periodically alleged that Chevron engaged in misconduct during the Lago Agrio trial, primarily in support of an unclean hands defense.  Although Appellants abandoned these allegations at trial, the district court found that "there was no credible evidence to support any [unclean hands] defense even if it had been pressed[.]"  SPA476–77 (634).  Chevron has previously rebutted these allegations, and Appellants have waived their unclean hands defense in any event.  *See* 691 Dkt. 331 at 8–14; 691 Dkt. 369 at 10; 691 Dkt. 370 ¶¶ 17–40, 48–68; 691 Dkt. 452 at 10 & n.12; 691 Dkt. 1349 at 24–27; 691 Dkt. 1474 at 1–18; 691 Dkt. 1497 at 1–2.

[5]  In Ecuador, cases generally begin in a provincial court, here the Provincial Court of Sucumbíos.  Appeals from this court are heard by a panel of judges sitting on the same provincial court.  *See* SPA295 (535).  Orders entered by this intermediate appellate panel can be appealed to Ecuador's National Court of Justice, a "court of cassation."  *See* SPA302 (539).  Certain decisions rendered by the National Court of Justice can be reviewed by Ecuador's Constitutional Court, which is subject to de facto control by Ecuador's political branches.  SPA435 (612).  Ecuador's "National Judicial Council," headed by Correa's former secretary, appoints and evaluates judges to both the National Court of Justice and the provincial courts.  SPA438 (613).

changed by two-thirds — and repeatedly — over the following months and was not finalized until late November 2011 (SPA427–28 (608) n.1573). Just five weeks later, the panel issued a 16-page order, which addressed only legal disputes, not the trial judgment's factual findings, and affirmed the judgment in its entirety. SPA297–98 (537); A452–68 (appellate order).

Rather than review the evidence or make new factual findings, the appellate panel deferred to the trial court with minimal discussion. For example, the appellate panel found that "the trial court has complied with [Article 115 of the Code of Civil Procedure], since, evaluating the evidence collectively, it refers to each item of evidence." A464. And with respect to causation, the appellate panel held only that "[t]he analysis of the relationship between damage and cause in the Ecuadorian Amazon is sound and derives from the examination of the items of evidence that exist in the record." *Id*.

The panel expressly stated that it had not considered Chevron's allegations of fraud. SPA295–98 (535–37). As for Chevron's assertion that the judgment contained material not found in the record, the appellate panel never identified any record source for any of the unfiled material (SPA298 (537)), and it "declined to address the fundamental implication of the overlap between the Judgment and the LAPs' unfiled work product — that the LAPs had written, or assisted Zambrano in writing, the Judgment." SPA299 (537).

The LAPs sought clarification of the order, asking that "'the [appellate] Division clarify and state that in fact it *ha[d]* analyzed Chevron's accusations, and that it *ha[d] not* found any fraud in the activities of the plaintiffs or their attorneys.'" SPA300 (538) (quoting SA6242.5) (district court's emphasis). As a result of this prompting, the panel issued an order ten days later indicating that it had not found "fraud," but stated in the very same sentence that it was "stay[ing] out of these [fraud] accusations, preserving the parties' rights . . . to continue the course of the actions that have been filed in the United States of America." SPA300–01 (538).

Chevron then sought review of the Lago Agrio judgment from the Ecuadorian National Court of Justice, a "cassation" court that reviews only legal arguments. SPA302 (539). That court, too, affirmed the Lago Agrio judgment in substantial part, although it invalidated the $8.6 billion punitive damages award as lacking any foundation under Ecuadorian law. SPA304 (540). It disregarded the evidence of fraud as "inapposite" for a cassation appeal. A3669.

On September 26, 2012, Appellants sought an embargo from the Lago Agrio court freezing the assets of Chevron's subsidiaries in Ecuador, Argentina, and Colombia. SA5581.1, 5581.6–8. Three weeks later, the court issued the requested embargo and purported to attach a Chevron subsidiary's intellectual property rights in Ecuador and a Chevron affiliate's bank account in Ecuador, on the grounds that

all assets held by Chevron subsidiaries were deemed to be the assets of Chevron Corporation.  SA5581.4.  The court also attached a $96 million international arbitration award that Chevron had obtained against the ROE in an unrelated matter.  SA5581.5; SPA306–07 (542).

## B. Donziger's Campaign to Extort Chevron

Donziger's corruption of the Lago Agrio litigation was not an end in itself, but a means to his larger goal to "produce a multi-billion dollar payout" from Chevron.  SPA379 (582).  Donziger believed that "[t]his case has to be won both in and out of the courtroom . . . If you had the case without the pressure, you would never get a result."  SA6283.  He corrupted the Lago Agrio proceeding in order to "magnify the pressure on Chevron by increasing both the perceived magnitude of its potential exposure and the perceived likelihood that the exposure in the end would culminate in huge liability."  SPA374 (579–80).

Donziger described his multi-layered scheme to his financial backer, Joseph Kohn as follows:

> The legal and political "space" around this case in both Ecuador and the U.S. has been intricately constructed over the last several years by those involved on a fulltime basis. . . . The space is occupied by players in the worlds of law, science, environmental activism, politics, the press, lobbying, diplomacy, celebrity, shareholders, financial analysts, regulatory agencies, and many others in Ecuador — including high-level officials in Ecuador's government. . . . We also see this as not just a legal case, but a political-style campaign driven by a legal case. The battle takes place on a daily basis, 24/7 per day, with no breaks for the normal rhythms of the typical legal practice.

SA5932; *see* SPA47 (402) n.139; SA6137 (chart produced by Donziger portraying pressure strategy). To this end, Donziger used proxies both witting and unwitting, through whom he waged a lengthy campaign of false and misleading statements intended to "instill fear of a catastrophic outcome in order to increase the amount Chevron would pay to avoid the worst." SPA378 (581); SA6132.

Through an array of public relations consultants and lobbyists he retained (SPA47–49 (402–03); SA1241–44 ¶¶ 89–94), Donziger disseminated allegations that he "knew were false or the truth of which he seriously doubted . . . to create 'pressure . . . to get the price up' and induce Chevron to settle" (SPA379–80 (582) (quoting SA5887)). Among other false statements, Donziger promoted the "flawed $6 billion" damages estimate that he had extracted from David Russell — even after he told Russell he would stop using it — to the SEC and to shareholders, intending to "create the perception that the litigation threatened serious harm to the company, was material to Chevron's bottom line, and would result in a lower share price and lower profits for Chevron shareholders." SPA53 (405); SPA57 (407); SPA381 (583); SA5796. Even Donziger himself admitted privately that this tactic was "bogus," but "he insisted that he would 'keep feeding them [the SEC] stuff' as long as the SEC was willing to continue talking with them." SPA60 (409) (quoting SA5805); *see also* SA5588. Likewise, Donziger and his proxies claimed that "'[e]xperts for the plaintiffs have concluded the disaster is at least 30 times larger

40

than the Exxon Valdez spill'" — even though in reality his experts had told him this was "vastly exaggerated" — and the district court found that this comparison was "highly misleading." SPA58 (408) n.185; SPA382 (584) (quoting SA5594). And Donziger made accusations of "genocide" even though the only expert he talked to debunked this claim, and other experts in the field did not even return his associate's phone calls. SA5803; SA4856; SA5582; SA447.

With the filing of the ghostwritten Cabrera report, Donziger expanded his allegations and widened his audience, citing the fraudulent report to Ecuadorian prosecutors, New York state officials, and federal courts, "trumpeting it . . . as the work of an independent, court-appointed expert who had conducted his work with the assistance of an independent team of scientists." SPA122 (443); SPA384–86 (584–86); SPA112–15 (437–39). In his testimony before Congress, Donziger falsely claimed that the Cabrera report was an "independent estimate of what is going on in terms of health." SA5931. To reinforce the impression of Cabrera's independence, Donziger had Stratus prepare "Comments" that endorsed the Cabrera report and claimed that "[i]n the U.S. Court system, Mr. Cabrera would be called a Technical Special Master," and then held these "Comments" out as further validation of the report. SA5199. At all points, Donziger's intent was not merely to generate ill will towards Chevron, but to induce by means of falsehoods those with power over the company — "to pressure Chevron themselves." SPA384–86 (585–

86); SA6287.

Donziger also benefitted from the support of the President of Ecuador. Since his 2006 election, President Correa has cemented his personal control over the Ecuadorian state and media, and he has used that control in public and private support of the LAPs and the campaign against Chevron. The district court made extensive factual findings regarding Correa's sweeping restructuring of the Ecuadorian government to, in Correa's words, "get my hands on the justice system." SPA421–40 (604–14) (quoting SA1430 ¶ 77); *see also* Argument Section III.B.2, *infra*.

As the district court found, Correa's tight grip on the judiciary has enabled him to exercise extraordinary control over the judiciary in cases of interest to the Ecuadorian government and Correa personally. Foremost among them is the Lago Agrio proceeding. As the district court found, "[i]t has been open and notorious in Ecuador for years that President Correa and the government support the LAPs in the case against Chevron." SPA209 (490). Correa has furthered Donziger's scheme in various ways. SPA132–37, 209–10, 443–45 (449–52, 491, 616). He has denounced Chevron at every turn, and even pursued the criminal prosecution of Texaco attorneys who negotiated the 1998 settlement and release with the ROE. SPA133–34 (449–50). And the district court found that witnesses against Appel-

lants in this action faced potential government reprisals.  691 Dkt. 843 at 25.[6]

Donziger's campaign against Chevron was well funded by a series of financial backers, some of whom Donziger also deceived to secure and maintain the financial resources necessary to carry out their racketeering.  Joseph Kohn, a Philadelphia attorney and shareholder in Kohn, Swift & Graf PLC, "provided most of the funding for the Lago Agrio case and related public relations activities from its inception until 2009."  SPA35 (395).  Kohn broke with Donziger, however, when he became suspicious of Donziger's conduct in the wake of early allegations by Chevron of collusion between the LAP team and the Ecuadorian court, and Donziger rebuffed Kohn's efforts to investigate.  SPA166–70 (467–70).  Kohn subsequently terminated his firm's financial support, and disavowed any financial interest in the judgment.  SPA170–75 (470–73).  Kohn testified against Donziger at trial, telling the district court, "[i]t is now clear to me that Mr. Donziger deceived and defrauded me, and that, as a result, we continued to pay millions of dol-

---

[6]    During the proceedings in the district court, multiple witnesses came forward purporting to have information about the LAP team's ghostwriting of the judgment — but they were unwilling to testify publicly out of fear of retaliation in Ecuador. During the pre-trial proceedings, the district court permitted these witnesses to submit declarations and sit for deposition without revealing their identities, based on its finding that "the declarants are justified in fearing reprisals at the hands of their own government if their identities become known."  691 Dkt. 843 at 25.  But because the district court was ultimately unwilling to permit these witnesses to testify without disclosing their identities, their testimony was never received into evidence. *See* SA2042–43; SA2534–35.

lars to that litigation that we never would have paid had we known the truth."
SPA175 (473) (quoting SA1371 ¶ 81). While Donziger personally cross-examined
Kohn at trial (SA3093–182), Donziger "for the most part failed to respond to
Kohn's testimony" (SPA176 (473)).

To replace Kohn's financial support, Donziger turned to Burford Capital
LLC. As with Kohn, "there is not much doubt that Donziger misled Burford —
either by misstating or failing to disclose material facts — in his determination to
raise money to pay for the litigation." SPA187 (479). Like Kohn, Burford's co-
founder and CEO testified at trial that had Burford known the truth about the
Cabrera report, it "would have walked away immediately." SPA187 (478) (quot-
ing SA726 ¶ 18).

A third major funder of the LAP team has for years been Russell DeLeon, a
former law school classmate of Donziger's. SPA140–41, 396–97 (453–54, 591–
92). The district court found that DeLeon has provided at least $2.25 million to the
LAPs' efforts directly, and paid for approximately 60% of the production costs of
*Crude* — a film commissioned by Donziger and promoted as a documentary.
SPA141, 178, 396 (454, 474, 591); *see also* SA1187 ¶ 95–100.[7] Unlike Kohn and

---

[7]  Documents disclosed by the LAPs just before trial suggested that DeLeon had
in fact provided over $20 million in financing. *See* SA6261. In subsequent court
filings in Gibraltar, DeLeon confirmed that he has invested $23 million in the liti-
gation. *See* Defence and Counterclaim of the First and Second Defendants, *Chev-*

Burford, however, DeLeon continued to support the LAP team even after the evidence of fraud became public.  SA6089; SA6261–62.  In light of his continued support of the ongoing criminal conspiracy against the company, Chevron has brought suit against DeLeon in Gibraltar, where he resides.  *See* SA596.  The trial court in that action, after a four-day hearing and after review of thousands of pages of documents, held that there is a *prima facie* case to support Chevron's allegations of conspiracy and extortion against DeLeon.  *Id.*

### C. Donziger's Misrepresentations to U.S. Courts in Discovery Proceedings

In late 2009, Chevron commenced actions in U.S. courts under 28 U.S.C. § 1782, which authorizes U.S. discovery in aid of foreign proceedings.  *See* SPA139 (453).  Chevron first sought discovery from consulting firms and individuals known to have been employed by the LAP team, and suspected of writing the Cabrera report.  *Id.*  Chevron later filed proceedings against the filmmakers behind *Crude* and against lawyers and other agents of the LAPs, including Donziger.  *See* SPA158–59 (463–64).  Appellants engaged in strenuous efforts to block or delay this discovery, ranging from petty evasions and frivolous delays to more egregious conduct that the district court found to constitute "obstruction of justice, plain and simple."  SPA399–401 (593–95).

---

*ron Corp. v. DeLeon*, No. 2012-C-232 (Sup. Ct. Gibraltar July 30. 2014).

Initially, Donziger sought to stonewall Chevron's discovery requests, and retained counsel to fight the discovery proceeding against his primary consulting firm, Stratus, on the ground that the LAP team purportedly had nothing to do with the Cabrera report. Based on Donziger's "false or misleading" representations in this regard, Jeffrey Shinder of the New York firm Constantine Cannon and John McDermott of the Denver firm Brownstein Hyatt Farber Schreck agreed to represent the LAPs in Colorado. SPA143–46 (455–56). Their representation, however, was short-lived. Shinder withdrew after he interviewed Beltman, who "'admitted to having written significant portions of the Cabrera report.'" SPA147 (457) (quoting SA2986). Shinder testified that this confession was "shocking" and it "profoundly troubled" him. SA2986–87. After McDermott spoke with Shinder about that withdrawal a few days later, his firm too withdrew, and McDermott told Donziger, "I feel if we proceed I may be compromising this firm's reputation and ethical stature and I cannot do that." SA5973; SPA148–49 (458) n.562. Another lawyer hired by Donziger to represent the LAPs, after reviewing Stratus's "Comments" calling Cabrera a "Technical Special Master," concluded "that Cabrera and [the Lago Agrio] plaintiffs can be charged with a 'fraud' respecting the former's report." SA5989.

Donziger also retained Jim Tyrrell of Patton Boggs, and together they developed a new strategy. Recognizing that "production by Stratus [in the discovery

proceeding] was extremely likely . . . [t]he LAP team quickly developed a plan to 'cleanse' the Cabrera Report in Ecuador[.]" SPA152–53 (460–61). "The idea was to have a new expert or experts repackage, or cleanse, the Cabrera Report." SPA154 (461). But even though these "cleansing" experts ultimately relied in large part on the Cabrera report, rather than conduct any independent work of their own (SPA190–91 (480–81)), "the LAPs needed to delay the Section 1782 proceeding in Denver as long as possible" to get those reports written and submitted to the Lago Agrio court so that they could assert that the Cabrera report was no longer relevant (SPA154 (461)).

Pursuant to "the strategy as outlined by Jim [Tyrrell, to] fight hard on all fronts all the time and concede nothing, buy as much time as possible" (SA6001), the LAP team proceeded to take frivolous positions and seek unjustified delay (SA6003) while dragging out Stratus's production, which they were controlling behind the scenes (SA6005). The centerpiece of their strategy was the Fajardo Declaration, which purported to lay out the LAP team's relationship with Cabrera, but in fact provided "an anodyne description" that was "highly misleading." SPA155 (462). Even the lawyers who drafted the declaration acknowledged that it "'omit[ted] the most important part'" and that it was "'misleading at best.'" SPA154 (462).

Shortly after filing the Fajardo Declaration in Colorado, the LAP team made

a filing in Lago Agrio, the "Fajardo Petition," which presented a similar "decep-tive" characterization of the Cabrera relationship, and requested permission to submit the reports of their "cleansing" experts.  SPA157–58 (463).  Once the Fa-jardo Petition was on file in Ecuador, they filed it in U.S. courts (including this Court, *see* SA6220), and falsely claimed that it disclosed their relationship with Cabrera.  SPA158 (464).[8]  Notwithstanding Appellants' obstruction, every single court from which Chevron sought § 1782 discovery granted it in whole or in part.[9]

---

[8]  When Chevron sought discovery into the LAP team's conduct in Ecuador, Donziger employed even more forceful methods to block it.  In order to stop an in-spection of HAVOC, a company that the LAP team claimed had conducted their sample analysis, Donziger pressured the judge who had ordered the inspection into cancelling it.  SA4664; SA4665; SA4671; SA4672.  In a 2007 email produced pur-suant to § 1782, Donziger revealed his motivation, confirming to Fajardo that "I AM SURE THAT TEXACO WILL BE ABLE TO INSPECT HAVOC SOME DAY IF WE DON'T PAY MORE ATTENTION AND GIVE MORE IMPORTANCE TO THE SITUATION.  AN INSPECTION OF THIS SORT WOULD BE A DISASTER FOR THE LAGO AGRIO CASE."  SA5876.

[9]  *In re Chevron Corp. (Berlinger)*, 709 F. Supp. 2d 283, 299 (S.D.N.Y. 2010), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011); *Chevron Corp. v. Shefftz*, 754 F. Supp. 2d 254, 268 (D. Mass. 2010); *In re Chevron Corp. (Bonifaz)*, 762 F. Supp. 2d 242, 253 (D. Mass. 2010); *In re Chevron Corp. (Rourke/Picone)*, 753 F. Supp. 2d 536, 541 (D. Md. 2010); *In re Chevron Corp. (Calmbacher)*, No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265, at *5 (N.D. Ga. Mar. 2, 2010); *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo. Mar. 4, 2010), Dkt. 23; *Chevron Corp. v. 3TM Consulting*, LLC, No. CIV.A. 4:10-MC-134, 2010 WL 8814519, at *1 (S.D. Tex. Apr. 5, 2010); *In re Chevron Corp. (Uhl, Baron, Rana & Associates, Inc./Villao)*, No. 2:10-CV-02675 (SRC), 2010 WL 8767338, at *1 (D.N.J. June 15, 2010), *aff'd in part*, 633 F.3d 153, 168 (3d Cir. 2011); *In re Chevron Corp. (Wray)*, No. 1:10-mc-00371-CKK (D.D.C. July 22, 2010), Dkt. 42; *In re Chevron Corp. (Donziger)*, No. 10-

Many of these courts found that the record revealed substantial fraud by the LAP team in the Lago Agrio proceedings. *In re Chevron Corp. (Donziger)*, 749 F. Supp. 2d 135, 140 n.19 (S.D.N.Y. 2010). [10]

Documents produced by Stratus and other LAP team consultants pursuant to the § 1782 proceedings quickly confirmed that they had ghostwritten the Cabrera report. *See*, *e.g.*, SA5888 (Stratus outline and workplan for drafting Cabrera report). The discovery also revealed what these consultants actually had found in Ecuador regarding the alleged environmental harm. In March 2008, for example,

---

MC-00002 (LAK) (S.D.N.Y. Aug. 6, 2010), Dkt. 2; *In re Chevron Corp. (Quarles)*, No. 3:10-CV-00686, 2010 WL 8767266, at *3 (M.D. Tenn. Aug. 17, 2010); *Chevron Corp. v. Champ*, Nos. 1:10mc27, 1:10mc28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp. (E-Tech Int'l/Kamp)*, Nos. 10-MC-21, 10-MC-22, 2010 WL 8786279, at *7 (D.N.M. Sept. 1, 2010), *adopted*, 2010 WL 8786202 (D.N.M. Sept. 13, 2010); *Chevron Corp. v. E-Tech Int'l*, No. 10CV1146-IEG (WMc), 2010 WL 3584520, at *7 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp. (Barnthouse)*, No. 1:10-mc-00053-SSB-KLL (S.D. Ohio Nov. 26, 2010), Dkt. 36; *In re Chevron Corp. (Scardina)*, No. 7:10-MC-00067, 2010 WL 4883111, at *4 (W.D. Va. Nov. 24, 2010); *In re Chevron Corp. (Allen)*, No. 2:10-MC-91, 2010 WL 9014422, at *5 (D. Vt. Dec. 2, 2010); *Chevron Corp. v. Page*, No. 8:11-CV-00395 (RWT) (CBD) (D. Md. Jan. 25, 2013), Dkt. 51, *aff'd*, 2014 WL 4723806 (4th Cir. Sept. 24, 2014); *In re Chevron Corp. (Banco Pichincha)*, No. 1:11-cv-24599 (MGC) (S.D. Fla. Feb, 27, 2013), Dkt. 129.

[10]  *See*, *e.g.*, *In re Chevron Corp. (Uhl, Baron, Rana & Associates, Inc./Villao)*, 633 F.3d 153, 166 (3d Cir. 2011); *In re Chevron Corp. (Banco Pichincha)*, No. 1:11-cv-24599 (MGC) (S.D. Fla. June 12, 2012), Dkt. 82 at 3–6, 26; *Chevron Corp. v. Page*, No. 8:11-CV-1942 (RWT) (D. Md. Aug. 31, 2011), Dkt. 33 at 73; *E-Tech Int'l*, 2010 WL 3584520, at *6; *Champ*, 2010 WL 3418394, at *6 ; *In re Chevron Corp. (Uhl, Baron, Rana & Associates, Inc./Villao)*, No. 2:10-CV-02675 (D.N.J. June 11, 2010), Dkt. 33 at 41–43, 47–48.

Douglas Beltman, the lead Stratus scientist preparing the report, told a colleague in Ecuador that "I do not think that contamination sufficient to impact the ecology extends very far beyond the pads, pits, and spills at the wells — there simply isn't a migration pathway." SA93–94. Later, Beltman told Donziger that he had evaluated "whether the Texpet cleanup in the 1990s complied with the technical requirements for the cleanup" but that "I did not find any clear instances where Texpet did not meet the conditions required in the cleanup." SA6138–39. Another LAP team expert, Miguel San Sebastian, told the team that his research regarding cancer rates in the region — which the LAP team relied on for their claim of elevated cancer rates — had "little validity" when used for this purpose, and that the Cabrera report was "incorrect" in "assum[ing] that all potential cancer cases were due to the oil exposure[.]" SA430–31.

As the LAP team's consultants began producing these and other documents and sitting for depositions, court after court commented on the cascading disclosures of fraud and corruption. In August 2010, for example — six months before the fraudulent Ecuadorian judgment issued, the Western District of North Carolina said about Appellants' ghostwriting of the Cabrera report: "While this court is unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be considered fraud by any court." *Chevron Corp. v.*

*Champ*, Nos. 1:10-mc-27, 1:10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010). Three days later, the District of New Mexico found that Appellants had engaged in "corruption of the judicial process, fraud, attorney collusion with the Special Master, inappropriate *ex parte* communications with the court, and fabrication of reports and evidence." *In re Chevron Corp.*, Nos. 10-MC-21, 10-MC-22 JH/LFG (D.N.M. Sept. 2, 2010), at *1. Reviewing evidence that the LAP team had ghostwritten the Ecuadorian judgment, the District of Maryland concluded that "Chevron ha[d] shown to anyone with common sense that [the Ecuadorian judgment was] a blatant cut and paste exercise." *Chevron Corp. v. Page*, — F. 3d —, 2014 WL 4723806, at *5 n.12 (4th Cir. Sept. 24, 2014). More recently, a trial court in Gibraltar presiding over Chevron's action against LAP funder Russell DeLeon found that "[i]f the Appeal court in Ecuador had before it anything like the evidence which has been put before me, it is indeed surprising on the face of it that at the least a rehearing [on Chevron's fraud allegations in the Lago Agrio litigation] was not ordered," and that "it is difficult to envisage how [Chevron] could properly and fairly have contested the [Lago Agrio] proceedings if its allegations of wholesale corruption of the judiciary and Government [of Ecuador] are true." SA627–28.

Two of the discovery proceedings — requests for discovery from the makers of *Crude* (the "*Berlinger*" proceeding) and from Donziger himself — were litigat-

ed before the district court that presided over this action. In the *Berlinger* proceeding, Chevron submitted two versions of *Crude* — one available on Netflix, and the other from the commercial DVD. A member of Cabrera's "independent" team, Carlos Beristain, appeared briefly in a meeting with Donziger, Fajardo, and other LAP team members in one version, but not the other. SPA141 (454). Although the LAPs told both the district court and this Court that the footage was "innocuous" and "of no relevance to anything" (SPA160 (464); *Chevron Corp. v. Berlinger*, Nos. 10-1918, 11-cv-0691 (LAK) (2d Cir. June 14, 2010), Dkt. 200 at 22–23), it was later revealed that Donziger and Fajardo had implored Berlinger to remove the Beristain scene, telling him that if it were made public, "the entire case will simply fall apart on us" (SPA160 (465)) — a statement which, according to the district court, "evidenced [ ] Donziger and Fajardo's awareness that their relationship with Cabrera [was] improper and, indeed, could prove fatal to the Lago Agrio case." SPA142 (454).

The ultimate production of 600 hours of footage was revelatory. *See* SPA160 (465). Most significant is a scene depicting a 2007 meeting among Donziger, consultants from Stratus, and Cabrera, in which Fajardo explains that "the work isn't going to be the expert's [Cabrera's]. All of us bear the burden." SPA90 (425); SA4705; SA4709. And he emphasized the importance of keeping this from Chevron: "Chevron's main problem right now is that it doesn't know

what the hell is going to happen in the global expert examination. In other words, they don't know that. I hope none of you tell them, please." SA4705; SA4708. The video clips of the meeting ended with Donziger commenting, "[T]hey could 'jack this thing up to $30 billion in one day.'" SPA90 (426) (quoting SA4711; SA4714–15).

The footage also included numerous scenes in which Donziger discussed his schemes to intimidate the Ecuadorian court and candidly acknowledged his plan to obtain a judgment based on political power — not evidence. *E.g.*, SPA32, 99–100, 138–39 (394, 430, 452–53). For example, in one clip, when his consultants told him that "all the reports are saying [contamination is] just at the pits and the stations and nothing has spread anywhere at all," Donziger responded, "[T]his is Ecuador, okay. . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. . . . [T]his is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money, to win." SPA92 (427) (quoting SA4721–23).

On the strength of this and other evidence, Chevron brought a proceeding seeking documents from Donziger himself. While Donziger claims that the court granted Chevron's request "because he filed his privilege log too late" (Donz. 27), the court acted only after it found that Appellants' belated submission of their privilege log was a "deliberate" delay tactic, and that the inclusion of thousands of

third-party communications with "a host of newspapers and magazines" and other facially invalid entries on the log itself suggested bad faith — an order affirmed by this Court. *In re Chevron Corp. (Donziger)*, 749 F. Supp. 2d 170, 184 (S.D.N.Y. 2010); *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393, 396 (2d Cir. 2010); *see also Page*, 2014 WL 4723806, at *3–4 (describing events in the *Donziger* § 1782 proceeding).[11]

Donziger employed similarly obstructive tactics in support of an action by the ROE against Chevron, seeking to stay Chevron's earlier AAA arbitration against the ROE. Donziger arranged for one of the LAP team consultants, Mark Quarles, to prepare a declaration about the proceedings in Ecuador and the LAP team's relationship with Cabrera. Donziger manipulated the content of this statement by making false assertions to Quarles, and while Quarles ultimately did not convey all of Donziger's falsehoods to the court, his declaration was "inaccurate" — stating that "Cabrera and his team have acted independently from both the plaintiffs and the defendant" — and Quarles later testified that he would not have

---

[11] Donziger claims that some of the excerpts contained in the *Crude* outtakes and in his own emails were taken out of context. Donz. 29–30. But the district court did not rely on two of Donziger's three examples, and Donziger alters the quotation the district court did rely on to suggest that he was describing Texaco alone. *Id.* The actual quote reads: "I once worked for a lawyer who said something I've never forgotten. He said, 'Facts do not exist. Facts are created.' And ever since that day, I realized how the law works." SA4727; SA4730–31. Donziger's assertion that he was talking exclusively about Texaco is untenable.

signed it had he known the truth. SPA114–15 (438–39) (quoting SA5883). The district court in this action concluded that Donziger's conduct constituted witness tampering. SPA402–03 (595).

## III. Related International Treaty Arbitration

When it had become clear that the ROE and Petroecuador would not honor their obligations under the 1995 settlement agreement with Texaco, Chevron filed a petition for arbitration against the ROE under the United States–Ecuador Bilateral Investment Treaty (the "BIT" arbitration). SA5564. In an effort to block that arbitration, the LAPs and the ROE brought actions in the Southern District, but the court consolidated and dismissed the petitions. *Republic of Ecuador v. Chevron Corp.*, No. 09 CIV. 9958 (LBS), 2010 WL 1028349 (S.D.N.Y. Mar. 16, 2010), *aff'd*, 638 F.3d 384 (2d Cir. 2011). In their petition, the LAPs, including Piaguaje and Camacho, falsely alleged that "[t]he best and most recent independent estimate available of the human health impact of this contamination is provided by the neutral Special Master [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages," and that "the final report [was] produced by the Cabrera team" consisting of "14 technical officials" that Cabrera had appointed. SA6335–36. The LAPs also falsely stated that "experts from the United States ha[d] reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around

the world." SA6336–37. In reality, these "experts" were employees at Stratus Consulting — and were the true authors of the Cabrera report.

A panel of three distinguished arbitrators (the "Tribunal") is presiding over the BIT arbitration, which is ongoing.[12] In January 2012, the Tribunal ordered the ROE to "take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against [Chevron] in the Lago Agrio Case." SA5578. The ROE, however, has refused to comply, in violation of its treaty obligations. SA5581.57.

The Tribunal issued its First Partial Award on September 17, 2013. In its First Partial Award, the Tribunal held that Chevron was entitled to sue for relief under the TexPet settlement agreements (SA6184 ¶ 112(1), (2)); that the settlement agreements released all public interest or collective environmental claims, including collective claims asserted by third parties like the LAPs (*id.* ¶ 112(3)); and that the agreement included future claims (SA6182 ¶ 106). The Tribunal left for de-

---

[12]   In accordance with the rules of the Permanent Court of Arbitration, one arbitrator was chosen by Ecuador, one by Chevron, and the third by the Secretary General of the Permanent Court of Arbitration. SA5564. Ecuador's choice was Vaughan Lowe, a professor of public international law at Oxford; Chevron's was Horacio A. Grigera Naón, the Director of the Center for International Commercial Arbitration at American University Washington College of Law and a former Secretary General of the Court of Arbitration of the International Chamber of Commerce in Paris; and V.V. Veeder, a preeminent barrister and Queen's Counsel, was selected as the panel's president. *See id.*

termination after a second merits hearing the question whether the Lago Agrio complaint asserted collective claims. *See* SA6185 ¶ 112(4).

Meanwhile, the LAP team has brought their judicial intimidation strategy to bear against the Tribunal, attacking it in the press and holding protests outside its hearings, complete with a protestor in a kangaroo outfit, to illustrate their charge that the Tribunal is a "kangaroo court." *In re Naranjo*, No. 13-772 (2d Cir. Apr. 3, 2013), Dkt. 58-12 at 2–3.

## IV. The Proceedings Below and Related Actions

Chevron filed this action in 2011. 691 Dkt. 1. The complaint alleged causes of action against Steven Donziger and other U.S. and Ecuadorian defendants for violations of RICO, conspiracy to violate RICO, fraud, tortious interference with contract, trespass to chattels, unjust enrichment, civil conspiracy, violations of New York Judiciary Law Section 487, and declaratory judgment. *Id.* at 119–46. All but two of the LAPs defaulted, as did the other Ecuadorian defendants (691 Dkt. 469 at 1), and the Stratus defendants settled (691 Dkt. 1002).

### A. The Preliminary Injunction and this Court's Ruling in *Naranjo*

Shortly after filing its complaint, Chevron sought a preliminary injunction restraining enforcement of the Lago Agrio judgment. 691 Dkt. 5 at 1–2. The district court issued an injunction a month later (*Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011)), and then severed Chevron's claim for declaratory

relief (which became known as "Count 9") (691 Dkt. 328). The court stayed pro-

ceedings in the original action (Chevron's RICO and state-law claims) and the sev-

ered "Count 9" action proceeded towards trial. 691 Dkt. 279 at 2.

Appellants took an appeal from the preliminary injunction to this Court, and

this Court vacated the injunction, holding that "the district court erred in construing

the Recognition Act to grant putative judgment-debtors a cause of action to chal-

lenge foreign judgments before enforcement of those judgments is sought." *Chev-*

*ron Corp. v. Naranjo*, 667 F.3d 232, 234 (2d Cir. 2012). Both at oral argument and

in its opinion, the panel recognized that Chevron's remaining claims could proceed

in the separate action then pending before the district court. *See* 826 Dkt. 69-2 at

76:19–78:24 (Tr. of Oral Arg., *Chevron Corp. v. Naranjo*, Nos. 11–1150, 11–1264

(2d Cir. Sept. 16, 2011) (Judge Lynch: "If we were to reverse this order . . . are

you telling us that you would go back to Judge Kaplan and ask to reactivate the

RICO claims and seek the same injunction under those claims?" Chevron Coun-

sel: "I think that we would have every right to go back to Judge Kaplan . . . [a]nd

clearly there's the ability to give injunctive relief under RICO and under common-

law fraud.")); *Naranjo*, 667 F.3d at 239 n.11 ("In light of the severance of Chev-

ron's claim under the Recognition Act, our resolution of the present appeal com-

pletely disposes of the underlying action, leaving nothing further to be addressed

on remand with respect to the severed claim, notwithstanding the continuation of

separate proceedings between these parties on other causes of action before the same district court judge.").  And this Court made clear that it "decide[d] only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon."  *Id.* at 238 n.8.  On remand, the district court dismissed the Count 9 action in its entirety.  *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK) (S.D.N.Y. Feb. 21, 2012), Dkt. 380.

In its *Naranjo* opinion, this Court held that while the Recognition Act does not provide for an affirmative, pre-enforcement cause of action for judgment debtors, the Act does authorize "[c]hallenges to the validity of foreign judgments under the Recognition Act" where the judgment-creditor raised the judgment as an "'affirmative defense[.]'"  667 F.3d at 241 (quoting NY CPLR 5303).  Accordingly, once the district court lifted the stay in the remaining action, Chevron moved for partial summary judgment on Appellants' res judicata and collateral estoppel defenses, and argued that those defenses placed recognition of the Ecuadorian judgment squarely at issue.  691 Dkt. 397 at 4.  Appellants refused to defend the Ecuadorian judgment and disavowed any reliance on it for purposes of res judicata or collateral estoppel.  691 Dkt. 450 at 1.  The court found that Appellants had put the Ecuadorian judgment at issue, however, and granted Chevron's motion with respect to res judicata, but denied it with respect to collateral estoppel, on the ground that the validity of the Lago Agrio judgment could not at that time be resolved on

summary judgment. *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 264–78, 291–92 (S.D.N.Y. 2012).

### B. Discovery Sanctions

In June 2012, Chevron sought discovery from the LAPs regarding their retention of counsel and Donziger's authority to act on their behalf, and served similar requests on Donziger. *See* SA519; SA522; SA513; SA516. The LAPs moved to dismiss all claims against them for lack of personal jurisdiction (691 Dkt. 518); counsel for Donziger and the LAPs informed Chevron that it would not produce documents from their Ecuadorian agents (691 Dkt. 562 at 1 n.1); and Chevron moved to compel production of the documents (*id.* at 1). The district court deferred ruling on the LAPs' motion to dismiss pending discovery (691 Dkt. 572 at 3), and shortly thereafter, the LAPs' attorney in this action suggested to Fajardo that he seek a ruling in Ecuador prohibiting him from turning over documents to his own clients (the LAPs) (A678–79; A735–38). Fajardo filed the action (the "*Córdova* action"), and the Ecuadorian court issued the order as requested. Only then did Appellants disclose the existence of the *Córdova* action to Chevron and the district court. A679. After the district court granted Chevron's motion to compel, Appellants informed the district court that they would not comply, and Chevron moved for sanctions. A679–80. The district court held a three-day evidentiary hearing, but deferred decision. *See* A681–82. Then, just before trial, the

60

LAPs included among their trial exhibits certain previously unproduced documents from Ecuador, culled and transmitted by Fajardo himself — notwithstanding *Córdova* — which bore directly on the LAPs relationship with Donziger.  A744–45.

On the basis of these facts, and as detailed in a 107-page opinion, the district court struck the LAPs' personal jurisdiction defense as a discovery sanction, finding that Appellants had acted in bad faith, that the *Córdova* action was collusive, that Appellants had willfully violated the order requiring them to produce documents from their Ecuadorian attorneys and agents, and that the sought-after documents likely related to the district court's personal jurisdiction over them.  A733–52.

### C. Trial

Trial on Chevron's remaining claims began in October 2013.  The district court heard 20 days of testimony, with trial ending on November 26, 2013.  Chevron called 24 witnesses at trial, including 11 fact witnesses with percipient knowledge of key events, one summary witness, and 12 expert witnesses.  Chevron also submitted the testimony of 23 others via deposition designations, including three members of the LAPs' legal team, two of the LAPs' technical experts from the Lago Agrio litigation, five of the "cleansing" experts and the individual who coordinated their reports, four of the LAPs' former attorneys in the United States, a former intern working for the LAPs in Ecuador, an employee of Donziger, and

each of the appearing defendants in this action.  The testimony of Chevron's witnesses went largely uncontroverted by Appellants, who instead attempted to establish bias or cast doubt on their motivations for testifying.  Appellants called only seven fact witnesses at trial, including the Ecuadorian judge, Nicolás Zambrano, who signed the judgment against Chevron.

On March 4, 2014, the district court returned its decision, finding Donziger liable under RICO for injuring Chevron through a pattern of racketeering, and granted Chevron equitable relief pursuant to both the RICO claim and an independent action for relief from the fraudulently procured Lago Agrio judgment. The court enjoined Donziger and the LAPs from profiting from the judgment or enforcing it in the United States.  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 641–44 (S.D.N.Y. 2014).

### D. Post-Trial Proceedings

Two weeks after the judgment issued, Appellants moved for a stay pending appeal.  691 Dkt. 1888.  The district court denied Appellants' motion in part and granted it in part, modifying a provision in the judgment to require that Donziger transfer his shares of Amazonia Recovery Limited, an organization created to distribute proceeds from the Lago Agrio judgment, to the court clerk (rather than Chevron) pending the outcome of this appeal.  *Chevron Corp. v. Donziger*, — F. Supp. 2d —, 2014 WL 1663119, at *14 (S.D.N.Y. Apr. 25, 2014) (691 Dkt.

1901).  Donziger has not complied.

On March 18, 2014, Chevron sought an award of attorney's fees for the legal costs it incurred prosecuting its RICO claim — an award mandated by the RICO statute.  *See* 18 U.S.C. § 1964(c); 691 Dkt. 1890.  At Appellants' request, the district court deferred consideration of that motion pending resolution of this appeal.  691 Dkt. 1902 at 2.

## SUMMARY OF ARGUMENT

After a seven-week trial, the district court found that Donziger led a racket-eering enterprise, targeted at Chevron, with full cooperation from the other Appel-lants. He procured a fraudulent judgment in Ecuador through bribery, relied on numerous falsehoods to coerce a payoff from Chevron, and lied to U.S. courts to further conceal these crimes. Appellants do not — and, as the evidence demon-strates, cannot — contest the district court's factual findings. Their attacks on the district court's conclusions of law have no merit. Accordingly, this Court should affirm the district court in all respects.

*First*, Chevron had standing to bring this case. Donziger claims that stand-ing disappeared in the course of this litigation, but black-letter law directs that standing be measured at the inception of litigation. Nor have developments in the case, including Chevron's decision to forgo money damages, rendered the dispute moot.

*Second*, the district court properly granted equitable relief against Donziger under the federal RICO statute. The court's ruling rests on extensive, virtually un-questioned findings of fact. Contrary to what Donziger argues, Chevron is not ju-dicially estopped from pursuing its RICO claim (or any other cause of action) be-cause of statements by Texaco in *Aguinda*. In any event, Texaco's representations in *Aguinda* are not what the Appellants suggest. Donziger also argues that RICO

does not allow a district court to grant injunctive relief to private litigants. This is one of the few legitimate disputes presented on appeal. The text strongly supports the district court's interpretation of the statute, and this Court should affirm it.

*Third*, Appellants devote most of their briefs to arguing that the Ecuadorian intermediate appellate court's orders amount to a "substitute judgment" that cures the pervasive fraud in the Lago Agrio trial proceedings. As the district court found, the Lago Agrio court's orders themselves do not support the claim that the appellate panel conducted a *de novo* review. Appellants' reliance on the appellate orders placed the impartiality of the Ecuadorian judiciary squarely at issue, and after a careful and extensive review of the evidence, the district court found that the Ecuadorian judiciary does not afford an impartial tribunal, especially in politicized cases. Principles of comity did not preclude this analysis — or the district court's conclusions — and this Court should affirm them.

*Fourth*, Appellants argue that the district court lacked the power to accord Chevron equitable relief from the fraudulently procured Lago Agrio judgment through the separate vehicle of an independent action, but precedent firmly establishes that this cause of action lies in the circumstances presented here. Furthermore, the evidence at trial established the elements of an independent action, Appellants were on full notice that Chevron was seeking equitable relief from the judgment, and the relief granted was consistent with this Court's decision in *Na-*

*ranjo*.  Finally, the district court properly exercised personal jurisdiction over the

LAPs in granting relief against them on this claim.

## STANDARD OF REVIEW

This Court reviews the district court's factual findings for "clear error." *Ornelas v. United States*, 517 U.S. 690, 694 n.3 (1996); Fed. R. Civ. P. 52(a)(6). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). When the district court evaluates and makes findings on the credibility of a testifying witness, "Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575. If the appellant fails to challenge the district court's factual findings, they must be taken as true. *See State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004).

This Court reviews pure questions of law and mixed questions of law and fact *de novo* (*MacWade v. Kelly*, 460 F.3d 260, 267 (2d Cir. 2006)), but it reviews underlying factual findings for clear error (*Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 182 (2d Cir. 2013)).

Finally, this Court reviews the district court's equitable determination to issue injunctive relief for abuse of discretion. *Cresswell v. Sullivan & Cromwell*,

922 F.2d 60, 71 (2d Cir. 1990). A district court will be found to have abused its discretion only when "(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18 (2d Cir. 2003) (alterations in original) (citations omitted).

# ARGUMENT

## I. The District Court Properly Held That Chevron Has Standing

Donziger challenges Chevron's standing to bring this case, but as the district court recognized, this "is a proposition that defies common sense" — there is undoubtedly a "case or controversy" here. SPA319 (548). In any event, Donziger's argument fails because it treats standing as a moving target. After trial, Appellants argued that Chevron's withdrawal of its damages claim and its decision to seek an injunction with limited geographic scope eliminated standing. *Id.* In rejecting this argument, the district court pointed out that standing "is determined as of the time the action is brought." SPA319 (549) n.1230.[13] The court held that "Chevron had standing . . . as of the commencement of this action," because it had alleged past and future injuries, and sought a remedy that would redress these harms (SPA320–21, 324–25 (549, 551–52)) — a conclusion that Appellants do not contest. The district court further explained that a party's decision to limit the relief it seeks might raise a question of mootness, but not one of standing. SPA320 (549). Because the litigants retained a concrete interest in resolution of the case and the

---

[13] As the district court held, this proposition is "horn book law." SPA320 (549). It is not drawn into question by the concurring opinion in *Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring). *See* Donz. 73 n.16. That concurrence concerns "new relief," 559 U.S. at 731, but Chevron always sought injunctive relief from the outset of this case. If anything, it has narrowed its request for relief. *See Comer v. Cisneros*, 37 F.3d 775, 800 (2d Cir. 1994) (holding that plaintiff's loss of desire for the sought-after relief "is really a mootness argument").

court granted Chevron at least a measure of effectual relief, the case was not moot. SPA320–22 (549–50); *see Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013).

The district court also explained why Chevron would have standing even on Appellants' "erroneous premise" that developments in the litigation could eliminate standing. SPA325–30 (552–55). The court identified three existing or imminent injuries to Chevron, all of which were "fairly traceable" to Appellants' conduct and redressable by the injunctive relief imposed by the court: the loss of revenue streams from trademarks seized in Ecuador, including the "Chevron" logo; the loss of a $96 million arbitral award Chevron had obtained against the ROE (both of which the Ecuadorian court ordered seized for the LAPs' benefit in satisfaction of the judgment) and the expense of legal fees to defend current and future enforcement proceedings. *Id.*

On appeal, Donziger asserts that the injunction will not redress these injuries. Donz. 79.[14] But, as the district court held, the loss of the trademarks and the arbitral award is partially redressed by the constructive trust, which secures for Chevron any proceeds from those seizures which flow to Appellants. SPA326–27 (552–53). Although Donziger tries to dismiss the likelihood that the LAPs will

---

[14] Chevron addresses Donziger's causation arguments in Argument Sections II.A.4, III.A and III.C, *infra*. Those arguments are even weaker in the justiciability context, because the "fairly traceable" standard is "lower than that of proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).

profit from these seizures as "speculation" (Donz. 79–80), the district court properly rejected this argument as "disingenuous," since Appellants' "own written enforcement strategy lays out the plan to use prejudgment attachment wherever possible" (SPA328 (553) (citing SA6314.17 (Invictus Memo)). As for the ministerial acts that remain in order for the LAPs to reap a tangible benefit from the seized assets, Donziger offers no reason to believe that they will not occur, or that the LAPs will walk away from the seizures on the threshold of securing them. Donz. 80–81. And contrary to Donziger's contentions (*id.*), redressability cannot be defeated simply by positing that another court or a party will refuse to obey an order. *See Chafin*, 133 S. Ct. at 1025; *United States v. Ross*, 302 F.2d 831, 834 (2d Cir. 1962) ("[T]he argument that an order is an abuse of discretion because the party to whom the order is directed may refuse to obey it[] is quite unappealing.").

Donziger also claims that the injunction would not redress past or future legal fees incurred by Chevron, because the "district court's injunction, by its own terms, does not prevent anyone from enforcing the judgment overseas." Donz. 81.[15] But the injunction does bar U.S. enforcement, and by barring Donziger from

---

[15] This argument is an about-face from Donziger's position just a few months earlier, when in the course of seeking an "emergency" stay of the very same injunction in the district court, he argued that the injunction's bar on monetization of the judgment prevented activity "critical to . . . foreign enforcement actions" (691 Dkt. 1888 at 18), and when Appellants, in their most recent attempt to remove the district judge, contended in this Court that, among other things, the injunction would

bringing any enforcement actions in the U.S. — where he always intended to try to enforce it (SPA183, 483–84 (477, 637); SA5938–72) — and denying him the profits from any judgment against Chevron, it will reduce the chances of further enforcement proceedings. This is sufficient to satisfy the redressability requirement. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007). Finally, Donziger's contention that he is not "slated" to receive "any funds from any auction" of trademarks or "from any arbitral award" is frivolous. *See* Donz. 81. His agreement with the LAPs and the Amazon Defense Front gives him "6.3 percent of all amounts collected in respect of the Lago Agrio litigation." SPA416 (602).

## II. The District Court Properly Held That Donziger Violated RICO and Enjoined Donziger from Benefitting from His Misdeeds

The district court found that in the course of his campaign against Chevron, Donziger recruited and managed a team of people who worked at his direction, perpetrated numerous falsehoods, and committed a string of unlawful acts, including extortion, wire fraud, money laundering, and bribery of foreign officials. This conduct constitutes a continuing violation of RICO, 18 U.S.C. § 1962. Accordingly, the district court construed RICO as authorizing equitable relief in actions brought by private parties, and entered an injunction "to prevent and restrain" further racketeering. *Id.*; SPA354 (569).

"even render meaningless the enforcement actions currently pending" (*In re Naranjo*, No. 13-772 (2d Cir. Sept. 18, 2013), Dkt. 160-1 at 9).

On appeal, Donziger offers virtually no challenge to the district court's factual findings regarding his racketeering. Instead, he takes issue with the district court's interpretation of the statute as authorizing private injunctive relief. Donz. 116–19. The court's reading of § 1964 is firmly supported by the text, furthers Congress's purpose in enacting civil RICO, and accords with settled principles regarding a trial court's equitable powers.

Donziger also argues that the district court's ruling constitutes an impermissible "collateral attack" on the Lago Agrio judgment, and that it is foreclosed by this Court's decision in *Naranjo* and Texaco's representations in *Aguinda*. Donz. 84–86, 94–99, 103–05. Each of these arguments fails on its own terms, as Chevron demonstrates below. At all events, the predicate acts that underpin the basis for the district court's RICO ruling go well beyond Appellants' procurement of a fraudulent judgment. Accordingly, this Court should affirm the equitable relief ordered under RICO.

## A. Chevron Satisfied the Elements of RICO by Demonstrating That Donziger Injured Chevron Through a Pattern of Racketeering

To establish a civil RICO violation, a plaintiff must show operation and management of an enterprise, through a pattern of racketeering activity that leads directly to the plaintiff's injuries. SPA366–67, 413–14 (575–76, 600–01). The district court correctly found that Chevron satisfied each of these elements — and the district court's findings go virtually unchallenged on appeal.

### 1. Operation and Management of an Enterprise

The evidence demonstrates the existence of an enterprise-in-fact. As the district court found, "the LAP team and its affiliates were a group of persons associated in fact for the common purpose of pursuing the recovery of money from Chevron via the Lago Agrio litigation, whether by settlement or by enforceable judgment, coupled with the exertion of pressure on Chevron to pay." SPA367 (576). Donziger was "in ultimate command" and "the head of the enterprise and the center of its decision-making power." SPA369, 413 (576, 600).

### 2. Pattern of Racketeering Activity

The record also proves that Donziger committed a pattern of racketeering, "whether viewed as an open- or closed-end pattern." SPA411 (599). "The pattern at issue in this case comprises, at the very least, a five-year effort to extort and defraud Chevron through the series of predicate acts [found by the district court]." *Id.*[16]

The district court made detailed findings in support of each predicate act underlying the RICO violation. With respect to the Hobbs Act violation (18 U.S.C.

---

[16] The district court found that the pattern of racketeering was domestic, and Donziger has waived any extraterritoriality challenge by failing to raise the issue on appeal. The district court's detailed findings on the individual predicate acts also establish that its judgment was not an impermissibly extraterritorial application of RICO under this Court's decision in *European Cmty. v. RJR Nabisco, Inc.*, No. 11-2475-CV, — F.3d —, 2014 WL 4085863 (2d Cir. Aug. 20, 2014).

§ 1951), the district court found that Donziger sought "to bring Chevron to its knees" and coerce a payout by instilling fear in Chevron. SPA372 (578). Donziger employed two types of wrongful conduct to accomplish this objective: first, "the corrupt and fraudulent behavior in and relating to the Lago Agrio litigation itself," and second, "the use of the media, NGOs, the disinvestment campaign, celebrity advocacy, lobbying, incitement of official investigations and inquiries, and the attempt to incite criminal prosecution of former Texaco lawyers in order to pressure Chevron to settle." SPA371–72 (578). As Chevron explains in Argument Section II.C.3, *infra*, the district court carefully delineated its findings of wrongful conduct to exclude any First Amendment protected speech or conduct. SPA371–89 (578–87).

Donziger leaves unchallenged the district court's findings that he sought to increase the cost of his lawsuit to Chevron through, among other things, the inflated and disavowed $6 billion damages estimate (SPA53–56 (406–07)), the forged reports from the LAPs' expert Calmbacher (SPA66–69 (412–14)), the Fernando Reyes and Gustavo Pinto "monitoring" scheme (SPA72–79 (416–19)), and the politically-motived criminal prosecutions of Chevron attorneys (SPA131–37 (448–52)). Nor does he dispute the court's findings that he and his co-conspirators sought to conceal their conduct through the use of code names (SPA93–94, 246–48 (427–28, 510–11)) or that they "relied upon estimates and comparisons that he

knew were false or the truth of which he seriously doubted . . . to create 'pressure . . . to get the price up' and induce Chevron to settle" (SPA379–80 (582) (quoting SA5887)). Donziger criticizes the district court's findings regarding his bribery and ghostwriting schemes — complaining that the court should not have relied on Guerra's testimony and should have credited Zambrano instead, and that it did not afford proper weight to the Ecuadorian courts that ignored the Cabrera fraud (Donz. 52–64) — but he ignores the bulk of the evidence relied upon by the district court, and does not come close to showing that any of the findings regarding his violation of the Hobbs Act were clearly erroneous.

Similarly detailed findings supported the other predicate acts:

- **Obstruction of Justice** (18 U.S.C. § 1503). Donziger "submitted the deliberately misleading Fajardo Declaration first to the court in Denver and then to many other courts throughout the country," in an effort to keep secret Stratus's role in drafting the Cabrera report. SPA400–01 (594).

- **Witness Tampering** (18 U.S.C. § 1512). Donziger attempted to alter testimony regarding Cabrera's collusion with the LAPs in a proceeding before Judge Sand in the Southern District of New York. SPA403 (595).

- **Wire Fraud** (18 U.S.C. § 1343). Donziger used the wires (principally email) to further a number of fraudulent schemes, including the ghostwriting of the Cabrera report; the false portrayal of Cabrera as neutral and impartial; the concealment of the true relationship among Cabrera, Stratus and the LAPs; the ghostwriting of the response to Chevron's objections to the Cabrera report; the attempts to deceive Chevron and courts in the Section 1782 proceedings; the ghostwriting of the Lago Agrio judgment; and the false statements to the media and to public officials. SPA393–94 (589–90).

- **Travel Act** (18 U.S.C. § 1952). Donziger furthered violations of the Foreign Corrupt Practices Act by causing payments to be made to Cabrera, a foreign judicial official, to improperly influence the outcome of the Lago Agrio judgment. SPA403–10 (595–99).

- **Money Laundering** (18 U.S.C. § 1956). Donziger "obtained money from outside the United States or . . . sent or caused money to be sent from the United States to another country," in furtherance of numerous RICO predicate acts. SPA394–99 (591–92).

### 3. Injury

As the district court found, Chevron has suffered injuries as a result of Donziger's unlawful conduct. SPA325–27 (552–53). Chevron remains subject to enforcement of the Lago Agrio judgment — procured through a massive fraudulent scheme — and has sustained legal fees and harm to reputation and goodwill. All of these are proven injuries that Donziger neither acknowledges nor contests on appeal. SPA484 (638). Absent injunctive relief, Chevron will continue to suffer these harms. *See* SPA486 (639).

Seizing on a footnote in the district court's opinion regarding the proof requirements in a RICO suit for damages (*see* SPA366 (575) n.1357), Donziger argues that the district court did not require Chevron to prove that it had been injured by Donziger's racketeering. Donz. 114–16. But the district court made extensive findings regarding Chevron's injuries, in particular holding that "[t]he attachment of Chevron's property, including the arbitration award, in Ecuador, was a product of the predicate acts." SPA415 (601); *see also* SPA306–07 (541) (attachment of

Chevron's assets); SPA325–26 (552) (attachment of Chevron's intellectual proper-ty); SPA484 (638) ("harm to [Chevron's] reputation and good will").  Indeed, Donziger stipulated that Chevron "incurred millions of dollars in legal fees . . . in connection with" its § 1782 discovery actions, and that these fees were incurred to obtain discovery regarding "the Lago Agrio Plaintiffs' representatives' relationship with Cabrera, including their financial relationship with Cabrera, and their in-volvement in drafting the Cabrera Report."  691 Dkt. 1657.  Donziger neither ad-dresses nor challenges these findings, or his stipulation.

### 4. Causation

RICO requires that a plaintiff show proximate cause — that is, "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); Donz. 114 (same).  The dis-trict court found that "[t]he mere recitation of the chain of causation alleged by Chevron is perhaps the best explanation of why that injury satisfies RICO's direct causation mandate." SPA415 (601) (quotation marks and alterations omitted). "Chevron's injuries are not indirect, incidental, or unintended — they were the very result Donziger sought by his predicate acts."  SPA416 (602).  Donziger sought to subject Chevron to vexatious enforcement proceedings and pre-judgment attachments, so he procured a fraudulent judgment as a vehicle to do that. Donziger intended to force Chevron to pay him off by creating fear of economic

harm through criminal and civil government investigations he prompted, so he fed falsehoods to enforcement bodies. And "[n]ot only are Chevron's injuries proximate consequences of the racketeering acts, but Donziger has realized gains from them at Chevron's expense and threatens to realize more." *Id.*

Donziger argues that the intermediate Ecuadorian appellate panel's decision broke the causal link between the fraudulently procured Lago Agrio judgment and Chevron's injuries. Donz. 73. But as demonstrated in Argument Section III.A, *infra*, this contention is baseless — there was no "second trial" or "substitute judgment," and no "*de novo* review" could have cured the fraudulent record or judgment. Even if the appellate panel had issued a new, truly untainted judgment, such an order would not eradicate the other harms that Chevron has suffered at Donziger's hands. Those harms alone fully satisfy RICO's causation requirement.

Donziger also asserts that "evidence of . . . pollution" in Ecuador was "the obvious independent cause" of the Lago Agrio judgment. Donz. 78–79. But even if that "evidence" had merit — and it has none (*see* Argument Section III.C, *infra*) — the speculative possibility that another court might "reach the same result for a different reason" cannot be an independent cause of Chevron's injuries. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). And again, this argument ignores the other injuries Chevron sustained that are distinct from the Lago Agrio judgment itself.

## B. The District Court Entered Appropriate Relief

Having found that Donziger violated RICO, the district court correctly concluded that it could grant equitable relief to prevent and restrain further RICO violations, and it properly exercised its equitable powers to achieve that end.

### 1. Equitable Relief Is Available to Private Litigants Under RICO

The district court interpreted RICO as authorizing a district court to grant equitable relief in an action brought by private litigants. SPA357 (570). Section 1964(a) grants district courts broad and unqualified jurisdiction to order equitable remedies in civil RICO actions, including injunctions "to prevent and restrain" further RICO violations. 18 U.S.C. § 1964(a). Contrary to what Donziger argues, nothing in § 1964(a) or any other provision of RICO confines this power to actions brought by the Attorney General. Interpreting § 1964(a)'s authorization of equitable relief to extend to all civil RICO actions, whether commenced by the federal government or a private party, is the only coherent construction of the statute's text, and the only reading that furthers Congress's purposes in enacting civil RICO. SPA357 (570). Accordingly, this Court should affirm the district court and hold that RICO permits private plaintiffs to seek equitable relief.

### a. The Plain Language of 18 U.S.C. § 1964 Permits Private Plaintiffs to Seek Equitable Relief in Civil RICO Actions

"Statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.'" *Raila v. United States*,

355 F.3d 118, 120 (2d Cir. 2004) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).  Here, "the text of the RICO statute . . . itself authorizes private parties to seek injunctive relief."  *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003).[17]

Section 1964, which authorizes civil RICO enforcement, includes four subsections:

- Subsection (a) authorizes district courts "to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to:  ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person . . . ."

- Subsection (b) authorizes the Attorney General to "institute proceedings under this section," and authorizes district courts, "[p]ending final determination thereof [to] enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper."

- Subsection (c) authorizes "any person injured in his business or property by reason of" a RICO violation to "sue therefor," and further provides that private plaintiffs are entitled to treble damages and "a reasonable attorney's fee."

- Subsection (d) gives preclusive effect to criminal RICO judgments in civil RICO proceedings brought by the U.S. government.

---

[17] While *Scheidler* was reversed on other grounds, it continues to be cited as persuasive authority.  *See, e.g.*, *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 344 (S.D. Iowa 2013) (noting that denying "injunctive relief to private-party civil RICO plaintiffs" is no longer "the prevailing view"); *see also In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1283 (S.D. Fla. 2003); *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 243–44 (S.D.N.Y. 2002) (Rakoff, J.), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003).

The plain language of § 1964(a) uses broad and unqualified terms to confer jurisdiction on district courts to hear civil RICO claims, and authority to issue "appropriate orders" — including injunctive relief — to all plaintiffs authorized to bring an action. 18 U.S.C. § 1964(a); *see also Scheidler*, 267 F.3d at 697 (observing that § 1964(a) provides a "general grant of authority for district courts to enter injunctions"). Section 1964(a) is unambiguous in this regard; as the district court held, the text "does not limit the breadth of that jurisdictional grant." SPA354 (569). The provision includes no reference regarding what types of plaintiffs may seek such relief, nor does it otherwise indicate that the availability of equitable relief turns on the identity of the party.

The sweeping authority granted by § 1964(a) is consistent with, and must be read in light of, RICO's express instruction that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970). This intent is consistent with § 1964(a)'s explicit direction that the remedies enumerated in that subsection are not exclusive. *See* 18 U.S.C. § 1964(a) (remedies "includ[e], but [are] not limited to" those listed); *see also Scheidler*, 267 F.3d at 697 (construing § 1964(a) as "a non-exclusive list of the remedies district courts are empowered to provide"). The only reasonable reading of § 1964(a), taken alone, is that all plaintiffs who can maintain a civil RICO action may seek, and be granted, injunctive relief.

The structure of § 1964 confirms that this construction is correct. Section 1964(a) authorizes district courts to employ "appropriate" remedies in all civil RICO actions, without limitation. The two subsections that directly follow — both of which, like § 1964(a), must be liberally construed to further RICO's remedial goals — clarify and supplement the scope of authority conferred in § 1964(a). Reading those provisions instead to circumscribe a district court's authority to provide equitable relief, as Donziger proposes (Donz. 116), would render RICO's civil remedies section incoherent.

The first of these two subsections, § 1964(b), recognizes the authority of the Attorney General to institute civil RICO proceedings. It also authorizes a court to enter "restraining orders or prohibitions, or take such other actions . . . as it shall deem proper" — but only "[p]ending final determination" of a proceeding. 18 U.S.C. § 1964(b). This provision authorizes the Attorney General to seek interim relief — something he could not obtain under traditional equitable doctrine. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 434 (2d Cir. 1995) (explaining that "[t]he maxim that 'equity will not enjoin a crime' . . . does not hold where Congress has explicitly authorized injunctive relief" in "a suit by the government" (citations omitted)); *see also Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1244 n.10, 1249 (11th Cir. 1999); Charles Alan Wright et al., 11A *Federal Practice & Procedure* § 2942 (3d ed. 2014). Section 1964(b) says (and implies) nothing about

the availability of injunctive relief to private plaintiffs pursuant to § 1964(a).

Section 1964(c) addresses private civil RICO plaintiffs. 18 U.S.C. § 1964(c). Unlike § 1964(b), which permits the Attorney General to "institute proceedings under this section" without any showing of injury, § 1964(c) requires that a private plaintiff be "injured in his business or property by reason of a [RICO] violation" in order to "sue therefor." Section 1964(c) also supplements the remedies available under § 1964(a), by allowing private parties to obtain treble damages and reasonable attorneys' fees. *Id.*

Though Donziger does not make this argument,[18] the Seventh Circuit considered and correctly rejected the argument that the two clauses of § 1964(c) are "tightly linked," such that private parties who meet the requirements of the first clause are limited to the remedies set forth in the second clause of that provision. *Scheidler*, 267 F.3d at 696. As the Seventh Circuit explained, that reading would render § 1964(a)'s authorization for injunctive relief a nullity. *Id.* at 697. It would mean that despite the general grant of authority for equitable remedies in § 1964(a), injunctive relief is available to a particular plaintiff only if Congress expressly says so in some *other* provision of the statute. Such a view runs afoul of

---

[18] Donziger's textual argument is limited to two sentences, in which he recites the first three subsections of § 1964 and offers the bare conclusion that "RICO's civil-remedies provision . . . limits *who* can seek such equitable relief. Donz. 116.

the principle that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citations omitted); *see also Scheidler*, 267 F.3d at 696 (treating the "two clauses of § 1964(c) . . . as tightly linked provisions, under which private plaintiffs may sue *only* for monetary damages" is not "a reasonable reading of the statute"); G. Robert Blakey & Scott D. Cessar, *Equitable Relief Under Civil RICO:  Reflections on* Religious Technology Center v. Wollersheim*:  Will Civil RICO Be Effective Only Against White-Collar Crime?*, 62 Notre Dame L. Rev. 526, 545 (1987).

Donziger may be suggesting that § 1964(b) — a provision that does not mention private plaintiffs — nonetheless bars those plaintiffs from seeking injunctive relief under § 1964(a).  That construction finds no support in the text and would render § 1964  incoherent.  The remedies addressed in § 1964(b) — interim relief — and § 1964(c) — treble damages and attorneys' fees — do not exhaust the broad remedial powers expressly conferred in § 1964(a).  If these provisions are read as constraining the relief available in a civil RICO action pursuant to § 1964(a), then some critical subset of § 1964(a)'s powers would go unallocated to either the Attorney General or private parties.  That result is illogical, and could not reflect Congressional intent.  As *Scheidler* explains, because § 1964(b) concerns only interim relief, it cannot be the source of the government's authority to

seek permanent relief upon final disposition of a RICO action.  Rather, "the gov-

ernment's authority to seek injunctions comes from the combination of the grant of

a right of action to the Attorney General in § 1964(b) and the grant of district court

authority to enter injunctions in § 1964(a)."  267 F.3d at 697.  The same logic ap-

plies to private plaintiffs:  "by parity of reasoning, . . .  private parties can also seek

injunctions under the combination of grants in §§ 1964(a) and (c)."  *Id.* at 697; see

also SPA354–55 (568–69).

Finally, there is no support in the law for Donziger's assertion that equitable

relief must be coupled with an award of monetary damages.  *See* Donz. 118–19.

Donziger offers no justification, textual or otherwise, for this supposed limitation,

and nothing in the text of § 1964 or any case suggests that Congress intended to so

limit the rights of victims of racketeering to seek equitable relief.  Moreover,

Donziger's reading of the statute is inconsistent with the fundamental purpose of

equitable relief:  to provide an adequate remedy where legal relief is insufficient.

### b. Allowing Private Plaintiffs to Seek Equitable Relief Promotes Congress's Purpose in Enacting Civil RICO

In enacting RICO's private enforcement provisions, Congress had the "ob-

jective of encouraging civil litigation to supplement Government efforts . . . . The

object of civil RICO is thus not merely to compensate victims but to turn them into

prosecutors, 'private attorneys general,' dedicated to eliminating racketeering ac-

tivity."  *Rotella v. Wood*, 528 U.S. 549, 557 (2000).  To that end, Congress specifi-

cally instructed that RICO "be liberally construed to effectuate its remedial purposes." § 904(a), 84 Stat. at 947; *see also* SPA356 (569).  Interpreting RICO to allow private plaintiffs to seek equitable relief promotes this objective.  Donziger's reading, on the other hand, needlessly strips courts of their power to issue effective relief in cases involving ongoing racketeering schemes, and this Court should reject it.

Donziger's passing reference to RICO's legislative history provides no support for his reading of § 1964.  Because the text of the statute is unambiguous, there is no need for the Court to even consider RICO's legislative history.  *See Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1267 (2011).  In any event, the only legislative history Donziger identifies is Congress's failure to enact proposed amendments to RICO that would have provided a more specific authorization for private parties to seek injunctive relief in civil RICO actions.  *See* Donz. 117.  But it is well settled that "[t]he fact that proponents of a particular view sought unsuccessfully to have a statute amended to state a proposition with unmistakable clarity tells nothing about whether the preexisting law already covered the point, albeit less clearly."  *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009).  "Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute" because "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others."  *Solid Waste Agency*

*of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–70 (2001) (quotation marks and citation omitted).

Donziger's own mischaracterization of one such failed proposal confirms that failed proposals are inherently unreliable indicia of legislative intent. Donziger claims that in *Sedima*, *S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), the Supreme Court "explained . . . that a proposed 'amendment that would have allowed private injunctive actions' was withdrawn because it was 'greeted with some hostility.'" Donz. 117 (quoting *Sedima*, 473 U.S. at 487). But that is a misleadingly selective quotation. *Sedima* actually says that "[t]he proposal was greeted with some hostility *because it had not been reviewed in Committee*." *Sedima*, 473 U.S. at 487 (emphasis added). That is a perfect example for why un-enacted proposed legislation is not a helpful interpretive clue.

The Ninth Circuit's decision in *Religious Technology Center v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986), which Donziger cites (Donz. 116), is unpersuasive for exactly this reason. In concluding that § 1964 does not authorize injunctive relief for private parties, *Wollersheim* "relied almost exclusively on the legislative history of RICO to reach its result, as opposed to the actual language of the statute." *Scheidler*, 267 F.3d at 695. In particular, the court recounted a series of failed legislative proposals that would have explicitly provided for private injunctive relief. *Wollersheim*, 796 F.2d at 1085–86. The court in *Wollersheim* admitted

88

that the availability of injunctive relief to private plaintiffs was a "plausible reading" of the RICO statute, but nonetheless gave dispositive weight to what it deemed to be RICO's legislative history. *Id.* at 1084. That approach "no longer conforms to the [Supreme] Court's present jurisprudence," as the Seventh Circuit cautioned. *Scheidler*, 267 F.3d at 695. It should carry no weight in this Court, either. *See United States v. Gowing*, 683 F.3d 406, 409 (2d Cir. 2012) (citing *Garcia v. United States*, 469 U.S. 70, 75 (1984) ("legislative history" cannot "trump the plain meaning of the text").

Donziger claims that this Court has "strongly suggested" that it would follow the reasoning of *Wollersheim*, but he misreads the cases on which he relies. Donz. 117–18 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 489 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479 (1985), and *Trane Co. v. O'Connor Secs.*, 718 F.2d 26, 28–29 (2d Cir. 1983)). Both cases reflect an early judicial resistance to the increased use of the civil RICO statute by private plaintiffs, especially in the securities fraud context, that the Supreme Court subsequently repudiated (and that Congress later addressed with the Private Securities Litigation Reform Act). *See* Blakey & Cessar, *supra*, at 533–35; Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 107, 109 Stat. 737, 758. *Trane* provides no analysis of RICO's text, and merely expresses "doubts as to the propriety of private party injunctive relief" in cases based on "garden-variety securi-

ties law violations." 718 F.2d at 28–29.  And while *Sedima* contains some analysis of the statutory text, it repeats the same flawed view of RICO's legislative history adopted in *Wollersheim.  See Sedima*, 741 F.2d at 489 n.20.  Significantly, the Supreme Court criticized *Sedima*'s interpretation of RICO's legislative history and its attempt to limit RICO's scope by reading in limitations not found in the statutory text.  *See Sedima*, 473 U.S. at 488–500.

### c. Absent Clear Contrary Direction from Congress, Federal Courts Can Grant Equitable Relief to Address Violations of Federal Statutes

The district court's interpretation of § 1964(a) is confirmed by "[t]he general rule . . . that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70–71 (1992); *see also Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 699 (2d Cir. 2010).  "'[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'"  *Franklin*, 503 U.S. at 66 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).  The RICO statute contains no command from Congress — let alone a "clear" one — forbidding the issuance of traditional equitable remedies to private plaintiffs.

Moreover, as Judge Rakoff explained in *Motorola Credit Corp. v. Uzan*, 202

F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003), "the right to grant injunctive relief in private civil actions in accordance with traditional principles of equity jurisdiction is one of the equitable powers given to federal courts by the Judiciary Act of 1789," and the RICO statute "nowhere expressly denies courts this power in private civil actions." 202 F. Supp. 2d at 243–44. In the absence of any contrary indication in the statute (and there is none here), "the normal presumption favoring a court's retention of all powers granted by the Judiciary Act of 1789 prevails." *Id.* at 244; *see also Aetna Cas. & Sur. Co. v. Liebowitz*, 730 F.2d 905, 909 (2d Cir. 1984) (explaining that "a specific statutory provision authorizing preliminary injunctive relief to maintain the status quo was no longer necessary" when Congress enacted RICO, given that where a federal statute provides for a general right to sue, "'federal courts may use any available remedy to make good the wrong done'") (quoting *Bell*, 327 U.S. at 684).[19]

---

[19] Even if this Court were to find that private plaintiffs may not obtain equitable relief under RICO and vacate the injunction, it should exercise its remedial power to uphold the district court's detailed factual findings regarding Donziger's RICO liability. "[F]ederal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*, 503 U.S. at 70–71. RICO expressly confers broad remedial authority: § 1964(c) authorizes "any person injured" by RICO violations to bring suit, independent of the remedy, and § 1964(a) authorizes district courts overseeing those suits to issue "appropriate orders" not limited to the enumerated examples. In this case, where the centerpiece of Donziger's ongoing racketeering is and has been a series of falsehoods that culminate in a fraudulent judgment, a freestanding determination of the true facts is more than "appropriate" — it is critical. A declaration of liability

## 2. The District Court Properly Exercised Its Equitable Powers to Bar Donziger from Profiting from His Crimes and to Protect Chevron from Further Injury

To redress the injuries Chevron has already sustained and to protect it from future harm, the district court enjoined Donziger from seeking to enforce the Lago Agrio judgment in the United States, and put in constructive trust any assets Donziger obtained that are traceable to the judgment. SPA589–93. Donziger claims this injunction is somehow inconsistent with *Naranjo*. He is mistaken.

The relief the district court ordered was well within its discretion. Chevron has suffered and, absent relief, will continue to suffer irreparable injuries with no adequate remedy at law. SPA182–83, 305–07, 327, 481–84 (476–77, 541–42, 553, 636–38); *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Monetary relief could not redress these injuries, as the district court concluded, in light of Donziger's purportedly insufficient financial resources and the injuries to Chevron's reputation, goodwill, and ability to conduct business. SPA485 (638); *see, e.g.*, A3447 ¶ 127; SA6970; 691 Dkt. 1211 at 1; 691 Dkt. 1370 at 3 & n.1; 691 Dkt. 1415 at 3; 691 Dkt. 1442 at 4; SA4614. The district court also correctly found that Chevron "has no adequate remedy at law." SPA481 (636); *see also* SPA483–

---

here would also preserve Chevron's right to attorney's fees under 18 U.S.C. § 1964(c).

85 (637–38).[20]

Donziger contends that the relief ordered by the district court somehow offends the "principles of international comity" set forth in *Naranjo*. Donz. 68–69, 84–86. But the "global anti-enforcement" injunction this Court reversed in *Naranjo* barred "the enforcement, anywhere in the world outside of Ecuador, of any judgment rendered against [Chevron] by the Ecuadorian courts." 667 F.3d at 238, 240. Such relief was qualitatively different from, and significantly broader than, the relief awarded here: an injunction barring the enforcement of the Lago Agrio judgment in the U.S., and preventing Appellants from profiting from their misconduct by allowing foreign enforcement proceedings to go forward, but ordering Appellants to put into a constructive trust any assets they obtain that are traceable to the judgment. SPA489–96 (641–44). Thus, unlike the injunction in *Naranjo*, the

_____

[20]   As to the remaining requirements for injunctive relief, the balance of hardships weighs in favor of an injunction, and the public interest is served by it. *See eBay*, 547 U.S. at 391. Donziger's only "hardship" would be the loss of the fruits of his fraudulent scheme, which poses no legally cognizable hardship at all. *See Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 76 (E.D.N.Y. 2011). By contrast, Chevron will face yet more vexatious lawsuits and continue to suffer harm to its goodwill, reputation, and business opportunities. Finally, the public interest is served in deterring fraud. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944); *see also NCR Corp. v. Feltz*, Nos. 91-4011, 91-4033, 91-4058, 983 F.2d 1068, at *2 (6th Cir. Jan. 21, 1993) (affirming preliminary injunction in RICO action); *Ellipso, Inc. v. Mann*, No. 05-1186 (RCL), 2005 WL 5298646, at *4 (D.D.C. Nov. 2, 2005) ("[T]he preliminary injunction will serve the public by protecting corporations from fraud and malfeasance."), *aff'd*, 480 F.3d 1153 (D.C. Cir. 2007).

relief here does not "preclude the courts of every other nation from ever consider-ing the effect of that foreign judgment." 667 F.3d at 244. And because the district court's order did not "enjoin the plaintiffs from even presenting the issue to the courts of other countries for adjudication under their own laws," the relief does not implicate "the legal rules that would govern the enforceability of an Ecuadorian judgment under the laws of France, Russia, Brazil, Singapore, Saudi Arabia or any of the scores of countries . . . in which the plaintiffs might undertake to enforce their judgment." *Id*.

Nor does the relief ordered by the district court here "render *Naranjo* a dead letter." Donz. 86. The declaration of nonrecognition under the New York Recog-nition Act, which was at issue in *Naranjo*, cannot be likened to the relief that is on appeal here, which is based on affirmative findings of extortion, bribery, and ob-struction of justice under RICO and predicate state and federal statutes. A party seeking relief via a RICO action must satisfy that statute's multiple elements (as well as those in the underlying predicate acts), and any party seeking relief in an independent action must satisfy the traditional requirements for equitable relief and demonstrate a "grave miscarriage of justice." *See* Argument Section IV, *infra*; *United States v. Beggerly*, 524 U.S. 38, 47 (1998); *Cresswell v. Sullivan & Crom-well*, 922 F.2d 60, 71 (2d Cir. 1990). Given these limitations, the parade of global litigants imagined by Donziger (Donz. 86) will never materialize. If a U.S. victim

of a racketeering and fraud scheme is able to prove that scheme at trial, then there

is nothing wrong with a U.S. court granting effective relief as to defendants over

whom that court has personal jurisdiction.

### C. Donziger's Remaining Arguments Regarding RICO Are Meritless

#### 1. The District Court's RICO Ruling Was Not an Impermissible Collateral Attack on the Lago Agrio Judgment

The fact that a fraudulent judgment — and the related corruption of a legal

proceeding — is a component of Donziger's racketeering does not preclude appli-

cation of RICO. To the contrary, numerous cases confirm racketeering encom-

passes corruption of the judicial process. *See Averbach v. Rival Mfg. Co.*, 809 F.2d

1016, 1018 (3d Cir. 1987) (collecting cases); *United States v. Angelilli*, 660 F.2d

23, 31–33 (2d Cir. 1981) ("[T]he purpose and history of the Act and the substance

of RICO's provisions demonstrate a clear congressional intent that RICO be inter-

preted to apply to activities that corrupt public or governmental entities.").

The cases Donziger cites (Donz. 94–95) are inapposite. In the majority of

them, a defendant raised the preclusive effect of a prior judgment in opposing a

RICO action.[21] Those cases do not apply here, where Donziger expressly disa-

---

[21] *See Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1186 (10th Cir. 2014) (collateral estoppel); *Polur v. Raffe*, 912 F.2d 52, 56–57 (2d Cir. 1990) (collateral estoppel); *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 508–09 (7th Cir. 1996) (*Rooker-Feldman* doctrine); *Homola v. McNamara*, 59 F.3d 647, 649–50 (7th Cir. 1995) (*Rooker-Feldman* doctrine); *Hendrick v. H.E. Avent*, 891 F.2d 583, 585–87 (5th Cir. 1990) (res judicata).

vowed a collateral estoppel defense and continues to do so (Donz. 95 n.21), and the

district court dismissed Appellants' res judicata defense on summary judgment.

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 292 (S.D.N.Y. 2012).  And in

any event, as explained in Argument Section II.C.1, *infra*, to the extent Donziger is

claiming that any Ecuadorian court decision precludes this action, such a defense

fails because Ecuador does not provide impartial tribunals.

Three of the other cases Donziger cites involve RICO actions in which the

plaintiff complained about litigation conduct, but could not establish that it consti-

tuted a RICO predicate crime.[22]  Those district court decisions do not establish a

per se rule against a RICO claim based on litigation conduct, and this Court has

expressly rejected such a rule.  *See United States v. Eisen*, 974 F.2d 246, 254 (2d

Cir. 1992).

Donziger also relies on *Gulf Petro Trading Co. v. Nigerian National Petrol.*

*Corp.*, 512 F.3d 742 (5th Cir. 2008), but that case concerns attacks on arbitral rul-

ings, which are governed here by the New York Convention on the Recognition

and Enforcement of Foreign Arbitral Awards treaty.  *Id.* at 745–47.  Donziger as-

serts that the New York Recognition Act should be construed to impose the same

---

[22]  *See Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F.
Supp. 2d 153, 168–72 (E.D.N.Y. 2010); *Kashelkar v. Rubin & Rothman*, 97 F.
Supp. 2d 383, 392–94 (S.D.N.Y. 2000); *Eli Lilly & Co. v. Roussel Corp.*, 23 F.
Supp. 2d 460, 483 n.35 (D.N.J. 1988).

limits on subject matter jurisdiction as the New York Convention, and that the Recognition Act thus bars RICO claims predicated on the fraudulent procurement of a judgment. Donz. 97. But a state law cannot limit a federal statute as a treaty does, and even when confronted with a treaty, the court in *Gulf* held that the New York Convention barred a RICO claim *only* where the sole harm alleged arose from the judgment itself — which is not the case here. *See* 512 F.3d at 751.

Donziger also argues that "clear principles of international law" weigh against applying RICO here, but he fails to identify any inconsistency between the Lago Agrio judgment and the "law of nations," or any "foreign relations" implications that might result from the decision below. Donz. 98–99. Indeed, the ROE has disclaimed any interest in the outcome of Chevron's RICO claim. 826 Dkt. 112-2 at 41. Donziger cites *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001), but that case concerned a foreign-government RICO *plaintiff* trying to remedy a tax evasion scheme. This case involves a straightforward application of RICO by one private party against another.

Finally, Federal Rule of Civil Procedure 60 does not bar this action. *See* Donz. 97–98. Rule 60 is not "an exclusive federal scheme" (Donz. 97) — to the contrary, the rule states on its face that it "does not limit a court's power to . . . entertain an independent action to relieve a party from a judgment, order, or proceeding." Fed. R. Civ. P. 60(d)(1).

## 2. Neither *Naranjo* nor Texaco's Representations to This Court in *Aguinda* Bar Chevron's RICO Claim

Contrary to Donziger's claim, this Court's decision in *Naranjo* did not "necessarily reject[] Chevron's alternative argument for affirmance on its RICO and common-law theories." Donz. 85–86. Indeed, this Court expressly noted that it was "decid[ing] only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon," and acknowledged "the continuation of separate proceedings between these parties on other causes of action before the same district court judge." *Naranjo*, 667 F.3d at 238 n.8, 239 n.11.

Donziger also implies that Texaco's statements to this Court in *Aguinda* bar Chevron's RICO claim against Donziger. Donz. 103. Donziger's estoppel argument is meritless, both as a defense to the RICO claim and as a shield for the Ecuadorian appellate courts' orders, as detailed below. *See* Argument Section III.B, *infra*; *see also* SPA467–73 (628–32).

## 3. Donziger's Conduct Was Not Protected by the First Amendment

Given Donziger's corruption of the Lago Agrio case and his RICO predicate acts, the district court properly rejected Donziger's argument that his conduct was protected by the First Amendment. SPA376–78 (580–81). On appeal, Donziger has effectively abandoned this defense, including only a single, conclusory reference to it (Donz. 111–12) in his brief. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) ("cursory,

conclusory references" to argument insufficient for appellate review). Nor can Donziger revive this argument through Amazon Watch's amicus brief. *See Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d Cir. 2001).

Even if Donziger's First Amendment defense were not waived, it has no merit. As the district court held, "corruption of an adjudicative process removes any shield that the First Amendment otherwise would provide . . . because 'bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition.'" SPA377–78 (581) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981)). Donziger's cursory claim that his conduct was protected petitioning (Donz. 111–12), like the Amazon Watch *amici's* argument that "deceptive advocacy" is protected (826 Dkt. 136 at 17), offers no meaningful response to the district court's analysis of this issue.

In the only sentence in Donziger's brief in which he refers to the First Amendment, Donziger cites *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006). Donz. 111–12. But *Sosa* did not involve any allegations regarding corruption of the judicial process itself, and thus it has no bearing here. The Amazon Watch *amici* argue that Donziger's litigation activities are protected petitioning under *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PREI*"). 826 Dkt. 136 at 18–19. But *PREI* expressly declined to con-

sider whether fraudulent petitioning was protected by the *Noerr-Pennington* doc-

trine or the Petition Clause (*see* 508 U.S. at 61 n.6), and this Court has already lim-

ited *PREI* to cases alleging that "a single action constitutes sham petitioning."  *See*

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000).

Nor does the Petition Clause protect any litigation in foreign courts.  *Sexual Minor-*

*ities Uganda v. Lively*, 960 F. Supp. 2d 304, 329 (D. Mass. 2013).  And in any

event, *amici's* assertion that the pervasive fraud here "did not reach the core of the

case or deprive it of legitimacy" (826 Dkt. 136 at 21 n.9) is untenable.

     Nor is there any merit to the Amazon Watch *amici's* purported concern that

the judgment here will "severely chill" the lawful "exercise of their First Amend-

ment rights of free speech, association, and petitioning government[.]"  826 Dkt.

136 at 1.  Indeed, the Amazon Watch *amici* concede that fraud and extortion are

not constitutionally protected.  *Id.* at 7.  They cite *NAACP v. Claiborne Hardware*

*Company*, 458 U.S. 886 (1982), and other cases for the proposition that "greater

precision" is required where illegal conduct takes place in the context of First

Amendment protected activities.  826 Dkt. 136 at 7–9.  But it is the Amazon Watch

*amici* and Donziger who lack precision — they offer only general and sanitized de-

scriptions of Donziger's conduct:  "[e]mails containing legal opinions," "attempts

to hold Chevron accountable," "an expansive media campaign," "lobby[ing] regu-

latory agencies and elected officials," and "submit[ing] [complaints] to the SEC."

826 Dkt. 136 at 4, 10–11; Donz. 111. Neither acknowledges the district court's comprehensive — and precise — findings regarding Donziger's extortion or his other unlawful conduct. *See* SPA378–89 (581–87). The district court's judgment works no change in the law, and neither the Amazon Watch *amici* nor any other "participant[] in public discourse" (826 Dkt. 136 at 5) can legitimately argue that the First Amendment protects attempts to obtain property based on knowing falsehoods and other indisputably illegal conduct, as found here by the district court.

The Amazon Watch *amici* also argue that Donziger's false and deceptive statements are entitled to protection under the "centuries-old common law litigation privilege." 826 Dkt. 136 at 12. Donziger failed to raise this issue on appeal, and it is therefore waived. *Niagara Mohawk*, 673 F.3d at 107. Moreover, New York's common law litigation privilege applies only to defamation claims. It does not protect statements aimed at "manipulat[ing] the legal process." *Mintz & Gold LLP v. Zimmerman*, 17 Misc. 3d 972, 977–78 (Sup. Ct. N.Y. Cnty. 2007).

Even if Donziger had a meritorious First Amendment defense to extortion properly before this Court, it would not undermine the district court's holding that Donziger violated RICO. The district court found that Donziger committed numerous predicate acts in addition to extortion. The district court's findings regarding Donziger's other predicate acts — wire fraud, money laundering, obstruction of justice, witness tampering, and Travel Act violations — are more than sufficient

to support the district court's RICO holding. *See United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) (elimination of a RICO predicate act on appeal does not justify reversal as long as at least two adequately proven acts remain).

## III. The Ecuadorian Appellate Orders Cannot Salvage the Corrupt Judgment or Cure Donziger's Racketeering

Appellants devote much of their briefs to arguing that the decisions of the Ecuadorian appellate courts somehow cleanse the corrupt Lago Agrio proceeding and wipe away the consequences of both Donziger's racketeering and Appellants' procurement of a fraudulent judgment. *See* Donz. 69–79; LAPs 23–53. Despite the district court's extensive findings that Appellants corrupted the Lago Agrio litigation, bribed the author of the expert report, and bribed the judge to let them ghostwrite the judgment, Appellants now argue that this fraud has "nothing to do with the Ecuadorian judgment that Chevron is attacking." Donz. 2. That is because, Appellants now claim, the Ecuadorian appellate panel "produced a substitute judgment" after a *de novo* review of the record. *Id.*; LAPs 21; *see also* LAPs 34–35, 53.

This notion defies common sense and provides no basis for reversing the district court's rulings on RICO or the independent action for relief from the judgment.[23] Nor is it the first time Appellants have tried to sidestep the fruits of their

---

[23] Chevron addresses Appellants' other challenges to the district court's rulings on

own fraud.  When Chevron discovered that Appellants had ghostwritten the Cabrera report, they responded by repackaging that report's findings in reports issued by new experts — a scheme they dubbed their "'cleansing' process."  SPA187–91 (479–81).  Now that their ghostwriting of the judgment has been discovered, they once again try to salvage their handiwork, this time by claiming that the Ecuadorian appellate courts reviewed the underlying record and independently came to the same conclusions.  But this "cleansing process" is no more legitimate or persuasive than Appellants' earlier attempts to resurrect the Cabrera report.

As a threshold matter, Appellants have waived this argument in several respects.  While they now invoke the Ecuadorian appellate rulings as their core issue on appeal, they raised them only in passing below, arguing that the intermediate appellate panel considered and rejected Chevron's allegations of fraud and misconduct.  *E.g.*, SA1745–46 (Appellants' opening argument).  Appellants have maintained throughout this litigation that the operative ruling was Zambrano's February 14, 2011 judgment.[24]  That is why they brought former Judge Zambrano

--------

the independent action in Argument Section IV, *infra*.

[24]  *See, e.g.*, SA1920 ("[T]he Ecuadorian Court of Appeals, who affirmed the judgment . . ."); 691 Dkt. 1851 (LAPs Post-Trial Brief) at 3 (describing Zambrano "defend[ing] his Judgment"); 691 Dkt. 1850 (Donziger Post-Trial Brief) at 3 ("[A]n appellate court unanimously affirmed" the trial court judgment); *id*. at 23–26 (describing the judgment "Judge Zambrano . . . entered . . . against Chevron"); *see also* SA1744–45 ("The only way to get to where Chevron wants to get, the dis-

to testify at trial below.  On appeal, however, Appellants have downgraded the trial court judgment to "preliminary" status, and asserted that the appellate panel produced a "substitute" judgment that is immune from attack.  *See* Donz. 33, 39.  And they claim it was the normal course of Ecuadorian law for the appellate panel to have ignored the widespread fraud below.

In support of this novel theory, Appellants offer this Court a variety of authorities, most of which have nothing to do with Ecuador, and none of which were presented to the district court.  *See* Donz. 74; LAPs 25–27.  Not one of Appellants' six notices of intent to rely on foreign law discussed the scope or effect of an Ecuadorian appellate court's *de novo* review power, and, thus, Appellants have waived this argument under Federal Rule of Civil Procedure 44.1.[25]  *See* 691 Dkt. 315; 691 Dkt. 316, 691 Dkt. 875, 691 Dkt. 1455, 691 Dkt. 1494, 691 Dkt. 1702; *see also Trafigura Beheer B.V. v. M/T Probo Elk*, 266 F. App'x 309, 311 (5th Cir. 2007); *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995).  Finally, while Appellants now cite to the appellate orders as evidence for the truth of the factual

crete inquiry of whether or not fraud tainted the verdict in Ecuador has to be arrived at through the allegations of bribing the judge.").

[25]   Rule 44.1 states:  "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  The advisory committee notes reiterate the requirement:  "To avoid unfair surprise, the *first sentence* of the new rule requires that a party who intends to raise an issue of foreign law shall give notice thereof."  Fed. R. Civ. P. 44.1 advisory committee's notes (emphasis in original).

statements they contain (*e.g.*, LAPs 15; Donz. 38, 75, 77), they have waived this argument as well.  Appellants concede the orders were not offered "for the truth" (LAPs 21 n.21), and the district court found them to be hearsay (SPA423–24 (606)), a ruling they do not challenge.

### A. The Ecuadorian Appellate Panel Did Not "Cleanse" Appellants' Fraud or Produce an Untainted "Substitute Judgment"

Even if Appellants had preserved their claim that the Ecuadorian appellate panel cleansed the Lago Agrio fraud, this argument is meritless for three independent reasons.  First, there was no such review.  The decisions of the Ecuadorian appellate panel make plain on their face that the panel did not conduct a *de novo* review or account for the tainted evidence in the Lago Agrio proceeding, as would be required for Appellants' "substitute judgment" theory to succeed.  Indeed, the district court found that the short span in which the appellate panel had to complete its work precluded any meaningful review of the expansive record anyway.  Second, as the district court's largely uncontested findings established, the trial record and proceedings were shot through with fraud, from the forged Calmbacher report through the orders Guerra ghostwrote while in the pay of the LAP team.  SPA66–69, 81–88, 187–91, 231–52 (412–14, 420–24, 479–81, 502–13).  Any purported *de novo* review of "untainted" evidence would have first required an analysis to determine the extent of the fraud's impact — which Appellants concede did not take place, and which they now claim could not have taken place because the panel

supposedly lacked jurisdiction to address Chevron's allegations of fraud (Donz. 74; LAPs 14–16).  Third, Appellants' theories about Ecuadorian law, and their assertion that it was proper for the appellate panel to ignore the widespread fraud in the proceedings below, are unsupported by their sources, which were never presented to the district court and barely address Ecuadorian law at all.  In short, Appellants' "cleansing" theory reveals no error — let alone a clear one — in any of the district court's factual findings or legal rulings.

### 1. There Was No *De Novo* Review of the Facts:  The Appellate Panel Did Not Evaluate the Evidence or Make Factual Findings, and It Deferred Extensively to the Trial Court

The appellate orders demonstrate on their face that no *de novo* review of the record took place, and no "substitute judgment" issued.[26]  The appellate panel's January 3, 2012 order totals a mere 16 pages and does not engage the voluminous trial court record in a manner consistent with the type of *de novo* appellate review that Appellants describe.  The January 13, 2012 clarification order is only four-and-a-half pages long, and is similarly devoid of any analysis of the evidence.  Merely reading these orders confirms that the panel never engaged in a substantive review of the evidentiary basis for the trial court's factual findings or its damages

---

[26]  The LAPs argue that the district court "erroneously assumed" that they had the burden to prove that the appellate panel conducted a *de novo* review.  LAPs 37.  But the court's conclusion was based on its own review of the order and record, and did not rely on any presumption.  SPA425–29 (606–08).

assessment.

Rather than employ any purported "*de novo* fact-finding . . . power" (LAPs 29), the appellate panel expressly deferred to the trial court's analysis of the evidence. It offered only the rubber-stamp approval that it "consider[ed] the lower court's appraisal . . . to be coherent and of good legal-logical judgment, because it stems from the body of evidence presented in the trial to which the trial court referred precisely." A465. It made similarly tautological pronouncements, and expressly deferred to the trial court, on every factual issue that it purported to address:

- **Sufficiency of the Evidence.** "[T]his is exactly what the trial judge did in the appealed judgment: Consider the evidence as a whole (and not just the documentary evidence that the defendant demands) to establish the facts in an indisputable and conclusive manner." A460. "[T]he trial court has complied with [Article 115 of the Code of Civil Procedure], since, evaluating the evidence collectively, it refers to each item of evidence." A464.

- **Causation.** "The analysis of the relationship between damage and cause in the Ecuadorian Amazon is sound and derives from the examination of the items of evidence that exist in the record." A464.

- **Injury and Damages.** "Then, the damages to the environment are legally proved and considering the causal relationship between the result of damage, and the action of the operations of the then Texpet, the Division does not find reasons to modify what was ordered in the lower court's judgment and states that it is appropriate to confirm the monetary amounts established as proportions of compensation and indemnization." A464–65.

At the end of the order, the panel acknowledged that the trial court erred in

finding "the presence of mercury in the concession area," but dismissed the error as irrelevant with no explanation: "Considering that this error is not capable of influencing the final decision, the rest of the judgment of February 14th, 2011, in all its parts, is ratified, including the award of measures of moral reparation or their alternative, and costs at this stage to be met by Chevron Corporation." A468.

The panel devoted most of the mere 20 combined pages in the first order and the clarification order to the trial court's jurisdiction (A453–54; A465), the LAPs' appeal requesting additional damages (A455–56), and Chevron's corporate separateness and release defenses (A456–62). It also devoted considerable space to various attacks on Chevron (*e.g.*, A454; A467) — even as it waved aside the abundant evidence that the LAPs bribed experts and judges, coerced others, and ghost-wrote the judgment. The clarification order primarily addressed the trial court's requirement that Chevron "apologize" or face a $9 billion fine (A489–90), criticized Chevron for allegedly failing to submit to Judge Zambrano the (only later-acquired) evidence that the LAPs bribed him (A491–92), and repeated the same conclusory assertion that it found the information in the record that Chevron identified as coming from the LAPs' unfiled work product (A491).

Nothing in the panel's order suggests that it analyzed the evidence and made its own calculations or weighed any evidence. The panel had almost nothing to say about the sampling results or the scientific analysis of those samples, the calcula-

tion of damages, or the ultimate disposition of the lawsuit — it simply adopted an $8 billion compensatory damages award on the *ipse dixit* conclusion that "the damages to the environment are legally proved." A464; *see also id.* (approving trial judge's "conviction of the existence of damage" and his "minimal margin of error in applying the interpretation method of sound discretion to assess scientific evidence").

The LAPs assert that one page of the appellate order, A463, shows that the appellate panel "reviewed large segments of the trial record dealing with the scope of environmental damage, repeatedly citing to specific items dealing with scope of damages." LAPs 48 (citing A463). But the portion of the appellate order to which the LAPs cite provides no support for their claim. Rather, that page constitutes the appellate panel's cursory response to Chevron's evidence that the judgment relied on material from outside the record. *See* A463; SPA212–23, 426–27 (492–98, 606–07). There, the panel claimed only that it was able to locate a record source for some of the evidence that Chevron demonstrated was not in the record[27] — a

---

[27]  Moreover, even on the narrow question of the record source for this material, the appellate panel's analysis is unpersuasive. First, as the district court found, "[t]he appellate court thus declined to address the fundamental implication of the overlap between the Judgment and the LAPs' unfiled work product — that the LAPs had written, or at least assisted Zambrano in writing, the Judgment." SPA427 (607). Second, the few cited pages from the record do not contain the information identified by the panel. The panel cites page 72,335 for data related to the Sacha North 2 Central Station, but the lab results there are from Sacha 14.

claim that not even Appellants have ever made and which the district court in this action rejected — and that it could "correct" the errors identified by Chevron as evidence that the judgment included the LAPs' unfiled work product. A463. The panel did not purport to identify the evidence necessary to support any component of the injuries or damages in the trial court judgment. *See id.*

In an effort to explain away the lack of any substantive analysis in the appellate orders, the LAPs claim — without citation — that the facts were not meaningfully disputed in the Lago Agrio proceeding. LAPs 48. But throughout the Lago Agrio litigation, including in its first-level appeal, Chevron vigorously disputed the LAPs' allegations regarding the impact of Texaco's operations. In its brief to the appellate panel, Chevron challenged every aspect of the trial court's factual findings concerning injury, causation, and damages. *See* SA7463–76. Chevron argued, among many other things, that:

- the plaintiffs failed to prove legally cognizable harm (SA7463);

- the record evidence "conclusively demonstrates that there is no threat to human beings in connection with the environmental conditions" (SA7464; *see also* SA7466–67);

---

*Compare* A463, *with* SA7316–17. Likewise, the panel claims that pages 100,978 and 119,378 provide the lab results for the Shushufindi field, but they refer to the laboratory data for LA06 and LA Central, respectively. *Compare* A463, *with* SA7318–19; SA7320–21. Neither refers to the Shushufindi field. *See* SA7318–19; SA7320–21.

- there was no record evidence of surface water or groundwater contamination (SA7471–72);

- there was record evidence of alternative causes for alleged harm to public health, including the documented presence of fecal matter in the water, malnutrition, limited health care, pesticide exposure, and Petroecuador's exclusive operations in the former concession area since 1990 (SA7482);

- expert reports in the record demonstrated the invalidity of the reports regarding a purported relationship between oil production activity and cancer (SA7484); and

- none of the compensation awards were supported by any evidence (SA7490).

The appellate panel addressed *none* of these arguments, or any of Chevron's other factual challenges. Indeed, the words "soil," "water," and "cancer" do not appear in the appellate orders at all, nor are any of the billions of dollars in damages awards even mentioned, let alone justified. The LAPs' suggestion that the scientific evidence against Chevron was undisputed (*see* LAPs 47) is false, and cannot excuse the appellate panel's failure to review that evidence.

The complete absence of any independent analysis of the record is not surprising, because, as the district court found, "it would have been impossible for any court to have conducted a *de novo* review of the 188-page Judgment and the trial record in the time the appellate court rendered its decision." SPA427 (607). Specifically, the district court found that the panel could not have conducted a "meaningful" review of the "more than 200,000 pages of trial evidence, 62,000 scientific laboratory analyses, testimony from dozens of witnesses, and more than 100 judi-

111

cial fields [sic] inspections" in the five weeks between its appointment and issuance of the order affirming the trial court judgment. SPA427–28 (607–08). This finding of fact is independently fatal to Appellants' theory, which is predicated on the allegation that this review actually took place.

Appellants urge on this Court an alternative reading of the record, but cannot show that the district court's factual findings on this point were clearly erroneous. They argue that the panel had nine months, not five weeks, to review the record, because the first appellate panel was constituted in March 2011, and the order did not come out until January 2012. LAPs 2–22; Donz. 78; *see also* 826 Dkt. 112-2 (ROE Amicus Br.) at 35–36. But they concede that the panel appointed in March 2011 was not the panel that issued the order — two of the three judges on the final panel were not appointed until November, five weeks before the order issued. *Id*. The district court's conclusion that the panel that actually issued the order was required to conduct any supporting review — but did not have time to do so — is a reasonable one, and Appellants offer no evidence to the contrary.

Appellants also assert that the record was "bloated" with legal argument that the panel was not required to review. But they do not identify what portions of the record they claim were superfluous, or explain how the appellate panel could determine which portions were relevant without reviewing them. And the district court's conclusion rested on the undisputed fact that the record included "62,000

scientific laboratory analyses, testimony from dozens of witnesses, and more than 100 judicial fields [sic] inspections" — something that remains true regardless of any "bloat." *See* SPA427 (608).

### 2. The Panel Relied on a Tainted Record, Including the Ghostwritten Cabrera Report

The fundamental flaws in the Lago Agrio proceeding made it impossible for appellate review to have yielded an untainted "substitute judgment."

First, even if the appellate panel had wanted to conduct a true *de novo* review of the trial court's record and judgment, the evidence of widespread fraud throughout the proceeding required that any such review begin with a determination of just what portions of the record were in fact legitimate. But certain material in the Lago Agrio record was irremediably tainted, and the manner in which the record was assembled was itself corrupted, underscoring the impracticality of *de novo* review. The LAPs acknowledge that in a civil law system such as Ecuador's, the trial judge exercises considerable control over the content of the record. LAPs 25–26; *see also* John H. Langbein, *The German Advantage in Civil Procedure*, 52 U. Chi. L. Rev. 823, 830 (1985). But in the Lago Agrio litigation, judge after judge was corrupt or corrupted. The first presiding judge, Alberto Guerra, testified in the district court that he had accepted bribes as a judge (SA2910–12), as Appellants emphasize (Donz. 51). Appellants do not dispute that they "directly coerced at least one judge [Yánez] and mobilized demonstrations to intimidate others."

113

SPA48, 81–84 (403, 420–22). "It is undisputed that [there was] a series of secret videotaped meetings with Judge Nuñez [who presided over the case in 2009] and Patricio Garcia, who was affiliated with the Republic of Ecuador's ruling party, in which they discussed the Ecuador litigation." SPA477 (634). Judge Zambrano relied on then-former Judge Guerra to ghostwrite orders in the Chevron case, and the LAPs bribed Guerra to favor them in those orders. SPA249–51 (509–11). The appellate panel did not purport to sort through the rulings made by these various judges, the evidence they admitted or excluded, or the investigations they ordered or refused in order to determine what in the record was "untainted." Nor do Appellants suggest that the panel did so — to the contrary, they insist it did not. LAPs 29–30; Donz. 74.

Second, the district court found that the Lago Agrio judgment *necessarily* depended on the fraudulent Cabrera report and on material taken from the LAPs' own files and not found in the record. SPA504–58 (646–89). Its analysis on this point was extensive and is unchallenged on appeal. The judgment relied on the Cabrera report, the court found, for "[t]he largest single component of the $8.646 billion award . . . the $5.4 billion award for remediation of soil at waste pits." SPA546 (682). That figure was based on a finding that there were 880 pits in the concession area, and it was "impossible that the pit count in the Judgment came from anything but the Cabrera report." SPA551 (685). The district court also

found that the judgment's $150 million award for potable water damage (SPA551–52 (685)) and its $200 million award to restore flora and fauna in the concession area (SPA553–54 (686–87)) were derived directly from the Cabrera report. And it specifically considered and rejected the assertion by the Lago Agrio court that it did not rely on the Cabrera report, and its attempted explanation for how it derived the crucial "pit count." SPA545–51 (681–85). Further, it found that the judgment incorporated LAPs' work product never filed with the court. SPA504–44 (646–81).

The appellate panel identified no alternative sources for this material, and the National Court of Justice uncritically accepted the trial court's false assertion that it did not rely on Cabrera. A3545–46. For the appellate orders to have any legitimacy, they would have to rest on review of a legitimate record — not the ghostwritten Cabrera report and the LAPs' unfiled work product.

### 3. Appellants Have No Support for Their Implausible Theory That Civil Law Appellate Panels May Ignore Massive Fraud in Trial Court Proceedings

Notwithstanding their complete failure of proof on the factual questions of what actually happened in Ecuador, Appellants claim that in light of general principles of civil law, the Ecuadorian appellate panel *must* have exercised *de novo* review, and thus as a matter of law the panel's orders eliminated any wrong flowing

from the Lago Agrio proceedings. LAPs 29; Donz. 38.[28]  But none of the materials Appellants cite stands for the proposition that the Ecuadorian appellate panel was required (or even permitted) to decide Chevron's appeal on the merits without addressing the evidence of fraud in the preparation of the record and the judgment. *See, e.g.*, LAPs 26–27, 30–34, 53; Donz. 72–74.  For example, Appellants cite Article 838 of the Ecuadorian Civil Code, which provides that the appellate court "will rule on the merit of the record," and "the ruling so issued will be subject to the appeals permitted by law."  *See* SPA426 (607) (citing Ecuador Code of Civ. P. 838).  *Cf.* LAPs 37 n.31; Donz. 73.  But this provision says nothing about the nature of an appellate panel's review, or its general ability to consider procedural fraud claims during the pendency of civil proceedings.  *See* SPA426 (607) n.1567.

---

[28]  Donziger's attempt to transform this question into a matter of law — a transparent attempt to sidestep the district court's findings — fails because the question here is not the "correct standard of review" in Ecuador.  Donz. 75.  It is whether or not the appellate panel could have and did weigh evidence and make factual findings independent of Appellants' years of fraud in Ecuador, thus severing the "causal link" between that fraud and Chevron's injuries flowing from the Ecuadorian judgment — a question of fact, not law.  *See* Donz. 73; *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 618 (2d Cir. 1991).  The factual nature of the inquiry is also made clear in the LAPs' brief.  LAPs 37 ("[T]he burden clearly rests with Chevron to establish that the Ecuadorian appeals judges failed to carry out their statutorily-defined duties."); *id.* at 48 ("[T]he three intermediate appeals court judges actually reviewed large segments of the trial record.").  Furthermore, the only authority Donziger cites is the Ecuadorian Supreme Court opinion (Donz. 75), but the district court ruled that opinion was inadmissible hearsay, a finding that Donziger does not challenge on appeal.  SPA423–24 (606).

Appellants' reliance on German and French legal sources highlights their lack of any support specific to the Ecuadorian legal system. And even if German and French law were identical to Ecuadorian law, none of these sources addresses the proper treatment of fraud on appeal — in particular, an appellate court's ability to reconstitute a concededly tainted trial court record and issue a *de novo* judgment untainted by that fraud. In fact, Appellants' authorities describe German *de novo* review in a way that clearly distinguishes it from what happened here. *See* Peter L. Murray & Rolf Stürner, German Civil Justice 373 (2004) (noting that the lower court's fact findings in the German system must be accepted absent a "clear indication of doubt of the correctness or completeness").

Only one of Appellants' secondary sources says anything specific about the Ecuadorian legal system. *See* José Rafael Bustamente, *Ecuador, in Civil Appeal Procedures Worldwide* 262 (Charles Platto ed., 1992). Contrary to Donziger's characterization, that source does not state that an appellate court's affirmance results in a "substitute trial court decision." Donz. 74. It says only that the appellate court has the power to "reverse and substitute [the] court decision." Bustamente, *supra*, at 266. But the appellate panel here did not reverse the trial court judgment, so there was nothing to substitute — nor did the panel purport to "substitute" its opinion, or even offer an alternative analysis of any factual issue. None of the cited sources establishes that a civil law appellate panel, in Ecuador or elsewhere,

could or should ignore evidence of fraud in the creation of the record or the rendering of a lower court's judgment.[29]

Longstanding precedent from numerous U.S. courts, including this one, confirms that U.S. courts would not countenance Appellants' approach. "Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989); *see also United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1938) (bribery of appellate judge was not harmless even if panel would have reached the same result regardless of the misconduct because "[j]udicial action, whether just or unjust, right or wrong, is not for sale"). "[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944).[30]

---

[29] Nor do *amici* offer any authority suggesting this is the case. *See* 826 Dkt. 119 at 11–13, 17–18.

[30] The LAPs' analogies to standards in the United States are truly strained. *See, e.g.*, LAPs 27–34, 53. The cases regarding "*de novo*" review of bankruptcy court and magistrate rulings (LAPs 27–29) are irrelevant because they do not concern a ruling procured by fraud on or by a lower court. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), and *ABF Freight System, Inc. v. NLRB*, 510 U.S. 317 (1994),

## B. The District Court Did Not Clearly Err in Holding That the Appellate Orders Could Not Cleanse the Fraudulent Judgment Because Ecuador Does Not Provide Impartial Tribunals

Appellants' argument that their fraud was wiped away by the *de novo* review of the Ecuadorian appellate panel fails on the facts — there was no such review. But it fails for an entirely independent reason as well: Ecuador did not provide impartial tribunals at any time relevant to this case. SPA445 (617). Appellants implicitly concede that this finding is fatal to their appellate cleansing argument (LAPs 53–54; Donz. 99–100), but cannot establish that it was clearly erroneous.

### 1. The District Court Correctly Held That Chevron Is Not Estopped from Challenging the Ecuadorian Judiciary or Its Judgments

The district court held that Texaco's statements in the *Aguinda* litigation did not estop Chevron from arguing that the Ecuadorian judiciary did not, and could not, fairly adjudicate the Lago Agrio dispute. The court also made extensive factual findings rejecting the key elements of Appellants' estoppel defense. SPA467–73 (628–32); *see also Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189, 194–98 (S.D.N.Y. 2011). Appellants recycle these arguments but cannot identify any error in the district court's findings or analysis.

do not mention appellate review and do not concern cases in which the outcome rested on fraud. As for the LAPs' invocation of "harmless error" review (LAPs 31), bribing a judge to issue a ghostwritten judgment cannot be deemed "harmless error" by any stretch of the imagination. Nor is Chevron, as the LAPs assert, advancing an argument based on the "structural error" doctrine. *See* LAPs 32–33.

"Judicial estoppel is an equitable doctrine invoked by a court at its discretion" (*New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation marks and citation omitted)), and accordingly, should be subject to abuse of discretion review on appeal. While Donziger argues that *de novo* review should apply, citing *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 142 (2d Cir. 2005) (Donz. 67–68), the reference in *Uzdavines* to *de novo* review is unsupported and had no bearing on the outcome of that case. 418 F.3d at 140–41, 143. Moreover, this Court has held on several subsequent occasions that the standard of review is an open question. *See, e.g.*, *Lia v. Saporito*, 541 F. App'x 71, 72 n.1 (2d Cir. 2013); *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 618 (2d Cir. 2012) ; *Welfare Fund, New England Health Care Emps. v. Bidwell Care Ctr., LLC*, 419 F. App'x 55, 59 n.6 (2d Cir. 2011). Given the fact-specific and subjective nature of judicial estoppel, this Court should follow all of the other circuits to have decided the question and adopt an abuse of discretion standard. *See, e.g.*, *Lia*, 541 F. App'x at 73 & n.1 (noting that Third, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted abuse of discretion standard); *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 30–31 (1st Cir. 2004) (adopting abuse of discretion standard of review). *Cf. NML Capital, Ltd. v. Republic of Arg.*, 699 F.3d 246, 257 (2d Cir. 2012) ("We review a district court's decision to grant equitable relief for abuse of discretion.").

### a. Chevron's Position Here Is Not Inconsistent with Texaco's Representations in *Aguinda*

Appellants cannot begin to establish a key element of a judicial estoppel defense:  that Chevron "took an inconsistent position in a prior proceeding." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000).  Appellants have shown no clear error in the district court's finding that Texaco, not Chevron, took a prior position on the Ecuadorian judiciary, and "Chevron did not merge with Texaco."  SPA468 (629) n.1747; SA684 (Veiga direct testimony); SA6344; SA6345; SA6346.  And even if Texaco's statements could be attributed to Chevron,[31] they are not "clearly inconsistent" with Chevron's position here for three independent reasons:  Texaco never promised to satisfy a fraudulently procured award, the circumstances in Ecuador have changed significantly, and the nature of a *forum non conveniens* dismissal makes it an inappropriate basis for estoppel.

---

[31]  Donziger's reliance on *Republic of Ecuador* (Donz. 105) to support this argument is unavailing.  As the district court noted (SPA469–70 (630) n.1750), the statements Donziger quotes are dicta, which this Court has not followed in subsequent opinions.  *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 235 n.2 (2d Cir. 2012) ("[T]he questions of whether U.S. or Ecuadorian law governs whether a successor-in-interest is liable for a predecessor's alleged environmental torts committed in Ecuador, and what that governing law has to say on the subject, are not before us.  We therefore express no opinion about them."); *Chevron Corp. v. Berlinger*, 629 F.3d 297, 300 (2d Cir. 2011) (noting that Texaco "became a wholly-owned subsidiary of Chevron in 2001").  Other courts are in accord.  *See, e.g.*, *Bonnifield v. Chevron Corp.*, No. B20655, 2009 WL 1111601, at *1 (Cal. Ct. App. Apr. 27, 2009) (finding that Chevron and Texaco are separate companies).  As for the brief Donziger identifies as filed by ChevronTexaco, it was filed by Texaco — ChevronTexaco was not a party in that action.  SPA469–70 (630) n.1750.

First, Donziger mischaracterizes Texaco's statements in *Aguinda*. Texaco did not "shower[] praise on Ecuador's judiciary, extolling its virtues" (Donz. 3), or "assure[] this [C]ourt that the courts of Ecuador were fully competent to provide a just resolution of this litigation" (LAPs 54). Rather, Texaco said that Ecuador provided "an adequate alternative forum" for the *Aguinda* plaintiffs' individualized personal injury and property damage claims. *See* SA54; *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002). It said nothing about the fitness of the Ecuadorian judiciary to resolve the claim asserted in the Lago Agrio litigation: the "collective rights" of "indigenous people . . . to live in a healthy environment, ecologically balanced and free of contamination." SA5241.

While Texaco did initially offer to satisfy a judgment entered by an Ecuadorian court on the *Aguinda* claims as a condition of dismissal (SPA471 (630–31)), Appellants submitted no evidence in the district court that this offer was accepted or otherwise relied upon; the offer appears nowhere in any court opinion; and the stipulation signed by the parties contained no promise to satisfy any Ecuadorian judgment. *See* SPA471–72 (631); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001). In fact, the record demonstrates that the *Aguinda* plaintiffs affirmatively *rejected* Texaco's offer because of its reservation of rights under the New York Recognition Act. *See* SA6355. An unacknowledged and unaccepted promise by Texaco made in the course of dismissal discussions cannot estop Chev-

ron here.  *See Bridgeway*, 201 F.3d at 141; *see also In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*, 809 F.2d 195, 204–05 (2d Cir. 1987) (holding that a district court erred in requiring a defendant to consent to the enforcement of any judgment subsequently issued in the foreign country in order to obtain a *forum non conveniens* dismissal).

Moreover, Texaco expressly reserved its "rights under New York's Recognition of Foreign Country Money Judgments Act."  SA6350.  Even the LAPs concede that "Chevron is — and should be — free to challenge specific judgments by individual Ecuadorian judges as having been 'obtained by fraud.'"  LAPs 54.  And Texaco surely did not waive this right.  *See Niagara Frontier Transp. Auth. v. Patterson-Stevens, Inc.*, 237 A.D.2d 965, 965 (4th Dep't 1997) (finding no waiver absent "clear language in the release").

Second, much has changed since *Aguinda*.  As detailed below (*see* Argument Section III.B.3, *infra*), the district court found that in the years since the Correa government assumed power and consolidated executive control over the other government branches, the judiciary has lost any semblance of impartiality or basic fairness when it comes to highly politicized cases like the Lago Agrio litigation.  *See* SPA429–40 (608–14).  As the court found, the Ecuadorian judiciary is effectively controlled by President Correa.  SPA433–40 (611–14).  It "never has recovered from" the judicial purges conducted in 2004 and 2005, and has "deteriorated

in recent years." SPA432–33 (610). Because those developments have "fundamentally altered the legal landscape," judicial estoppel has no application here. *Osorio v. Dole Food Co*., 665 F. Supp. 2d 1307, 1344 (S.D. Fla. 2009), *aff'd sub nom. Osorio v. Dow Chem. Co.*, 635 F.3d 1277 (11th Cir. 2011) (per curiam) (addressing changes in Nicaraguan judicial system); *see also United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1147 (9th Cir. 1998) (refusing to apply judicial estoppel where promised activity "was no longer a reasonable possibility" in light of subsequent events).

Appellants do not demonstrate clear error in these findings. While they argue that Ecuador's judiciary has either remained the same or improved since 2002 (Donz. 105–06; LAPs 57–58), they made no attempt in the district court to rebut Chevron's evidence (*see* SPA431 (610)). Nor can they use the Republic of Ecuador's amicus submission to salvage this argument now. *See Int'l Bus. Machs. Corp. v. Edelstein*, 526 F.2d 37, 45 (2d Cir. 1975); 4 Am. Jur. 2d *Amicus Curiae* § 8 (2014).[32]

Even if Appellants' suggestion that the Ecuadorian judiciary has improved

---

[32]  In its proposed amicus curiae brief (826 Dkt. 112-2), the ROE asks this Court to consider hundreds of pages of documents in support of its untimely arguments (826 Dkt. 113). These documents are not part of the record below and thus should not be considered here. *See Edelstein*, 526 F.2d at 45. In any event, none of the ROE's "evidence" establishes that its judiciary is independent in practice.

since 2002 was properly before this Court, it is unpersuasive. The LAPs claim that "the only material change in Ecuadorian justice since [*Aguinda*] stems from a change in the political complexion of Ecuador, and a corresponding change in who gets to be a judge." LAPs 57. Donziger echoes this argument, claiming that Chevron and the district court ignored negative characterizations of the Ecuadorian judiciary in State Department reports before 2009. Donz. 106–07. For all the reasons explained below, *see* Argument Sections III.B.2–3, *infra*, the district court's findings about the inadequacy of the Ecuadorian judiciary are unassailable. As to Donziger's specific contention that the State Department reports do not reflect deterioration in the integrity of the judiciary, he ignores a serious development first described in the 2006 report: "the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases and on judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature." SPA441 (615) (quoting SA5920); SA477–81. Contrary to Donziger's contentions, these reports do not show improvement in the Ecuadorian judiciary, let alone "clear error" by the district court.

Finally, a *forum non conveniens* dismissal does not estop the party that sought the dismissal from challenging enforcement of a subsequent judgment, as both the Huaorani and Earthrights International ("ERI") *amici* suggest. 826 Dkt. 111-2 at 4; 826 Dkt. 106-2 at 7–8. Neither amicus offers any basis for the asser-

tion that the standards for these different analyses are the same, and in fact they are not. *See, e.g.*, *Bano v. Union Carbide Corp.*, 809 F.2d 195, 204–05 (2d Cir. 1987); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1413 (9th Cir. 1995) (highlighting differences between the *forum non conveniens* and Recognition Act standards).[33]

The requisite considerations of whether an adequate alternative forum exists and balancing of interests in competing fora reflect a narrow inquiry that must be conducted before any foreign litigation has commenced. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429, 434–36 (2007) (supporting early *forum non conveniens* disposition). At this stage, courts are often reluctant to label a foreign forum "inadequate" unless the substantive or procedural law in the foreign jurisdiction is "so clearly inadequate or unsatisfactory" that it affords "no remedy at all." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 & n.22 (1981). In fact, the "requirement of an adequate alternative forum '[o]rdinarily . . . will be satisfied when the defendant is 'amenable to process' in the other jurisdiction.'" *Aguinda*, 142 F. Supp. 2d at 539. Thus, even though a foreign legal system may constitute an "adequate" forum for purposes of *forum non conveniens*, a judgment

---

[33] Indeed, the Huaorani readily acknowledge that the standards are not aligned, and argue that this creates an "access to justice gap." 826 Dkt. 106-2 at 22–24. Whatever the possible academic force of this concern, there is no reason to address it in this case, where the plaintiffs in the foreign proceeding intentionally availed themselves of the systematic weaknesses in the foreign judiciary at issue, and did not raise the differing standards before the district court or in this Court.

from that judicial system may later be deemed unenforceable because it lacked impartial tribunals or due process. Especially where, as here, the foreign judiciary in question was fundamentally restructured and taken over by the executive in the intervening time. SPA429–41 (608–15).[34]

### b. Appellants' Unclean Hands Bar Them from Raising Judicial Estoppel

Even if Appellants could establish the elements of judicial estoppel — which they cannot — they could not invoke it because they forfeited any equitable protection through their corruption of the Lago Agrio litigation. "[T]he estoppel doctrine invoked by defendants is rooted in equity, and . . . subject to the equitable maxim that he who comes into equity must come with clean hands." *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003) (quotation marks and citation omitted), *affirmed in part, vacated in part, and remanded*, 388 F.3d 39 (2d Cir. 2004). The unclean hands doctrine bars reliance on equitable defenses where "the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is 'directly related to the subject matter in litigation' and

---

[34] In its amicus curiae brief, ERI criticizes the district court for failing to elaborate on the standard for giving conclusive effect to foreign judgments. *See* 826 Dkt. 111-2 at 7 (quoting SPA430 (609) n.1585). In fact, the district court does so, although not in the footnote ERI cites. *See* SPA429–30 (608–09) nn.1580–84. The cases ERI cites describe the respective standards for *forum non conveniens* dismissal and enforcement under the Recognition Act, but, as explained, the goals — and thus the standards — for these two doctrines are different.

has injured the party attempting to invoke the doctrine." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (quoting *Weiss v. Mayflower Doughnut Corp.*, 1 N.Y.2d 310, 316 (1956)).

Both requirements are satisfied here. Appellants' "unconscionable conduct" is closely related to "the subject matter in litigation," and specifically to the impartiality of the Ecuadorian judiciary. Appellants bribed one judge, coerced others, and committed a range of other frauds in Ecuadorian litigation and they cannot now seek equitable protection against Chevron's challenge to the fitness of that judiciary. And the district court found that the conduct injured Chevron, satisfying the second requirement. SPA334–41, 486 (557–61, 639). Accordingly, Appellants may not invoke any equitable doctrines here.

### 2. The District Court Did Not Clearly Err in Finding That Ecuador Fails to Provide Impartial Tribunals, Especially in Politicized Cases in Which President Correa Has an Interest

After carefully weighing the evidence, the court concluded that "Ecuador, at no time relevant to this case, provided impartial tribunals or procedures compatible with due process of law," particularly "in cases that have become politicized." SPA440, 445 (614, 617). On appeal, this Court reviews for clear error any factual determinations regarding Ecuador's judiciary, and reviews *de novo* any legal determinations. *Guzzo v. Cristofano*, 719 F.3d 100, 109 (2d Cir. 2013).

Appellants have identified no errors of either law or fact in the district

court's rulings on this point, and their objections are limited in scope and unpersuasive. They attack the credibility of one of Chevron's expert witnesses, Dr. Vladimiro Álvarez Grau. But credibility determinations are the province of the trier of fact, and Appellants cannot demonstrate that the district court's credibility ruling was clearly erroneous. The court's conclusion that Ecuadorian courts do not provide impartial treatment, especially in highly politicized cases such as this one, was well supported by the facts and should be sustained by this Court.

### a. The District Court Applied the Correct Legal Framework in Evaluating Ecuador's Judicial System

While Appellants raise scattershot objections to the legal standards applied by the district court (Donz. 2–3, 105–09; LAPs 53–65), the court examined the appropriate factors in assessing Ecuador's judiciary. Precedent instructs that a key indicator of whether a nation provides impartial tribunals and procedures compatible with due process is the extent to which the political branches of government dominate the judiciary. *See Bridgeway*, 201 F.3d at 142 n.3; *see also, e.g.*, *DeJoria v. Maghreb Petrol. Explor. S.A.*, No. 1:13-cv-654-JRN, 2014 WL 4065614, at *11 (W.D. Tex. Aug. 13, 2014) (evaluating Moroccan judicial system). The structure of the legal system and the manner in which it operates are also relevant. *See Bridgeway*, 201 F.3d at 142 n.2.

The district court considered each of these factors, as detailed below. *See* Argument Section III.B.2.b, *infra*. And in doing so, the court looked to the same

type of evidence that this Court has relied upon in making similar assessments about other judicial systems: U.S. State Department country reports (which this Court has deemed "clearly admissible" factual findings, prepared pursuant to Congressional reporting obligations), as well as expert testimony from attorneys licensed to practice in a particular jurisdiction. *Bridgeway*, 201 F.3d at 142, 144; *see also* Ronald A. Brand, *Federal Judicial Center International Litigation Guide: Recognition and Enforcement of Foreign Judgments*, 74 U. Pitt. L. Rev. 491, 510–14 (2013) (courts consider expert testimony, State Department reports, other independent studies, foreign constitutions, and treaties).

Appellants complain that the district court "condemned the entire Ecuadorian judiciary, top to bottom, as incapable of producing decisions worthy of respect." Donz. 2–3; *see also* Donz. 105; LAPs 53–65 & n.47. But as explained below, the district court considered not just Ecuador's judicial system as a whole, but also the narrower question of how the judiciary treats highly politicized cases like this one. *See* Argument Section III.B.2.b, *infra*.

Appellants' other objections to the district court's legal analysis are meritless. The district court was not required to find that Ecuador's judiciary had a "wholesale contempt for the rule of law," or that there was a "complete breakdown" of or a "state of chaos" in the judiciary. *See* LAPs 54, 62 n.47; Donz. 109. Finally, Appellants' strained analogies to U.S. practices regarding judicial ap-

pointments (Donz. 108–09; LAPs 57–58, 61–62) are irrelevant — "[t]he similarity or dissimilarity of the [foreign] procedures to our own is not the issue; the issue is only the basic fairness of the foreign procedures." *Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 688 (7th Cir. 1987).

### b. The District Court's Factual Findings Regarding the Ecuadorian Judiciary Are Amply Supported by the Record

Appellants' challenge to the sufficiency of the evidence in support of the district court's findings that Ecuador lacked impartial tribunals at the relevant times faces a "very heavy burden" on appeal. *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998). Their failure to put forward any contrary evidence at trial makes that burden even higher, and limits this Court's review to whether the district court's finding was "supportable" based on the evidence presented. *Bridgeway*, 201 F.3d at 142. The district court's careful analysis and extensive discussion of the evidence regarding the Ecuadorian judicial system — much of which Appellants fail to even acknowledge — amply satisfy this standard.

The court's findings regarding the Ecuadorian judicial system rested primarily on a close analysis of developments over the past decade — in particular, the emergence of a structure that affords the executive dominance over the judicial branch. Specifically, the court found that while Ecuador experienced a "brief period of stability and judicial independence" after enacting its nineteenth constitution in 1998, "[t]his changed dramatically" in 2004, when the President and Ecuadorian

131

legislature "purged the three highest judicial tribunals," declared a state of emergency, and conducted a second purge of the Supreme Court. SPA432–33 (610). The court found that these events set off a series of structural changes incompatible with impartiality and due process, from which "Ecuador's judiciary never has recovered." SPA433 (610).

The court detailed the evidence regarding this dramatic incursion on the judiciary's independence. In 2005, the Ecuadorian Congress assumed control over Supreme Court appointments, and the Supreme Court in turn assumed control over lower court appointments. SPA433 (610–11). The situation worsened with President Correa's election in 2006. Shortly after his inauguration, Correa purged Congress and the Constitutional Tribunal, using "threats of violence" and calling out the National Police to enforce his will. SPA434 (611). In October 2008, the constitution was amended to give President Correa authority to terminate the appointments of 31 Supreme Court justices and to dissolve Congress. SPA435 (612).

Two years later, the court noted, "President Correa asserted the need to hold a referendum 'to get my hands on the justice system.'" SPA437 (612). His efforts resulted in the creation of a Transitional Judicial Council, which subjected sitting judges to "psychological examination" and fired "[h]undreds of judges." SPA437 (612–13). After just a few more months, Correa declared another state of emergency and gave the Transitional Judicial Council control over judicial appoint-

ments, and in January 2012, the Council appointed all 21 judges of the National Court of Justice. SPA437–38 (613). Judges who criticized this process or who did not support the government were fired, and judges "closest to the Correa administration" were installed in their place. SPA438 (613). Dr. Álvarez, an expert witness on Ecuador's judiciary, testified that "from July 26, 2011 to December 1, 2012, . . . 324 judges were removed, 232 were suspended, 58 were fined, and 13 were reprimanded." A1466 (Álvarez testimony).

Both Dr. Álvarez and Sandra Elena, an expert on comparative judicial systems, testified about the corrosive impact of Correa's actions. Elena looked at numerous indices relating to judicial independence, judicial corruption, and public confidence in the judiciary, all of which confirm that Ecuador lacks impartial tribunals and peg Ecuador as having one of the least independent judiciaries of all Latin American countries. SA1082 ¶¶ 45, 49, 52, 54, 56, 59, 65; *see also id.* ¶¶ 73, 76, 78, 80.c, 84 (Ecuador is "one of the most corrupt countries").

In addition to identifying these systematic flaws in the Ecuadorian judicial system, the district court also found that Correa's assertion of power over the judiciary had especially serious consequences for politicized cases.[35] Correa "inter-

---

[35] The district court's analysis comports with the view that "[t]he substitution of otherwise generally applicable laws with an oppressive legal regime applying only to a few select foreign defendants is the very antithesis of 'basic fairness,' as contemplated by the international concept of due process." *Osorio v. Dole Food Co.,*

fere[d] in judicial matters of interest to the Ecuadorian government" (SPA436 (612)), and spared no tactics in doing so. The court noted that "[i]n a number of recent cases, judges have been threatened with violence, removed, and/or prosecuted when they ruled against the government's interests." *Id.* Evidence at trial also established that the Correa administration warned trial judges that if they enjoined the ROE from implementing any government program, and that injunction were overturned on appeal, the ROE will sue the judges personally for damages. SA5369–73.

Dr. Álvarez concluded that in light of Correa's actions, "'the Judiciary can no longer act impartially and with integrity where the matter or dispute to be decided involves important political, social, or economic issues, and is instead subjected to constant pressure and threats that influence its decisions.'" SPA440 (614). The district court determined that "Álvarez's portrayal of the Ecuadorian judiciary is consistent with the U.S. Department of State's Country Reports in recent years . . . [which have] recognized that the judiciary was 'susceptible to outside pressure and corruption,' particularly in cases of interest to the government." SPA440–41 (614–15).

---

665 F. Supp. 2d 1307, 1342 (S.D. Fla. 2009), *aff'd sub nom.*, *Osorio v. Dow Chem. Co.*, 635 F.3d 1277 (11th Cir. 2011) (per curiam); *see also Bank Melli*, 58 F.3d at 1411–12 (finding of lack of due process based on unfair bias directed at special class of plaintiffs).

The district court highlighted one especially egregious case. In the 2011 *El Universo* lawsuit, President Correa personally sued a newspaper, "its columnist, and certain of its directors regarding an editorial piece on the president's alleged lies." SPA438 (613). Five judges presided seriatim over the case, the fifth entering a 156-page judgment in Correa's favor just two days after being appointed. SPA438–39 (613). The judge he replaced then came forward and revealed that before she was removed from the case, Correa's lawyer had offered her a bribe to issue a signed judgment written by Correa's legal team, and she then fled to Colombia, seeking asylum. SPA439 (614). A forensic examination of the judge's computer confirmed the judgment had not been written by the judge who issued it. *Id.* Nonetheless, the National Court of Justice, which had recently been reconstituted by Correa (SPA437 (612)), affirmed a $30 million fine payable to President Correa and three-year prison sentences. SPA439 (614). After widespread international condemnation, Correa pardoned the defendants.[36] SPA439-40 (614)

As the district court noted, Donziger embraced these weaknesses in the Ecuadorian judiciary and sought to turn them to his own ends. Donziger described

---

[36] *See*, *e.g.*, SA488–89 (Editorial, *Ecuador's Assault on Free Speech*, N.Y. Times, Feb. 21, 2012); SA482–84 (Editorial, *Ecuadorean President Rafael Correa's assault on media freedom*, Wash. Post, Jan. 11, 2012); SA485–87 (*Judge in Ecuador libel case flees country*, Miami Herald, Feb. 23, 2012); SA493–506 (Mario Vargas Llosa, *The leader's honor*, El Pais, Feb. 26, 2012).

the Lago Agrio litigation as "a political battle that's being played out through a legal case. . . . [The judges] don't have to be intelligent enough to understand the law, just as long as they understand the politics." SPA442 (615). Donziger also proclaimed he wanted to "send a message that [the judges] cannot 'fuck with us anymore — not now, and not — not later, and never.'" SPA443 (615). And when someone suggested to Donziger and his co-counsel that "the judge would be 'killed' for ruling against the LAPs, Donziger responded that the judge 'might not be [killed], but he'll think — he thinks he will be . . . [w]hich is just as good.'" *Id.*

The district court also scrutinized how Chevron had been treated in the Ecuadorian courts and the role that Correa played in the Lago Agrio litigation. The court found that "[i]t has been open and notorious in Ecuador for years that President Correa and the government support the LAPs in the case against Chevron." SPA209 (490). When Correa was elected, Donziger — who would soon have multiple meetings with Correa himself — described the incoming administration as "all these people . . . we already have connections with, they love us and want to help us, okay? So, we've gone basically from a situation where we couldn't even get in the door to meet many of these people in these positions to one where they're actually asking us to come and asking what they can do." SA4698; SA4699–700; *see also* SPA132 (449); SA706.

Donziger's assessment was accurate, and President Correa manifested his

support for the LAPs in numerous ways. Correa denounced Chevron as "an enemy of our country" in numerous public speeches. SPA444 (616) n.1657 (quoting SA6318 (*Ecuador's president denounces Chevron as 'enemy of our country*,' The Raw Story, Aug. 17, 2013)); SPA132–37 (449–52). Nor did Correa rely solely on public statements to deliver his message — he told the LAPs' representatives that he would "call the judge" on their behalf, and fired at least one high government official who did not sufficiently support the LAPs. SPA443 (616). At Donziger's behest, Correa even pushed for the criminal prosecution of Texaco's attorneys involved in the 1998 settlement and release with the ROE. Donziger's "purpose was plain — to force Chevron to settle the lawsuit." SPA131 (448). Donziger himself admitted as much, describing the criminal charges as the "key issue" that "could force [Chevron] to the table for a possible settlement." SA4862. The charges were eventually dismissed in June 2011 — a development that the district court attributed to Donziger's view that they had become a liability in Chevron's U.S. discovery proceedings. SPA137 (451–52) n.520.

Appellants do not challenge any of these findings, or explain how such a judicial system could be described as impartial or providing due process. The LAPs try instead to minimize their import, characterizing the findings as "a change in the political complexion of Ecuador, and a corresponding change in who gets to be a judge." LAPs 57. But the record is not compatible with that characterization; to

the contrary, the record is replete with evidence that supports the district court's findings.  SPA429–45 (608–17).

Appellants also contend that President Correa's actions regarding this case are irrelevant.  Donz. 108.  The district court's findings belie that assertion.  In any event, the district court's finding of judicial inadequacy rested on the historical record, expert witness testimony, and State Department reports, not on Correa's support for the LAPs.  SPA430–43 (609–16).  Only after the court had established the inadequacies of Ecuador's judiciary in politicized cases did it turn to Correa's support for the LAPs.  Correa's involvement, the court concluded, served to confirm that the Lago Agrio case was among the class of "politicized" cases for which the Ecuadorian judiciary does not provide impartial tribunals or due process.  SPA445 (616).

The LAPs contend that there was insufficient evidence to establish that "President Correa tampered with the appellate judges in this case."  LAPs 61–62 & 62 n.47.  But an assessment of a judicial system's impartiality does not require specific evidence of corruption in the proceedings at issue.  And regardless, President Correa's control over the tenure and appointment of judges, his history of using this control to obtain the results he desires, and his relentless campaign against Chevron and in favor of the LAPs undoubtedly sent a clear message to the appellate panel:  As Correa himself said, "[O]ur indigenous friends" must win

(SA6217), and Chevron, the "enemy of our country" (SA6318), must lose.

Rather than addressing the evidence on the merits, Appellants attack the messenger. The district court relied in part on the testimony of Dr. Vladimiro Álvarez Grau, a distinguished Ecuadorian lawyer, former government minister, and commentator on Ecuadorian judicial affairs. SPA430–31 (609–10) n.1586. Appellants claim that Dr. Álvarez's testimony was colored by his status as a "political opponent of President Correa." Donz. 45; *see also* LAPs 60. But the district court described Álvarez as an "impressively credentialed expert who has practiced law in Ecuador for 43 years and has held numerous elected and appointed public offices and legal academic positions in that country." SPA430 (609) n.1586. The court considered and squarely rejected Appellants' charge of bias, explaining that it had "evaluated Álvarez's demeanor among other things and [found him] a credible witness," and noting that "Defendants offered no evidence to rebut Álvarez's testimony." SPA431 (609–610) n.1586. That assessment is entitled to substantial deference; this Court "[is] not allowed to second-guess [it]." *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

In addition to crediting Dr. Álvarez's testimony, the district court based its findings on historical facts about the structure and operation of the Ecuadorian judiciary. *See* SPA432–40 (610–14). Appellants do not dispute those facts, which were supported at trial by contemporaneous press accounts, government reports,

and other sources.  *See generally* A1407–74 (Álvarez testimony); *see also* SA1082

¶ 3 (testimony of expert witness Sandra Elena that "Ecuador lacks an impartial ju-

dicial system").  The district court also relied on recent State Department reports,

which concluded that Ecuadorian courts "were 'corrupt, ineffective, and protective

of those in power.'"  SPA440–41 (614) (quoting 2010 and 2011 reports).  As the

district court observed, those reports "described 'the susceptibility of the judiciary

to bribes for favorable decisions and resolution of legal cases and on judges parcel-

ing out cases to outside lawyers who wrote judicial sentences on cases before the

court and sent them back to the presiding judge for signature.'"  SPA441 (615)

(quoting 2008 and 2009 reports).[37]

Donziger now argues for the first time — citing material outside the record

— that "the State Department reports have grown more favorable over time."

Donz. 108.  That contention is neither properly before this Court nor accurate.

Donziger notes that the phrase "generally considered independent and impartial"

appears in the reports for the first time in 2006.  *Id.* at 107.  That snippet would be

---

[37]  The LAPs acknowledge that the State Department and other agencies have is-
sued reports "deploring corruption in the Ecuadorian judiciary," but discount them
because they "do not chronicle a complete breakdown of the rule of law."  LAPs
62 n.47.  But a "complete breakdown of the rule of law" is not the standard here —
the question is "whether the foreign procedures are 'fundamentally fair' and 'do
not offend against basic fairness.'"  SPA430 (609) (quoting *Soc'y of Lloyd's v.
Ashenden*, 233 F.3d 473 (7th Cir. 2000)).

slim support for Donziger's characterization in any event, but Donziger fails to inform the Court that this phrase appears in a new subsection titled "Civil Judicial Procedures and Remedies" and refers specifically to the Administrative Conflicts Tribunal — a body that is not even relevant in this case.[38] Donziger also omits the fact that the highly relevant language about "judges parceling out cases to outside lawyers" appears for the first time in the 2006 Human Rights Report. SA477–81. Donziger's response is misleading and lacking in substance, and it provides no basis for questioning the district court's findings.

Indeed, even Appellants' own witnesses confirmed the decline of the Ecuadorian judiciary in recent years. Alejandro Ponce Villacís, whom Donziger described as a law professor on whom he "relied to a great degree" (SA4327) testified that in 2007 he believed that the administration of justice in Ecuador was worse than it had been ten years earlier (SA4003). As the district court found, Ponce told Donziger around that same time that "'[a]ll the judges here are corrupt.'" SPA442 (615) (quoting SA4682; SA4683–84). Donziger responded, "They're all corrupt! It's — it's their birthright to be corrupt.'" *Id.* The district court found that this and many other statements by Donziger and his co-

---

[38] The sentence from which Donziger quotes states, in its entirety: "Civilian courts and the Administrative Conflicts Tribunal, generally considered independent and impartial, handle lawsuits seeking damages for, or cessation of, human rights violations." SA5918–28 (2008 Human Rights Report: Ecuador).

conspirators "evidence their acknowledgment that the Ecuadorian judiciary does not provide impartial tribunals." SPA442–43 (615–16) (citing SA4667; SA4668–70; SA4677; SA4678–79; SA4680; SA4681; SA4685; SA4686–88; SA4732; SA4733–36; SA4737; SA4738–41).

### 3. The District Court's Findings Regarding the Ecuadorian Judiciary Comport with Principles of Comity

Appellants contend that principles of international comity barred the district court from enjoining Appellants or finding that the Ecuadorian judiciary does not adhere to basic standards of fairness and due process. LAPs 63–65; Donz. 84–86, 90–91.[39] A district court's application of comity considerations is reviewed under an abuse of discretion standard. *AEP Energy Servs. Gas Holding Co. v. Bank of Am.*, 626 F.3d 699, 719 (2d Cir. 2010); *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 856 (2d Cir. 1997). The decision below more than clears that bar. Indeed, principles of comity strongly support the district court's examination of this issue and its findings, and this Court's decision in *Naranjo* does not suggest otherwise.

Because comity requires "having due regard" to "the rights of [the forum's] own citizens, or of other persons who are under the protection of its laws" (*Hilton*

---

[39] The LAPs even go so far as to ask this Court to make arrangements to "administer[] the proceeds" of the judgment — a step that would surely require recognition of that judgment. LAPs 65.

*v. Guyot*, 159 U.S. 113, 164 (1895)), a court must evaluate the fairness of a foreign judgment (and the procedures that gave rise to it) before enforcing it.  Comity "is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency." *Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms Co.*, 466 F.3d 88, 92 (2d Cir. 2006) (quotation marks and citation omitted).  "The principle of comity has never meant categorical deference to foreign proceedings." *In re Treco*, 240 F.3d 148, 157 (2d Cir. 2001).  To the contrary, "[n]o nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum." *Pravin*, 109 F.3d at 854 (quotation marks omitted).  Courts "will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interest of the United States." *Id.*

Comity does not allow, let alone require, U.S. courts to rubber-stamp a fraudulent foreign judgment or ignore a racketeering scheme just because it involves misconduct in another country.  When a "foreign act is inherently inconsistent with the policies underlying comity," deference could "tend . . . to legitimize" the disfavored conduct, thereby "undercutting" the very "goals" that comity is designed to "serv[e]." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984).  That is precisely why courts sometimes decline to recognize foreign judgments:  "to facilitate trust among nations and their

judicial systems by preventing one jurisdiction from using the trappings of sovereignty to engage in a sort of seignorage by which easy judgments are minted and sold to any plaintiff willing to pay for them." *Naranjo*, 667 F.3d at 241.

Federal and New York law both require U.S. courts to examine a foreign legal system before giving preclusive effect to its decisions. *See Ackerman v. Levine*, 788 F.2d 830, 842 n.12 (2d Cir. 1986); *Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997); NY CPLR 5303, 5304(a)(1). And "due process requires that no other jurisdiction shall give effect, even as a matter of comity, to a judgment elsewhere acquired without due process." *Griffin v. Griffin*, 327 U.S. 220, 229 (1946). This principle is codified in New York's Recognition Act, which prohibits courts from recognizing a foreign judgment "rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law." NY CPLR 5304(a)(1).[40]

---

[40] The obligation to examine the fairness of foreign courts arises in a variety of contexts. *See* SPA430 (609) n.1585; *see also Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 587–88 (2d Cir. 1983) (refusing to enforce contractual forum selection clause because of the inadequacy of the Iranian judicial system); *Shardar v. Att'y Gen. of U.S.*, 503 F.3d 308, 318 (3d Cir. 2007) (reopening petitioner's asylum claim because "the court system in Bangladesh is corrupt"); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1137 (9th Cir. 2004) (evaluating evidence of judicial and political corruption in Armenia and holding the country's "judicial system is not independent"); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985) (declining to enforce forum selection clause due to the political environment of Iran).

The cases cited by the LAPs do not suggest otherwise. LAPs 63–65. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), recognized that the courts of one nation generally will not evaluate the validity of a foreign sovereign's public acts within its own territory, but that decision does not require uncritical deference to foreign acts. In *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), the Supreme Court criticized the Ninth Circuit for paying "little heed to the risks to international comity its expansive view of general jurisdiction posed." *Id.* at 763. This case presents quite a different situation: The district court made considered determinations about the Lago Agrio judgment based on overwhelming evidence and largely unchallenged factual findings.[41]

While Appellants insist that this Court's decision in *Naranjo* compelled the district court to accept the Lago Agrio judgment without examining the fairness of

---

[41] The ROE refers in its proposed amicus curiae brief (*see* 826 Dkt. 112-2) to the Third Circuit's opinion in *In re Chevron Corp.*, 650 F.3d 276 (3d Cir. 2011), which states: "Though it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system." *Id.* at 294. The decision in *In re Chevron Corp.* dealt narrowly with the application of the crime-fraud exception — which ultimately raised factual issues that the court remanded for further consideration. *See id.* To the extent the Third Circuit expressed reluctance, at that early phase of the litigation, to make rulings concerning the impartiality of the Ecuador's judiciary, this was because "the circumstances supporting [Chevron's] claim of fraud largely are allegations and allegations are not factual findings." *Id*. (emphasis added). Here, by contrast, Chevron has proven its claims of fraud by clear and convincing evidence in a lengthy trial, and Appellants do not challenge the district court's detailed factual findings as clearly erroneous.

the Lago Agrio proceedings and the Ecuadorian judiciary more generally, they are wrong. Indeed, this Court recognized in *Naranjo* that when a foreign judgment creditor puts the validity of its judgment at issue "in a pending action" by raising it as an "affirmative defense," U.S. courts must assess the validity of that judgment before giving it effect. *Naranjo*, 667 F.3d at 241 (citing NY CPLR 5303). This is exactly what happened here. Appellants put the validity of the Ecuadorian court decisions at issue throughout these proceedings under the guise of collateral estoppel, comity, and, now, their appellate cleansing theory — and it is Appellants' litigation strategy that necessitated the district court's recognition analysis. *See* Argument Section IV.B, *infra*. While Donziger suggests that *Naranjo* somehow foreclosed this inquiry, in fact the court did no such thing. *See Naranjo*, 667 F.3d at 246 n.17 ("[W]e express no views on the merits of the parties' various charges and counter-charges regarding the Ecuadorian legal system . . . , which may be addressed as relevant in other litigation before the district court or elsewhere.").

In sum, the district court's rulings regarding the Lago Agrio judgment and the appellate orders fully accorded with principles of comity. Its thorough consideration of the evidence and careful tailoring of injunctive relief underscore the respect for diverse judicial systems that it brought to this task.

### C. Donziger's Allegations of Environmental Harm Are Irrelevant, Unsupported by the Record, and False

Appellants claim that Chevron did not contest allegations of environmental

harm, and that the district court "acknowledged" such harm. *See* Donz. 2, 6; LAPs 47–48. These allegations are false. And while they have been one of Appellants' constant refrains throughout this litigation, they were irrelevant to the legal claims before the district court and are irrelevant here as well.[42] The only issue presented in this action is whether Donziger and the LAPs operated and engaged in a pattern of racketeering activities to pressure and extort Chevron. As the district court explained, "[t]he issue here is not what happened in the Oriente more than twenty years ago and who, if anyone, now is responsible for any wrongs then done." SPA16 (385).

Though neither Chevron nor the district court had any obligation to address these allegations, they are false. They are not supported by the evidence Donziger cites — where he cites anything at all — and many of them are, in fact, rebutted by the evidence that is in the record. For example, Donziger claims that TexPet's use of unlined pits "fell below industry standards." Donz. 6. The TexPet memorandum he cites, however, does not say that. To the contrary, it states that "the possibility of pollution by our current waste disposal into pits is very minimal[.]" A2072–73. Donziger cites another memorandum, which observes that the use of pits to remove oil from produced water "can no longer be considered 'good prac-

---

[42] The district court held on multiple occasions that Appellants' environmental allegations were not relevant to this action. *E.g.*, 691 Dkt. 679 at 11; A513.

tice.'" Donz. 7. That document concludes that the operation nonetheless "shows no evidence of environmental impact of the pits beyond the actual facility site" (A1911) and that "petroleum operations have had a relatively insignificant impact on the environment outside of facility sites" (A1909).[43]

Donziger criticizes TexPet's disposal of produced water into surface water (Donz. 6), but the record confirms that this practice, too, was legal in Ecuador when TexPet operated there (SA7131), and commonplace in the U.S. at that time (SA7129–30). Donziger also claims that Texaco's operations resulted in "toxic sludge" and exposure to "contaminated water" (Donz. 7–8), but the actual sample data proves otherwise. Of the 221 water samples taken during the Lago Agrio litigation, "99% . . . , including 100% of the public drinking water supplies, meet the most stringent drinking water criteria . . . established by Ecuador, the U.S. Environmental Protection Agency . . . , and the World Health Organization . . . during the period in which Texpet operated the Concession." SA6981–82. In fact, the LAPs stopped testing for contamination of drinking water during the Lago Agrio litigation because they found no evidence supporting their claims. *See* SA4716; SA4717–26; 691 Dkt. 486 ¶¶ 100, 150–51.

---

[43] The record shows that the use of unlined pits has at all times been legal in Ecuador, and that 97.5% of U.S. pits in use in 1984 were unlined as well. SA7122–27.

Donziger also alleges that TexPet's operations resulted in increased "cancer deaths, miscarriages, [and] birth defects." Donz. 8. This assertion is also bereft of evidence to support it. He cites an article from *The New Yorker* — not admissible evidence — and even there, edits the quote to conceal that the article simply recites what "the plaintiffs contended." *Id.* (citing Patrick Radden Keefe, *Reversal of Fortune*, The New Yorker (Jan. 9, 2012), *available at* http://nyr.kr/1wuTEbd).

Finally, Donziger claims that "Chevron's own handpicked evidence" confirmed its liability. Donz. 20 (citing A2330–31; A2348–50). But he offers only a hearsay expert report submitted by the ROE in the pending arbitration, not any of Chevron's evidence. *See* A2282–2932; A3140–3385. And the numbers he selects from it are spurious. Donziger claims that "experts found significant toxic contamination at 91% of the wells operated solely by Chevron," and he identifies various compounds that he asserts are found at these "sites." Donz. 20. But when the ROE's report states that 91 percent of sites were contaminated, it means a single sample from anywhere at the site exceeded regulatory criteria that were not even in force when TexPet operated. Additionally, the report ignores the impact of Petroecuador's two decades of continued operations in the region. *Compare* A2330 (using TPH limit effective March 1997), *with* SA334 (discussing TPH limits applicable to remediation).

*       *       *

The district court's factual findings establish that Donziger and his associates have been engaged in an ongoing racketeering scheme, and that he has injured and, absent relief, will continue to injure Chevron through his racketeering. His attempts to evade this judgment by positing intervening causes, the need for "comity," and other objections were all rightly rejected by the district court. The relief the district court entered is narrowly drawn and will, at least in part, "prevent and restrain" further racketeering and irreparable harm. This Court should affirm the district court's judgment and relief as to Donziger.

## IV. The District Court Properly Granted Chevron Equitable Relief from the Fraudulently Procured Lago Agrio Judgment

Separate from its power to enjoin Donziger under RICO, the district court had jurisdiction and the authority through an independent action to enjoin all Appellants from benefiting from the fraudulent Lago Agrio judgment or enforcing it in the United States. While the LAPs challenge the district court's exercise of personal jurisdiction over them, Donziger does not, and could not, argue that he is not subject to the district court's jurisdiction. And through his conduct, along with that of their other New York agents, the LAPs purposefully availed themselves of New York and the protection of its laws. Moreover, when directed to defend their personal jurisdiction objection by producing documents related to their management of these New York agents, they refused and affirmatively obstructed the district court's orders, thus forfeiting their defense.

150

Because it had jurisdiction over Appellants, the district court had the authority to enter equitable relief against them. Independent actions for equitable relief from fraudulent judgments entered in foreign courts are a long-standing feature of American law, as this Court has recognized. *Griffith v. Bank of N.Y.*, 147 F.2d 899, 903 (2d Cir. 1945) ("[J]udgments obtained by extrinsic fraud can be attacked collaterally."); *see also McDonald v. McDonald*, 228 A.D. 341, 344 (1st Dep't 1930) ("The rule is that a judgment rendered . . . in a foreign country[] may be attacked collaterally . . . for fraud on the court, or between the parties to the action.").

## A. The District Court Has Personal Jurisdiction Over the LAPs

The district court correctly concluded that the LAPs "transacted business" in New York, that Chevron's claims "arise out" of the LAPs' New York conduct, and that exercising personal jurisdiction over the LAPs accords with due process. SPA458–64, 467 (624–28). Additionally, the district court correctly held that the LAPs forfeited their personal jurisdiction defense by refusing to produce documents held by their Ecuadorian agents. *See* Statement of the Case, *supra*; SPA446 (617); A748–51. The LAPs' contrary arguments (*see* LAPs 66–77) lack merit.

### 1. The District Court Properly Exercised Specific Personal Jurisdiction Over the LAPs Under NY CPLR 302

This Court should affirm the district court's rejection of the LAPs' personal jurisdiction defense. New York's long-arm statute authorizes New York courts to

"exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . transacts any business within the state."  NY CPLR 302(a).  Jurisdiction under this provision requires "'an articulable nexus,' or a 'substantial relationship,' between the claim asserted and the actions that occurred in New York" (*Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988) and *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981))), and the exercise of jurisdiction must be consistent with due process (*see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)).  The district court correctly found that each of these requirements was satisfied.  *See* SPA446–67 (617–28).

First, the district court properly found that the LAPs transacted business in New York through their agent, Donziger.  SPA460–63 (624–26).  Donziger is a New York resident and a New York lawyer; he performed legal work for the LAPs while in New York, including initiating and intervening in lawsuits in New York courts.  The LAPs' retention agreements with him contain New York choice-of-law clauses.  *Id.*  These acts plainly constitute "transacting business" under CPLR 302(a)(1).  *See Fischbarg v. Doucet*, 38 A.D.3d 270, 273 (1st Dep't 2007), *aff'd*, 9 N.Y.3d 375 (2007) (finding personal jurisdiction over California plaintiff who hired New York lawyer); *see also Sunward Elecs.*, *Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) ("A choice of law clause is a significant factor in a personal ju-

risdiction analysis because the parties, by so choosing, invoke the benefits and pro-
tections of New York law."); *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951, 2012 WL
1681167, at *3 (S.D.N.Y. May 9, 2012) ("[A]ppeal to courts located in New York
constituted purposeful availment of the state's privileges.").

Moreover, many of the acts Donziger committed on the LAPs' behalf oc-
curred in New York. He orchestrated the ghostwriting of the Cabrera report from
New York, "he recruited investors, lawyers, and experts in and from New York,"
and "he arranged for the state's attorney general and the city comptroller to exert
pressure on Chevron." SPA462 (626). "There can be no serious doubt that the
[LAPs] transacted business in New York." *Id.*

Citing *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501 (2007), and *Marvel Charac-
ters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013), the LAPs contend that Section
302(a)(1) "is inapplicable" when a "non-domiciliary's sole contact with New York
is through an 'agent' who is seeking to advance the non-domiciliary's legal claims
that arise under, and are pending under, the laws of another forum." LAPs 67 n.50.
But *Ehrenfeld* held only that a foreign national did not "transact[] business" in
New York merely by sending demand letters and attempting to serve a New York
plaintiff with process for a foreign libel action. 9 N.Y.3d at 504–05, 509. And
*Marvel Characters* rejected personal jurisdiction based only on "a communication
from out-of-state, required for the exercise of rights conferred under a federal stat-

ute." 726 F.3d at 130. As explained above, the LAPs' extensive New York contacts dwarf the limited, ministerial acts deemed insufficient in *Ehrenfeld* and *Marvel Characters*.

Second, the district court also properly found that "Chevron's fraud claims arise out of many of Donziger's activities in New York." SPA463 (626). The arising-out-of (or "relatedness") requirement is "relatively permissive." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339–40 (2012). It does not require "causation," and excludes only claims that are "completely unmoored" from New York conduct. *Id.*

The evidence amply demonstrates that Chevron's claims arise out of the LAPs' New York contacts. Donziger's New York activities were all part of the same scheme, in which the fraudulent judgment was a key threat in the campaign against Chevron. Donziger maintained New York bank accounts that were "essential to support the very operation that proximately caused Chevron's injury" (SPA463 (626)), and from which he transferred funds to Ecuador to bribe Judge Zambrano's ghostwriter, and to fund the LAPs' work product that appears in the judgment itself. *See* SPA245–48 (509–11) nn.955–56 (citing SA6018.1; SA6036–42; SA6043–74; SA6075–80); SA5660–76 (Banco Pichincha Account Summary for Selva Viva); SPA212–23 (492–98) n.863 (citing SA6122–31). And the ghost-written judgment relies heavily on the ghostwritten Cabrera report (SPA545–57

(681–88)), the production of which Donziger managed from New York (SPA463, 115–22 (626, 439–44)).

The LAPs' response is to invoke two cases that concern only *general* personal jurisdiction. LAPs 66–70 (discussing *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) and *Helicopteros v. Hall*, 466 U.S. 408 (1984)). Those cases are inapposite to the specific jurisdiction finding below, and the LAPs do not otherwise show that their New York conduct is "completely unmoored" from Chevron's claims. *Licci*, 20 N.Y.3d at 339.

Third, the district court properly found that its exercise of personal jurisdiction comported with due process because the LAPs "purposefully have availed themselves of the benefits of New York and its laws and could foresee being haled into court here," and that doing so "would comport with fair play and substantial justice." SPA465 (627–28). By means of the lawsuits that Donziger filed and maintained on their behalf and the bank accounts that supported his schemes, the LAPs extensively availed themselves of the benefits of New York and its laws. They cannot credibly maintain that the district court "ignored the need for personal volitional affiliation with New York by the Ecuadorian clients." LAPs 70.

Moreover, Donziger's conduct was not "wholly autonomous" (LAPs 71), and the district court did not rest its contrary finding solely on the "mere existence of a formal agency relationship," as the LAPs assert (*id.*). "An attorney has the

implied authority to take all steps necessary in an action which he has been hired to bring." *Elman v. Belson*, 32 A.D.2d 422, 426 (2d Dep't 1969). "A company [or individual] cannot deputize another to take certain actions on its behalf and then disclaim knowledge or interest when those actions give rise to a legal dispute." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004). Here, "the LAPs effectively gave Donziger, Fajardo, and their other lawyers carte blanche to do as they saw fit." SPA461 (625) n.1731 (citing SA4082–83 (J. Piaguaje trial testimony)). Indeed, even now, the LAPs make no effort to disavow Donziger's conduct. On the contrary, they seek to benefit from it, suggesting that this Court "consider the creation of a vehicle, fully responsive to the plaintiffs, capable of administering the proceeds of the $8.65 billion Ecuadorian remediation judgment[.]" LAPs 65; *see Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 538 (1967) (holding that where a party "receive[d] considerable benefits from" its agents' activities, it "may not be heard to complain about the burdens").

The LAPs contend that they lacked knowledge or control over Donziger's conduct. But the record contradicts that characterization, as the district court found. *See* SPA350 (566) n.1304. Specifically, the record established that:

- Appellant Hugo Camacho Naranjo read Chevron's complaint, which was filed before the Ecuadorian court rendered its judgment. SA6135–36. He also testified that he knew Chevron alleged that the LAP team had committed fraud. SA680. Likewise, Appellant Javier Piaguaje Payaguaje testified that he was aware of Chevron's allegations after Chevron filed its complaint. SA1690–91; SA4129.

- The LAPs have continued to approve Donziger's conduct and retain him as their attorney even long after they were on notice of Donziger and his team's wrongful acts. Their retention agreement with Donziger was executed on their behalf in January 2011 by Fajardo (SA5597–609), whose actions they have "ratif[ied] and approve[d]," whether "carried out directly or through other persons" (*see* SA5268–69; SA5319). Throughout and even after the Lago Agrio litigation, Donziger traveled to Ecuador at least monthly. *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 211 (S.D.N.Y 2013). He also communicated with Pablo Fajardo and his Ecuadorian colleagues "multiple times a day." *Id.* 211–12. Camacho testified that he understood he was ratifying Fajardo's actions in order to allow the Lago Agrio litigation to continue. SA679. Piaguaje also testified that he approved of every action taken by Fajardo on behalf of the LAPs in any court, as well as every action by Fajardo to raise money. SA4082–85; *see also* SA5268–69; SA5319.

The LAPs have similarly ratified Donziger's actions and approved of his continued retention through the Assembly — an organization formed, according to a LAPs trial witness, "to meet on a regular basis and to monitor the lawsuit and to work with the lawyers to make their views known about how they thought the lawsuit should be litigated." SPA45 (401) n.130; SA6012; SA6265. Donziger appeared at a January 15, 2013 meeting and gave a presentation on the U.S. litigation. SA6261–67. And at an October 2010 Assembly meeting, the organization stated its "unconditional and total support for [its] attorney and colleague, Steven

157

Donziger." SA6254. In light of this evidence, the LAPs cannot now disclaim their extensive availment of New York's laws through Donziger.

## 2. The District Court Acted Well Within Its Discretion in Striking the LAPs' Personal Jurisdiction Defense

In any event, the LAPs have not established that the district court abused its discretion in striking their personal jurisdiction defense. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982) (describing standard).

### a. The District Court Applied the Correct Legal Standard

The district court struck the LAPs' personal jurisdiction defense after finding that doing so was "just" and that "the documents Chevron seeks . . . go[] to the question of this Court's personal jurisdiction over the [LAPs]." A750; *see also* A721–24; A747–50. The LAPs concede that Federal Rule of Civil Procedure 37 empowers the district court to strike a personal jurisdiction defense as a discovery sanction. LAPs 74. But they argue that, to do so, there must be a "culpable, considered refusal to respond to jurisdictional discovery [and] a plausible basis for suspecting that the failure to respond to discovery is part of a cover-up designed to hide important (and otherwise unavailable) jurisdictional facts." LAPs 74–75. And they urge that the sanctioned party must be "(a) personally culpable; (b) in a position to respond to the discovery orders personally; (c) plausibly believed to be hiding significant information; and [that] (d) no other means of obtaining the in-

158

formation exist." LAPs 75.

The LAPs already waived this argument by (correctly) conceding to the district court that "[a] court may impose jurisdictional sanctions if: 1) the sanction is just; and 2) the sanction is 'specifically related to the particular "claim" which was at issue in the order to provide discovery.'" 691 Dkt. 1631 at 22 (quoting *Ins. Corp. of Ireland*, 456 U.S. at 707). Their concession was appropriate because it is what the Supreme Court held in *Insurance Corporation of Ireland*: that "a sanction consisting of a finding of personal jurisdiction" was subject to the same considerations applicable to all discovery sanctions. 456 U.S. at 706. "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* at 707. The Court expressly rejected the argument the LAPs make here: that "there is something unique about the requirement of personal jurisdiction, which prevents it from being established or waived like other rights." *Id.* at 706.

Neither district court case cited by the LAPs (LAPs 75) conflicts with *Insurance Corporation of Ireland*. Indeed, both follow it. In one, the district court described the deceptive tactics employed by the defendant to evade discovery, but did not suggest that such conduct was a necessary predicate to striking the defendant's jurisdictional defense. *Satcorp Int'l Grp. v. China Nat'l Imp. & Exp. Co.*, 917 F. Supp. 271, 273–77 (S.D.N.Y. 1996) (Kaplan, J.). In the other, the district court de-

scribed the "willful" nature of the defendant's misconduct, but likewise did not

suggest that such showing was required to exercise personal jurisdiction over the

defendant. *Volkart Bros.*, *Inc. v. M/V Palm Trader*, 130 F.R.D. 285, 289–90

(S.D.N.Y. 1990).

### b. The LAPs' Bad Faith Conduct Obstructed Discovery into Their Purposeful Availment of New York and Its Laws, Thus Justifying the Striking of Their Personal Jurisdiction Defense

After a three-day evidentiary hearing, the district court issued a lengthy

opinion finding that the LAPs acted in "bad faith in their failure to produce docu-

ments" (A655), that they had "the practical ability to produce [the documents]"

(*id.*), and that the documents were "necessary to resolve the LAPs' jurisdictional

challenge" and "could not be obtained by other means" (A704; A715). The district

court struck the LAPs' personal jurisdiction defense based on those findings. The

LAPs make three arguments against the district court's sanction. None has merit.

First, the LAPs argue that "[n]o plausible basis exists to believe that a trove

of hidden facts exists linking any of the Lago Agrio plaintiffs to New York."

LAPs 75. The evidence at trial established, however, that the LAPs maintain a

"roomful" of documents in Ecuador under the control of their Ecuadorian lawyers,

and that these documents include the minutes of the meetings of the organization

through which they monitor and control Donziger's New York activities. *See, e.g.*,

SA4381; SA4383; SA6261–67; SPA580 (701) n.169. The district court found that

Chevron's discovery requests related to the LAPs' control of their attorneys and agents, including Donziger, and "[d]iscovery of those communications and activities is necessary to resolve the LAPs' jurisdictional challenge." A704; *see also* 691 Dkt. 1756 at 1–3. And the district court found that the LAPs "acted in bad faith in their failure to produce documents" (A655), which alone is "sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002). The LAPs do not offer any basis for rejecting these findings.

Second, the LAPs argue — without any evidentiary support — that they have not "engaged in culpable behavior" because they "were not in a position to direct Mr. Donziger, much less Ecuadorian counsel." LAPs 76. But Donziger and Ecuadorian counsel are the LAPs' own lawyers. As the district court held, the LAPs cannot disclaim liability for the acts of their agents based on a lack of knowledge or control. SPA460–61 (624–25); *see also Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1355 (S.D.N.Y. 1988) ("When . . . agents are acting within the scope of their authority, the principal is liable for any acts of fraud the agents commit."). Moreover, the LAPs point to no evidence undermining the district court's finding that they "have the practical ability to produce the documents" — indeed, Fajardo selectively did so. A655; A695–97;

161

A732; A742–47.

Third, the LAPs argue that the documents in question were "fully discovera-ble from Mr. Donziger, or from a host of alternative sources." LAPs 77. But Donziger evaded the same discovery as the LAPs, was subject to the same order, and likewise refused to comply with that order. *See* A673–95. The LAPs cite no evidence of any alternative sources, or contest the district court's finding that "[t]he bulk of the information sought in Chevron's document requests could not be obtained by other means." A715.

## B. Claims for Equitable Relief from Fraudulently Procured Judgments Are a Well Established Feature of American Law

Appellants dispute the existence of the independent action for equitable re-lief from a fraudulent judgment; they also contend that such an action can only be brought in the court that issued the original judgment, that it cannot be applied to a foreign judgment, and that the New York Recognition Act has displaced this form of action. Donz. 88–92; LAPs 83–85. These arguments all rest on misconceptions about the source and scope of the independent action.

### 1. Federal Courts in New York Are Authorized to Relieve Parties from Fraudulently Procured Judgments

American courts have long been authorized to relieve a party from a judg-ment in egregious circumstances. Such relief may be sought "offensively — that is, by a plaintiff" in an independent action. *Morrel v. Nationwide Mut. Fire Ins.*

*Co.*, 188 F.3d 218, 223 (4th Cir. 1999).  Courts have the power to issue a variety of equitable remedies to protect defrauded judgment debtors, including "restraining the beneficiaries of the judgment from taking any benefit whatever from it" — which is precisely the relief issued in this case.  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944).[44]

It is "well settled" that New York courts enjoy this widely recognized authority.  *Griffith*, 147 F.2d at 903; *see also Oppenheimer v. Westcott*, 47 N.Y.2d 595, 602–03 (1979) (recognizing the "independent action route" to "attack a judgment").  As one leading treatise explains, "[t]oday, a litigant may attack a judgment on the basis of fraud either by . . . motion in the original action to vacate the judgment, or by an independent or collateral attack."  10 Jack B. Weinstein et al., *New York Civil Practice: CPLR* § 5015.08 (2014); *see generally* 73 N.Y. Jur. 2d Judgments ch. VIII, pt. D (2014).

Moreover, the Federal Rules expressly recognize the independent action.  Fed. R. Civ. P. 60(d)(1) ("This rule does not limit a court's power to . . . entertain

---

[44]  *See also* Henry Campbell Black, *A Treatise on the Law of Judgments* § 356, at 437 (1891) ("The power and jurisdiction of the courts of equity to enjoin a party from enforcing a judgment which he has obtained, when it would be against conscience to permit him to do so, is . . . firmly established."); John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 919a, at 605 (5th ed. 1941) ("The equitable jurisdiction to . . . restrain judgments and decrees of any court which have been obtained by a fraud practiced upon the court and the losing party[] is well settled and familiar.").

an independent action to relieve a party from a judgment, order or proceeding."). As the Supreme Court has observed, although "nearly all of the old forms of obtaining relief from a judgment" were abolished by the 1946 amendments to the Federal Rules of Civil Procedure, this "revision made equally clear . . . that one of the old forms, *i.e.*, the 'independent action,' still survived." *United States v. Beggerly*, 524 U.S. 38, 45 (1998).

### 2. Independent Actions for Relief from a Fraudulent Judgment Need Not Be Brought in the Issuing Court

Contrary to Donziger's assertion (Donz. 89–90), there is no requirement that an independent action be brought in the court that issued the original judgment. "[A] court of equity may grant relief from a judgment rendered in a foreign state[.]" *Foreign Judgments*, 73 N.Y. Jur. 2d Judgments § 234 (2014). "The nature of the independent action is such that . . . the decree or judgment need not have been rendered by the court whose equitable jurisdiction is invoked." James Wm. Moore & Elizabeth B. A. Rogers, *Federal Relief from Civil Judgments*, 55 Yale L.J. 623, 653–54 (1946). In fact, the Advisory Committee's notes to the 1946 amendments to Rule 60 expressly provide that an independent action "may or may not be begun in the court which rendered the judgment." Fed. R. Civ. P. 60 advisory committee's notes.

This Court has recognized that federal courts may enjoin enforcement of a fraudulent judgment entered by a court of another jurisdiction. *See, e.g., Coving-*

*ton Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 732–34 (2d Cir. 1980) ("pass[ing] upon the validity" of a judgment entered by the Northern District of Georgia); *Hadden v. Rumsey Prods., Inc.*, 196 F.2d 92, 96 (2d Cir. 1952). Other circuits are in accord. *See Morrel*, 188 F.3d at 223; *Indian Head Nat'l Bank of Nashua v. Brunelle*, 689 F.2d 245, 248–49 (1st Cir. 1982); *Locklin v. Switzer Bros., Inc.*, 335 F.2d 331, 334 (7th Cir. 1964); *Bros. Inc. v. W. E. Grace Mfg. Co.*, 320 F.2d 594, 607 (5th Cir. 1963). New York state courts have repeatedly recognized this principle as well. *See, e.g.*, *Davis v. Cornue*, 151 N.Y. 172 (1896); *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348 (1901); *Averbuck v. Averbuck*, 270 A.D. 116, 118–19 (1st Dep't 1945).

Ignoring this wide swath of precedent, Donziger contends that *Crouse v. McVickar*, 207 N.Y. 213 (1912), permits a defrauded judgment debtor to seek relief only "in the original action." Donz. 89–90. This Court has already rejected that argument. *See Griffith*, 147 F.2d at 903. Not only does *Crouse* make no mention of prohibiting New York courts from enjoining judgments procured through egregious fraud, it "actually reiterates and re-enforces the general rule, well settled in New York, that judgments obtained by extrinsic fraud can be attacked collaterally." *Id.*[45]

---

[45] Likewise *Vinokur v. Penny Lane Owners Corp.*, 269 A.D.2d 226 (1st Dep't 2000), and *Khallad v. Blanc*, 96 A.D.3d 1574 (4th Dep't 2012) (Donz. 89–90), do

Donziger's citations to Wright & Miller and *Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir. 1964), are similarly unavailing. *See* Donz. 90. Donziger quotes an out-of-context description of a case referenced in the Wright & Miller treatise, while ignoring the section actually devoted to "Independent Actions for Relief" from judgments. That section states that independent actions "may be brought in any court of competent jurisdiction," including "in a court other than the one that gave the original judgment." Charles Alan Wright et al., 11 *Federal Practice & Procedure* § 2868 (3d ed. 2014).[46] And in *Lapin*, the Ninth Circuit held only that a Rule 60(b) action to modify a decree on the basis of "changed circumstances" could only be brought in the issuing court. 333 F.2d at 170. *Lapin* expressly declines "to hold that [considerations of comity] deprive all courts other than the issuing court of jurisdiction" over claims for equitable relief. *Id.* at 172.[47]

_____

not address whether egregious acts to defraud, such as bribery, could be raised in an independent action.

[46] While § 2868 analyzes "Independent Actions for Relief," the section Donziger cites (§ 2870) analyzes claims for "fraud on the court," which are distinct from independent actions for equitable relief. *See* 12 *Moore's Federal Practice – Civil* § 60.81 (2014) ("Although 'fraud on the court' will always support relief from a judgment, regardless of whether it is raised by motion under Rule 60(b), in an independent action, or sua sponte, it is a separate concept from the idea of an independent action in equity for relief from a judgment." (internal citations omitted)).

[47] Donziger cites additional cases in a footnote, without explanation. Donz. 90 n.19. Those cases do not discuss the availability of independent actions and do not support his argument. Indeed, several directly contradict him. For example, in *McDonald v. McDonald*, the court held that "a judgment rendered . . . *in a foreign*

### 3. Independent Actions Are Available to Provide Relief from Foreign Judgments

The authority to provide equitable relief extends to foreign proceedings, contrary to what Donziger suggests. Donz. 91–92. That principle dates back well over a century. *See* 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 899, at 238 (13th ed. 1886) (courts of equity may enjoin litigation between "parties to a suit in a foreign country"). And it has been applied consistently over the intervening years. *See Fraud as to Foreign Judgment*, 73 N.Y. Jur. 2d Judgments § 267 (2014); *see also, e.g.*, *Venizelos v. Venizelos*, 30 A.D.2d 856 (2d Dep't 1968) (enjoining enforcement of Greek judgment); *Tamimi v. Tamimi*, 38 A.D.2d 197 (2d Dep't 1972) (authorizing action to set aside Thai judgment); *Pentz v. Kuppinger*, 107 Cal. Rptr. 540, 596 (Ct. App. 1973) (permitting plaintiff to bring suit in California to enjoin enforcement of Mexican judgment); *Injunction Against Enforcement of Judgment Rendered in Foreign Country or Other State*, 64 A.L.R. 1136 (1930) ("[I]t is not uncommon for courts, by a decree operating *in personam* upon parties personally subject to the jurisdiction, to enjoin the enforcement of a judgment rendered in a foreign country or a sister state, even though the court which

---

*country*[] may be attacked collaterally . . . for fraud on the court, or between the parties to the action." 228 A.D. at 344 (emphasis added). And in *Trebilcox v. McAlpine*, 17 N.Y.S. 221 (3d Dep't 1891), the court held that a New York court "having jurisdiction of the parties, may adjudge that a judgment in another state is void because recovered by fraud." *Id.* at 222.

rendered the judgment had jurisdiction.").

The cases Donziger cites (Donz. 91–92, n.20) are inapposite. *Veltze v. Bucyrus-Erie Co.*, 154 F.R.D. 214 (E.D. Wis. 1994), addressed the narrow question of whether Rules 60(b)(5) and 60(b)(6) allowed the court to declare that a judgment debtor had satisfied a Peruvian judgment. In *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578 (7th Cir. 2008), the court held that sanctions issued pursuant to 28 U.S.C. § 1927, a statute that has nothing to do with this case, could not issue based on misconduct before a Mexican court. *Id.* at 585–88. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987), concerned federalism principles and abstention under *Younger v. Harris*, 401 U.S. 37 (1971), which likewise have no relevance to Chevron's claim for equitable relief. As for the 28 U.S.C. § 1782 proceeding that Donziger references (Donz. 91–92), the statement he points to reflected only the limited nature of the discovery proceeding, not any constraints on an independent action. *In re Chevron Corp. (Quarles)*, No. 3:10-cv-00686 (M.D. Tenn. Sept. 21, 2010), Dkt. 108.

### 4. The Recognition Act Does Not Displace New York Courts' Equitable Powers with Respect to Fraudulent Judgments, and *Naranjo* Does Not Suggest Otherwise

The Recognition Act does not displace or preempt the long-held power of New York courts to grant equitable relief from foreign judgments procured by fraud. *See* Donz. 88–89; LAPs 84. The New York Court of Appeals has "empha-

sized that a clear and specific legislative intent is required to override the common law and that such a prerogative must be unambiguous." *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 351 (2011) (quotation marks and citation omitted). Nothing in the text or legislative history of the Recognition Act demonstrates any such intent.

The Recognition Act "was principally a codification of pre-existing New York case law permitting the enforcement of foreign country money judgments." *Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313, 1318 n.6 (2d Cir. 1973). As the legislative history indicates, it "codifies, rather than reforms existing United States decision law respecting the recognition of foreign judgments." Judicial Conference Mem. in Support, Bill Jacket, L 1970, ch. 1981, at 5; *see also* Barbara Kulzer, *Recognition of Foreign Country Judgments in New York: The Uniform Foreign Money-Judgments Recognition Act*, 18 Buff. L. Rev. 1, 47 (1969) ("The Uniform Foreign Money Judgments Recognition Act was not intended to be a sweeping reform of the common law, but a codification of it . . . .").[48]

The power to provide relief from fraudulent judgments is wholly distinct from judgment enforcement. An action for such relief is not available to merely

---

[48] The New York Court of Appeals has relied upon this article in discerning the New York legislature's intent in passing the Recognition Act. *See CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V.*, 100 N.Y.2d 215, 221 & n.3 (2003).

"disappointed" litigants, and cannot be brought on the Recognition Act's wide-ranging grounds for non-recognition, such as lack of subject-matter jurisdiction, lack of notice, inconvenience, and First Amendment concerns. *See* NY CPLR 5304. It lies only when a judgment was obtained through a "grave miscarriage of justice" (*Beggerly*, 524 U.S. at 47), and such are the circumstances here.

Permitting equitable relief from foreign judgments would in no way render the Recognition Act a "nullity," as the LAPs suggest. LAPs 84. The independent action does not provide a vehicle for recognition and enforcement, which is the purview of the Recognition Act. Nor does it undermine the statute's goal of promoting recognition of New York judgments abroad, since the Recognition Act itself has an exception for a judgment procured by fraud. *See* NY CPLR 5304(b)(3).

The LAPs also assert that under the law of the case, based on *Naranjo*, the district court was not allowed to enjoin enforcement of a money judgment in the U.S. unless the LAPs attempt to enforce that judgment here. LAPs 84. But *Naranjo* holds no such thing. This Court made clear in *Naranjo* that it was considering the availability of the declaratory relief that Chevron sought only under the Recognition Act (Count 9), and not on any other grounds. *See* 667 F.3d at 240, 245.[49] In their successful opposition to Chevron's petition for certiorari in *Na-*

---

[49] Appellants mischaracterize this action as "on remand" from *Naranjo* (826 Dkt. 61-1 ¶ 3), such that *Naranjo* is "the law of this case." LAPs 84. This Court im-

*ranjo*, Appellants acknowledged, indeed advanced, this point, describing the decision as "turn[ing] largely on careful interpretation of a New York statute [i.e., the Recognition Act]." Br. in Opp. to Petition for a Writ of Certiorari, *Chevron Corp. v. Naranjo*, No. 11-1428 (July 12, 2012), at 21.[50] And in any event, Appellants have placed the recognition of the Ecuadorian court orders at issue in the course of this litigation, as their heavy emphasis on the appellate court's orders confirms. *See* Argument Section III.B.3, *supra*.

---

plicitly rejected that characterization at oral argument on Appellants' 2013 writ petition. *See* SA548 (Judge Parker: "Judge Kaplan is adjudicating a different case. He's adjudicating Chevron's RICO claim, which is another case."); SA551 (Judge Livingston: "[T]he cases were severed and the [*Naranjo*] panel expressly says we decide only those issues that related to the severed declaratory judgment claim."); *see also* SA545–46 (Judge Livingston: "I'm having trouble seeing . . . how the letter or spirit of our mandate [in Naranjo] has anything to do with the adjudication of these RICO and common law fraud claims when the prior panel expressly said, we're not reaching those.").

[50] If the Court is inclined to adopt Appellants' interpretation of the Recognition Act as precluding an independent action under New York law, it may nonetheless affirm the judgment based purely on federal law. Federal courts have jurisdiction over "'all suits . . . in equity.'" *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). Accordingly, a federal court can "entertain an independent action in equity for relief from judgment on the basis of its independent and substantive equitable jurisdiction." *United States v. Timmons*, 672 F.2d 1373, 1378 (11th Cir. 1982); *see also Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945); *United States v. Razmilovic*, 419 F.3d 134, 141, n.7 (2d Cir. 2005) (stating that the All Writs Act, 28 U.S.C. § 1651(a), grants federal courts all powers "that would be authorized under traditional equitable jurisdiction"). As the district court found, and Appellants do not dispute, the district court had diversity jurisdiction over this action. SPA318 (547) n.1228.

### 5. Ecuadorian Law Does Not Apply to Chevron's Independent Action for Equitable Relief

Although Donziger argues that Ecuadorian law applies to Chevron's independent action for equitable relief (Donz. 92), he has established no "actual conflict" between Ecuadorian law and either New York or federal law. That is the "first step" in any choice of law analysis, and eliminates the need to consider the issue further. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (quotation marks and citation omitted). As the district court found, it is illegal under Ecuadorian law to ghostwrite judicial opinions and bribe judges and independent, court-appointed experts, and that is the gravamen of an independent action as well. SPA212 (492), 225 (499), 334 (557) n.1272. Indeed, if Ecuadorian law were otherwise, it would be repugnant to New York public policy and could not be given force here in any event. *See Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 78–80 (1993).

The only Ecuadorian law that Donziger identifies is the Collusion Prosecution Act. Donz. 92. Donziger waived this argument by failing to address the Collusion Prosecution Act below, as required by general waiver rules and by Rule 44.1. In any event, it would not change the analysis. According to Donziger, that statute is a "remedy . . . which creates a private right of action to air collateral allegations of fraud in Ecuadorian court proceedings." Donz. 92. "New York courts classify legal rules as 'substantive' when they relate closely to an underlying

right and 'procedural' when they deal with the remedy by which that right is enforced." *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 992 F. Supp. 2d 316, 319 (S.D.N.Y. 2014) (quotation marks and citation omitted). Thus, the Collusion Prosecution Act is procedural in nature and, in New York, "procedural questions are always governed by the law of the forum." *Hausman v. Buckley*, 299 F.2d 696, 700 (2d Cir. 1962).[51]

### C. Appellants Were on Notice That Chevron Sought Equitable Relief from the Fraudulently Procured Judgment

Donziger claims he lacked notice that Chevron was seeking equitable relief from the Lago Agrio judgment. Donz. 87. He is wrong; Chevron provided notice by pleading its equitable claim in its complaint. After pleading examples of Appellants' fraud "before the Lago Agrio court" (SA254), Chevron alleged that, because of Appellants' fraud, it was "entitled to" a "permanent injunction that enjoins [Appellants]" from seeking to enforce the Lago Agrio judgment (SA255). And Chevron expressly requested "equitable relief as appropriate pursuant to applicable law," including "a permanent injunction" preventing Appellants from enforcing the judgment. SA265.

Even if Chevron had not specifically pleaded this claim, the district court properly amended Chevron's complaint under Federal Rule of Civil Procedure

---

[51] Nor is the Collusion Prosecution Act an adequate remedy at law. *See* Argument Section IV.D, *infra*.

15(b) to include it. A district court may amend a pleading to include an issue when the record demonstrates that the parties recognized that the issue had entered the case at trial (*Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985)), and when a defendant was not "prejudiced by the implied amendment" because it "had a fair opportunity to defend" the issue. *United States v. Certain Real Prop. & Premises, Known as 890 Noyac Rd., Noyac, N.Y.*, 945 F.2d 1252, 1257 (2d Cir. 1991) (internal citation omitted).

The district court's ruling comports with those principles. As the district court found, "all of the issues were tried by consent even if all were not specifically raised in the pleadings." *See* SPA475 (633). Long before trial, it was clear that Chevron's claim for equitable relief "had entered the case." *Noyac Rd.*, 945 F.2d at 1257. In December 2012 — nearly a year before trial — the LAPs sought certification under 28 U.S.C. § 1292(b) to take an interlocutory appeal on the question whether Chevron, as "a foreign judgment debtor," could "bring an affirmative common-law fraud claim in New York against a judgment creditor based on alleged fraud in obtaining the foreign judgment." 691 Dkt. 650 at 1. When the district court denied certification in January 2013, it explained that Chevron's claim was not merely for "common-law fraud," but also for equitable relief from the Lago Agrio judgment, noting that "[r]elief for fraud in the procurement [of] a prior judgment long was available in independent actions in equity." 691 Dkt. 707 at 13,

15–16. When the LAPs challenged Chevron's claim for equitable relief in this Court (*see, e.g.*, *In re Naranjo*, No. 13-772 (2d Cir. Mar. 5, 2013), Dkt. 1-1 at 26–27), Donziger successfully moved to join and "voice his support for the Petition." *In re Naranjo*, No. 13-772 (2d Cir. Mar. 18, 2013), Dkt. 44 at 2. Thus, all Appellants had notice of Chevron's claim and an opportunity to defend against it during the seven-week trial. The district court did not abuse its discretion in amending Chevron's complaint.

### D. The District Court Properly Held That Chevron Satisfied the Elements for Equitable Relief from a Fraudulent Judgment

To obtain equitable relief from a judgment procured by fraud, a plaintiff must establish that fraud has occurred; that the plaintiff has no other adequate remedy; that the plaintiff did not create the need for equitable relief; and that relief is necessary to "prevent a grave miscarriage of justice." *Beggerly*, 524 U.S. at 47; *see Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2d Cir. 1997). Chevron proved each of these elements, as the district court found.

Three of these factors are essentially unchallenged by Appellants. As explained above, Appellants committed extensive fraud in procuring the Lago Agrio judgment. *See* Statement of the Case Section II.A, *supra*. Chevron did not create the need for the relief it seeks, and Appellants do not argue otherwise. Appellants' fraud was "sufficiently gross" to merit relief by an independent action for equitable relief. *Beggerly*, 524 U.S. at 46 (quotation marks and citation omitted). Appel-

lants resorted to bribery, corruption, and clandestine ghostwriting of both the Cabrera report and the multi-billion dollar judgment itself. *See* Statement of the Case Section II.A, *supra*. Appellants' conduct denied Chevron its basic right to a fair trial, and far exceeds conduct that the Supreme Court has found sufficient to warrant relief from a judgment. *See, e.g.*, *Beggerly*, 524 U.S. at 47 (relief justified because of a forged letter); *Hazel-Atlas*, 322 U.S. at 246 (relief based on a ghost-written article). Appellants do not challenge these findings or argue that they are insufficient to satisfy the elements of an independent action for equitable relief.

The only element that Appellants arguably contest is the district court's finding that Chevron "has no adequate remedy at law." SPA481 (636). Donziger suggests that "[t]he availability" of the Collusion Prosecution Act and Chevron's pending appeal with the Constitutional Tribunal of Ecuador might provide Chevron a remedy. Donz. 92–93. But Donziger waived any such argument on the Collusion Prosecution Act by failing to raise it below or give notice under Rule 44.1 that he intended to rely on this point of Ecuadorian law. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 209 (2d Cir. 2003). Although he asserted in his post-trial brief that Chevron "continues to have[] available remedies in Ecuador" (691 Dkt. 1850 at 60), that statement does "not . . . preserve the issue for appeal" because it does "not even cite the . . . authority upon which [Donziger] now primarily relies." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132–33

(2d Cir. 2008).

Even if Donziger had preserved this argument and squarely argued it here, it lacks merit. Neither mechanism referenced by Donziger provides a remedy that is "plain and adequate and as certain, prompt, complete, and efficient to attain the ends of justice and its prompt administration as the remedy in equity." *Inadequacy of Remedy at Law*, 73 N.Y. Jur. 2d Judgments § 237 (2014). As the district court found, the Ecuadorian judiciary does not provide impartial tribunals or procedures consistent with due process, and thus cannot provide an adequate remedy at law through either the Collusion Prosecution Act or an appeal in the Lago Agrio case. SPA481–83 (636–37). The district court also found that "the Judgment has been enforceable in Ecuador, and elsewhere, at least since the intermediate appellate court ruled" (SPA482 (637)), and because "[a]ssets already have been seized in Ecuador . . . there is no assurance that Chevron could recoup property applied to the Judgment between now and any decision by the Constitutional Court even if it prevailed." SPA482–83 (637). Equitable relief was thus plainly necessary to prevent harm to Chevron, and the same considerations supporting the RICO injunction against Donziger support injunctive relief against all Appellants under Chevron's independent action. *See* Argument Section II.A, *supra*.[52]

---

[52] Donziger is wrong to contend (Donz. 91 n.20) that the district court's injunction against initiating state enforcement actions violates the Anti-Injunction Act. The

Finally, for the same reasons that *Naranjo* did not foreclose the district court from granting relief on Chevron's RICO claims (*see* Argument Section II.C.2, *supra*), it also did not prevent the court from granting equitable relief on this claim.

## E. Neither the Republic of Ecuador Nor Any of Its Citizens Were Indispensable Parties

The LAPs urge that this action be dismissed because numerous parties are absent from it. LAPs 78–83. This argument is meritless.

### 1. The LAPs Are Either Parties or Adequately Represented, and Are Not Necessary Parties to Chevron's RICO Claim in Any Event

To the extent the LAPs argue that the other Lago Agrio plaintiffs are necessary parties, their argument does not help them because the two appearing LAPs were parties and adequately represented their 45 co-defendants. *See Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 232–33 (S.D.N.Y. 2005).

The LAPs maintain that the district court lacked personal jurisdiction over them. As explained already, they are wrong. *See* Argument Section IV.A, *supra*. And even if they were right, dismissal of Chevron's claims would be inappropriate. Rule 19(b) provides for dismissal when "a judgment rendered in the person's *absence* might prejudice that person or the existing parties." Fed. R. Civ. P. 19(b) (emphasis added). No judgment was rendered in the LAPs' absence — the two

---

Anti-Injunction Act permits a federal court to restrain a party from instituting state proceedings. *See Pathways, Inc. v. Dunne*, 329 F.3d 108, 114 (2d Cir. 2003).

appearing LAPs were present throughout, vigorously litigated the claims against them, and never raised a Rule 19(b) objection in the district court. The other defaulted. This objection now is thus both meritless and waived.

Moreover, as the LAPs concede (*see* LAPs 78), "Rule 19(b) dismissal may be avoided if the party before the court can adequately represent the interests of" absent defendants. *Marvel Characters*, 726 F.3d at 131–35. Donziger adequately represents the LAPs because they share the "same ultimate objective" — enforcing the Lago Agrio judgment — and the LAPs cannot identify any "evidence of collusion, adversity of interest, nonfeasance, or incompetence [that] may suffice to overcome the presumption of adequacy." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179–80 (2d Cir. 2001).[53]

### 2. Other Residents of the Region Are Not Necessary Parties

In 2012, the Huaorani (or Waorani) Intervenors, a group of Lago Agrio residents, moved to intervene in this case. 691 Dkt. 646. The LAPs opposed the motion (as did Chevron) on the grounds that (1) the Huaorani "assert[ed] no direct and legally recognized or protected right"; (2) even if the Huaorani had such an interest, it was "adequately protected by Defendants Camacho and Piaguaje"; and (3) the motion was "grossly untimely." 691 Dkt. 689 at 6, 8, 9; *see also* 691 Dkt.

---

[53] *Butler* involved a motion to intervene under Rule 24, but the adequacy analysis is the same under Rules 19 and 24. *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389–90 (2d Cir. 2006).

674 at 4, 12.  The district court agreed with the LAPs and denied the motion.

A514–23.  The LAPs now attempt to reverse course, but they are bound by the position on which they prevailed.  *See Manning v. Energy Conversion Devices, Inc.*, 13 F.3d 606, 608–09 (2d Cir. 1994).  Although they justify their reversal by suggesting that their former counsel were not "independent and unconflicted" (LAPs 80 n.55), they offer no evidence for that position, and they have not previously complained about the firm that represented them in opposing the Huaorani's motion.

In any event, the district court did not abuse its discretion in concluding that the Huaorani are not necessary parties.  *See ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.*, 102 F.3d 677, 682 (2d Cir. 1996) (stating standard).[54]  The Huaorani were not parties to the Lago Agrio case and do not have a "direct, substantial, and legally protectable" interest in this case, regardless of whatever benefits they hope to see from the Lago Agrio judgment.  *See United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 415 (2d Cir. 2001); *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 970 (9th Cir.

---

[54]  The LAPs argue, without citing any authority, that the district court's intervention analysis is not owed deference (LAPs 80 n.56), but that is incorrect.  Matters of joinder and intervention are reviewed for an abuse of discretion.  *See Mastercard Int'l*, 471 F.3d at 385–86 (necessary-party challenge); *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197 (2d Cir. 2000) (intervention).

2008) ("[Under Rule 19(a), a party's] interest must be more than a financial stake, and more than speculation about a future event." (quotation marks and citation omitted)).  And if residents of the region have any legal interest in *this* litigation, such interest was "adequately protected by the existing parties."  *Gibbs Wire & Steel Co. v. Johnson*, 255 F.R.D. 326, 329 (D. Conn. 2009).  As the district court held, the Huaorani's "objectives are entirely aligned with those of the existing defendants, most notably but not exclusively the [LAPs]."  A517.

### 3. The Republic of Ecuador Is Not a Necessary Party

The LAPs also contend that the ROE was a required party because a district court must *sua sponte* join a foreign sovereign before it evaluates that nation's judiciary.  LAPs 83 n.57.  That argument has no merit.

First, the ROE was not a required party under Rule 19(a) because it does not claim a "legally protected interest" here.  *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) (quotation marks and citation omitted).  The LAPs cite nothing to support their view that countries have a "legally protected interest" in every judgment issued by their courts.  Adopting such a rule would upend foreign judgment recognition because, under U.S. law, foreign sovereigns cannot be joined unless they waive sovereign immunity.  *See* 28 U.S.C. § 1604.  Courts accordingly

do not require joinder in this area,[55] or in other contexts in which foreign judiciaries are examined. *See infra* Argument Section III.B.3. The LAPs cite *Republic of the Philippines v. Pimentel*, 553 U.S. 851 (2008), but that case is inapposite because the sovereign there *did* have a legally protected interest in the dispute: it was among the claimants to the property at issue.

Second, even if the ROE had an interest warranting joinder, it waived that interest. Just before trial, when a third party made ROE documents available to Chevron, the ROE intervened — but only to assert claims of privilege and confidentiality. *See* 691 Dkt. 1528 at 4. In its motion, the ROE stated that before the document disclosure, it had "no certain interest requiring its intervention in this dispute between Chevron and the Defendants." *Id.* at 1. In this appeal, moreover, the ROE has moved to file an amicus brief, but it does not argue that it should have been a party below. *See* 826 Dkt. 112-1; 826 Dkt. 112-2. The ROE's choice not to intervene on broader grounds and its express disavowal of an interest in doing so further establishes that it is not a necessary party. *See ConnTech Dev. Co.*, 102 F.3d at 683.

Finally, even if the ROE were a necessary party under Rule 19(a), that

---

[55]   *See, e.g.*, *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 137 (2d Cir. 2000) (affirming refusal to recognize Liberian judgment because Liberia did not provide impartial tribunals without requiring the government of Liberia as a party); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1410–13 (9th Cir. 1995) (same for Iran).

would not justify dismissal of this action under Rule 19(b). "[V]ery few cases should be terminated due to the absence of [required, nonjoinable] parties unless there has been a reasonable determination that their nonjoinder makes just resolution of the action impossible." *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987). No party rendered resolution of Chevron's claims "impossible" by its absence. And because this action has proceeded through trial, the parties' interest in a "fully litigated judgment may be overborne only by greater contrary considerations than those that would be required at an earlier stage of the litigation." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 180 (2d Cir. 2007). No such considerations are present here.

## CONCLUSION

The district court's factual findings — which Appellants do not challenge — are comprehensive and well-grounded in extensive evidence. Those findings establish that Donziger violated RICO, that Appellants procured the Ecuadorian judgment by fraud, and that Appellants have injured and will continue to injure Chevron. The district court's targeted remedy will prevent Appellants from benefitting from their misdeeds, and will limit, if not stop, Appellants from subjecting Chevron to further harms. That relief was well within the district court's discretion and is adequately supported by each of the court's liability findings. Accordingly, Chevron requests that the Court AFFIRM the judgment of the district court.

Dated:  October 1, 2014                  Respectfully submitted,


                                <u>     /s/ Theodore B. Olson     </u>

                                GIBSON, DUNN &
                                CRUTCHER LLP

                                Theodore B. Olson
                                1050 Connecticut Ave., N.W.
                                Washington, DC 20036
                                Telephone: (202) 955-8500
                                Facsimile: (202) 467-0539

                                Randy M. Mastro
                                Andrea E. Neuman
                                200 Park Avenue
                                New York, New York 10166
                                Telephone: (212) 351-4000
                                Facsimile: (212) 351-4035

                                William E. Thomson
                                333 South Grand Avenue
                                Los Angeles, California 90071
                                Telephone: (213) 229-7000
                                Facsimile: (213) 229-7520

                                *Attorneys for Chevron Corporation*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's order (826 Dkt. 77) because this brief contains 45,395 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ Theodore B. Olson
Theodore B. Olson
